# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND-ODESSA DIVISION

| | |
|---|---|
| RICHARD LOGAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROPETRO HOLDING CORP., DALE REDMAN, JEFFREY SMITH, IAN DENHOLM, SPENCER D. ARMOUR, III, SCHUYLER E. COPPEDGE, STEPHEN HERMAN, MATTHEW H. HIMLER, PETER LABBAT, GOLDMAN, SACHS & CO., BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, J.P. MORGAN SECURITIES LLC, EVERCORE GROUP L.L.C., RBC CAPITAL MARKETS, LLC, PIPER JAFFRAY & CO., RAYMOND JAMES & ASSOCIATES, INC., DEUTSCHE BANK SECURITIES INC., JOHNSON RICE & COMPANY L.L.C., and TUDOR, PICKERING, HOLT & CO. SECURITIES, INC.,<br><br>Defendants. | Case No.: 7:19-CV-217<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard Logan ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by ProPetro Holding Corp. ("ProPetro" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by ProPetro; and (c) review of other publicly available information concerning ProPetro.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that: a) purchased or otherwise acquired ProPetro securities pursuant and/or traceable to the Company's false and/or misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's March 2017 initial public offering ("IPO" or the "Offering"); and/or b) purchased or otherwise acquired ProPetro securities between March 17, 2017 and August 8, 2019, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants, under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      ProPetro is an oilfield services company that provides hydraulic fracturing and complementary services to leading upstream oil and gas companies engaged in the exploration and production of North American unconventional oil and natural gas resources.

3.      On March 20, 2017, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 25 million shares of common stock at a price of $14.00 per share. The Company received proceeds of approximately $175 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for repayment of certain loans, for the purchase of additional hydraulic fracturing units, and for general corporate purposes.

4.     On August 8, 2019, after the market closed, the Company issued a press release delaying its second quarter earnings conference call and quarterly report, citing an ongoing review by its audit committee. In a Form 8-K filed with the SEC on the same day, the Company stated that the review concerned, among other things, expense reimbursements and certain transactions involving related parties or potential conflicts of interest. The Form 8-K also stated that approximately $370,000 had been improperly reimbursed to members of senior management. Moreover, the Company expected to report a material weakness in its internal control over disclosure.

5.     On this news, the Company's share price fell $4.59 per share, or over 26%, to close at $12.75 per share on August 9, 2019, on unusually high trading volume.

6.     By the commencement of this action, ProPetro stock was trading as low as $11.44 per share, a nearly 18% decline from the $14 per share IPO price.

7.     The Registration Statement was false and misleading and omitted to state material adverse facts. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's executive officers were improperly reimbursed for certain expenses; (2) that the Company had engaged in certain undisclosed transactions with related parties; (3) that the Company lacked adequate disclosure controls and procedures; (4) that the Company lacked effective internal control over financial reporting; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the

Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company'S principal executive offices are located in this district.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Richard Logan, as set forth in the accompanying certification, incorporated by reference herein, purchased ProPetro securities during the Class Period, pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant ProPetro is incorporated under the laws of Delaware with its principal executive offices located in Midland Texas. ProPetro's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "PUMP."

15.     Defendant Dale Redman ("Redman") was, at all relevant times, the Chief Executive Officer ("CEO") and a Director of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant Jeffrey Smith ("Smith") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company, and signed or authorized the signing of the Company's

Registration Statement filed with the SEC.

17.     Defendant Ian Denholm ("Denholm") was, at all relevant times, the Chief Accounting Officer ("CAO") of the Company.

18.     Defendants Redman, Smith, and Denholm (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

19.     Defendant Spencer D. Armour, III ("Armour") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     Defendant Schuyler E. Coppedge ("Coppedge") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Stephen Herman ("Herman") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Matthew H. Himler ("Himler") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.     Defendant Peter Labbat ("Labbat") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendants Redman, Smith, Armour, Coppedge, Herman, Himler, and Labbat are

collectively referred to hereinafter as the "Securities Act Individual Defendants."

25.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") served as an underwriter for the Company's IPO.

26.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the Company's IPO.

27.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the Company's IPO.

28.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.

29.     Defendant Evercore Group L.L.C. ("Evercore") served as an underwriter for the Company's IPO.

30.     Defendant RBC Capital Markets, LLC ("RBC Capital") served as an underwriter for the Company's IPO.

31.     Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter for the Company's IPO.

