**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| **RICHARD LOGAN, Individually and On Behalf of All Others Similarly Situated, ET AL.**<br>*Plaintiffs,*<br><br>**VS.**<br><br>**PROPETRO HOLDING CORP., ET AL.**<br>*Defendants.* | **Case No. MO:7:19-CV-00217-DC**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT – EXCHANGE ACT CLAIMS ONLY ........ 2

II. JURISDICTION AND VENUE ........ 6

III. THE PARTIES ........ 7

A. Plaintiffs ........ 7

B. Exchange Act Defendants ........ 9

IV. EXCHANGE ACT CLAIMS ........ 10

A. Background and Summary of the Fraud ........ 10

1. ProPetro's Business and Operations ........ 10

2. Throughout the Class Period, Investors Focused on ProPetro's Executive Team and Their Longstanding Relationships as Fundamental to the Company's Rapid Success ........ 13

3. Defendants Were Required to Maintain Adequate Internal and Disclosure Controls and to Disclose Material Related-Party Transactions ........ 16

4. Throughout the Class Period, Defendants Represented, and Investors Understood, That ProPetro Had Adequate Internal and Disclosure Controls and That All Related-Party Transactions Had Been Disclosed ........ 22

5. ProPetro's Rapid Growth ........ 23

6. ProPetro CAO Denholm's Undisclosed Moonlighting at PBEX ........ 25

7. ProPetro Has a History of Related-Party Transactions and Its Senior Executives and Directors Control Several Undisclosed Related Entities ........ 28

8. ProPetro Conducts Two Subsequent Secondary Offerings While Concealing Internal Control Deficiencies and Related-Party Transactions ........ 30

9. ProPetro Experiences Major Board Turnover, Replacing its Chairman and Losing Two of the Four Members of its Audit Committee ........ 32

10. The Truth Is Revealed: Defendants Admit That They Engaged in Material Undisclosed Related-Party Transactions and That ProPetro Had Material Weaknesses in its Internal Controls ..................... 33

a. August 8, 2019—ProPetro Discloses an Internal Investigation Into Improper Expense Reimbursements and Related Party Transactions ..................... 34

b. August 30, 2019—ProPetro's General Counsel Announces his Resignation in the Wake of the Audit Committee Investigation ..................... 38

c. October 9, 2019—CAO Denholm Resigns ..................... 39

d. October 18, 2019—the Market Learns of the SEC Investigation ..................... 42

e. October 31, 2019—Additional Details Regarding Denholm's Related Party Transactions Emerge ..................... 43

11. Post Class Period Events ..................... 44

B. Additional Allegations of Scienter ..................... 46

C. Defendants' Materially False and Misleading Statements and Omissions ..................... 52

1. Materially False and Misleading Statements and Omissions Contained in the IPO Offering Documents ..................... 52

a. Statements Concerning ProPetro's Internal Controls and Disclosure Controls and Procedures ..................... 52

b. Statements Concerning Related-Party Transactions ..................... 56

2. Materially False and Misleading Statements and Omissions Contained in ProPetro's Forms 10-Q ..................... 59

a. Statements Concerning Internal and Disclosure Controls ..................... 59

b. Statements Concerning Related-Party Transactions ..................... 63

3. Materially False and Misleading Statements and Omissions Contained in ProPetro's Forms 10-K ..................... 64

a. Statements Concerning Internal and Disclosure Controls ..................... 64

b. Statements Concerning Related-Party Transactions ..................... 70

4. Materially False and Misleading Statements and Omissions Contained in ProPetro's August 16, 2017 Form 8-K ..... 71

5. Materially False and Misleading Statements and Omissions Contained in ProPetro's Proxy Statements ..... 72

D. Loss Causation ..... 74

E. The Presumption of Reliance ..... 76

F. Causes of Action Brought Pursuant to the Exchange Act ..... 78

COUNT I ..... 78

COUNT II ..... 81

V. SECURITIES ACT CLAIMS ..... 82

A. Securities Act Defendants ..... 83

B. The IPO Offering Documents Contained Material Untrue Statements and Omitted to Disclose Material Facts ..... 83

1. Materially False and Misleading Statements Concerning Related-Party Transactions ..... 86

2. Materially False and Misleading Statements Concerning ProPetro's Internal Controls and Disclosure Controls and Procedures ..... 88

COUNT III ..... 90

COUNT IV ..... 92

VI. CLASS ACTION ALLEGATIONS ..... 94

VII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 96

VIII. PRAYER FOR RELIEF ..... 96

IX. JURY DEMAND ..... 97

1. Lead Plaintiffs Nykredit Portefølje Administration A/S, Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, and Oklahoma City Employee Retirement System (together, "Lead Plaintiffs"), and additional named plaintiff Police and Fire Retirement System of the City of Detroit, individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against ProPetro Holding Corp. ("ProPetro" or the "Company") and the Executive Defendants (defined below), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

2. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning ProPetro and the Executive Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by ProPetro with the U.S. Securities and Exchange Commission ("SEC"); (iv) interviews with former ProPetro employees and other knowledgeable individuals; and (v) other publicly available information. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3. Lead Plaintiffs bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who (a) purchased, or otherwise acquired ProPetro common stock on the open market from March 17, 2017 to October 31, 2019, both dates inclusive (the "Class Period"), and were damaged thereby; or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering, subject to certain exclusions

addressed in paragraph 281 below (the "Class"). The Defendants in this action are ProPetro; Dale Redman, ProPetro's Chief Executive Officer ("CEO"); Jeffrey Smith, ProPetro's former Chief Financial Officer ("CFO") and current Chief Administrative officer; and Ian Denholm, ProPetro's former Chief Accounting Officer ("CAO"). Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"). The Exchange Act claims and the Securities Act claims are pleaded separately in this Complaint, and any allegations of fraud or intentional misconduct are expressly disclaimed for purposes of the Securities Act claims.

## I. PRELIMINARY STATEMENT – EXCHANGE ACT CLAIMS ONLY

4. This case concerns the disparity between Defendants' repeated, unqualified representations to investors that ProPetro had adequate controls, and the internal reality at ProPetro. That internal reality was far different, and involved severely deficient controls, self-dealing, millions in related-party transactions (by the very executives appointed to protect against them), a Chief Accounting Officer also serving as the Chief Financial Officer at another company, and a complicated web of related, undisclosed entities. Defendants belatedly admitted that ProPetro's controls suffered from material weaknesses—allowing millions in improper transactions to be concealed during the Class Period. Even Defendants' admissions seem designed to evade the heart of these problems. The Company has, for example, failed to explain why half of the Audit Committee of the Board resigned just weeks before the disclosure of its investigation, and has similarly failed to provide detail concerning the catalyst for the investigation.

5. After going public in March 2017, ProPetro reported what appeared to be steady success and growth: the "fracking" services company was leveraging its close business relationships into fast growing revenue. The Company and its executives repeatedly touted their

success and assured investors, in unqualified terms, that their accounting and controls were by the book. For example, in each of the Company's periodic filings with the SEC, signed by Defendants Redman, Smith or Denholm, ProPetro certified that its internal and disclosure controls were adequate and that they had been designed to, among other things, ensure that all material information, including related-party transactions, was disclosed as required by SEC regulations and the applicable accounting rules. Those standards are set forth in detail below. These disclosures were critical to assuring investors that while ProPetro pursued its strategy of leveraging personal relationships for growth, it had the controls in place to ensure that its SEC filings accurately reflected the internal realities at the Company.

6. Unfortunately, the reality inside ProPetro was much different than what was depicted in its SEC filings. The Company has admitted that at least two "material weaknesses" in its internal and disclosure controls existed during the Class Period. Most troubling is that ***the very executives who were primarily responsible for ensuring that ProPetro told investors the truth*** about the subjects at issue here—its CEO Dale Redman, CFO Jeffrey Smith, Chief Accounting Officer Ian Denholm and General Counsel Mark Howell—***are all personally implicated*** in the Company's scandal. They either personally engaged in and benefitted from the improper transactions or resigned from ProPetro in the wake of the scandal. Redman and Smith personally received $370,000 in improper payments and have been demoted and stripped of their reporting functions. Howell resigned without any explanation. Denholm, whose Class Period "moonlighting" is described below, was "asked" to resign. The SEC is investigating. ProPetro is over a half-year delinquent in its SEC filings. All the while, the disclosures revealing the truth of ProPetro's problems have ***wiped out over $700 million in shareholder value.***

7. ProPetro's success story began to unravel when it disclosed an investigation into its internal and disclosure controls and improper related-party transactions. As described below, the Company has since revealed improper or undisclosed related party transactions totaling approximately $4 million and internal controls suffering from "material weaknesses."

8. First, on August 8, 2019, the Company announced that its Audit Committee was conducting an internal investigation and revealed the investigation's initial findings that Redman and Smith had caused ProPetro to improperly pay them for personal expenses exceeding $370,000. Per the Company's admission, those are just the transactions that the CEO and CFO personally engaged in "since" the IPO, as of which date ProPetro is required to disclose them. ProPetro also admitted on August 8, 2019 that it was "likely to conclude" that it had "internal control deficiencies, rising to the level of a material weakness" that made the Company's "disclosure controls and procedures" ineffective. As a result of this news, ProPetro shares immediately lost over a quarter of their value (26%) in a single day. The Company has since confirmed that it had at least two "material weaknesses" in its internal and disclosure controls that rendered such controls "not effective" and has advised its shareholders not to rely on the assurances regarding its controls in prior SEC filings.

9. Second, on August 30, 2019, in the wake of the internal Audit Committee investigation, the Company announced, without any explanation, Howell's resignation. ProPetro shares fell by over 9% on this news.

10. Third, on October 18, 2019, news outlets revealed that the Company was under investigation by the SEC for violating its accounting, internal controls and public reporting obligations. ProPetro shares immediately shed an additional 8% of their value.

11. Finally, on October 31, 2019, an analyst report by Culper Research revealed additional Class Period related-party transactions involving Defendant Denholm. ProPetro shares lost over 9% of their value.

12. The Company has now confirmed that Denholm—who was personally responsible for the Company's internal controls and accounting—himself engaged in undisclosed related-party transactions valued at over $3.6 million. Astoundingly, Plaintiffs' investigation has revealed that during the Class Period, while CAO of ProPetro, ***Denholm had a second job as the Chief Financial Officer (CFO) at PBEX,*** an operator of oil and gas wells that has significant overlapping business relationships with ProPetro. Denholm's executive position at PBEX has never been acknowledged or disclosed to investors. Notably, the founder of PBEX is also linked to Diamondback Energy, one of ProPetro's biggest customers.

13. The Company's disclosures on these subjects have been opaque at best, suggesting that Defendants continue to hope that they will not be required to fully account for the facts that the Audit Committee's counsel at Brown Rudnick have likely uncovered. Meanwhile, the ***Company remains delinquent, for over two quarters, in its SEC reporting,*** while its opaque disclosures have raised significant questions about Defendants' candor to investors. For example, ProPetro has offered no explanation for how an Audit Committee investigation into its purchase of fracking equipment from AFGlobal spurned an inquiry into related-party transactions and its internal and disclosure controls.

14. In addition, in the weeks before ProPetro's Audit Committee announced the ongoing nature and preliminary results of its investigation (on August 8), ***two of its four members*** who had been involved in directing that investigation—Steven Beal and Royce Mitchell—***resigned without any explanation***. The Company ***has never acknowledged*** that the investigation

was thus completed by two of its existing members, one of whom—Alan Douglas—***fails to meet ProPetro's own standard that all members of its Audit Committee be independent***.

15. The Company has explained very little about the transactions through which Redman and Smith enriched themselves, even though they represent very significant amounts to have been incurred by ProPetro as "personal" expenses, and investors have not received a well-deserved explanation for the transactions involving Denholm. ProPetro has also never acknowledged that Denholm worked a second job that likely created material conflicts of interest, and significant distractions, while he was responsible for the critical disclosures that ProPetro made to investors.

16. ProPetro's revelations that it had been misleading investors since its IPO have wiped out over $700 million in shareholder value. By this Action, Plaintiffs and the Class seek to recover their losses.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 771, and 77o).

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §§ 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. V 1331 and 1337.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. In addition, ProPetro

maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

## III. THE PARTIES

### A. Plaintiffs

21. Lead Plaintiff Nykredit Portefølje Administration A/S ("NPA") is a regulated investment management company based in Denmark. NPA manages more than $114 billion in assets. As set forth in the accompanying certification, the Funds represented by NPA purchased ProPetro common stock during the Class Period and suffered damages as a result of the conduct complained of herein.

22. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") is a benefit pension fund with approximately $2.9 billion in assets under management as of June 30, 2019. Created in 1980 and headquartered in Oklahoma City, Oklahoma Firefighters serves firefighters throughout Oklahoma.

23. Lead Plaintiff Oklahoma Law Enforcement Retirement System ("Oklahoma Law Enforcement") is a defined benefit pension fund with over $1 billion in assets under management as of June 30, 2019. Headquartered in Oklahoma City, Oklahoma Law Enforcement administers retirement and survivor benefits, and medical benefits, for law enforcement officers of the State of Oklahoma and their families.

24. Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police") is a benefit pension fund with over $2.6 billion in assets under management as of June 30,

2019. Created in 1980 and headquartered in Oklahoma City, Oklahoma Police serves police officers of participating municipalities throughout Oklahoma.

25. Lead Plaintiff Oklahoma City Employee Retirement System ("Oklahoma City") provides pension and survivor benefits to full-time civilian employees of the municipality of Oklahoma City, where Oklahoma City Employees is headquartered. Established in 1958, Oklahoma City Employees has approximately $750 million in assets under management as of June 30, 2018.

26. As set forth in the accompanying certifications, Oklahoma Firefighters, Oklahoma Law Enforcement, Oklahoma Police, and Oklahoma City each purchased ProPetro common stock during the Class Period and suffered damages as a result of the conduct complained of herein. In addition, Oklahoma Law Enforcement purchased 15,800 shares of ProPetro common stock in ProPetro's Initial Public Offering (defined below) on March 17, 2017, at the offering price of $14 per share pursuant to the materially false and misleading IPO Offering Documents (defined below).

27. Additional named plaintiff the Police and Fire Retirement System of the City of Detroit ("Detroit PFRS") provides retirement benefits for current and former police officers and firefighters of the City of Detroit. As of July 2019, Detroit PFRS managed over $2.8 billion in assets for the benefit of its members. As set forth in the accompanying certification, Detroit PFRS purchased ProPetro common stock during the Class Period and suffered damages as a result of the conduct complained of herein.

28. Lead Plaintiffs and Detroit PFRS are collectively referred to herein as the "Plaintiffs." Plaintiffs' Certifications are collected and attached hereto as Appendix A.

**B. Exchange Act Defendants**

29. Defendant ProPetro Holding Corp. ("ProPetro" or the "Company") is a publicly-traded corporation headquartered in Midland, Texas. ProPetro provides hydraulic fracturing and complementary services through its "pressure pumping" division to upstream oil and gas companies engaged in the exploration and production of North American unconventional oil and natural gas resources. In March 2017 the Company conducted an initial public offering through which it raised approximately $170 million. ProPetro common stock trades on the New York Stock Exchange under the symbol "PUMP."

30. Defendant Dale Redman ("Redman") co-founded ProPetro in 2005 and has been serving as the Company's Chief Executive Officer since 2008. Redman has also served on ProPetro's board of directors since 2005. As of October 3, 2019, pursuant to an agreement with the Company, Redman no longer serves as ProPetro's principal executive officer, though he remains in the role of CEO and in control of ProPetro's day-to-day operations. In the time since the Company's IPO alone, when it became necessary to report and disclose financial information to investors, Redman took advantage of ProPetro's inadequate internal controls, and improperly obtained approximately $346,000 in cash from the Company for personal expenses.

31. Defendant Jeffrey Smith ("Smith") co-founded ProPetro in 2005 and served as the Company's Chief Financial Officer ("CFO") from 2005 until he was reassigned to a newly created "Chief Administrative Officer" role in 2019. In the time since the Company's IPO alone, when it became necessary to report and disclose financial information to investors, Smith also took advantage of ProPetro's inadequate internal controls, and improperly obtained approximately $18,000 in cash from the Company for personal expenses.

32. Defendant Ian Denholm ("Denholm") was the Director of Finance at ProPetro from 2013 to 2017 and was the Chief Accounting Officer ("CAO") of ProPetro from August 2017 until

his resignation in October 2019. As alleged below, over the course of the Class Period, Denholm engaged in improper, undisclosed related-party transactions involving the finance, purchase, and sale of assets valued at approximately $3.6 million. In addition, during the Class Period, Denholm served as CFO of PBEX, an exploration and production company that is a "bonded operator of oil and gas wells in both Texas and New Mexico." Denholm's simultaneous service at PBEX while he was the CAO of ProPetro—a public company with investor reporting obligations—has never been disclosed.

33. Redman, Smith, and Denholm are collectively referred to herein as the "Executive Defendants." The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of ProPetro and its subsidiaries, directly participated in the management of ProPetro's operations, including its public reporting functions, had the ability to, and did control, ProPetro's conduct, and were privy to confidential information concerning ProPetro and its business, operations and financial statements, as alleged herein.

34. ProPetro and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

## IV. EXCHANGE ACT CLAIMS

### A. Background and Summary of the Fraud

#### 1. ProPetro's Business and Operations

35. ProPetro provides hydraulic fracturing ("fracking") and other well completion and drilling services to upstream oil and gas companies through its "pressure pumping" division. It was founded in 2005 by its current CEO, Defendant Dale Redman, and current Chief Administrative Officer, Jeffrey Smith, as a holding company for ProPetro Services, Inc.

36. On March 16, 2017, ProPetro disclosed that it would conduct an initial public offering of 25,000,000 shares of its common stock at $14 per share, of which 13,250,000 shares

were to be sold by the Company and 11,750,000 were to be sold by the selling stockholders, Energy Capital Partners, ProPetro's then-controlling shareholder (the "Initial Public Offering" or "IPO"). The Company announced that it intended to use the proceeds of the Initial Public Offering to repay debt outstanding under the Company's term loan, to fund the purchase of additional hydraulic fracturing units, and for general corporate purposes.

37. Prior to going public, ProPetro's share capital was principally owned by Energy Capital Partners, together with its affiliate funds and related persons. In connection with its initial public offering, the Company filed a Registration Statement on Form S-1 on February 8, 2017 (the "IPO Registration Statement"), indicating its intention to list its shares on the New York Stock Exchange ("NYSE"). The Company filed with the SEC amendments to the IPO Registration Statement on Form S-1A on February 23, 2017, March 7, 2017, and March 13, 2017 (the "IPO Registration Statement Amendments").