32.     Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter for the Company's IPO.

33.     Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter for the Company's IPO.

34.     Defendant Johnson Rice & Company L.L.C. ("Johnson") served as an underwriter for the Company's IPO.

35.     Defendant Tudor, Pickering, Holt & Co. Securities, Inc. ("Tudor") served as an underwriter for the Company's IPO.

36.     Defendants Goldman Sachs, Barclays, Credit Suisse, J.P. Morgan, Evercore, RBC Capital, Piper Jaffray, Raymond James, Deutsche, Johnson, and Tudor are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37.     ProPetro is an oilfield services company that provides hydraulic fracturing and complementary services to leading upstream oil and gas companies engaged in the exploration and production of North American unconventional oil and natural gas resources.

### The Company's False and/or Misleading
### Registration Statement and Prospectus

38.     On May 13, 2017, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective on March 16, 2017.

39.     On March 20, 2017, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 25 million shares of common stock at a price of $14.00 per share. The Company received proceeds of approximately $175 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for repayment of certain loans, for the purchase of additional hydraulic fracturing units, and for general corporate purposes.

40.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

41.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

42.     Regarding a policy governing the review of related party transactions, the Registration Statement stated, in relevant part:

> Our board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee will review on at least a quarterly basis all

transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions. In connection with this offering, we will establish an audit committee consisting solely of independent directors whose functions will be set forth in the audit committee charter. We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest. We anticipate that such policy will be a written policy included as part of the audit committee charter that will be implemented by the audit committee and in the Code of Business Conduct and Ethics that our board of directors will adopt prior to the completion of this offering.

The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for comparable services; (vi) whether it is a single transaction or a series of ongoing, related transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

43.    Moreover, as to internal control over financial reporting, the Registration Statement stated, in relevant part:

**The requirements of being a public company, including compliance with the reporting requirements of the Exchange Act and the requirements of the Sarbanes-Oxley Act and the NYSE, may strain our resources, increase our costs and distract management, and we may be unable to comply with these requirements in a timely or cost-effective manner.**

As a public company, we will need to comply with new laws, regulations and requirements, certain corporate governance provisions of the Sarbanes-Oxley Act of 2002, related regulations of the SEC and the requirements of the NYSE, with which we are not required to comply as a private company.

\* \* \*

We will be required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act as early as our fiscal year ending December 31, 2018.

Section 404 requires that we document and test our internal control over financial reporting and issue management's assessment of our internal control over financial reporting. This section also requires that our independent registered public accounting firm opine on those internal controls upon becoming a large accelerated filer, as defined in the SEC rules, or otherwise ceasing to qualify as an emerging growth company under the JOBS Act. We are evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission. During the course of our ongoing evaluation and integration of the internal control over financial reporting, we may identify areas requiring improvement, and we may have to design enhanced processes and controls to address issues identified through this review. For example, we anticipate the need to hire additional administrative and accounting personnel to conduct our financial reporting.

We cannot be certain at this time that we will be able to successfully complete the procedures, certification and attestation requirements of Section 404 or that we or our independent registered public accounting firm will not identify material weaknesses in our internal control over financial reporting. If we fail to comply with the requirements of Section 404 or if we or our independent registered public accounting firm identify and report such material weaknesses, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on our stock price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

44.    The Registration Statement was materially false and misleading and omitted to state: (1) that the Company's executive officers were improperly reimbursed for certain expenses; (2) that the Company had engaged in certain undisclosed transactions with related parties; (3) that the Company lacked adequate disclosure controls and procedures; (4) that the Company lacked effective internal control over financial reporting; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading**
**Statements Issued During the Class Period**

45.    The Class Period begins on March 17, 2017. On that day, the Company's stock

began trading on the NYSE.

46. On March 27, 2018, the Company filed its annual report on Form 10-K for the period ended December 31, 2017 (the "2017 10-K"). Therein, the Company reported $981.86 million revenue and $12.61 million net income.

47. Under "Controls and Procedures," the 2017 10-K stated, in relevant part:

[O]ur principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2017.

**Management's Report on Internal Control over Financial Reporting**

We are required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which requires our management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting. We will not be required to make our first assessment of our internal control over financial reporting until the year of our second annual report required to be filed with the SEC.

Our independent registered public accounting firm is not yet required to formally attest to the effectiveness of our internal controls over financial reporting, and will not be required to do so for as long as we are an "emerging growth company" pursuant to the provisions of the JOBS Act.