38. On March 20, 2017, ProPetro filed a prospectus (the "IPO Prospectus") pursuant to the "IPO Registration Statement" (together with the IPO Prospectus and the IPO Registration Statement Amendments, the "IPO Offering Documents") for the offering of 25 million shares of common stock priced at $14 per share. Of these shares, ProPetro's then-controlling shareholder Energy Capital Partners sold 13,843,145 shares; Special Situations Fund III, L.P. sold 902,052 shares; Defendant Redman sold 370,370 shares; ProPetro Chief Operating Officer David Sledge sold 81,106 shares; Defendant Smith sold 222,221 shares; and ProPetro's then-Chairman of the Board, Spencer Armour, sold 81,106 shares. The Initial Public Offering was underwritten by investment banks Goldman Sachs & Co. and Barclays Capital along with a syndicate of additional banks. The underwriters of the IPO were granted an option to purchase up to an additional 3.75 million shares from the selling stockholders, and they partially exercised this option, purchasing

an additional 3,706,961 shares from the selling stockholders, which were offered to the public as part of the IPO.

39. Through its pressure pumping division, ProPetro provides hydraulic fracturing, or "fracking," and related services to oil and gas companies engaged in the exploration and production ("E&P") of North American unconventional oil and gas resources. Fracking is the process of pumping water, sand, and chemicals at a high pressure through already-drilled wells causing fissures in the rock surrounding the wells through which natural gas then flows into the wells for collection.

40. Many of ProPetro's customers are "blue-chip" E&P companies such as Callon Petroleum, Diamondback Energy, Parsley Energy, Pioneer Natural Resources, Surge Energy, and XTO Energy (a subsidiary of Exxon Mobil Corporation since 2010).

41. ProPetro has fleets of "hydraulic fracturing units" that it deploys to its clients for fracking and related E&P services. The capabilities of these fleets are measured in horsepower. At the time of its Initial Public Offering, ProPetro had 420,000 hydraulic horsepower with ten fleets—a 42,500 horsepower average fleet size—with plans to expand to 16 fleets by 2018.

42. In 2016, ProPetro's "pressure pumping" division accounted for 94% of the Company's total revenue, with 97% of the activity taking place in the Permian Basin, a large sedimentary basin in the southwestern United States. During the Class Period, 99% of ProPetro's revenue originated in the Permian Basin. ProPetro disclosed that its market share for pressure pumping in the Permian Basin increased from 5% in 2011 to 16% in 2016, making it the Permian's largest pressure pumper based on total horsepower at the time of ProPetro's IPO.

43. Unlike its competitors, ProPetro provides dedicated fleets and personnel to its clients that are tailored to meet each client's needs. Each unit in ProPetro's fracking fleet has a

designated team of personnel, many of whom have worked continuously with the same customer for several years, some since ProPetro's inception. Many of ProPetro's customers have integrated ProPetro's fleet scheduling with their own well development programs. This approach to ProPetro's business has resulted in consistently high fleet utilization rates—meaning that few, if any, of ProPetro's fleets sit dormant.

44. Immediately following ProPetro's IPO, analysts commended ProPetro for its high fleet utilization, which was at 100% from September 2016 through the time of the Initial Public Offering in March 2017 and distinguished ProPetro from its competitors. Further, for every fleet that ProPetro planned to add in 2017, it had dedicated customers. This eliminated fleet reactivation costs, which can be significant, and which are incurred by many of ProPetro's competitors without similarly dedicated fleets. The Company credited its high utilization rate to customer loyalty based on longstanding relationships. On May 12, 2017, for example, Evercore ISI reported that ProPetro "boasts best in class profitability thanks to 100% utilization, superior throughput and a uniform fleet (lending itself to lower R&M expenses). A Permian-centric focus coupled with a dedicated logistics team and solid working relationships with customers and suppliers also help support margins[.]"

### 2. Throughout the Class Period, Investors Focused on ProPetro's Executive Team and Their Longstanding Relationships as Fundamental to the Company's Rapid Success

45. ProPetro lends its success and its consistent full-fleet utilization to its longstanding customer relationships in the Permian Basin, many of which operate on a "handshake" basis without the formality of typical contracts with rigid pricing terms. Indeed, throughout the Class Period, Defendants emphasized the importance of the way ProPetro manages both its customer and supply chain vendor relationships to the Company's success, and highlighted the roles that its senior executives—Defendant Redman, in particular—played in those client relationships.

46. For example, in an August 8, 2017 press release, Defendant Redman stated that ProPetro's "relationships with customers are built on a strong long-term foundation of loyalty and trust. This provides us with optimal visibility as well as confidence that our pressure pumping services will continue to be highly utilized beyond 2017." Redman echoed this during an August 9, 2017 conference call with investors, stating that the Company "would not have seen this success without the continued support of our customers. These relationships are the life blood of the company[.]"

47. Redman similarly informed investors during a November 2, 2017 conference call with investors that because "100% of our frac operations [are] focused on the Permian and being headquartered in Midland, we are fortunate to not only enjoy exceptionally close relationships with our customers, but also understand the unique complexities of operating in the Permian."

48. The market thus placed significant value on these relationships and understood that they depended upon the credibility of the Company's CEO, Redman. Investors took these statements at face value and viewed these longstanding relationships as a unique characteristic of the Company that set it apart from its competitors, understanding that these relationships enhanced the present and future value of the Company and viewing them as critical to the Company's success.

49. Following the Initial Public Offering, analysts were immediately focused on ProPetro's "all in the family" approach to doing business as a reason for the Company's success and maintained that focus throughout the Class Period. The Company's success was attributed, in part, to the purported quality of its customer relationships and management's ties to ProPetro's customers and suppliers.

50. For example, on April 11, 2017, Credit Suisse reported that ProPetro's "management teams' work experience is in the Permian. They are the local guys. They live and work with their customers and their families. Their historical performance and customer loyalty is very impressive. We see this as an advantage. Culture eats strategy for breakfast in this business." The same report noted that ProPetro operates "***on a handshake-only basis***" which, while "***unconventional for most modern public companies***," ProPetro uses "to its advantage, as pricing and frac designs can be changed quickly. Speed and flexibility has resulted in good service quality and deep customer relationships between PUMP and its multiple Permian-centric operators."[1]

51. Similarly, on May 11, 2017, Credit Suisse reported following ProPetro's second quarter earnings call that "[m]anagement waxed poetic about their commitment to customers, ***the fact that customers are neighbors and that they will never lead pricing but work more collaboratively than most and win long term.*** " Credit Suisse similarly reported on August 10, 2017, that ProPetro "has a relationship-driven approach to maintaining high levels of utilization."

52. The market valued ProPetro's longstanding relationships, and similarly saw the value in the fact that ProPetro management "live and work with their customers and their families." However, investors also understood that these kinds of informal agreements and close-knit working relationships between friends and family as colleagues created the risk of improper related party transactions and self-dealing, heightening the need for adequate internal and disclosure controls.

53. Related-party transactions ultimately pose an increased risk that a company's financial statements will be materially misstated. Particularly given the nature of ProPetro's

[1] All emphases added unless otherwise noted.

business, investors relied on Defendants' repeated representations throughout the Class Period that the Company maintained a robust system of internal controls and disclosure controls and procedures designed to prevent unauthorized, self-serving business transactions, and further, that Defendants had disclosed all material related-party transactions.

### 3. Defendants Were Required to Maintain Adequate Internal and Disclosure Controls and to Disclose Material Related-Party Transactions

54. Related-party transactions have proven to be an easy and effective vehicle for public companies to misrepresent the economic substance and reality of their financial transactions, including by enriching insiders at the expense of the company and its shareholders. Specifically, the influence of a related party might yield different transaction terms than those that would have resulted from negotiations between independent parties. In other instances, such influence might produce a transaction that would not have occurred at all if the negotiations were between strangers. Accordingly, to prevent self-dealing and to ensure that public companies' representations to investors are comprehensive, accurate, and not misleading, the securities laws, SEC regulations and U.S. accounting rules require that public companies maintain robust controls over their disclosures and financial reporting, and that all material related-party transactions are reviewed, authorized, and disclosed to investors.

55. Public companies like ProPetro are thus required to design "disclosure controls and procedures" and "internal controls over financial reporting" to ensure that their representations to investors—both financial and non-financial—are accurate. Disclosure controls and procedures mandate that information required to be disclosed by a company under the Exchange Act of 1934 is communicated to company management, including its CEO, CFO, and CAO sufficiently in advance of the company's filing dates, to allow senior management ample time to consider and decide what information will be disclosed. Disclosure controls and procedures include, for

example, components meant to provide reasonable assurances that transactions are recorded properly to permit preparation of financial statements in accordance with Generally Accepted Accounting Principles (“GAAP”), the common set of accounting principles, standards, and procedures that United States companies use to compile their financial statements.

56. Likewise, internal controls over financial reporting are designed by or under the supervision of a company’s CEO and CFO to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the company’s financial statements in accordance with GAAP. As discussed below, management is required to evaluate these controls to determine their effectiveness with respect to preventing or detecting material misstatements of financial statements in a timely manner.

57. Several statutes, regulations, and industry standards required Defendants to maintain adequate internal controls and disclosure controls and procedures, to disclose related-party transactions, and to certify that the controls they had in place were adequate.

58. ***First***, federal law requires that the CEO and CFO of public companies certify the company’s quarterly and annual reports filed with the SEC and the procedures established by the company to prepare the company’s financial statements and its disclosures generally.

59. Specifically, Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 (“SOX”)—meant to ensure that a public company’s CEO and CFO take a proactive role in their company’s public disclosure and to give investors confidence in the accuracy, quality, and reliability of a company’s periodic SEC reports—requires that a CEO and CFO of a public company address in their quarterly and annual SEC filings (Forms 10-Q and 10-K, respectively) (1) the material accuracy and fair presentation of the report’s disclosures; (2) establishment and maintenance of “disclosure controls and procedures”; and (3) deficiencies in, and material changes

to, internal control over financial reporting. The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls. These certifications communicate to investors that all material information required to be disclosed is contained in the report.

60. Similarly, Section 404 of SOX, 15 U.S.C. § 7262, requires that management of a public company and its outside auditor annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose the conclusion to investors. The SEC's rules provide that management may not conclude that a company's internal controls over financial reporting are effective if there are one or more "material weaknesses" in internal controls. A statement that internal controls over financial reporting are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

61. Under the Public Company Accounting Oversight Board's (PCAOB) Accounting Standards, a "material weakness" in internal controls over financial reporting is a control deficiency so severe that there exists a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. A "significant deficiency," by contrast, is a deficiency in internal control over financial reporting that is less severe than a material weakness, but important enough to merit attention by

those responsible for oversight of a company's financial reporting. Defendants' representations that ProPetro's controls were adequate assured investors that they could rely on the information, both financial and non-financial, reported in ProPetro's SEC filings to make informed investment decisions. As discussed below, these Defendants have now admitted that those representations were false.

62. ***Second***, Item 307 of SEC Regulation S-K, 17 CFR § 229.307, requires that a company disclose the conclusions of its CEO and CFO regarding the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by the periodic report.

63. Item 308 of SEC Regulation S-K, 17 CFR 229.308(a)(3), similarly requires that a company provide annual reports on the state of its internal controls over financial reporting containing a statement of management's responsibility for maintaining adequate internal controls, identifying the framework used by management to evaluate the effectiveness of the internal controls, and the assessment of the effectiveness of the internal controls.

64. ***Third***, Item 404 of SEC Regulation S-K, 17 CFR § 229.404, explicitly requires that public companies "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved ***exceeds $120,000***, and in which any related person had or will have a direct or indirect material interest." Item 404 requires the disclosure of, *inter alia*:

(1) The name of the related person and the basis on which the person is a related person;

(2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction;

(3) The approximate dollar value of the amount involved in the transaction;

(4) The approximate dollar value of the amount of the related person's interest in the transaction; and

(5) ***Any*** other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

65. ***Fourth***, because the nature of related party relationships and transactions may give rise to higher risks of material misstatement of financial statements, GAAP requires that public companies disclose related party transactions. The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers.

66. ASC 850, which addresses related party relationships and transactions, required ProPetro to disclose related-party transactions during the Class Period. ASC 850 requires specifically that companies disclose related-party transactions "so that users of the financial statements can evaluate their significance. Therefore, this topic establishes requirements to disclose certain significant related party transactions and control relationships." 850-10-10-1. Under ASC 850, "related party transactions" include those between "***an entity and its principal owners, management, or members of their immediate families***," as well as those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" means any company that is under

common control or management with the public company and other parties with significant influence. ASC 850-10-20. Further, under ASC 850, a description of related-party transactions must include: (***1) a description of the transactions and other information necessary to understand the effects of the transactions on the company's financial statements; (2) dollar amounts of the transactions; and (3) amounts due to or from related parties and terms and manner of settlement.*** 850-10-50-1.

67. Importantly, ASC 850 provides further that transactions between related-parties are related-party transactions even though they may not be given accounting recognition. For example, an entity may receive services from a related party without charge and not record receipt of the services. While not providing accounting or measurement guidance for such transactions, FASB ASC 850 requires their disclosure. 850-10-05-5.

68. Public company management (here, the Executive Defendants) is responsible for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards, AS § 1001.03 specifically provides:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

69. The obligation to identify and disclose related-party transactions is a fundamental and straightforward principle for public companies. The above standards from SOX, various SEC regulations and GAAP, which ProPetro and the Executive Defendants repeatedly represented they complied with, required ProPetro to review, detect, and disclose both related-party transactions

and any weaknesses in the Company's internal controls and disclosure controls and procedures, and to certify the effectiveness of those controls and procedures.

#### 4. Throughout the Class Period, Defendants Represented, and Investors Understood, That ProPetro Had Adequate Internal and Disclosure Controls and That All Related-Party Transactions Had Been Disclosed

70. Throughout the Class Period, Defendants assured investors that ProPetro had internal controls in place that were adequate to prevent unauthorized related-party transactions and detect self-dealing, and disclosure controls to ensure that to the extent any such material transactions occurred that they would be promptly disclosed. Because ProPetro operated in a tight-knit business environment, these representations about internal and disclosure controls were critical to investors.

71. For example, in ProPetro's Class Period quarterly and annual SEC filings, Defendants represented that ProPetro followed strict practices and procedures to review and authorize related-party transactions. Defendants further represented that all such transactions that the Company or its executives were a party to were disclosed in ProPetro's SEC filings.

72. In ProPetro's Class Period quarterly and annual SEC filings, Defendants also repeatedly represented and certified the adequacy of ProPetro's internal controls, representations that were particularly important to investors given how Defendants conducted ProPetro's business and the fact that they frequently contracted with friends and family. As discussed above, these internal control procedures and processes are designed to protect the Company's assets and provide a means to ensure that ProPetro's public disclosures appropriately reflect the Company's internal financials and operations.

73. Specifically, in ProPetro's Class Period quarterly and annual SEC filings, Defendants provided a "reasonable assurance" that ProPetro had "effective" controls and that all material information was disclosed to investors. Defendants Redman and Smith also certified in

the Company's Class Period quarterly and annual SEC filings that they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures" as required by the Sarbanes-Oxley Act of 2002, certifying that these and other controls would prevent the Company's disclosures from being misstated. These certifications assured investors that ProPetro's controls were adequate to ensure that the Executive Defendants' disclosures about ProPetro's compliance with GAAP and related-party disclosures were accurate, transparent, and fairly presented the condition of the Company.

74. Investors bought into the Company's approach to doing business and understood, based on Defendants' statements concerning ProPetro's controls and related-party transactions, that all of its transactions were subject to a strict system of controls and thus were above-board and that all material information was reviewed and disclosed.

75. Contrary to the Executive Defendants' certifications concerning their "evaluations" of ProPetro's "effective" internal and disclosure controls and as discussed below, however, Defendants have now ***admitted*** that during the Class Period, ProPetro's internal controls over financial reporting in fact suffered from material weaknesses. These material weaknesses were directly related to the Company's ability to detect the improper use of Company funds and related-party transactions, and resulted in both improper payments to Defendants Redman and Smith, and a related-party transaction involving third-party entities owned or controlled by Defendant Denholm. Accordingly, the Exchange Act Defendants' Class Period statements concerning ProPetro's internal controls were materially false and misleading.

### 5. ProPetro's Rapid Growth

76. To prepare for its IPO and after going public, ProPetro focused on revenue growth, sacrificing critical controls and disclosure obligations. Under pressure from the market, and its early pre-IPO investors such as Energy Capital Partners, to prove its worth among more established

competitors, the Company exhibited rapid growth by significantly increasing its fleet size and activity levels on an expedited basis. The following chart demonstrates ProPetro's extreme growth following its IPO and throughout the Class Period:




77. In the nine quarters following its IPO (Q1 2017 through Q1 2019) ***ProPetro's revenue effectively tripled***. While the market responded positively to ProPetro's growth, in reality, ProPetro misled investors about its ability to maintain adequate controls while simultaneously experiencing the rapid revenue growth it was experiencing. While its revenue grew in multiples, the Company and the Executive Defendants—well aware of and focused on the growth that the Company was experiencing—misrepresented that the Company's legal, compliance, and accounting functions were maintaining the same pace of growth. But they were not.

78. Instead, ProPetro focused on proving its worth to investors by prioritizing revenue growth and did so at the expense of other non-revenue producing functions such as legal and compliance, both functions focused on maintaining adequate and effective internal controls and disclosure controls and procedures.

79. Analysts would later explain the fallout from the Audit Committee investigation by observing that ProPetro's "internal control systems [] were inadequate to meet the company's torrid pace of growth over the past 24 months."

**6. ProPetro CAO Denholm's Undisclosed Moonlighting at PBEX**

80. Unbeknownst to investors during the Class Period, Denholm was also serving as the CFO at a privately-held company with close business ties to ProPetro. As ProPetro's Chief Accounting Officer, Denholm had critical, and proscribed, functions at ProPetro. Chief accounting officers are responsible for overseeing accounting functions, the compilation and reporting of financial statements and for the maintenance, application, and improvement of internal and disclosure controls, as well as for a company's regulatory compliance. These are paramount functions, particularly at a newly-public and rapidly growing company like ProPetro. In addition to his apparent self-interested related-party transactions, Denholm also betrayed the loyalty and trust of ProPetro investors by taking on a second job at another company, *at the C-suite level*, during the Class Period.

81. As discussed below, Defendant Denholm—along with his business partner Adam Cunyus ("Cunyus")—controlled and either owned or partly owned third party entities Clarabby Development, LLC, Conquistador Capital, LLC, and Dahlia Development, LLC (the "Clarabby Entities"). Each of these entities existed prior to the start of the Class Period and remained active throughout the Class Period. Cunyus is the sole member of Clarabby Holdings, LLC, the holding

company for Clarabby Development, and is also listed as a manager of Clarabby Development, LLC.

82. During the Class Period, unbeknownst to investors, Denholm carried out related-party transactions, including an improper transaction whereby the Clarabby Entities sold an iron testing facility to ProPetro, a transaction valued at approximately $3.6 million (the "Clarabby Transactions"). ProPetro disclosed no information concerning the Clarabby Transactions or any of these related entities throughout the Class Period.