48. Regarding related party transactions, the 2017 10-K incorporated by reference the information from the 2018 proxy statement, which stated:

We lease our corporate offices from South Midkiff Partners LLC, an entity owned jointly by Dale Redman, David Sledge, Spencer Armour and Jeff Smith, pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $72,000 per year. We also lease five properties adjacent to the corporate office from South Midkiff Partners LLC with annual base rents of $30,000, $30,000, $90,000, $90,000 and $180,000.

We paid Dale Redman, our Chief Executive Officer, $265,278 for the year ended December 31, 2017, for reimbursement of costs incurred through use of his aircraft.

We rent certain flowback equipment from PD Properties, an entity jointly owned by Dale Redman, our Chief Executive Officer. For the year ended December 31, 2017, we paid $192,000 under this lease.

We lease a property adjacent to our corporate headquarters from Industrial Loop Partners, LLC, an entity wholly owned by an affiliate of Bandera Ventures. For the year ended December 31, 2017, we paid $335,194 under the lease. The lease has a remaining term of approximately six years. Mr. Blackwell, one of our directors, through his approximately 33% interest in Bandera Ventures, may be deemed an indirect beneficiary of this lease.

Jordan Frosch is a corporate sales manager for the company and the son-in-law of Dale Redman. Mr. Frosch received total compensation of approximately $438,212 for his services for the year ended December 31, 2017.

\* \* \*

### *Policies and Procedures for Related Party Transactions*

Any request for us to enter into a transaction with an executive officer, director, principal stockholder or any of such persons' immediate family members or affiliates, among others, in which the amount involved exceeds $120,000, must first be presented to our audit committee for review, consideration and approval. All of our directors and executive officers are required to report to the audit committee chair any such related person transaction. In approving or rejecting the proposed agreement, our audit committee shall consider the facts and circumstances available and deemed relevant to the audit committee, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party, the extent of the related party's interest in the transaction and the conflicts of interest and corporate opportunity provisions of our certificate of incorporation. If we should discover related person transactions that have not been approved, the audit committee will be notified and will determine the appropriate action, including ratification, revision or termination of such transaction.

49.    On March 1, 2019, the Company filed its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"). Therein, the Company reported $1.7 billion revenue and $173.9 million net income. As to disclosure controls and procedures, the report stated that the CEO, CFO, and CAO had concluded that the Company's "disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2018." Moreover, the report stated that "management's assessment is that ProPetro Holding Corp. maintained effective internal control over financial reporting as of December 31, 2018."

50.    Regarding related party transactions, the 2018 10-K incorporated by reference the information from the 2019 proxy statement, which stated:

We lease our corporate offices from PD Properties, an entity owned by Dale Redman, pursuant to a five-year lease agreement with a five-year extension option requiring a base rent of $72,000 per year. We also lease five properties adjacent to the corporate office from South Midkiff Partners LLC, an entity owned jointly by Dale Redman, David Sledge, Spencer Armour and Jeff Smith, with annual base rents of $30,000, $30,000, $90,000, $90,000 and $180,000.

We paid Dale Redman, our Chief Executive Officer, $393,034 for the year ended December 31, 2018, for reimbursement of costs incurred through use of his aircraft.

We rent certain flowback equipment from PD Properties, an entity owned by Dale Redman, our Chief Executive Officer. For the year ended December 31, 2017, we paid $192,000 under this lease.

We lease a property adjacent to our corporate headquarters from Industrial Loop Partners, LLC, an entity wholly owned by an affiliate of Bandera Ventures. For the year ended December 31, 2018, we paid $345,250 under the lease. The lease has a remaining term of approximately six years. Mr. Blackwell, one of our directors, through his approximately 33% interest in Bandera Ventures, may be deemed an indirect beneficiary of this lease.

Jordan Frosch is our Sales Manager and the son-in-law of Dale Redman. Mr. Frosch received total compensation of approximately $530,511 for his services for the year ended December 31, 2018.

Sam Sledge is our Investor Relations Director and the son of David Sledge. Sam Sledge received total compensation of approximately $717,481 for his services for the year ended December 31, 2018.

Morgan Stovall is our Corporate Controller and the daughter of Jeffrey Smith. Ms. Stovall received total compensation of approximately $338,873 for her services for the year ended December 31, 2018.