83. Cunyus, who consummated the Clarabby Transactions along with Denholm and the Clarabby Entities, is also the former Chief Operating Officer of a privately held company called PBEX, LLC ("PBEX"), an E&P company headquartered in Texas and formed in 2012 that purchases oil and gas rights.

84. According to publicly available sources and former PBEX employees, ***Denholm was the Chief Financial Officer of PBEX at the same time that he was Chief Accounting Officer of ProPetro.*** This relationship was never disclosed to ProPetro investors. Indeed, for a senior executive of a public company to hold a second job is a distraction from their ongoing responsibilities and creates the risk of conflicts of interest and self-dealing.

85. Former Employee ("FE") 1 worked in accounts payable at PBEX from October 2017 until May 2018. FE 1's direct supervisor reported directly to Denholm at PBEX. It was FE 1's understanding that Denholm was the CFO of PBEX during this time. FE 1 reported that Denholm was in the PBEX offices once or twice a week. FE 1 also reported that when Denholm was not in the PBEX offices, she understood that Denholm was working at ProPetro, and that other times, he and Cunyus were at ProPetro meetings. FE 1 further reported that Denholm was

employed at PBEX prior to when she commenced her employment there, and that Denholm's tenure at PBEX continued through April or May 2018, when she left PBEX.

86. PBEX also shares certain close business relationships with ProPetro, further implicating the prospect of related-party or self-dealing transactions involving Denholm.

87. For example, PBEX's chairman is Wes Perry, who is also a director of Viper Energy. Spencer Armour, the former Chairman of ProPetro's Board, is also a director of Viper Energy. Viper Energy is a substantial owner of, and controls, Diamondback Energy. Diamondback is one of ProPetro's largest customers. Thus, the relationship between PBEX, where Denholm worked, and a company controlled by Perry, which shares ownership with one of ProPetro's largest customers, suggests an undisclosed web of relationships that was purposefully hidden from investors.

88. Given the critical and consuming requirements of his CAO role at ProPetro, including his responsibility to Company shareholders, Denholm's dual-employment at PBEX during the Class Period—in a leadership role nonetheless—was a significant contributor to the material weaknesses in the Company's internal and disclosure controls.

89. Denholm's undisclosed business and employment relationships are just part of a complicated web of related entities in the oil and gas industry that are controlled by or otherwise affiliated with ProPetro or the Executive Defendants, creating questions about conflicts of interest, the propriety of the transactions engaged in by ProPetro, the completeness of ProPetro's Class Period disclosures, and the thoroughness of the Audit Committee Investigation.

### 7. ProPetro Has a History of Related-Party Transactions and Its Senior Executives and Directors Control Several Undisclosed Related Entities

90. As represented in its SEC filings, throughout the Class Period the Company was, and is currently, a party to several agreements with entities owned or controlled by Defendant Dale Redman and other related parties.

91. For example, ProPetro has disclosed that its offices are leased from a business owned by Defendant Redman, and that it had leased other properties from businesses jointly owned by ProPetro senior executives.

92. ProPetro has also disclosed that it has rented equipment from a business owned by Defendant Redman, and that in 2018, ProPetro purchased $10.3 million of "frac sand" from a mine located on the property of an oil and gas company in which Redman is a 44% owner. The sale resulted in Redman receiving approximately $300,000 in royalties.

93. These transactions evince ProPetro's reliance on related-party transactions to do business. In addition to the entities disclosed in ProPetro's SEC filings, however, ProPetro's executives are affiliated with several other undisclosed entities operating in the oil and gas industry, indicating that the extent of related-party transactions and relationships involving ProPetro was not fully disclosed:

- Clarabby Development, LLC, Conquistador Capital, LLC, and Dahlia Development, LLC were created or were controlled by Defendant Denholm, ProPetro's former Chief Accounting Officer. Conquistador Capital, LLC was registered with the Texas Secretary of State in 2014, Dahlia Development, LLC in February 2017 prior to ProPetro's IPO, and Clarabby Development, LLC was registered in January 2018. As discussed herein, in 2018, Clarabby Development sold two properties to ProPetro in what ProPetro later disclosed as related-party transactions;

- FloCap Injection Services, LLC, formed in June 2014, is a provider of specialty chemicals and capillary tubing services to oil and gas production companies such as ProPetro. FloCap is headquartered at the same address as ProPetro's corporate headquarters, and its formation documents list both Redman and Smith as managing members. In 2018, FloCap merged with

two other chemical companies to form Imperative Chemical Partners, LLC, which includes both Redman and Smith as managing members;

- PBEX, LLC, an E&P company, the earliest version of which was registered in Texas in 2012, had Denholm as its CFO for a period during the Class Period while Denholm was CAO of ProPetro, though nowhere on PBEX's website is a CFO mentioned amongst the remainder of the leadership team. As discussed above, a former PBEX employee confirmed that Denholm was employed at PBEX from mid-2017 to April or May 2018. As discussed above, PBEX has significant financial business relationships and connections with Diamondback, one of ProPetro's largest customers;

- Energy Entrepreneur Fund 1, LLC, formed in January 2015, lists Defendant Denholm as its registered agent, and its members include Redman, Denholm, Smith, and former ProPetro board chairman Spencer Armour;

- Ener-Coil LLC, a capillary tubing services provider to companies like ProPetro, is also apparently *headquartered at the same address as ProPetro*, and its directors include Defendant Redman;

- South of the Border Materials, LLC, formed in September 2011, was created by Redman, Smith, and other current and former ProPetro employees, and *lists both its address as Defendant Smith's residence, and its phone number as ProPetro's corporate contact number*;

- HR Double S, LLC, formed in June 2010 and dissolved in September 2017, was headquartered at Defendant Smith's home address, and listed Defendants Redman and Smith as members;

- Lore Venture Group LLC, formed in April 2013, names Defendants Denholm and Smith as the two sole members;

- D&J Realty, LLC lists its mailing address as the home address of Jeffrey Smith, and Redman is the registered agent; and

- Red Hogg LLC, registered in October 2006, names Defendant Redman as managing member and lists a residential, single-family home as its registered address.

94. Raising further questions as to the nature of these related entities is the fact that—per Defendant Redman's own admission—Alan Douglas ("Douglas"), a ProPetro director, and member of the Audit Committee, was also a longtime friend of Redman as well as Redman's personal accountant. Additionally, Douglas is a signatory on at least two of the above undisclosed

third-party entities that name ProPetro executives, employees, and board members. According to public documents, for example, Douglas signs off on Energy Entrepreneur Fund 1, LLC's and Red Hogg LLC's documents as its accountant. Douglas' personal relationship with Redman and his affiliation with related entities calls into question his independence as a director. Indeed, the NYSE Listed Company Manual provides that in determining whether a director is truly "independent," "the concern is independence from management[.]" It cannot be said, given Douglas' relationship with Redman, that he was truly an "independent" director.

95. On March 21, 2017, immediately following ProPetro's Initial Public Offering, Defendant Redman made a speech before a community group called Marketplace Midland during which he spoke of his relationship with Douglas. Specifically, Redman stated: "There's an accountant in this town . . . I take my taxes in. He hands me an envelope. I go to the elevator, open it up. It's $5,000. When you see a man named Alan Douglas, don't make a big deal out of it. Alan Douglas was my answer to prayer . . . I was forever changed because of that check."

96. At the time this comment was made and thereafter throughout the Class Period, Douglas remained a member of the Audit Committee of the Board of ProPetro which was, as discussed below, ultimately responsible for investigating improper expense reimbursements to Defendants Redman and Smith, and related-party transactions involving Company executives.

#### 8. ProPetro Conducts Two Subsequent Secondary Offerings While Concealing Internal Control Deficiencies and Related-Party Transactions

97. On November 2, 2017, in the midst of ProPetro's expansion, ProPetro announced that it intended to conduct a secondary public offering of 10 million shares of its common stock to be sold by the selling stockholders, Energy Capital Partners (the "2017 Secondary Offering"). That day, it filed a registration statement with the SEC on Form S-1 for the public offering of 10 million shares (plus 1.5 million shares pursuant that the underwriters were granted an option to

purchase) of common stock at the offering price of $15.50 per share (the "November 2017 Registration Statement"). The November 2017 Registration Statement was amended to add securities on November 6, 2017 (the "November 2017 Registration Statement Amendment").

98. On November 6, 2017, ProPetro filed, pursuant to the November 2017 Registration Statement, a prospectus for the offering of 12,000,000 shares of common stock (plus 1.8 million shares pursuant that the underwriters were granted an option to purchase) at the offering price of $15.50 per share (the "November 2017 Prospectus," and together with the November 2017 Registration Statement and the November 2017 Registration Statement Amendment, the "2017 Secondary Offering Documents"). The 2017 Secondary Offering was underwritten by investment bank Goldman Sachs as book-runner, along with a syndicate of other investment banks.

99. On May 10, 2018, ProPetro issued a press release announcing another secondary offering of 12,000,000 shares of its common stock again to be sold by the selling stockholders, Energy Capital Partners (the "2018 Secondary Offering").

100. On May 10, 2018, ProPetro filed a preliminary prospectus (the "May 2018 Prospectus")—supplements to which were filed with the SEC on May 11, 2018 and May 14, 2018 (the "May 2018 Prospectus Supplements")—pursuant to its May 10, 2018 registration statement filed on Form S-3ASR (the "May 2018 Registration Statement," and together with the May 2018 Prospectus, and the May 2018 Prospectus Supplement, the "2018 Secondary Offering Documents") for the offering of 12,000,000 shares of common stock at $19.10 per share (plus 1.8 million shares pursuant that the underwriters were granted an option to purchase). The 2018 Secondary Offering was underwritten by Goldman Sachs & Co. and Barclays Capital.

101. Following the 2018 Secondary Offering, Energy Capital Partners had fully liquidated its shares of ProPetro and held a 0% ownership interest in the Company. In total, Energy Capital Partners realized approximately $480 million in proceeds from the Secondary Offerings.

102. As detailed below, both the 2017 and 2018 Secondary Offering Documents made materially false and misleading statements about the related-party transactions that the Company was then a party to, as well as the policies and procedures that the Company followed to review and authorize related party transactions. The 2017 and 2018 Secondary Offering Documents also made statements reaffirming that amongst ProPetro's expansive growth, the Company maintained adequate disclosure controls and procedures to ensure the reliability and veracity of ProPetro's SEC reporting.

**9. ProPetro Experiences Major Board Turnover, Replacing its Chairman and Losing Two of the Four Members of its Audit Committee**

103. In July 2019, just before ProPetro would disclose an investigation, led by the Audit Committee of its Board of Directors, into the adequacy of its internal and disclosure controls, related-party transactions, and potential conflicts of interest, the Company made sudden, unexplained changes to both its Board and its Audit Committee.

104. On July 12, 2019, ProPetro filed a Form 8-K with the SEC detailing certain changes to the Board. ProPetro appointed Phillip Gobe as chairman of ProPetro's Board in place of Spencer Armour. Notably, Armour is listed as a member of certain of ProPetro's undisclosed related entities described above. In addition to Armour's demotion, Board and Audit Committee member Steven Beal resigned, without explanation.

105. Then, on August 1, 2019, ProPetro filed another Form 8-K with the SEC providing that another Board member—Royce Mitchell—resigned after being on the Board for only five-

and-a-half months. The Company's announcements of these changes provided no detail concerning the Board members' departures.

106. The Audit Committee announced the preliminary results of its investigation on August 8, 2019. As of July 10, 2019, ProPetro's Audit Committee had consisted of Beal, Mitchell, Alan Douglas, and Anthony Best. By the time the initial results of its investigation were revealed, half of the members of the Committee (Beal and Mitchell) who had been directing that investigation were already gone and Douglas lacked the necessary independence. Critically, and consistent with ProPetro's pattern of opaque disclosures, the Company has provided no explanation for the Audit Committee turnover and has not even acknowledged that half of the members Committee resigned from the Board during the course of its investigation.

### 10. The Truth Is Revealed: Defendants Admit That They Engaged in Material Undisclosed Related-Party Transactions and That ProPetro Had Material Weaknesses in its Internal Controls

107. Throughout the Class Period, ProPetro and its senior executives engaged in a scheme to conceal related-party transactions. At the same time, certain of the Company's most senior executives, including both CEO Redman and former CFO Jeffrey Smith, improperly received hundreds of thousands of dollars from the Company for personal expenses. And the CAO, Denholm, had engaged in undisclosed related-party transactions totaling $3.6 million.

108. Similarly, Defendants misrepresented the adequacy of ProPetro's internal controls and disclosure controls and procedures. Defendants represented to investors that ProPetro had adequate internal and disclosure controls, only to later admit that those controls suffered from material weaknesses.

109. The truth concerning Defendants' fraud began to emerge on August 8, 2019 when ProPetro delayed its second quarter 2019 quarterly filing and related earnings call due to a previously undisclosed ongoing internal investigation being conducted by the Audit Committee of

the Company's Board of Directors (the "Audit Committee"). Subsequent disclosures over the following months, ending on October 31, 2019, provided additional revelations concerning the details of Defendants' misrepresentations to investors.

### a. August 8, 2019—ProPetro Discloses an Internal Investigation Into Improper Expense Reimbursements and Related Party Transactions

110. On August 8, 2019, ProPetro filed a Form 8-K with the SEC and issued a press release stating that it would be rescheduling its second quarter 2019 earnings conference call and quarterly report, citing a previously undisclosed investigation by its audit committee (the "Audit Committee Investigation" or the "Investigation"). To date, the Company still has not filed its Form 10-Q quarterly report for the quarter ending in June 2019.

111. Specifically, ProPetro disclosed that the Audit Committee was conducting an internal investigation concerning related-party transactions, potential conflicts of interest, and expense reimbursements to certain Company executives:

> The Audit Committee (the Committee) of the Company's board of directors (the Board), with assistance of independent outside counsel and accounting advisors, is in the process of conducting an internal review which initially focused on the Company's disclosure of agreements previously entered into by the Company with AFGlobal Corporation (AFGlobal) for the purchase of Durastim hydraulic fracturing fleets and effective communications related thereto. The review was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest. Substantial work related to the review has been completed to date, and the Committee expects to complete its review within the next 30 days. The Company is also in the process of implementing improvements to address certain findings identified to date in the review.

112. While the Company claimed that its agreement to purchase hydraulic fracturing fleets from AFGlobal was the catalyst for the Investigation that ultimately expanded to the Company's controls and related-party transactions, to-date, the Company has not explained how what appears to be a vanilla purchase agreement transformed into an investigation into the

Company's executives. Nor did the Company acknowledge the turnover on the Audit Committee during the final stages of the investigation (as discussed above).

113. ProPetro further disclosed that in connection with the investigation, in reviewing the Company's internal controls, the Audit Committee discovered several improper transactions involving Redman and Smith, dating back to at least the IPO, and suggesting there were additional such transactions prior to that date (which the Company, then privately-held, was not obligated to publicly disclose). The Investigation

> identified, due to inadequate documentation associated with the Company's expense reimbursement practices, certain expenses reimbursed to members of senior management, including the chief executive officer and chief financial officer, that were incorrectly recorded as expenses of the Company and appropriately allocable to the officers individually. Each of these officers has reimbursed the Company in full for the identified amounts. The reimbursed amounts totaled approximately $370,000 <u>since</u> the Company's initial public offering in 2017. Of the total amounts, approximately $346,000 were attributable to the chief executive officer and approximately $18,000 were attributable to the chief financial officer.

114. The Company stated that the Audit Committee's evaluation of internal control deficiencies was not yet complete, management "is likely to conclude that certain internal control deficiencies, <u>rising to a level of material weakness</u>, resulting in the Company's disclosure controls and procedures not being effective. In the course of the continuing review, management may identify additional deficiencies that rise to a level of a material weakness."

115. Based on the investigation and its then findings to-date, the Company disclosed that it would be implementing certain "immediate improvement measures to address areas identified to date in the review." These measures included "enhancing disclosure controls through the formation of a disclosure committee and the appointment of a Chief Disclosure Officer," and "revising and expanding key Company policies and procedures to enhance the Company's control environment, including with respect to transactions involving related parties or potential conflicts

of interest." The Company stated further that as the review moved forward, the Board "expects to adopt a formal remediation plan to address internal control and disclosure control deficiencies identified in the review, including with respect to any material weakness that may be identified in the Form 10-Q."

116. Finally, given the ongoing nature of the Audit Committee's investigation, ProPetro disclosed that it planned to file a Form 12b-25 Notification of Late Filing with the SEC regarding its second quarter 2019 Form 10-Q. ProPetro stated that "expects to file the Form 10-Q as soon as possible following the completion of the review, subject to any definitive conclusions of the review that would cause further delay."

117. This disclosure shook investors' faith in Defendants' representations that ProPetro maintained adequate internal and disclosure controls and that it had either prevented or detected and disclosed all material related-party transactions, particularly given the Company's acknowledgement that the improper reimbursements to Smith and Redman occurred "since [ProPetro's] initial public offering in 2017." Accordingly, in response to ProPetro's disclosure, shares of ProPetro common stock ***fell 26%***, from $17.34 on August 8, 2019 to $12.75 on August 9, 2019, on extremely heavy trading volume of nearly 10 million shares, ***erasing over $460 million of shareholder value in a single day***.

118. Analysts immediately linked ProPetro's disclosure to the stock price drop, commenting that ProPetro left investors unsure of the depth of Defendants' wrongdoing and self-dealing. For example, following ProPetro's disclosure on August 8, 2019, Jefferies reported on August 8, 2019 that "[g]overnance questions likely drive shares significantly lower[.]"

119. Analysts also commented on the opaque nature of ProPetro's disclosure, specifically the lack of details surrounding the origin and progression of the Investigation. For

example, JPMorgan reported on August 8, 2019 that "[t]he origins of the investigation (surrounding disclosures of the DuraStim agreements) are still a fairly shrouded mystery to us, and we think investors will have to wait until the eventual conference call to better understand the circumstances."

120. Negative analyst commentary continued the next day, August 9, 2019, with Stephens reporting that ProPetro "stock will be weak today, as the Company . . . announced the delaying of the earnings call and 10Q, pending a review of the Board's audit committee, which initially focused on disclosure of agreements for Durastim fleets, and later expanded to expense reimbursements and related party transactions/potential conflicts of interest." Wolfe Research similarly reported that "market focus will be on the extenuating circumstances around CEO and CFO conduct and the Audit Committee's findings of 'incorrectly recorded' expense items. **Depending on Audit Committee findings and subsequent disclosure, potential CEO/CFO misconduct could not only negatively impact PUMP's relationships with existing customers (currently rooted with the CEO), but could also reverberate across a NAM [North American] OFS [oilfield services] sector that is already perceived to be structurally impaired.**" (emphasis in original).