51.    On May 7, 2019, the Company announced its first quarter 2019 financial results, reporting $546.2 million revenue and $69.8 million net income. Moreover, regarding fleet expansion in, the press release stated, in relevant part:

**Operational Highlights and Fleet Expansion**

As previously announced, ProPetro expanded its fracturing capacity by 510,000 HHP, representing 8 fleets and related pump down equipment, through its transaction with Pioneer. This transaction increased the Company's total capacity to 1,415,000 HHP. Effective utilization of the Company's fracturing assets during the first quarter of 2019 was 27.0 fleets. ProPetro expects effective utilization in the second quarter of 2019 to be approximately 26.0 fleets.

The Company also plans to build and deploy two electrically powered *DuraStim* (for further information, see "The *DuraStim* Difference" section later in this release) fleets by the end of 2019. Each of these fleets consists of 36,000 HHP and related power equipment. Both of these fleets will be deployed to existing customers under dedicated agreements.

During the quarter the Company also expanded its cementing operation by deploying one additional unit, bringing total current cementing capacity to 21 units. Also, as previously announced, ProPetro plans to organically expand its cementing operation by 3 additional units this year as well as organically expand its coil tubing capacity by 1 additional unit.

* * *

**The *DuraStim* Difference**

Designed by AFGlobal Corporation's ("AFGlobal") Pressure Pumping Technologies group, the *DuraStim* frac pump, at 6,000 HHP, offers the equivalent of three times the effective horsepower of a conventional frac unit, while operating at approximately 10% of the cyclic rate.

52.     On June 28, 2019, the Company announced revised agreements with AFGlobal, stating in a press release, in relevant part:

- ProPetro Revises Previous Agreements with AFGlobal and Agrees to Purchase One Additional *DuraStim*® Fleet in 2019 in addition to Two Previously Announced, has Option to Purchase Up to Three Additional Fleets through End of 2020

- Announces that XTO Energy Inc. and Diamondback Energy are Expected to Deploy First Electrically Powered *DuraStim*® Hydraulic Fracturing Fleets in Permian Basin

- Announces Purchase of First Two TM2500 Gas Turbines to Power *DuraStim*® Fleets from Baker Hughes, a GE company

- Technology Expected to Significantly Reduce Costs and Create New Safety and Environmental Advantages for ProPetro Customers

53.     The above statements identified in ¶¶45-52 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company's executive officers were improperly reimbursed for certain expenses; (2) that the Company had engaged in certain undisclosed transactions with related parties; (3) that the

Company lacked adequate disclosure controls and procedures; (4) that the Company lacked effective internal control over financial reporting; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

### The Subsequent Disclosure

54.　On August 8, 2019, after the market closed, the Company issued a press release delaying its second quarter earnings conference call and quarterly report, citing an ongoing review by its Audit Committee. In a Form 8-K filed with the SEC on the same day, the Company stated that the review concerned, among other things, expense reimbursements and certain transactions involving related parties or potential conflicts of interest. The Form 8-K also stated that approximately $370,000 had been improperly reimbursed to members of senior management since the Company's initial public offering in 2017. Moreover, the Company expected to report a material weakness in its internal control over disclosure.

55.　Regarding the scope of the Audit Committee's review, the Form 8-K stated, in relevant part:

> The Audit Committee (the "Committee") of the Company's board of directors (the "Board"), with assistance of independent outside counsel and accounting advisors, is in the process of conducting an internal review which initially focused on the Company's disclosure of agreements previously entered into by the Company with AFGlobal Corporation ("AFGlobal") for the purchase of Durastim® hydraulic fracturing fleets and effective communications related thereto. The review was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest. Substantial work related to the review has been completed to date, and the Committee expects to complete its review within the next 30 days. The Company is also in the process of implementing improvements to address certain findings identified to date in the review.

56.　Regarding the Committee's findings, the Company stated, in relevant part:

> As previously announced by the Company on June 28, 2019, the Company entered into revised agreements with AFGlobal pursuant to which it agreed to purchase one additional Durastim® hydraulic fracturing fleet, in addition to its agreements to purchase two Durastim®hydraulic fracturing fleets that were entered into during the quarter ended March 31, 2019. The Company also secured an option to purchase up to three additional fleets exercisable through the

end of 2020. These revised agreements amended and/or replaced previous contracts to purchase a total of six DuraStim® fleets, including four DuraStim® fleets that the Company committed to purchase in April 2019.