121. On August 11, 2019, Wells Fargo commented on the lingering ambiguity surrounding the Investigation, reporting that "we have limited insight into the audit committee review and potential board actions, and acknowledge significant potential downside to our estimates depending on how the review unfolds." The report further attributed the pressure on ProPetro's stock price to the announcement of the Investigation: "PUMP's disclosure on Thursday (8/8/19) of an audit committee's review of its disclosures of agreements with AF Global, its related party transaction disclosures (no failures identified), and its expense reimbursement practices that

found $370K of incorrectly reimbursed expenses by PUMP's CEO and CFO (since reimbursed to the Company) drove significant underperformance in the shares Friday[.]"

122. The same Wells Fargo report emphasized the risk to the Company if Redman were implicated in the Audit Committee Investigation: "We view CEO Dale Redman as a critical part of PUMP's success and future prospects (PUMP benefits from atypically strong customer relationships, in [our] view), and based on limited disclosures it is difficult to handicap the extent of the 'key person' risk that currently exists."

123. On August 12, 2019, J.P. Morgan reported that because the Audit Committee Investigation was ongoing, there was

> risk of further disclosures or potentially negative ramifications. Consistent investor feedback indicates that potential loss of CEO Dale Redman is the one that engenders the most concern given PUMP's customer relationship-heavy strategy and his central role in cultivating them. For now, ProPetro is adamant there is nothing revealed thus far that suggests cause for such concerns, but we expect the overhang to persist until the process is completed.

**b. August 30, 2019—ProPetro's General Counsel Announces his Resignation in the Wake of the Audit Committee Investigation**

124. After market close on August 30, 2019, only two weeks after it disclosed the Audit Committee Investigation, ProPetro announced that its General Counsel and Corporate Secretary Mark Howell was resigning from his position effective September 29, 2019.

125. In response to Howell's resignation, the price of ProPetro common stock fell 9.2%, from $10.65 on August 30, 2019 to $9.67 on September 3, 2019, wiping out approximately $100 million in ProPetro's market capitalization.

126. Analysts immediately tied Howell's resignation to the Audit Committee Investigation. For example, on September 2, 2019, Alta Corp. Capital reported that "the Company is currently going through an internal review and audit, and in our view, this resignation should be considered in that context."

127. Simmons Energy similarly reported on September 3, 2019 that Howell's resignation "adds even more uncertainty and questions to a situation which is seemingly more complex than originally envisioned. Therefore, the appropriate action on our part is to move to the sidelines, thus we downgrade PUMP to Neutral. . . . The GC's departure is complicated, in our view, thus until the dust settles with the investigation, it's hard to advocate buying the stock even despite healthy upside to our new price target."

**c. October 9, 2019—CAO Denholm Resigns**

128. After market close on October 9, 2019, ProPetro filed a Form 8-K with the SEC announcing that it had substantially completed its factfinding for the Audit Committee Investigation, but that it was "continuing to review one or more related party transactions [that] involve real estate transactions and do not involve any of the Company's current or former customers or vendors."

129. The Form 8-K further confirmed what had been previously disclosed in the August 8, 2019 disclosures, that the Investigation "***identified a number of internal control deficiencies. As a result of these deficiencies, the Company's management is likely to conclude that there were one or more material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date.***"

130. The Company disclosed that while factfinding was purportedly substantially complete, ProPetro still was not prepared to file its second quarter Form 10-Q (which was already two months late) because additional time was required for the Company's management to certify the accuracy of the financial information and the effectiveness of ProPetro's disclosure controls and procedures. ProPetro would also need additional time "to evaluate the impact of any identified material weaknesses on the Company's prior filings. The Company's conclusions regarding any

material weaknesses could result in a requirement to amend prior SEC filings." The Company gave no anticipated timeline for filing its Form 10-Q.

131. In addition to these updates concerning the Audit Committee Investigation, as part of its "Remediation and Improvement Plan . . . to address the internal and disclosure control deficiencies" identified in the Investigation, the Company announced certain management changes.

132. First, the Company appointed Phillip A. Gobe as the Company's Executive Chairman and principal executive officer, meaning that he would thereafter be responsible for certifying ProPetro's annual and quarterly reports and for overseeing the remediation and improvement plan. Second, the Company announced that while CEO Redman would no longer serve as ProPetro's "principal executive officer," he would nonetheless retain his role as CEO and "be primarily responsible for managing the Company's day-to-day operations and pursuing business initiatives[.]" Third, Defendant Smith was reassigned from CFO to the newly created role of Chief Administrative Officer, and an interim CFO, Darin G. Holderness, was appointed. Defendants Redman and Smith retained their management posts even though they had received hundreds of thousands of dollars of improper expenses reimbursements from the Company. Fourth, the Company announced the resignation of Defendant Denholm, ProPetro's Chief Accounting Officer.

133. Denholm's separation agreement, which was attached to the Company's Form 8-K, stated without further explanation that Denholm had "notified the Company of transactions involving Clarabby Development, LLC, Clarabby Holdings, LLC, Conquistador Capital, LLC and Dahlia Development, LLC, Denholm, and Adam Cunyus," which the separation agreement defined as the "Clarabby Transactions." Notably, despite the Company's representation that it had

substantially completed all factfinding related to the Investigation, Denholm's separation agreement provided that Denholm would "assist the Company with respect to its investigation of the Clarabby Transactions." As had become a pattern regarding the investigation, the October 9, 2019 disclosures provided no additional information or detail concerning these transactions.

134. The Form 8-K revealed that the Audit Committee had previously retained the Brown Rudnick LLP law firm to assist in its conduct of the Investigation, and that the new Chief Financial Officer, Darin Holderness, had also been previously working on that Investigation.

135. The Company also appointed a Chief Disclosure Officer, formed a Disclosure Committee, and adopted "enhanced documentation and revis[ed] key accounting policies and procedures with an emphasis on transactions involving related parties or potential conflicts of interest and travel and entertainment and expense reimbursement."

136. Analysts remained skeptical of the ongoing Investigation and the Company's update, with Barclays reporting on October 10, 2019:

> Coming well past the 30-day timeline given when the company announced its audit committee was performing a review and the subsequently delayed 10Q filing with the SEC, the results of the review were somewhat anti-climactic with a few management changes, but CEO Dale Redman remaining with the Company. Considering the Company has been radio silent the past 2 months, the results of the review weren't particularly enlightening regarding the details of the inquiry and likely comes up short in terms of placating all of the investor concerns. While much of the Street has focused on related party transactions and expense reimbursements, ***we believe the heart of the issue related to internal control systems that were inadequate to meet the company's torrid pace of growth over the past 24 months.***

137. That same day, Credit Suisse reported that, while ProPetro's October 9, 2019 disclosure was a "key first step to get investors comfortable with the story again[,] . . . ***there is wood to chop on governance to make investors fully comfortable again. Key items: (1) filing the 2Q 10-Q, (2) define & remediate material weaknesses, and (3) close internal review without incremental issues.***"

**d. October 18, 2019—the Market Learns of the SEC Investigation**

138. On October 18, 2019, Reuters reported that SEC had commenced an investigation of ProPetro's internal financial controls, disclosures, and financial reporting.

139. News of the SEC investigation raised serious doubts regarding Defendants' earlier assurances that there was nothing significant to uncover concerning ProPetro management, and caused ProPetro's share price to decline by 8.1%, erasing another $70 million in ProPetro's market capitalization.

140. Analysts immediately tied ProPetro's stock price decline to news of the SEC investigation. For example, Alta Corp. Capital reported on October 20, 2019 that "PUMP closed down 8.1% on Friday after press reports suggested that the SEC was investigating the Company on its financial disclosures. The management team has not contradicted the news so far despite the strong market reaction on Friday." The same report also concluded that ProPetro's "20% under-performance versus the peer group is likely the result of disclosures regarding internal control weaknesses and press reports suggesting that the SEC is investigating the Company."

141. On October 21, 2019, Stephens reported that on Friday, October 18, 2019, "Reuters circulated rumors (unconfirmed by the Company) of an SEC investigation into PUMP's financial disclosures, sparking an ~8% sell-off. In our opinion, this uncertainty adds to the cloud of sentiment surrounding PUMP that is unlikely to fully lift until all filings are up to date, the internal review is finalized, and the extent of any potential SEC investigation is clarified."

142. J.P. Morgan similarly reported a week later, on October 28, 2019, that "[d]espite the benign update to the company's internal review, the stock remains heavily pressured by investor concerns over potential new negative disclosures, particularly following the report of an SEC probe." Alta Corp. Capital reported on October 31, 2019 that "the overhang from the potential of an SEC investigation may stay with PUMP until it is fully resolved."

**e. October 31, 2019—Additional Details Regarding Denholm's Related Party Transactions Emerge**

143. In the midst of uncertainty surrounding the Audit Committee Investigation, on October 31, 2019, Culper Research issued an analyst report (the "Culper Report") detailing several entities founded or controlled by the Executive Defendants and suggesting that, contrary to what the Company's disclosures suggested, governance issues at ProPetro were far from "contained."

144. Specifically, the Culper Report provided, for the first time, details regarding several undisclosed companies that appeared, based on public information, to be either founded or controlled by Defendants and affiliated with the oil and gas industry. The report suggested that there was more to disclose than the Investigation ostensibly uncovered, and that investors should be wary of the Company's representations that, apart from a potential real estate transaction, there was nothing further to disclose.

145. Importantly, regarding these real estate transactions, the Culper Report pointed out that, although the Company claimed to have substantially completed its factfinding related to the Investigation, it was still investigating transactions involving Clarabby Development, LLC, of which Defendant Denholm was a founding and controlling member. According to the Culper Report—and confirmed bv the Company just two weeks later—Clarabby Development sold ProPetro at least two properties in 2018. Defendants never previously disclosed these transactions.

146. The Culper Report also questioned whether the Investigation would produce meaningful, honest results given that management itself took part in conducting the Investigation, and because at least one member of the Audit Committee—Alan Douglas—was far from disinterested given that he was Defendant Redman's longtime friend and personal accountant. The Culper Report observed that Douglas himself was the signatory for several third-party entities that were either founded or managed by ProPetro executives, including Defendants.

147. The Culper Report revealed to investors that the propriety and credibility of the Investigation itself could not be trusted and raised questions as to the completeness of ProPetro's previous disclosures concerning its related party transactions and internal controls. It cautioned investors that the Investigation was unlikely to produce meaningful results.

148. In response to the Culper Research report, ProPetro shares dropped 9.36% on heavy trading volume of 4.3 million shares, further erasing another $80 million in ProPetro shareholder value.

149. Analysts and news outlets immediately commented on the Culper Report, Seeking Alpha reporting on October 31, 2019, for example, that ProPetro shares "plunged more than 9% in today's trade after short seller Culper Research issued a negative report questioning business dealings among its executives and board members, and criticizing an internal audit into disclosures and related-party transactions as a "'farce.'"

150. Reuters similarly reported the same day that ProPetro "shares fell as much as 10% on Thursday after investment researcher Culper Research released a report outlining business dealings among its executives and board members, and criticized an internal audit into disclosures and related-party transactions as a 'farce.'" Bloomberg reported the same day that ProPetro's shares fell following the Culper Report's conclusion that ProPetro shares were "ultimately worthless."

**11. Post Class Period Events**

151. Confirming the revelations in the Culper Report, and despite previously disclosing that it had substantially completed its fact finding for the Investigation, ProPetro filed a Form 8-K on November 13, 2019, disclosing that its audit committee had identified "one related party transaction that was not previously disclosed." The Form 8-K disclosed that the transaction

involved ProPetro's former Chief Accounting Officer, Defendant Denholm. Specifically, according to the Form 8-K, during 2018

> (i) ("Entity A") that is 50% owned by the Company's former Chief Accounting Officer (the "Former CAO") and 50% by the Former CAO's business partner (who is not affiliated with the company) loaned approximately $770,000, and (ii) an entity that is owned 100% by the Former CAO ("Entity B") loaned approximately $57,000 to another entity that is owned 100% by the former CAO's business partner ("Entity C").

152. The 8-K also stated that "[t]he loaned funds were used by Entity C during 2018 to pay for a portion of the acquisition, development, and construction costs associated with an iron testing facility and a portion of the acquisition and development costs associated with a maintenance facility that were sold or leased to the Company." According to the Company, "[t]he approximately $827,000 of funds loaned by Entity A and Entity B to Entity C were repaid in full by Entity C, without interest."

153. The Form 8-K further disclosed that during 2019,

> Entity A provided approximately $500,000 of funds to Entity C, which funds the Company understands were used during 2019 to pay for a portion of the development and construction costs associated with the iron testing facility. The Company purchased the iron testing facility from Entity C, reimbursed Entity C for certain development costs associated with the maintenance facility, and leased a property adjacent to the iron testing facility and the maintenance facility property from Entity C. In total, the Company has paid approximately $3,600,000 to Entity C, which includes $2,300,000 associated with the iron testing facility[.]

154. The Company further claimed that it had not identified any items that would require restatement of its previously reported financials, but that the Investigation did identify a number of internal control deficiencies and concluded that there were at least two material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls not being effective as of a prior date. Specifically, the Company reported that, while "management continues to evaluate the impacts of the identified control deficiencies, management has concluded that at least one of these material weaknesses existed as of December 31, 2018." Given these

findings, the Company concluded that "[t]hese determinations affect the conclusions regarding effectiveness previously expressed by the Company's management in . . . the Company's Annual Report on Form 10-K for the year ended December 31, 2018 . . . and . . . in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019[.]" The Company further concluded that "***investors should no longer rely on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent registered public accounting firm included in the 2018 Annual Report.***"

155. Despite its prior representation that the Investigation was nearly complete, ProPetro disclosed that it "expects that management and its independent registered public accounting firm may need to perform additional procedures with respect to historical periods prior to the Company making any amended, delinquent or future SEC filings."

156. Further, the Company, previously silent on the fact of the SEC investigation reported in October by Reuters, confirmed the investigation, and specifically that it received a letter from the SEC on October 24, 2019 regarding an SEC investigation related to the Company's August 8, 2019 disclosure.

157. While the Company's November 13, 2019 update did not provide new information to investors, analysts acknowledged the continued overhang on ProPetro stock from the Investigation. Alta Corp. Capital reported on November 13, 2019, for example, that "the identification of a new related-party transaction with respect to the Company's former CAO means that until the Company files an SEC document stating that it has discovered all weaknesses, there are always risks around the discovery of additional items."

**B. Additional Allegations of Scienter**

158. As set forth above and summarized further below, numerous facts demonstrate that Defendants knowingly or recklessly misled investors about the state of ProPetro's internal and

disclosure controls and related party transactions. These allegations pertain solely to Plaintiffs' Exchange Act claims.

159. ***Defendants Redman, Smith, and Denholm Violated Company Policy by Engaging in Improper Transactions From Which They Personally Benefitted.*** Defendants have admitted, and it is undisputed, that Redman and Smith received compensation of $346,000, and $18,000, respectively, that reflected improper payments for personal expenses that violated the Company's compensation policies, and were not detected by either ProPetro's internal controls or disclosure controls. The Company's August 8, 2019 Form 8-K indicates that the reported transactions are only those that occurred "since" ProPetro's IPO. In addition, as detailed above, Defendants have admitted that Denholm similarly engaged in $3.6 million in improper transactions between entities he owned, controlled and financed, and ProPetro. Denholm's transactions violated ProPetro's policies, and were not detected or disclosed pursuant to the Company's internal and disclosure controls, which Denholm was (among other people) personally responsible for. Given Denholm, Smith and Redman's publicly stated knowledge of the Company's related-party transaction policies and controls as reflected in the certifications and SEC filings they signed disclosing and describing those policies and controls, their violations of those policies were intentional. Having knowingly violated the Company's policies and circumvented the controls that were supposed to result in these transactions being detected and disclosed, Defendants were motivated to and knowingly made the false and misleading statements to investors detailed below, which, *inter alia*, misrepresented the transaction policies and controls that they circumvented.

160. ***Defendants Redman and Smith Were Personally Responsible for Certifying that ProPetro's Internal and Disclosure Controls Were Adequate.*** As noted above, since the Company's IPO, Redman and Smith personally engaged in improper transactions totaling

approximately $370,000, whereby Company assets were transferred to them, when instead these transactions should have been prevented and detected by the Company's internal controls. If "adequate," ProPetro's disclosure controls should have ensured that those transactions were publicly and timely disclosed, which they were not. Defendants Redman and Smith repeatedly represented and certified that they evaluated ProPetro's internal controls throughout the Class Period, and that such controls were "adequate" and "effective." Defendants also represented and certified in ProPetro's Class Period quarterly and annual filings that ProPetro's disclosure controls were also adequate. Defendants have now admitted that ProPetro's internal controls were deficient, and suffered from at least two material weaknesses during the Class Period. Smith and Redman both personally circumvented, for their own personal benefit, those disclosure and internal controls. Thus, Smith and Redman's representations and certifications regarding ProPetro's controls reflect either their actual knowledge of the internal and disclosures controls, and the attendant material weaknesses, or, (less plausibly) they indicate that Redman and Smith made the controls representations and certifications with severe recklessness by failing to gain any understanding or properly informing themselves concerning the true state of affairs. Either scenario amply supports a strong inference of scienter.

161. ***Defendant Denholm Was Charged With Evaluating the Sufficiency of ProPetro's Internal Controls and Related Party Transactions but Was Personally Engaged In Such Improper, Undisclosed Transactions That Circumvented ProPetro's Controls.*** As ProPetro's Chief Accounting Officer, Defendant Denholm was responsible for ProPetro's accounting functions, including audit preparation, SOX compliance, and both maintaining and monitoring adequate internal and disclosure controls. By the very nature of this role, Denholm was aware of the inadequate state of ProPetro's internal controls throughout the Class Period. Further, as alleged

above and as ultimately uncovered by the Audit Committee Investigation, Denholm himself took advantage of the material weaknesses in ProPetro's internal controls by successfully carrying out self-serving related-party transactions during the Class Period valued at approximately $3.6 million. He nevertheless signed SEC filings representing that the Company maintained adequate controls and disclosed all material related-party transactions. That Denholm was charged with managing ProPetro's accounting and was thus intimately familiar with the Company's internal controls—and the fact that he took advantage of material weaknesses in those same controls while falsely representing their adequacy to investors—supports a strong inference of scienter.

162. ***The ProPetro Board Took Away Redman's and Smith's Responsibility for Certifying ProPetro's SEC Filings.*** As discussed above, following Defendants' disclosure of the Audit Committee Investigation, the ProPetro Board, while allowing Redman to remain CEO for operations purposes and while laterally moving Smith from Chief Financial Officer to Chief Administrative Officer, stripped Redman and Smith of their responsibility for certifying the adequacy of the financial statements and other disclosures in ProPetro's quarterly and annual SEC filings. Defendants Redman and Smith represented that they designed and evaluated disclosure controls sufficient to provide reasonable assurance that all material information was disclosed. The Company's decision to replace them for purposes of this certification signals a total lack of faith that they could be trusted to fulfill this role, which establishes a strong inference of their scienter.