As part of its review of internal controls, the Committee identified, due to inadequate documentation associated with the Company's expense reimbursement practices, certain expenses reimbursed to members of senior management, including the chief executive officer and chief financial officer, that were incorrectly recorded as expenses of the Company and appropriately allocable to the officers individually. Each of these officers has reimbursed the Company in full for the identified amounts. ***The reimbursed amounts totaled approximately $370,000 since the Company's initial public offering in 2017.*** Of the total amounts, approximately $346,000 were attributable to the chief executive officer and approximately $18,000 were attributable to the chief financial officer.

Based on the review conducted to date, the Committee and management has not identified any failure to appropriately disclose related party transactions. The Committee and management have also not identified to date any items that would require revision or restatement of the Company's historical financial statements. However, the review is continuing and there is no assurance that additional items will not be identified. The Company does not intend to provide additional updates on the results of the review until it is concluded or the Company determines that further disclosure is appropriate or necessary.

57.     On this news, the Company's share price fell $4.59 per share, or over 26%, to close at $12.75 per share on August 9, 2019, on unusually high trading volume.

58.     By the commencement of this action, ProPetro stock was trading as low as $11.44 per share, a nearly 18% decline from the $14 per share IPO price.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired ProPetro securities: a) issued in connection with the Company's IPO; and/or b) between March 17, 2017 and August 8, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ProPetro's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of ProPetro common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by ProPetro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ProPetro; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65.   The market for ProPetro's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, ProPetro's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired ProPetro's securities relying upon the integrity of the market price of the Company's securities and market information relating to ProPetro, and have been damaged thereby.

66.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ProPetro's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about ProPetro's business, operations, and prospects as alleged herein.

67.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ProPetro's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period

resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

68.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

69.     During the Class Period, Plaintiff and the Class purchased ProPetro's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

70.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ProPetro, their control over, and/or receipt and/or modification of ProPetro's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ProPetro, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

71.     The market for ProPetro's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

disclose, ProPetro's securities traded at artificially inflated prices during the Class Period.  On April 22, 2019, the Company's share price closed at a Class Period high of $24.66 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of ProPetro's securities and market information relating to ProPetro, and have been damaged thereby.

72.   During the Class Period, the artificial inflation of ProPetro's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ProPetro's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of ProPetro and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

73.   At all relevant times, the market for ProPetro's securities was an efficient market for the following reasons, among others:

(a)   ProPetro shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, ProPetro filed periodic public reports with the SEC and/or the NYSE;

(c)   ProPetro regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   ProPetro was followed by securities analysts employed by brokerage firms who

wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

74.    As a result of the foregoing, the market for ProPetro's securities promptly digested current information regarding ProPetro from all publicly available sources and reflected such information in ProPetro's share price. Under these circumstances, all purchasers of ProPetro's securities during the Class Period suffered similar injury through their purchase of ProPetro's securities at artificially inflated prices and a presumption of reliance applies.

75.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to

any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ProPetro who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

78.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

79.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

80.     ProPetro is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

81.     As issuer of the shares, ProPetro is strictly liable to Plaintiff and the Class for the misstatements and omissions.

82.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

83.     By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

84.     Plaintiff acquired ProPetro shares pursuant and/or traceable to the Registration Statement for the IPO.

85.     Plaintiff and the Class have sustained damages.  The value of ProPetro common stock has declined substantially subsequent to and due to the Defendants' violations.

## SECOND CLAIM
### Violation of Section 15 of the Securities Act
### (Against the Securities Act Individual Defendants)

86.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

87.     This count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

88.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of ProPetro within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause ProPetro to engage in the acts described herein.

89.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

90.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## THIRD CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against ProPetro and the Individual Defendants)

91.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

92.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase ProPetro's securities

at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Company and the Individual Defendants, and each of them, took the actions set forth herein.

93.     the Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ProPetro's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Company and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

94.     The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ProPetro's financial well-being and prospects, as specified herein.

95.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ProPetro's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ProPetro  and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

96.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's

management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

97.     The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ProPetro's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

98.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ProPetro's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the

absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired ProPetro's securities during the Class Period at artificially high prices and were damaged thereby.

99.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that ProPetro was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ProPetro  securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

100.    By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

102.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

103.    The Individual Defendants acted as controlling persons of ProPetro within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105.    As set forth above, ProPetro and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: September 16, 2019

By: _____*/s/ Joe Kendall*_____
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com

**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

*Attorneys for Plaintiff Richard Logan*