163. ***ProPetro Made Several Board Changes, Including Losing Half of its Audit Committee, Immediately Prior to the Announcement of the Audit Committee's Investigation***. Sudden unexplained changes made to the ProPetro Board, including the resignation of two of the four members of the Company's Audit Committee, immediately prior to ProPetro's announcement

of the Investigation (being conducted by the Audit Committee) supports a strong inference of scienter. As alleged above, first, on July 11, 2019, just weeks before disclosing the Audit Committee Investigation, ProPetro appointed Phillip Gobe as chairman of ProPetro's Board in place of Spencer Armour. Notably, Armour is listed as a member of certain of ProPetro's undisclosed related entities described above. In addition to Armour's demotion, board member Steven Beal, who had been a member of the Audit Committee, also resigned on July 11, 2019. Then, on August 1, 2019, just a week before the Company's disclosure of the Audit Committee's Investigation, and while that investigation was ongoing, Royce Mitchell, one of the three remaining members of the Audit Committee when the Investigation was initiated, also resigned. Given the nature and findings of the Audit Committee Investigation, these sudden Board changes support a strong inference of scienter.

164. ***Howell and Denholm Resigned Following the Disclosure of the Investigation.*** Further supporting a strong inference of scienter is the fact that ProPetro's general counsel resigned following the disclosure of the Audit Committee Investigation. As alleged above, Howell "resigned" from ProPetro just one month following the Company's disclosure. As ProPetro's general counsel, Howell was responsible for, among other things, reviewing and signing the Company's Forms 8-K and proxy statements, and reviewing and authorizing potential related-party transactions. Similarly, Defendant Denholm suddenly resigned "at the request of the Company" following the Audit Committee Investigation. The timing and circumstances of Denholm's and Howell's resignations demonstrate that ProPetro's Board understood that the lapses and failures of ProPetro's internal and disclosure controls were profound and originated at the highest levels of the Company.

165. ***Denholm Was Employed by PBEX, Which Has Business Relationships With ProPetro, While Serving as the Company's CAO***. Denholm, as CAO, was one of the executives at ProPetro who was principally responsible for the Company's financial disclosures, related-party transaction reviews and disclosures, and its internal and disclosure controls. For a rapidly growing Company such as ProPetro, this was a demanding, full-time job requiring Denholm's full attention and loyalty. In addition to having personally engaged in undisclosed, improper related-party transactions that violated Company policy, Denholm was (unbeknownst to investors), simultaneously "moonlighting" at PBEX. This arrangement, hidden from investors, further reflects Denholm's, and ProPetro's, knowing deception of investors, and extreme recklessness in the application and management of its internal and disclosure controls.

166. ***ProPetro Still Has Not Filed Its Delinquent SEC Filings.*** The fact that ProPetro still has not filed its delinquent SEC filings, including its Second Quarter 2019 Form 10-Q, Third Quarter 2019 Form 10-Q, and 2019 Form 10-K, supports a strong inference of scienter. As alleged above, on August 8, 2019, over six months ago, the Company disclosed that it would be unable to file its Second Quarter 2019 Form 10-Q due to the open-endedness of the Audit Committee Investigation. The Company later disclosed in October 2019 that although factfinding for the Investigation was supposedly "substantially complete," the Company still was not prepared to file its delinquent quarterly filing, and further, that it would be unable to become current before the end of 2019. Now a month-and-a-half into 2020, the Company has yet to file its delinquent quarterly and annual reports and has not given investors any timeline as to when it plans to become current. The Company's long delay in making its required disclosures indicates the seriousness of the underlying conduct and supports a strong inference of scienter.

167. ***Defendant Redman Sold $5.2 million in ProPetro Stock and Defendant Smith Sold $3.1 Million.*** Defendant Redman sold more than 370,000 shares of ProPetro stock for proceeds of nearly $5.2 million in the Company's IPO. Defendant Smith similarly sold over 220,000 shares of ProPetro stock for proceeds of over $3.1 million in the Company's IPO. Redman and Smith were thus motivated to make the misleading statements they made in the IPO Offering Documents to ensure they would reap the significant proceeds from those sales at inflated prices. ProPetro's IPO sellers benefited from the false statements concerning ProPetro's internal and disclosure controls as described herein. Defendants used these statements to assure investors that ProPetro had a sound approach to doing business and that the IPO documents contained all material information about the Company that investors needed to make informed decisions. The fact that Defendants Redman and Smith both personally benefitted from the impact of these false statements on ProPetro's stock price supports a strong inference of scienter.

## C. Defendants' Materially False and Misleading Statements and Omissions

168. Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions, including those concerning the adequacy of ProPetro's internal controls, disclosure controls and procedures, and the Company's related-party transactions.

### 1. Materially False and Misleading Statements and Omissions Contained in the IPO Offering Documents

#### a. Statements Concerning ProPetro's Internal Controls and Disclosure Controls and Procedures

169. The IPO Offering Documents misled investors by making materially false and misleading statements about ProPetro's internal controls and disclosure controls and procedures. The IPO Offering Documents, signed by Redman and Smith, contained a risk factor concerning

ProPetro's internal controls over financial reporting and the Company's compliance with Section 404 of SOX. Defendants ProPetro, Redman, and Smith stated:

> ***We are evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission. During the course of our ongoing evaluation and integration of the internal control over financial reporting, we may identify areas requiring improvement, and we may have to design enhanced processes and controls to address issues identified through this review. . . .***
>
> We cannot be certain at this time that we will be able to successfully complete the procedures, certification and attestation requirements of Section 404 or that we or our independent registered public accounting firm will not identify material weaknesses in our internal control over financial reporting***. If we fail to comply with the requirements of Section 404 or if we or our independent registered public accounting firm identify and report such material weaknesses, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud*** and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

170. The foregoing statement was materially false and misleading when made. It was misleading for Defendants ProPetro, Redman, and Smith to state that ProPetro was "evaluating our existing controls," "may identify areas requiring improvement," and "may have to design enhanced processes and controls to address issues identified through this review" when, in reality, ProPetro's internal controls were already deficient and Defendants, rather than effectively "evaluate" ProPetro's internal controls, took advantage of their deficiencies by carrying out improper transactions, including transactions from which Redman and Smith personally benefitted. It was further misleading for Defendants ProPetro, Redman, and Smith to state that any failure to comply with the requirements of Section 404 of SOX could cause investors to lose confidence in ProPetro's reported financial information and that a material weakness in the

effectiveness of ProPetro's internal controls could result in an increased chance of fraud when, as alleged above, the Company's internal controls were already suffering from material weaknesses at the time this statement was made, and Defendants took advantage of those material weaknesses. Moreover, Defendants have admitted that the amounts improperly paid to Defendants Redman and Smith as business expenses are only those that occurred since the Company's Initial Public Offering in 2017 and that ProPetro was required to disclose as a public company. Had ProPetro's controls been sufficient, these reimbursements would not have occurred, and any improper transactions would have been disclosed to investors. By omitting this crucial fact, this risk factor led investors to believe that ProPetro's controls were not, in fact, suffering from any material weaknesses.

171. The 2017 Secondary Offering Documents, signed by Defendants Redman, Smith, and Denholm similarly stated with respect to ProPetro's internal controls over financial reporting:

> ***We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act of 2002, or Sarbanes-Oxley Act. Section 404 requires that we document and test our internal control over financial reporting and issue management's assessment of our internal control over financial reporting. . . . If we fail to continue to comply with the requirements of Section 404 of the Sarbanes-Oxley Act, or if we or our auditors identify and report material weaknesses in internal control over financial reporting, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of*** fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.
>
> * * *
>
> ***We are required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which requires our management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting.***

172. The foregoing statements were materially false and misleading when made. It was misleading for Defendants ProPetro, Redman, Smith and Denholm to state that "[w]e are required to comply with certain provisions of Section 404 of [SOX]," which "requires that we document and test our internal control over financial reporting" when, in reality, ProPetro was not in compliance with Section 404 of SOX at the time this statement was made because ProPetro's internal controls were already deficient and Defendants, rather than effectively "document and test" ProPetro's internal controls, took advantage of their deficiencies by carrying out improper transactions, including transactions from which Redman, Smith, and Denholm personally benefitted. It was further misleading for Defendants to state that any failure to comply with the requirements of Section 404 of SOX could cause investors to lose confidence in ProPetro's reported financial information and that a material weakness in the effectiveness of ProPetro's internal controls could result in an increased chance of fraud when, as alleged above, the Company's internal controls were already suffering from material weaknesses at the time this statement was made, and Defendants took advantage of those material weaknesses. As Defendants have admitted, the amounts improperly reimbursed to Defendants Redman and Smith as business expenses are only those which occurred ***since*** the Company's Initial Public Offering in 2017 and which the Company was required to disclose. Had ProPetro's controls been sufficient, these reimbursements would not have occurred, and any improper transactions would have been disclosed to investors. By omitting this crucial fact, this risk factor led investors to believe that there were ProPetro's controls were not, in fact, suffering from any material weaknesses. The statements in ¶171 were additionally materially false and misleading for failing to disclose Denholm's employment at PBEX, which, among other things, contributed to or exacerbated the material weaknesses in ProPetro's disclosure and internal controls.

173. It was misleading for the Executive Defendants to state as quoted in ¶171 that ProPetro is "required to comply with the SEC's rules implementing Section 302 of [SOX]" when, in reality, ProPetro was not in compliance with Section 302 of SOX at the time this statement was made. Indeed, at the time this statement was made, ProPetro's disclosure controls and procedures were inadequate to detect and ensure disclosure of Defendants Redman, Smith, and Denholm's improper transactions.

174. The 2018 Secondary Offering Documents, signed by Defendants Redman, Smith, and Denholm, incorporated by reference ProPetro's 2017 Form 10-K, April 2018 Proxy, and First Quarter 2018 Form 10-Q (defined below). Accordingly, the 2018 Secondary Offering Documents incorporated (and thereby made anew) all the materially false and misleading statements and omissions concerning ProPetro's internal and disclosure controls as specified in ¶¶181-83, 189, 194-96, 199, and 201, below. These statements are materially false and misleading for the reasons set forth in ¶¶184, 186, 197-98, 200, and 202, below.

**b. Statements Concerning Related-Party Transactions**

175. As alleged above, the IPO Offering Documents also misled investors by making materially false and misleading statements concerning ProPetro's related-party transactions. Specifically, the IPO Offering Documents contained a section entitled "Related-Party Transactions," which purported to list all related-party transactions to which the Company was then a party, but failed to include any transactions that would later be disclosed by the Company in the fall of 2019 involving Defendants Redman, Smith, and Denholm.

176. The IPO Offering Documents also contained a section entitled "Procedures for Review, Approval and Ratification of Related Person Transactions." That section provided:

> Our board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee ***will review on at least a quarterly basis all***

> ***transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions.*** In connection with this offering, we will establish an audit committee ***consisting solely of independent directors*** whose functions will be set forth in the audit committee charter. We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest. . .
>
> The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for comparable services; (vi) whether it is a single transaction or a series of ongoing, related transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

177. Defendants ProPetro, Redman, Smith, and Denholm made substantially similar statements to those in ¶¶175-76 concerning related-party transactions in the 2017 Secondary Offering Documents.

178. The foregoing statements quoted or referenced in ¶¶175-76 were materially false and misleading when made. First, these statements create the misleading impression that Defendants consistently followed a detailed protocol for reviewing and approving related-party transactions, when in reality, Defendants' procedures were ineffective and inconsistently or not followed, and resulted in the improper reimbursement of personal expenses and the consummation and non-disclosure of material related-party transactions as alleged herein. Had ProPetro had adequate processes and procedures in place for reviewing and detecting related-party transactions, such reimbursements would not have occurred. Second, these statements fail to disclose any part

of the improper $370,000 transactions that Redman and Smith engaged in for their personal benefit, do not mention Denholm's connection to Clarabby Development, LLC, Dahlia Development LLC, and Conquistador Capital LLC, fail to disclose ProPetro's business dealings and relationships with these entities that are owned and controlled by Denholm, and fail to disclose Denholm's employment at PBEX. Defendants' failure to disclose these transactions violated Item 404 of Regulation S-K. Moreover, Defendants have admitted that the amounts improperly paid to Defendants Redman and Smith as business expenses are only those which occurred since the Company's Initial Public Offering in 2017 and which ProPetro was required to disclose as a public company.

179. Defendants' statement in ¶176 that ProPetro's audit committee would consist "solely of independent directors" was also materially false and misleading when made. At the time this statement was made and as alleged above, Alan Douglas was a member of the ProPetro Board of Directors and the Audit Committee of the Board. Alan Douglas was also the signatory to a number of undisclosed related third-party entities, a longtime friend of Defendant Redman's, and Redman's personal accountant. The NYSE Listed Company Manual provides that in determining whether a director is truly "independent," "the concern is independence from management[.]" Given Douglas' personal history and friendship with Redman as alleged above, Douglas cannot be considered "independent" for purposes of this standard.

180. The 2018 Secondary Offering Documents, signed by Redman, Smith, and Denholm incorporated by reference ProPetro's 2017 Form 10-K, April 2018 Proxy, and First Quarter 2018 Form 10-Q (defined below). Accordingly, the 2018 Secondary Offering Documents incorporated (and thereby made anew) all of the materially false and misleading statements and omissions concerning ProPetro's related-party transactions as specified in ¶¶190-91, 203, 205, 208, and 210-

11, below. These statements are materially false and misleading for the reasons set forth in ¶¶192, 204, 209, and 212, below.

### 2. Materially False and Misleading Statements and Omissions Contained in ProPetro's Forms 10-Q

#### a. Statements Concerning Internal and Disclosure Controls

181. On May 12, 2017, ProPetro filed with the SEC its Form 10-Q for the quarter ended March 31, 2017, which was signed by Defendants Redman and Smith (the "First Quarter 2017 Form 10-Q"). With respect to ProPetro's disclosure controls and procedures, the First Quarter 2017 Form 10-Q, Item 4, represented that ProPetro

> ***maintain[s] disclosure controls and procedures that are designed to provide reasonable assurance*** that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

Defendants Redman and Smith further represented in the First Quarter 2017 Form 10-Q that

> ***we have evaluated, under the supervision and with the participation of our management, including our principal executive officer [Redman] and principal financial officer [Smith], the effectiveness of the design and operation of our disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, ***our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2017***.

With respect to ProPetro's internal controls over financial reporting, Defendants Redman and Smith represented:

> ***No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

182. In connection with ProPetro's First Quarter 2017 Form 10-Q, Defendants Redman and Smith also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") as to the effectiveness and adequacy of ProPetro's disclosure controls. Specifically, Redman and Smith certified that ProPetro's disclosure controls and procedures, including those cited in the foregoing paragraph, were effective. Redman and Smith also certified that they were each ***personally "responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant" and that they

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> disclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

183. These Certifications also provided that Redman and Smith had disclosed to ProPetro's auditors and Audit Committee "[a]ll ***significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and "***[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's control over financial reporting.***"

184. The preceding statements in ¶¶181-83 regarding ProPetro's internal controls and disclosure controls and procedures, as well as Defendant Redman's and Defendant Smith's SOX

Certifications as to the effectiveness of ProPetro's internal and disclosure controls, were materially false and misleading when made. It was misleading for Defendants Redman and Smith to state that ProPetro's "disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2017" when, in reality, ProPetro's disclosure controls and procedures were inadequate. As Defendants have now admitted, ProPetro's internal and disclosure controls were deficient, rising to the level of material weakness, and resulting in ProPetro's disclosure controls and procedures not being effective. As a result of these deficient controls, Defendants Smith and Redman improperly charged a total of $370,000 of personal expenses to the Company, and the Company failed to disclose related-party transactions involving Defendant Denholm valued at approximately $3.6 million. Additionally, as Defendants themselves have admitted, the amounts improperly reimbursed to Defendants Redman and Smith as business expenses are those known to have occurred and which the Company was required to disclose ***since*** the Company's Initial Public Offering in 2017. Had ProPetro had adequate controls in place for reviewing and detecting related-party transactions, such reimbursements would not have occurred. In response to the deficiencies uncovered by the Audit Committee Investigation, Defendants claimed that they implemented a "Remediation and Improvement Plan . . . to address the internal and disclosure control deficiencies" identified.

185. Defendants made substantially similar statements to those in ¶¶181-83 concerning ProPetro's internal controls and disclosure controls and procedures in the following subsequent SEC filings:

- ProPetro's Form 10-Q for the quarter ended June 30, 2017, filed with the SEC on August 10, 2017 and signed by Redman and Smith ("Second Quarter 2017 Form 10-Q");

- ProPetro's Form 10-Q for the quarter ended September 30, 2017, filed with the SEC on November 2, 2017 and signed by Redman, Smith, and Denholm ("Third Quarter 2017 Form 10-Q");
- ProPetro's Form 10-Q for the quarter ended March 31, 2018, filed with the SEC on May 9, 2018 and signed by Redman, Smith, and Denholm ("First Quarter 2018 Form 10-Q");
- ProPetro's Form 10-Q for the quarter ended June 30, 2018, filed with the SEC on August 9, 2018 and signed by Redman, Smith, and Denholm ("Second Quarter 2018 Form 10-Q");
- ProPetro's Form 10-Q for the quarter ended September 30, 2018, filed with the SEC on November 8, 2018 and signed by Redman, Smith, and Denholm ("Third Quarter 2018 Form 10-Q"); and
- ProPetro's Form 10-Q for the quarter ended March 31, 2019, filed with the SEC on May 8, 2019 and signed by Redman, Smith, and Denholm ("First Quarter 2019 Form 10-Q").

186. The statements in each of the Forms 10-Q identified in ¶185 above were materially false and misleading, and omitted materials facts, for the same reasons as set forth above in ¶184. Those statements signed by Defendant Denholm were additionally materially false and misleading for failing to disclose his personal role in related-party transactions that violated the Company's policies, and his employment at PBEX, which, among other things, contributed to or exacerbated the material weaknesses in ProPetro's disclosure and internal controls. Defendants' failure to disclose these transactions violated Item 404 of Regulation S-K.

187. The statements made in ProPetro's First Quarter 2019 Form 10-Q concerning the Company's internal and disclosure controls and procedures were additionally false and misleading because Defendants have admitted to at least one material weakness in ProPetro's internal controls existing as of December 31, 2018 that resulted in ProPetro's internal control over financial reporting and disclosure controls and procedures not being effective. Specifically, the Audit Committee concluded based on the Investigation that its "determinations affect the conclusions regarding effectiveness previously expressed by the Company's management in . . . the Company's

Annual Report on Form 10-K for the year ended December 31, 2018 . . . and . . . in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019[.]"

188. Additionally, ProPetro's First Quarter 2017 Form 10-Q, Second Quarter 2017 Form 10-Q, and Third Quarter 2017 Form 10-Q stated that "[t]here have been no material changes to our principal risks that we believe are material to our business, results of operations, and financial condition from the risk factors previously disclosed in our final prospectus dated March 16, 2017 and filed with the SEC pursuant to Rule 424(b)(4), as amended, on March 20, 2017," thereby incorporating the risk factor quoted at ¶169, above, concerning the Company's compliance with Section 404 of SOX. These statements are materially false and misleading for the reasons set forth in ¶170, above.

189. ProPetro's First Quarter 2019 Form 10-Q stated that "[t]here have been no material changes to our principal risks that we believe are material to our business, results of operations, and financial condition from the risk actors previously disclosed in our Form 10-K," thereby incorporating the risk factor quoted at ¶201, below, concerning the Company's compliance with Section 404 of SOX. These statements are materially false and misleading for the reasons set forth in ¶202.

**b. Statements Concerning Related-Party Transactions**

190. ProPetro's First Quarter 2017 Form 10-Q also contained a section entitled "Related-Party Transactions," which made certain representations about the transactions that the Company was then a party to, but failed to include any of the transactions that would later be disclosed by the Company in the fall of 2019 involving Redman, Smith, and Denholm. ProPetro also provided in its First Quarter 2017 Form 10-Q that "[a]ll related party transactions are immaterial and have not been separately shown on the face of the financial statements."

191. Defendants made substantially similar statements to those in ¶190 concerning their related party transactions in ProPetro's Second Quarter 2017 Form 10-Q, Third Quarter 2017 Form 10-Q, First Quarter 2018 Form 10-Q, Second Quarter 2018 Form 10-Q, Third Quarter 2018 Form 10-Q, and First Quarter 2019 Form 10-Q.

192. The foregoing statements quoted or referenced in ¶¶190-91 were materially false and misleading when made. These statements fail to disclose any part of the improper $370,000 transactions that Redman and Smith engaged in for their personal benefit, do not mention Denholm's connection to Clarabby Development, LLC, Dahlia Development LLC, and Conquistador Capital LLC, fail to disclose ProPetro's business dealings and relationships with these entities that are owned and controlled by Denholm, and fail to disclose Denholm's employment at PBEX. Defendants' failure to disclose these related-party transactions violated Item 404 of Regulation S-K. Defendants' statement that "all related party transactions are immaterial and have not been separately shown on the face of the financial statements" creates the misleading impression that the Executive Defendants were not engaging in improper transactions, and that ProPetro's controls were sufficient to capture and account for any such transactions (including the Clarabby Transactions).

### 3. Materially False and Misleading Statements and Omissions Contained in ProPetro's Forms 10-K

#### a. Statements Concerning Internal and Disclosure Controls

193. On March 27, 2018, ProPetro filed with the SEC its Form 10-K for the year ended December 31, 2017, which was signed by Defendants Redman, Smith, and Denholm (the "2017 Form 10-K"). On March 1, 2019, ProPetro filed with the SEC its Form 10-K for the year ended December 31, 2018, which was signed by Defendants Redman, Smith, and Denholm (the "2018 Form 10-K").

194. With respect to ProPetro's disclosure controls and procedures, ProPetro's 2017 Form 10-K and 2018 Form 10-K represented that ProPetro

> maintain[s] disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

Defendants further represented in ProPetro's 2017 Form 10-K and 2018 Form 10-K that they

> evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2017.***

With respect to ProPetro's internal controls over financial reporting, Defendants represented in ProPetro's 2017 Form 10-K:

> ***We are required to comply with the SEC's rules implementing Section 302 of [SOX], which requires our management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting.***
>
> ***No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

195. In connection with ProPetro's 2017 and 2018 Forms 10-K, Defendants Redman and Smith signed SOX Certifications as to the effectiveness and adequacy of ProPetro's internal and disclosure controls and procedures. Redman and Smith certified that ProPetro's internal and disclosure controls and procedures, including those cited in the foregoing paragraph, were

effective. Specifically, Redman and Smith certified that they were ***personally "responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant" and that they

> designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]
>
> evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> disclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

196. Defendants Redman's and Smith's SOX Certifications also provided that Redman and Smith had disclosed "***[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and "***[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***"

197. The preceding statements in ¶¶193-96 in ProPetro's 2017 and 2018 Forms 10-K regarding ProPetro's internal and disclosure controls and procedures, as well as Defendant Redman's and Defendant Smith's SOX Certifications as to the effectiveness of ProPetro's internal and disclosure controls, were materially false and misleading when made. It was misleading for Defendants to state that ProPetro's "disclosure controls and procedures were effective at the reasonable assurance level as of December 31" and that "no changes in our system of internal control over financial reporting . . . occurred . . . that have materially affected, or are reasonably

likely to materially affect, our internal control over financial reporting" when, in reality, ProPetro's disclosure controls and procedures were inadequate. As Defendants have now admitted, ProPetro's internal and disclosure controls were deficient, rising to the level of material weakness, and resulting in ProPetro's disclosure controls and procedures not being effective. As a result of these deficient controls, Defendants Smith and Redman improperly charged a total of $370,000 of personal expenses as Company expenses, and the Company failed to disclose related-party transactions involving Defendant Denholm valued at approximately $3.6 million. Had ProPetro had adequate controls in place for reviewing and detecting related-party transactions, such transactions would not have occurred. In response to the deficiencies uncovered by the Audit Committee Investigation, Defendants claimed that they implemented a "Remediation and Improvement Plan . . . to address the internal and disclosure control deficiencies" identified.

198. The statements made in ProPetro's 2018 Form 10-K concerning the Company's internal and disclosure controls and procedures were additionally false and misleading because Defendants have admitted to at least one material weakness in ProPetro's internal controls existing as of December 31, 2018 that resulted in ProPetro's internal control over financial reporting and disclosure controls and procedures not being effective. The Company concluded based on the Investigation that "[t]hese determinations affect the conclusions regarding effectiveness previously expressed by the Company's management in . . . the Company's Annual Report on Form 10-K for the year ended December 31, 2018 . . . and . . . in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019," and that, as such, "investors should no longer rely on managements report on internal control over financial reporting . . . included in the 2018 Annual Report."

199. ProPetro's 2018 Form 10-K contained SOX Certifications as to the effectiveness of ProPetro's internal controls:

> ***The management of ProPetro Holding Corp. is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. ProPetro Holding Corp. maintains a system of internal accounting controls designed to provide reasonable assurance, at a reasonable cost, that assets are safeguarded against loss or unauthorized use and that the financial records are adequate and can be relied upon to produce financial statements in accordance with accounting principles generally accepted in the United States of America***. The internal control system is augmented by written policies and procedures, an internal audit program and the selection and training of qualified personnel. ***This system includes policies that require adherence to ethical business standards and compliance with all applicable laws and regulations***. . . .
>
> Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of the design and operations of our internal control over financial reporting as of December 31, 2018 based on criteria established in the 2013 Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on this evaluation, management's assessment is that ProPetro Holding Corp. maintained effective internal control over financial reporting as of December 31, 2018***.

200. The foregoing statement was materially false and misleading when made. It was misleading for Defendants to state that ProPetro's "maintains a system of internal accounting controls designed to provide reasonable assurance . . . that the financial records are adequate and can be relied upon to produce financial statements in accordance with accounting principles generally accepted in the United States of America" and that ProPetro "maintained effective internal control over financial reporting as of December 31, 2018" when, in reality, ProPetro's internal controls were inadequate at the time this statement was made. As Defendants have now admitted, ProPetro's internal controls were deficient, rising to the level of material weakness as of December 31, 2018. As a result of these deficient controls, Defendants Smith and Redman improperly charged a total of $370,000 of personal expenses as Company expenses, and the Company failed to disclose at least one related-party transaction involving Defendant Denholm

valued at approximately $3.6 million. Had ProPetro had adequate controls in place for reviewing and detecting related-party transactions, such transactions would not have occurred. In response to the deficiencies uncovered by the Audit Committee Investigation, Defendants claimed that they implemented a "Remediation and Improvement Plan . . . to address the internal and disclosure control deficiencies" identified.

201. ProPetro's 2018 Form 10-K described certain purported risk factors regarding the Company's compliance with SOX and the adequacy of its internal controls over financial reporting:

> ***We are subject to certain requirements of Section 404 of the Sarbanes-Oxley Act. If we fail to comply with the requirements of Section 404 or if we or our auditors identify and report material weaknesses in internal control over financial reporting, our investors may lose confidence in our reported information and our stock price may be negatively affected.***
>
> ***We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404. Section 404 requires that we document and test our internal control over financial reporting and issue our management's assessment of our internal control over financial reporting*** . . . .
>
> If we fail to comply with the requirements of Section 404, or if we or our auditors identify and report material weaknesses in our internal control over financial reporting, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. ***In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, financial condition, prospects, results of operations and cash flows***.

202. The foregoing statement was materially false and misleading when made. ProPetro has since admitted that as of this reporting date its internal controls were inadequate and suffered from material weaknesses. Thus, it was misleading to state that "[w]e are required to comply with certain provisions of Section 404 of [SOX]," which "requires that we document and test our

internal control over financial reporting" when, in reality, ProPetro was not in compliance with Section 404 of SOX at the time this statement was made because ProPetro's internal controls were already deficient and Defendants, rather than effectively "document and test" ProPetro's internal controls, took advantage of their deficiencies by carrying out improper transactions, including transactions from which Redman, Smith, and Denholm personally benefitted. It was further misleading to state that any failure to comply with the requirements of Section 404 of SOX could cause investors to lose confidence in ProPetro's reported financial information and that a material weakness in the effectiveness of ProPetro's internal controls could result in an increased chance of fraud when, as alleged above, the Company's internal controls were already suffering from a material weakness at the time this statement was made. By omitting this crucial fact, this risk factor led investors to believe that there were ProPetro's controls were not, in fact, suffering from any material weaknesses.

**b. Statements Concerning Related-Party Transactions**

203. ProPetro's 2017 Form 10-K and 2018 Form 10-K also contained a section entitled "Related-Party Transactions," which made certain representations about the transactions to which the Company was then a party, but did not include any of the transactions that would later be disclosed by the Company in the fall of 2019 involving Redman, Smith, and Denholm. ProPetro's 2017 and 2018 Form 10-Ks further provided that "[a]ll related party receivables and payables are immaterial and have not been separately shown on the face of the financial statements."

204. These statements were materially false and misleading when made. These statements fail to disclose any part of the improper $370,000 transactions that Redman and Smith engaged in for their personal benefit, do not mention Denholm's connection to Clarabby Development, LLC, Dahlia Development LLC, and Conquistador Capital LLC, fail to disclose ProPetro's business dealings and relationships with these entities that are owned or controlled by

Denholm, and fail to disclose Denholm's employment at PBEX. Defendants' failure to disclose these transactions violated Item 404 of Regulation S-K. Defendants' statement that "all related party receivables and payables are immaterial and have not been separately shown on the face of the financial statements" creates the misleading impression that Defendants were not engaging in improper transactions, and that ProPetro's controls were sufficient to capture and account for any such transactions.

205. Additionally, the 2017 Form 10-K and 2018 Form 10-K incorporated by reference "information . . . concerning certain relationships and related person transactions and director independence" from the April 2018 Proxy and April 2019 Proxy (defined below), respectively. Accordingly, the 2017 and 2018 Forms 10-K incorporated (and thereby made anew) the materially false and misleading statements and omissions concerning ProPetro's related party transactions as specified in ¶¶208, 210-11, below. These statements are materially false and misleading for the reasons set forth in ¶¶209, 212.

**4. Materially False and Misleading Statements and Omissions Contained in ProPetro's August 16, 2017 Form 8-K**

206. On August 22, 2017, ProPetro filed with the SEC a Form 8-K, signed by Howell, announcing Defendant Denholm's promotion to Chief Accounting Officer (the "August 2017 Form 8-K"). In the August 2017 Form 8-K, ProPetro stated that "[t]here are no family relationships between Mr. Denholm and any director or executive officer of the Company, and ***Mr. Denholm has no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.***"

207. The above statement was materially false and misleading when made. Contrary to ProPetro's representation that "Mr. Denholm has no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K," as the Company

has now admitted, Defendant Denholm was a party to undisclosed related-party transactions valued at approximately $3.6 million during the Class Period involving entities owned and controlled by Denholm, of which Defendants' failure to disclose was in direct violation of Item 404 of Regulation S-K.

### 5. Materially False and Misleading Statements and Omissions Contained in ProPetro's Proxy Statements

208. On April 26, 2018, ProPetro filed a proxy statement on Schedule 14A with the SEC, signed by Howell (the "April 2018 Proxy"). In the April 2018 Proxy, ProPetro assured investors that its "Audit Committee is ***comprised solely of 'independent' directors***, as defined under and required by Rule 10A-3 of the Securities Exchange Act of 1934[.]"

209. The foregoing statement was materially false and misleading when made. It was misleading for ProPetro to state that its Audit Committee was "comprised solely of 'independent directors'" when, at the time this statement was made and as alleged above, Alan Douglas was a member of the ProPetro Board of Directors and its Audit Committee. Alan Douglas was also the signatory on the corporate documents for a number of undisclosed related third-party entities, a longtime friend of Defendant Redman's, and Redman's personal accountant. The NYSE Listed Company Manual provides that in determining whether a director is truly "independent," "the concern is independence from management[.]" Given Douglas' personal history and friendship with Redman as alleged above, Douglas cannot be considered "independent."

210. Also in the April 2018 Proxy, ProPetro listed a number of "Related Party Transactions" detailing the related party transactions that the Company was then a party, but failed to include any of the transactions that would later be disclosed by the Company in the fall of 2019 involving Redman, Smith, and Denholm.

211. The April 2018 Proxy also included "policies and procedures for related party transactions." These procedures provided:

> Any request for us to enter into a transaction with an executive officer, director, principal stockholder or any of such persons' immediate family members or affiliates, among others, in which the amount involved exceeds $120,000, ***must first be presented to our audit committee for review, consideration and approval. All of our directors and executive officers are required to report to the audit committee chair any such related person transaction.*** In approving or rejecting the proposed agreement, our audit committee shall consider the facts and circumstances available and deemed relevant to the audit committee, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party, the extent of the related party's interest in the transaction and the conflicts of interest and corporate opportunity provisions of our certificate of incorporation. If we should discover related person transactions that have not been approved, the audit committee will be notified and will determine the appropriate action, including ratification, revision or termination of such transaction.

212. The foregoing statements in ¶¶210-11 were materially false and misleading when made. First, these statements fail to disclose any part of the improper $370,000 transactions that Redman and Smith engaged in for their personal benefit, do not mention Denholm's connection to Clarabby Development, LLC, Dahlia Development LLC, and Conquistador Capital LLC, fail to disclose ProPetro's business dealings and relationships with these entities that are owned and controlled by Denholm, and fail to disclose Denholm's employment at PBEX. Defendants' failure to disclose these transactions violated Item 404 of Regulation S-K. Second, these statements create the misleading impression that Defendants consistently followed a detailed protocol for reviewing and approving related-party transactions, when in reality, Defendants' procedures were ineffective and inconsistently followed, and resulted in the improper reimbursement of personal expenses and the consummation and non-disclosure of material related-party transactions as alleged herein. Had ProPetro had adequate processes and procedures in place for reviewing and detecting related-party transactions, such reimbursements would not have occurred.

213. ProPetro made substantively identical statements to those in ¶¶208, 210-11 in ProPetro's proxy statement filed on Form 14A with the SEC on April 23, 2019 and signed by Howell ("2019 Proxy"). Those statements were materially false and misleading when made for the reasons set forth in ¶¶209, 212, above.

**D. Loss Causation**

214. The market price of ProPetro's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein.

215. Defendants' misstatements and omissions detailed herein artificially inflated the price of ProPetro's stock. The artificial inflation in ProPetro's stock price was removed when the true facts, conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on August 8, 2019, August 30, 2019, October 18, 2019, and October 31, 2019, which revealed the nature and extent of Defendants' related-party transactions and the issues with ProPetro's internal and disclosure controls. These disclosures, more particularly described below, reduced the amount of artificial inflation in the price of ProPetro's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

216. On August 8, 2019, after the close of trading on the NYSE, ProPetro announced a previously undisclosed audit committee investigation into certain improper expense reimbursements and related-party transactions involving certain of the Executive Defendants. This disclosure caused ProPetro stock to immediately fall by 26% in trading on August 9, 2019, dropping from a closing price of $17.34 per share on August 8, 2019, to a closing price of $12.75 per share on August 9, 2019, on extremely heavy trading volume of 9.7 million shares.

217. ProPetro's August 8, 2019 disclosure partially corrected Defendants' prior materially misleading statements and omissions. This disclosure partially revealed that

Defendants' statements concerning related-party transactions and the effectiveness of ProPetro's internal controls were materially false and misleading. Notwithstanding that partially corrective information, Defendants' false statements and omissions continued to operate as a fraud on the market because the August 8, 2019 disclosure failed to disclose the extent to which ProPetro's internal and disclosure controls were deficient, and to the extent which Defendants themselves, including Denholm, were complicit in enabling—and benefitting from—those deficiencies.

218. After market close on Friday, August 30, 2019, ProPetro disclosed that its general counsel, Mark Howell, was resigning. This disclosure caused ProPetro stock to fall 9.2%, dropping from the $10.65 per share close on August 30, 2019, to a closing price of $9.67 per share on Tuesday, September 3, 2019 (the next trading after August 30, 2019), on elevated trading volume of over 2 million shares.

219. ProPetro's August 30, 2019 disclosure partially corrected Defendants' prior materially misleading statements and omissions. This disclosure revealed to investors that ProPetro's internal controls were inadequate, that its senior executives, including Howell and the Executive Defendants, had not created proper and adequate internal controls, contrary to their representations, and that ProPetro was not in compliance with applicable laws and regulations. Notwithstanding that partially corrective information, these disclosures did not reveal the full truth to investors.

220. On October 18, 2019, the market learned that the SEC had commenced an investigation into ProPetro concerning its internal controls and financial disclosures. This disclosure caused ProPetro stock to fall 8.1%, dropping from $8.61 per share on October 17, 2019 to a closing price of $7.91 per share on October 18, 2019, on heavy trading volume of 5.9 million shares.

221. ProPetro's October 18, 2019 disclosure partially corrected Defendants' prior materially misleading statements and omissions. This disclosure partially revealed the extent and gravity of the deficiencies in ProPetro's internal and disclosure controls. Notwithstanding that partially corrective information, these disclosures did not reveal the full truth to investors.

222. On October 31, 2019, Culper Research published an analyst report revealing that the related-party and internal control issues at ProPetro were, in reality, significantly worse than the Company claimed because ProPetro executives, including Defendant Denholm, were involved with a number of other undisclosed related parties. This disclosure caused ProPetro stock to fall 9.4%, dropping from $8.55 per share on October 30, 2019 to a closing price of $7.75 per share on October 31, 2019, on elevated trading volume of 4.3 million shares.

**E. The Presumption of Reliance**

223. Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) ProPetro's common stock was actively traded in an efficient market on the New York Stock Exchange;

(b) ProPetro's common stock traded at high weekly volumes;

(c) As a regulated issuer, ProPetro filed periodic public reports with the SEC;

(d) ProPetro was eligible to file, and did file, registration statements with the SEC on Form S-3;

(e) ProPetro regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through

other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f) The market reacted promptly to public information disseminated by ProPetro;

(g) ProPetro securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(h) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of ProPetro securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired ProPetro common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

224. Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for ProPetro's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

225. Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

### F. Causes of Action Brought Pursuant to the Exchange Act

**COUNT I**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**(Against Defendant ProPetro and the Executive Defendants)**

226. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

227. During the Class Period, ProPetro and the Executive Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding ProPetro's business, operations, management and the intrinsic value of ProPetro securities; (ii) enabled Defendants to artificially inflate the price of ProPetro securities; and (iii) caused Plaintiffs and other members of the Class to purchase ProPetro securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually took the actions set forth herein.

228. The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for ProPetro securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Executive Defendants are also sued as controlling persons as alleged below.

229. These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in

a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations and financial results of ProPetro as specified herein.

230. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ProPetro's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ProPetro securities during the Class Period.

231. These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section IV.C.:

(a) Defendant ProPetro: Defendant ProPetro is liable for the false and misleading statements and omissions made by any Defendant, which are set forth above in Section IV.C.;

(b) Defendant Redman: Defendant Redman is liable for the false and misleading statements and omissions made in IV.C.(1), (2), (3);

(c) Defendant Smith: Defendant Smith is liable for the false and misleading statements and omissions made in IV.C.(1), (2), (3); and

(d) Defendant Denholm: Defendant Denholm is liable for the false and misleading statements and omissions made in IV.C.(1), (2), (3), except for those in ¶¶169, 175, 182-83.

232. Defendants Redman, Smith, and Denholm, as the most senior officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Company, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by ProPetro. Defendants Redman, Smith, and Denholm had direct

involvement in the daily business of the Company and participated in the preparation and dissemination of ProPetro's materially false and misleading statements set forth above.

233. The allegations in this Complaint establish a strong inference that Defendants ProPetro, Redman, Smith, and Denholm acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them.

234. Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for ProPetro common stock, which inflation was removed from the stock when the true facts became known. Plaintiffs and the other members of the Class would not have purchased ProPetro common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

235. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of ProPetro securities during the Class Period.

## COUNT II
## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
## (Against the Executive Defendants)

237. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

238. Defendants Redman, Smith, and Denholm acted as controlling persons of ProPetro within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

239. By reason of their high-level positions of control and authority as the Company's most senior officers and as its Directors the Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by ProPetro during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

240. In their capacities as ProPetro's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Redman, Smith, and Denholm signed ProPetro's SEC filings and Sarbanes-Oxley

certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by ProPetro during the Class Period.

241. Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Redman, Smith, and Denholm each acted with scienter, as set forth more fully in Section IV.B.

242. By virtue of their positions as controlling persons of ProPetro and as a result of their own aforementioned conduct, Defendants Redman, Smith, and Denholm, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## V. SECURITIES ACT CLAIMS

243. In this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶281 below). These Securities Act claims are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims.

244. On March 16, 2017, ProPetro announced that it intended to conduct the Initial Public Offering of 25 million shares of common stock to raise funds to pay debt and for general corporate purposes, among other things. The Initial Public Offering was conducted pursuant to the IPO Registration Statement, the IPO Registration Statement Amendments, and the IPO Prospectus (i.e., the IPO Offering Documents). ProPetro completed the Initial Public Offering on March 22, 2017, and the underwriters later partially exercised their option to purchase additional shares from the selling stockholder, which were offered to the public as part of the IPO.

245. The IPO Offering Documents made material misstatements and omissions concerning ProPetro's related-party transactions, internal controls, and disclosure controls and procedures, as specified below.

**A. Securities Act Defendants**

246. Each of the following Defendants is statutorily liable under Section 11 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated (and thereby made anew) in the IPO Offering Documents.

247. Defendants Redman and Smith (described above at ¶¶30-31) were each officers of ProPetro and signed the IPO Registration Statement. Defendant Redman was also a member of the ProPetro board since 2005, including at the time of the filing of the IPO Offering Documents.

248. Defendant ProPetro Holding Corp. ("ProPetro" or "the Company") is a corporation headquartered in Midland, Texas. ProPetro provides hydraulic fracturing and complementary services through its "pressure pumping" division to upstream oil and gas companies engaged in the exploration and production of North American unconventional oil and natural gas resources. In March 2017, the Company conducted the Initial Public Offering.

249. Defendants ProPetro, Redman, and Smith are, for the purposed of Plaintiffs' Securities Act Claims, hereinafter referred to as the "Securities Act Defendants."

**B. The IPO Offering Documents Contained Material Untrue Statements and Omitted to Disclose Material Facts**

250. In the IPO Offering Documents, the Securities Act Defendants made material misstatements and omitted to disclose material facts about ProPetro's engagement in and ability to report related-party transactions, and concerning the Company's internal controls and disclosure controls and procedures, representing that ProPetro had effective internal controls for financial reporting such that it properly and timely identified, resolved, and accounted for financial risks to

the Company. ProPetro has now admitted through a series of disclosures, among other things, that (a) the Company's internal and control disclosure controls suffered from "material weaknesses," rendering them "ineffective"; (b) that Defendants Redman and Smith engaged in material related-party transactions from which they received payments from ProPetro for "personal" expenses, in violation of the Company's policies regarding related-party transactions, and which the Defendants failed to disclose; and (c) that the Company had allowed its CAO, Denholm, who was personally responsible for the Company's disclosures, to engage in millions in related-party transactions, that violated ProPetro's policies and led to his resignation.

251. Specifically, on August 8, 2019, ProPetro filed a Form 8-K with the SEC disclosing that an investigation by Company's Audit Committee revealed related party transactions, potential conflicts of interest, and expense reimbursements to certain Company executives:

> The Audit Committee (the Committee) of the Company's board of directors (the Board), with assistance of independent outside counsel and accounting advisors, is in the process of conducting an internal review which initially focused on the Company's disclosure of agreements previously entered into by the Company with AFGlobal Corporation (AFGlobal) for the purchase of Durastim hydraulic fracturing fleets and effective communications related thereto. The review was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest. Substantial work related to the review has been completed to date, and the Committee expects to complete its review within the next 30 days. The Company is also in the process of implementing improvements to address certain findings identified to date in the review.

252. ProPetro further disclosed that in connection with the Investigation, in reviewing the Company's internal controls, the Audit Committee discovered a number of improper transactions involving Redman and Smith, dating back to at least the IPO, and suggesting there may have been additional such transactions prior to that date (which the Company, then privately-held, was not obligated to publicly disclose). The Audit Committee

> identified, due to inadequate documentation associated with the Company's expense reimbursement practices, certain expenses reimbursed to members of

> senior management, including the chief executive officer and chief financial officer, that were incorrectly recorded as expenses of the Company and appropriately allocable to the officers individually. Each of these officers has reimbursed the Company in full for the identified amounts. The reimbursed amounts totaled approximately $370,000 since the Company's initial public offering in 2017. Of the total amounts, approximately $346,000 were attributable to the chief executive officer and approximately $18,000 were attributable to the chief financial officer.

253. Then, after an August 30 disclosure announcing the resignation of ProPetro's General Counsel, on October 9, 2019, ProPetro filed a Form 8-K with the SEC announcing that it had substantially completed its factfinding for the Audit Committee Investigation, but that it was "continuing to review one or more related party transactions [that] involve real estate transactions and do not involve any of the Company's current or former customers or vendors." The Form 8-K further confirmed what had been previously disclosed in the August 8, 2019 disclosures, that the Investigation "***identified a number of internal control deficiencies. As a result of these deficiencies, the Company's management is likely to conclude that there were one or more material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date.***"

254. Finally, on November 13, 2019, ProPetro filed a Form 8-K disclosing that its audit committee had identified "one related party transaction that was not previously disclosed." The Form 8-K disclosed that the transaction involved ProPetro's former Chief Accounting Officer ("CAO"), Defendant Denholm. Specifically, according to the Form 8-K, during 2018

> (i) an entity (Entity A) that is 50% owned by the Company's former Chief Accounting Officer (the "Former CAO") and 50% by the former CAO's business partner, who is not affiliated with the company, loaned approximately $770,000, and (ii) another entity (Entity B) that is owned 100% by the Former CAO loaned approximately $57,000 to another entity that is owned 100 percent by the former CAO's business partner (Entity C).

255. The 8-K also stated that "[t]he loaned funds were used by Entity C during 2018 to pay for a portion of the acquisition, development, and construction costs associated with an iron

testing facility and a portion of the acquisition and development costs associated with a maintenance facility that were sold or leased to the Company." According to the Company, "[t]he approximately $827,000 of funds loaned by Entity A and Entity B to Entity C were repaid in full by Entity C, without interest."

256. The Form 8-K further disclosed that

> Entity A provided approximately $500,000 to Entity C, which funds the Company understands were used during 2019 to pay for a portion of the development and construction costs associated with the iron testing facility. The Company purchased the iron testing facility from Entity C, reimbursed Entity C for certain development costs associated with the maintenance facility, and leased a property adjacent to the iron testing facility and the maintenance facility from Entity C. In total, the Company has paid approximately $3,600,000 to Entity C, which includes $2,300,000 associated with the iron testing facility[.]

257. The Company also said that the Investigation did identify a number of internal control deficiencies and concluded that there were at least two material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls not being effective as of a prior date. These disclosures made clear that Defendants' statements in the IPO Offering Documents were materially false and misleading, and omitted to disclose material facts.

**1. Materially False and Misleading Statements Concerning Related-Party Transactions**

258. The IPO Offering Documents contained a section entitled "Related-Party Transactions," which purported to list all related-party transactions to which the Company was then a party, but failed to include any transactions that would later be disclosed by the Company in the fall of 2019 involving Defendants Redman, Smith, and Denholm. By omitting these facts about the Company's most senior leadership, the IPO Offering Documents were materially false and misleading at the time they were issued.

259. The IPO Offering Documents also contained a section entitled "Procedures for Review, Approval and Ratification of Related Person Transactions." That section provided:

> ***Our board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee will review on at least a quarterly basis all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions.*** In connection with this offering, we will ***establish an audit committee consisting solely of independent directors*** whose functions will be set forth in the audit committee charter. We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest. We anticipate that such policy will be a written policy included as part the audit committee charter that will be implemented by the audit committee and in the Code of Business Conduct and Ethics that our board of directors will adopt prior to the completion of this offering.
>
> The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for comparable services; (vi) whether it is a single transaction or a series of ongoing, related transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

260. The foregoing statements quoted or referenced in ¶¶258-59 were materially false and misleading when made. First, these statements create the misleading impression that Defendants consistently followed a detailed protocol for reviewing and approving related-party transactions, when in reality, Defendants' procedures were ineffective and inconsistently or not followed, and resulted in the improper reimbursement of personal expenses and the consummation and non-disclosure of material related-party transactions as alleged herein. Had ProPetro had adequate processes and procedures in place for reviewing and detecting related-party transactions,

such reimbursements would not have occurred. Second, these statements fail to disclose any improper transactions that Redman and Smith engaged in for their personal benefit, do not mention Denholm's connection to Clarabby Development, LLC, Dahlia Development LLC, and Conquistador Capital LLC, and fail to disclose ProPetro's business dealings and relationships with these entities that are owned and controlled by Denholm. Defendants' failure to disclose these transactions violated Item 404 of Regulation S-K. Moreover, Defendants have admitted that the amounts improperly paid to Defendants Redman and Smith as business expenses are only those which occurred since the Company's Initial Public Offering in 2017 and which the Company was required to disclose as a public company.

261. Defendants' statement in ¶259 that ProPetro's audit committee would consist "solely of independent directors" was also materially false and misleading when made. At the time this statement was made and as alleged above, Alan Douglas was a member of the ProPetro Board of Directors and the Audit Committee of the Board. Alan Douglas was also the signatory to a number of undisclosed related third-party entities, a longtime friend of Defendant Redman's, and Redman's personal accountant. The NYSE Listed Company Manual provides that in determining whether a director is truly "independent," "the concern is independence from management[.]" Given Douglas' personal history and friendship with Redman as alleged above, Douglas cannot be considered "independent" for purposes of this standard.

**2. Materially False and Misleading Statements Concerning ProPetro's Internal Controls and Disclosure Controls and Procedures**

262. The IPO Offering Documents also misled investors by making materially false and misleading statements about ProPetro's internal controls and disclosure controls and procedures. The IPO Offering Documents contained a risk factor stating that ProPetro was evaluating its controls:

> We are evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission. During the course of our ongoing evaluation and integration of the internal control over financial reporting, we may identify areas requiring improvement, and we may have to design enhanced processes and controls to address issues identified through this review. For example, we anticipate the need to hire additional administrative and accounting personnel to conduct our financial reporting.
>
> We cannot be certain at this time that we will be able to successfully complete the procedures, certification and attestation requirements of Section 404 or that we or our independent registered public accounting firm will not identify material weaknesses in our internal control over financial reporting. If we fail to comply with the requirements of Section 404 or if we or our independent registered public accounting firm identify and report such material weaknesses, the accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

263. The foregoing statement was materially false and misleading when made. It was misleading to state that the Company was aware of its Section 404 obligations, that it would "test [its] internal control over financial reporting," that it was "evaluating [its] existing controls," any failure to comply with the requirements of Section 404 of SOX could cause investors to lose confidence in ProPetro's reported financial information and that a material weakness in the effectiveness of ProPetro's internal controls could result in an increased chance of fraud when, in fact the Company was *already* suffering from material weakness in its internal controls that enabled Defendants Smith and Redman to reimburse themselves for personal expenses with Company funds. Rather than merely explain that it would have to comply with Section 404 and test its internal controls, the Company should have also disclosed to investors that its internal controls were *already* suffering from material weaknesses, which it later admitted. The omission

of this fact, which existed at the time of the IPO, rendered the statements about the need to comply with Section 404 materially misleading. As the Company also stated in the Offering Documents, the condition of ProPetro's internal controls were material to investors, noting that failure to "comply with the requirements of Section 404" could cause investors to lose confidence in [ProPetro's] financial information, which could have a negative effect on the stock price of [its] common stock." Indeed, this is precisely what occurred. But the Company omitted to tell investors that, in fact, those material weaknesses *already existed* at the time of the IPO.

## COUNT III
## VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT IN CONNECTION WITH THE IPO
## (Against the Securities Act Defendants)

264. Plaintiffs repeat and reallege each and every allegation above relating only to the Securities Act claims as if fully set forth herein. Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Initial Public Offering pursuant to the IPO Offering Documents which contained untrue statements and omissions of material fact. This Claim for Relief does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have materially misstated statements of opinion or belief when made and at the time of the IPO. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

265. This claim is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants on behalf of Plaintiffs and members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Initial Public Offering and were damaged by the acts alleged herein. This claim is based solely in strict liability and

negligence. ProPetro was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to IPO Offering Documents of the registered securities set forth below.

266. Defendants Redman and Smith each signed the IPO Registration Statement—which formed the IPO Offering Documents—as a senior officer and/or director of ProPetro within the meaning of Section 11 of the Securities Act.

267. The ProPetro common stock described in this Count was issued and sold pursuant to the IPO Offering Documents. All purchases of the registered securities after the issuance of the IPO Offering Documents are traceable to the IPO Offering Documents.

268. The IPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

269. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the IPO Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

270. In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

271. None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Offering

Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

272. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the IPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

273. As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the IPO Offering Documents.

274. By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the IPO Offering Documents.

275. This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the IPO Offering Documents.

## COUNT IV
## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT IN CONNECTION WITH THE IPO
## (Against the Defendants Redman and Smith)

276. Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

277. This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o against Defendants Redman and Smith on behalf of members of the Class who purchased or otherwise acquired ProPetro securities pursuant and/or traceable to the IPO Offering Documents and were damaged by acts alleged herein. For the purposes of this Count, Plaintiffs assert only

strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Initial Public Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Initial Public Offering.

278. At all relevant times, Defendants Redman and Smith were controlling persons of ProPetro within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions at ProPetro and/or because of their positions on the ProPetro Board, the Defendants Redman and Smith had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

279. Specifically, Defendants Redman and Smith each served as an executive officer of ProPetro. At the time of the IPO, Defendant Redman served as the CEO and a director of ProPetro, and Defendant Smith served as ProPetro's CFO. As such, at all times relevant, Defendants Redman and Smith each participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in ProPetro's business affairs. Defendants Redman and Smith also participated in the preparation and dissemination of the IPO Offering Documents. Defendants Redman and Smith also participated in the preparation and dissemination of certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Initial Public Offering. Because of their positions of control and authority as senior officers of ProPetro, each of these Defendants was able to, and did, control the contents of certain or all the IPO Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

280. By reason of the aforementioned conduct and by virtue of their positions as controlling persons of ProPetro, each of these ProPetro Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Securities Act Defendants are liable under Section 11 of the Securities Act, to Plaintiffs and members of the Class who purchased or otherwise acquired ProPetro securities pursuant to or traceable to the IPO Offering Documents. As a direct and proximate result of the conduct of these Defendants, Plaintiffs and members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## VI. CLASS ACTION ALLEGATIONS

281. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a Class consisting of all persons and entities who (a) purchased, or otherwise acquired ProPetro common stock on the open market from March 17, 2017 to October 31, 2019, both dates inclusive (the "Class Period"), and were damaged thereby; or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering. Excluded from the Class are Defendants; ProPetro's affiliates and subsidiaries; the officers and directors of ProPetro and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

282. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ProPetro common shares were actively traded on the New York Stock Exchange. As of April 30, 2019, ProPetro had approximately 100,419,802 million shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of

members of the proposed Class. Members of the Class can be identified from records maintained by ProPetro or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

283. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

284. Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(c) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d) whether the members of the Class have sustained damages, and the proper measure of damages.

285. Plaintiffs' claims are typical of those of the Class.

286. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

287. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and

expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

288. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

289. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of ProPetro who knew that the statement was materially false or misleading when made.

## VIII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding Plaintiffs and the Class members damages, including interest;

(c) Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## IX. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: February 13, 2020

By: /s/ *James A. Harrod*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jeroen van Kwawegen
James A. Harrod
Brenna Nelinson
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jeroen@blbglaw.com
jim.harrod @blbglaw.com
brenna.nelinson@blbglaw.com

**GRANT & EISENHOFER P.A.**
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

**MARTIN & DROUGHT, P.C.**
Gerald T. Drought
State Bar No. 06134800
Federal Bar No. 8942
Frank B. Burney
State Bar No. 03438100
Bank of America Plaza, 25th Floor 300
Convent Street San Antonio, Texas 78205
Telephone: (210) 227-7591
Facsimile: (210) 227-7924
gdrought@mdtlaw.com
fburney@mdtlaw.com

*Liaison Counsel for Plaintiffs*

**CLARK HILL PLC**
Ronald A. King
212 E. Cesar Chavez Ave
Lansing, MI 48906
Telephone: (517) 318-3015
Facsimile: (517) 318-3068
rking@clarkhill.com

*Counsel for Plaintiff Police and Fire Retirement System of the City of Detroit*

# Appendix A

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

We, the undersigned representatives of Nykredit Portefølje Administration A/S ("NPA"), the court-appointed Lead Plaintiff, acting on behalf of the entities listed in Schedule A (the "Funds"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. We are authorized to execute this Certification on behalf of NPA. We have reviewed the Amended Complaint and NPA has authorized its filing.

2. We are duly authorized to institute legal action on behalf of NPA and the Funds. NPA is litigating the claims of the Funds pursuant to an assignment.

3. Neither NPA nor the Funds purchased the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

4. NPA fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

5. The Funds' transactions in the ProPetro Holding Corp. securities that are the subject of this action are set forth in Schedule A attached hereto.

6. NPA has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re ProPetro Holding Corp. Securities Litigation,* No. 19-cv-217 (W.D. Tex.)

7. NPA will not accept any payment for serving as a representative party on behalf of the Class beyond NPA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 11 day of February, 2020.

Andreas T. Wagner
*Senior Legal Advisor*

Tage Fabrin-Brasted
Managing Director

## SCHEDULE A

**Investeringsforeningen Nykredit Invest**
**Transactions in ProPetro Holding Corp.**

| Account | Transaction | Date | Shares | Price |
|---|---|---|---|---|
| NKB 31006 INV MM INVEST JAPAN AKK | Purchase | 4/23/2019 | 46,414 | 25.1158 |
| | Transfer out | 5/3/2019 | (46,414) | 22.4500 |
| NKB NI GLO AKT SRI AKK 31004 | Transfer in | 5/3/2019 | 46,414 | 22.4500 |
| | Purchase | 5/15/2019 | 38,560 | 22.5776 |
| | Purchase | 5/16/2019 | 20,440 | 23.4939 |
| | Purchase | 5/23/2019 | 3,001 | 20.2598 |
| | Purchase | 6/27/2019 | 5,955 | 19.3200 |
| | Purchase | 7/3/2019 | 2,921 | 20.1619 |
| | Purchase | 7/5/2019 | 3,900 | 20.4844 |
| | Sale | 8/22/2019 | (35,890) | 11.4319 |
| | Sale | 8/23/2019 | (85,301) | 10.6164 |
| NKB 31005 INV MULTI MAN INVST JAPAN | Purchase | 4/23/2019 | 12,082 | 25.1109 |
| | Transfer out | 5/3/2019 | (12,082) | 22.4500 |
| NYKREDIT INVEST GLOBALE AKTIER SRI | Purchase | 5/24/2018 | 24,147 | 19.0888 |
| | Purchase | 6/28/2018 | 1,122 | 15.3574 |
| | Purchase | 2/8/2019 | 8,306 | 16.7667 |
| | Purchase | 2/11/2019 | 10,218 | 17.1261 |
| | Purchase | 2/12/2019 | 3,281 | 17.1273 |
| | Purchase | 3/5/2019 | 774 | 21.0110 |
| | Purchase | 3/28/2019 | 986 | 22.6490 |
| | Purchase | 4/10/2019 | 8,011 | 23.5100 |
| | Purchase | 4/23/2019 | 4,875 | 24.5300 |
| | Transfer in | 5/3/2019 | 12,082 | 22.4500 |
| | Purchase | 5/15/2019 | 40,144 | 22.5776 |
| | Purchase | 5/16/2019 | 21,280 | 23.4939 |
| | Sale | 9/4/2018 | (25,269) | 15.0698 |
| | Sale | 6/26/2019 | (1,025) | 18.8890 |
| | Sale | 8/6/2019 | (1,604) | 15.8800 |
| | Sale | 8/22/2019 | (31,785) | 11.4319 |
| | Sale | 8/23/2019 | (75,543) | 10.6164 |

**Investeringsforeningen Nykredit Invest Engros**
**Transactions in ProPetro Holding Corp.**

| Account | Transaction | Date | Shares | Price |
|---|---|---|---|---|
| NKB 10520 GLOBALE AKTIER SRI | Purchase | 5/24/2018 | 55,782 | 19.0888 |
| | Purchase | 2/8/2019 | 12,891 | 16.7667 |
| | Purchase | 2/11/2019 | 15,857 | 17.1261 |
| | Purchase | 2/12/2019 | 5,092 | 17.1273 |
| | Purchase | 4/3/2019 | 7,198 | 21.8800 |
| | Purchase | 5/15/2019 | 33,266 | 22.5776 |
| | Purchase | 5/16/2019 | 17,634 | 23.4939 |
| | Sale | 9/4/2018 | (55,782) | 15.0698 |
| | Sale | 6/24/2019 | (2,054) | 18.7700 |
| | Sale | 8/6/2019 | (2,311) | 15.8800 |
| | Sale | 8/6/2019 | (18,012) | 15.8800 |
| | Sale | 8/22/2019 | (20,600) | 11.4319 |
| | Sale | 8/23/2019 | (48,961) | 10.6164 |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD LOGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROPETRO HOLDING CORP., *et al.*,<br><br>Defendants. | **Civil Action No.:** 7:19-CV-217<br><br>**CERTIFICATION ON BEHALF OF OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM**<br><br>**CLASS ACTION** |

I, Chase Rankin, on behalf of Oklahoma Firefighters Pension and Retirement System ("OFP"), certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1. I am the Executive Director of OFP. I am familiar with the matters set forth herein and am duly authorized to make this certification on behalf of OFP.

2. I have reviewed the first-filed securities class action complaint filed against ProPetro Holding Corp. ("ProPetro") and the amended class action complaint, and OFP has authorized the filing of the latter.

3. OFP did not purchase or acquire the securities of ProPetro at the direction of counsel or in order to participate in any private action.

4. OFP is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

5. Attached as Schedule A to this Certification is a list of OFP's transactions during the Class Period in the ProPetro securities that are the subject of the above-captioned actions.

6. During the three-year period preceding the date of this certification, OFP has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws of the United States in the following cases:

<u>Moved and Appointed Lead Plaintiff</u>:

- *Hall v. Rent-A-Center, Inc.,* No. 4:16-cv-0978 (E.D. Tex.)
- *In re Novo Nordisk Sec. Litig.,* No. 3:17-cv-00209 (D.N.J.)
- *Weiner v. Tivity Health Inc.,* No. 3:17-cv-1469 (M.D. Tenn.)
- *In re Campbell Soup Co. Sec. Litig.,* No. 1:18-cv-14385 (D.N.J.)
- *Mulquin v. Nektar Therapeutics*, No. 4:18-cv-06607-HSG (N.D. Cal.) (appointed co-lead plaintiff)
- *Potts v. Weight Watchers International Inc., et al.,* No. 1:19-cv-02005 (S.D.N.Y.)
- *Employees Retirement System of the Puerto Rico Electric Power Authority v. Conduent, Inc. et al.,* No. 2:19-cv-08237 (D.N.J.)

<u>Moved and Not Appointed</u>:

- *Oklahoma Firefighters Pension and Retirement System v. Lexmark International, Inc.*, No. 1:17-cv-05543-WHP (S.D.N.Y.)
- *Tung v. Bristol-Myers Squibb Co.*, No. 1:18-cv-01611-JPO (S.D.N.Y.)
- *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc. et al,* No. 1:19-cv-01323 (N.D. Ill.)

<u>Moved, Appointment Pending</u>:

- *In re Resideo Technologies, Inc. Sec. Litig.*, No. 0:19-cv-2863 (D. Minn.)
- *Omdalh v.* Farfetch Limited, et al., No. 1:19-cv-8657 (S.D.N.Y.).

7. OFP will not accept any payment for serving as a representative party on behalf of the proposed class beyond its pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correc[redacted]

Executed [redacted], 2020.

Oklahoma [redacted]t System

By: [redacted]

Chase Rankin, Executive Director

# ProPetro Holdings Corp. -- Schedule A
## Oklahoma Firefighters Pension and Retirement System

**Cusip:** 74347M108
**Ticker:** US74347M1080
**Class Period:** March 17, 2017 through October 31, 2019

**Beginning Holdings: 0 shares**

| Purchases | | |
|---|---|---|
| **Trade Date** | **Quantity** | **Price** |
| 01/16/18 | 1,000 | $20.96 |
| 01/16/18 | 10,000 | $21.20 |
| 01/17/18 | 2,955 | $21.37 |
| 01/17/18 | 4,622 | $20.89 |
| 01/17/18 | 5,281 | $21.39 |
| 01/17/18 | 6,889 | $21.45 |

| Sales | | |
|---|---|---|
| **Trade Date** | **Quantity** | **Price** |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD LOGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROPETRO HOLDING CORP., *et al.*,<br><br>Defendants. | **Civil Action No.:** 7:19-CV-217<br><br>**CERTIFICATION ON BEHALF OF OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM**<br><br>**CLASS ACTION** |

I, Duane Michael, on behalf of Oklahoma Law Enforcement Retirement System ("OLERS"), certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1. I am the Executive Director of OLERS. I am familiar with the matters set forth herein and am duly authorized to make this certification on behalf of OLERS.

2. I have reviewed the first-filed securities class action complaint filed against ProPetro Holding Corp. ("ProPetro") and the amended class action complaint, and OLERS has authorized the filing of the latter.

3. OLERS did not purchase or acquire the securities of ProPetro at the direction of counsel or in order to participate in any private action.

4. OLERS is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

5. Attached as Schedule A to this Certification is a list of OLERS's transactions during the Class Period in the ProPetro securities that are the subject of the above-captioned actions.

6. During the three-year period preceding the date of this certification, OLERS has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws of the United States in the following cases:

Moved and Appointed Lead Plaintiff:

- *Oklahoma Law Enforcement Ret. Sys. v. Telefonaktiebolaget LM Ericsson,* No. 1:18-cv-03021 (S.D.N.Y.)
- *Danker v. Papa John's International, Inc., et al.,* No. 1:18-cv-07927 (S.D.N.Y.)
- *In Re Floor & Decor Holdings, Inc. Securities Litigation*, No. 1:19-cv-2270 (N.D.G.A.)

Moved and Not Appointed:

- *Mullins v. AZZ, Inc., et al.,* No. 4:18-cv-00025 (N.D. Tex.)

7. OLERS will not accept any payment for serving as a representative party on behalf of the proposed class beyond its pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __12th_ day of _February___, 2020.

Oklahor[redacted]ent Retirement System

By: [redacted]___________________________

Duane Michael, Executive Director

# ProPetro Holdings Corp. -- Schedule A
## Oklahoma Law Enforcement Retirement System

**Cusip:** 74347M108
**Ticker:** US74347M1080
**Class Period:** March 17, 2017 through October 31, 2019

**Beginning Holdings: 0 shares**

| Purchases | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 03/17/17 | 15,800 | $14.00 |
| 03/07/19 | 7,460 | $19.40 |
| 03/07/19 | 3,108 | $19.46 |
| 03/29/19 | 15,233 | $22.58 |
| 06/04/19 | 1,550 | $18.92 |
| 06/20/19 | 4,637 | $19.56 |
| 10/10/19 | 6,221 | $9.23 |
| 10/11/19 | 1,656 | $9.22 |
| 10/14/19 | 2,341 | $9.19 |
| 10/28/19 | 11,306 | $9.33 |

| Sales | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 09/20/19 | 1,917 | $9.51 |
| 09/20/19 | 6,481 | $9.47 |
| 10/10/19 | 3,000 | $9.52 |
| 10/10/19 | 14,350 | $9.47 |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD LOGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROPETRO HOLDING CORP., *et al.*,<br><br>Defendants. | **Civil Action No.:** 7:19-CV-217<br><br>**CERTIFICATION ON BEHALF OF OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM**<br><br>**CLASS ACTION** |

I, Ginger Sigler, on behalf of Oklahoma Police Pension and Retirement System ("OPPRS"), certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1. I am the Executive Director of OPPRS. I am familiar with the matters set forth herein and am duly authorized to make this certification on behalf of OPPRS.

2. I have reviewed the first-filed securities class action complaint filed against ProPetro Holding Corp. ("ProPetro") and the amended class action complaint, and OPPRS has authorized the filing of the latter.

3. OPPRS did not purchase or acquire the securities of ProPetro at the direction of counsel or in order to participate in any private action.

4. OPPRS is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

5. Attached as Schedule A to this Certification is a list of OPPRS's transactions during the Class Period in the ProPetro securities that are the subject of the above-captioned actions.

6. During the three-year period preceding the date of this certification, OPPRS has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws of the United States in the following cases:

Moved and Appointed Lead Plaintiff:

- *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 1:17-cv-02169 (S.D.N.Y.)
- *Milbeck v. TrueCar, Inc.*, No. 2:18-cv-02612 (C.D. Cal.)
- *Okla. Police Pension & Ret. Sys. v. Nevro Corp.*, No. 3:18-cv-05181 (N.D. Cal.)
- *Ronge v. Camping World Holdings, Inc.*, No. 1:18-cv-07030 (N.D. Ill.)
- *Mo-Kan Iron Workers Pension Fund v. Teligent, Inc.*, No. 1:19-cv-03354 (S.D.N.Y.)
- *Potts v. Weight Watchers International Inc., et al.*, No. 1:19-cv-02005 (S.D.N.Y.)
- *Employees Retirement System of the Puerto Rico Electric Power Authority v. Conduent, Inc. et al.*, No. 2:19-cv-08237 (D.N.J.)
- *Plymouth County Ret. Sys. v. Evolent Health, Inc.*, No. 1:19-cv-01031 (E.D. Va.)

Moved and Not Appointed:

- *McKenna v. Dick's Sporting Goods, Inc.*, No. 1:17-cv-03680 (S.D.N.Y)
- *Hessefort v. Super Micro Computer, Inc.*, No. 3:18-cv-00838 (N.D. Cal.)

Moved, Appointment Pending:

- *City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight, Inc. et al*, No. 19-cv-128 (D. Utah)

7. OPPRS will not accept any payment for serving as a representative party on behalf of the proposed class beyond its pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 12th day of February, 2020.

Oklahoma Police Pension and Retirement System

By: [signature]

Ginger Sigler, Executive Director

# ProPetro Holdings Corp. -- Schedule A
# Oklahoma Police Pension and Retirement System

**Cusip:** 74347M108
**Ticker:** US74347M1080
**Class Period:** March 17, 2017 through October 31, 2019

**Beginning Holdings: 0 shares**

| Purchases | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 02/05/18 | 21,143 | $17.63 |
| 02/05/18 | 4,021 | $17.98 |
| 03/26/18 | 17,581 | $16.65 |
| 06/01/18 | 9,087 | $16.21 |

| Sales | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 12/17/18 | 5,539 | $14.57 |
| 08/19/19 | 6,514 | $11.65 |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD LOGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROPETRO HOLDING CORP., *et al.*,<br><br>Defendants. | **Civil Action No.:** 7:19-CV-217<br><br>**CERTIFICATION ON BEHALF OF OKLAHOMA CITY EMPLOYEE RETIREMENT SYSTEM**<br><br>**CLASS ACTION** |

I, Paul Bronson, on behalf of Oklahoma City Employee Retirement System ("OKC ERS"), certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1. I am the Chairman of OKC ERS. I am familiar with the matters set forth herein and am duly authorized to make this certification on behalf of OKC ERS.

2. I have reviewed the first-filed securities class action complaint filed against ProPetro Holding Corp. ("ProPetro") and the amended class action complaint, and OKC ERS has authorized the filing of the latter.

3. OKC ERS did not purchase or acquire the securities of ProPetro at the direction of counsel or in order to participate in any private action.

4. OKC ERS is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

5. Attached as Schedule A to this Certification is a list of OKC ERS's transactions during the Class Period in the ProPetro securities that are the subject of the above-captioned actions.

6. During the three-year period preceding the date of this certification, OKC ERS has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws of the United States in the following case:

Moved and Appointed Lead Plaintiff:

- *Doherty v. Pivotal Software, Inc. et al.*, No. 3:19-cv-03589 (N.D. Cal.)

7. OKC ERS will not accept any payment for serving as a representative party on behalf of the proposed class beyond its pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 12th day of February, 2020.

Oklahoma City Employee Retirement System

By: Paul Bronson

Paul Bronson, Chairman

# ProPetro Holdings Corp. -- Schedule A
# Oklahoma City Employee Retirement System

**Cusip:** 74347M108
**Ticker:** US74347M1080
**Class Period:** March 17, 2017 through October 31, 2019

**Beginning Holdings: 0 shares**

| Purchases | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 01/16/18 | 500 | $20.96 |
| 01/16/18 | 5,700 | $21.20 |
| 01/17/18 | 1,651 | $21.37 |
| 01/17/18 | 2,950 | $21.39 |
| 01/17/18 | 3,848 | $21.45 |
| 01/17/18 | 2,582 | $20.89 |

| Sales | | |
|---|---|---|
| Trade Date | Quantity | Price |
| 06/14/19 | 2,484 | $18.19 |

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, David Cetlinski, on behalf of Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Detroit P&F. I have reviewed the Amended Complaint to be filed in this matter.

2. Detroit P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Detroit P&F is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Detroit P&F's transactions in the ProPetro Holding Corp. securities that are the subject of this action are set forth in the chart attached hereto.

5. Detroit P&F has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Einhorn v. AxoGen, Inc.*, No. 19-cv-00069 (M.D. Fla.)

6. Detroit P&F is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Allegheny County Emp. Ret. Sys. v. Energy Transfer LP*, No. 20-cv-00200 (E.D. Pa.)

7. Detroit P&F has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Craig v. CenturyLink, Inc.*, No. 18-cv-296 (D. Minn.)
   *In re Wageworks, Inc., Sec. Litig.*, No. 18-cv-1523 (N.D. Cal.)
   *In re Revolution Lighting Technologies, Inc. Sec. Litig.*, No. 19-cv-980 (S.D.N.Y.)

8. Detroit P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Detroit P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of February, 2020.

David Cetlinski
Executive Director
*Police and Fire Retirement System of the City of Detroit*

**Police and Fire Retirement System of the City of Detroit**
**Transactions in ProPetro Holding Corp.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/7/2019 | 4,039 | 19.4574 |
| Purchase | 3/7/2019 | 9,695 | 19.4000 |
| Purchase | 3/29/2019 | 19,798 | 22.5771 |
| Purchase | 6/20/2019 | 6,026 | 19.5584 |
| Purchase | 10/10/2019 | 7,456 | 9.2261 |
| Purchase | 10/11/2019 | 1,987 | 9.2152 |
| Purchase | 10/14/2019 | 2,807 | 9.1895 |
| Purchase | 10/28/2019 | 13,562 | 9.3264 |
| Sale | 9/20/2019 | (2,491) | 9.5097 |
| Sale | 9/20/2019 | (8,422) | 9.4680 |
| Sale | 9/24/2019 | (2,203) | 9.2815 |