**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| **RICHARD LOGAN, Individually and on Behalf of All Others Similarly Situated,**<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**PROPETRO HOLDING CORP., ET AL.**<br><br>    *Defendants.* | **Case No. MO:7:19-CV-00217-DC** |

**LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ v

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

I.   PROPETRO CONDUCTED ITS INITIAL PUBLIC OFFERING
     IN MARCH 2017 ...................................................................................................... 4

II.  AS A PUBLIC COMPANY PROPETRO WAS REQUIRED TO
     MAINTAIN ADEQUATE INTERNAL AND DISCLOSURE
     CONTROLS .............................................................................................................. 5

III. DEFENDANTS FALSELY REPRESENTED THAT PROPETRO'S
     INTERNAL AND DISCLOSURE CONTROLS WERE ADEQUATE ........................... 6

     A.   DEFENDANTS' STATEMENTS ABOUT INTERNAL CONTROLS
          AND DISCLOSURE CONTROLS ...................................................................... 6

     B.   DEFENDANTS' STATEMENTS ABOUT RELATED PARTY
          TRANSACTIONS ............................................................................................. 8

     C.   DEFENDANTS' STATEMENTS ABOUT PROPETRO'S CODE
          OF ETHICS ..................................................................................................... 9

IV.  IN REALITY, PROPETRO'S INTERNAL CONTROLS WERE MATERIALLY
     DEFICIENT, ALLOWING FOR ILLICIT TRANSACTIONS ...................................... 9

     A.   AUGUST 8, 2019 – PROPETRO DISCLOSES THE AUDIT
          COMMITTEE INVESTIGATION ...................................................................... 10

     B.   AUGUST 30, 2019 – PROPETRO DISCLOSES THE ABRUPT
          RESIGNATION OF ITS GENERAL COUNSEL .................................................. 11

     C.   OCTOBER 9, 2019 – PROPETRO AGAIN ANNOUNCES A LIKELIHOOD
          OF "MATERIAL WEAKNESSES" IN ITS INTERNAL CONTROLS,
          DEMOTIONS FOR REDMAN AND SMITH ...................................................... 12

     D.   OCTOBER 18, 2019 – SEC INVESTIGATION IS REPORTED .......................... 13

     E.   OCTOBER 31, 2019 AND NOVEMBER 13, 2019 – PROPETRO
          DISCLOSES DENHOLM'S RELATED PARTY TRANSACTIONS ....................... 13

     F.   MARCH 16, 2020 – REDMAN "RESIGNS" AND HIS VIOLATIONS OF
          THE CODE OF ETHICS ARE DISCLOSED ...................................................... 14

i

V.     PROPETRO ADMITS THAT ITS INTERNAL CONTROL DEFICIENCIES WERE THE RESULT OF "POOR TONE AT THE TOP" FROM REDMAN, SMITH, DENHOLM AND ARMOUR ................................................................ 16

ARGUMENT ......................................................................................................... 17

VI.   THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT ..................................................................................... 17

        A.   THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................. 17

              1.   Defendants Misrepresented the Condition of ProPetro's Internal and Disclosure Controls ................................................. 19

                    a.   Defendants' Post-Class Period Admissions Establish Falsity ..................................................................................... 20

                    b.   Defendants' Statements Representing the Adequacy of ProPetro's Internal and Disclosure Controls Are Actionable ................................................................................. 21

                    c.   Defendants' SOX Certifications Are Actionable ................... 24

                    d.   Defendants' Risk Warnings Are Actionable ........................... 25

                    e.   Defendants' Internal Control Statements in ProPetro's Code of Ethics and Conduct Are Actionable .......................... 26

                    f.   Defendants' Statements in ProPetro's IPO Documents Are Actionable ..................................................................... 29

              2.   Plaintiffs Adequately Alleged Materially False and Misleading Statements and Omissions Concerning Defendants' Related-Party Transactions ..................................... 30

                    a.   Plaintiffs Adequately Allege that Statements Concerning Related-Party Transactions in ProPetro's SEC Filings Were Materially False and Misleading ............... 31

                    b.   Plaintiffs Adequately Allege that the Clarabby Transactions Rendered Defendants' Statements Materially False and Misleading ............................................. 32

                    c.   Plaintiffs Adequately Allege that Defendants' Omissions Concerning PBEX Were Materially False and Misleading ..................................................................... 34

d.   Plaintiffs Adequately Allege that Defendants' Omissions Concerning PT Petroleum Rendered Defendants' Statements Materially False and Misleading.................................................................. 36

e.   Plaintiffs Adequately Allege that Defendants' Statements and Omissions Concerning Defendants' Improper Expense Reimbursements Were Materially False and Misleading ............................................... 38

3.   Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions Concerning Defendant Redman's Undisclosed Share Pledges ........................ 39

4.   Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions Concerning Audit Committee Independence.............................................. 45

5.   The Complaint Is Not a Puzzle ...................................................... 46

B.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ................................. 48

1.   Defendants' Exploitation of ProPetro's Deficient Internal Controls to Supports a Strong Inference of Scienter .................... 50

a.   Redman Had Actual Knowledge of His Own Undisclosed Share Pledges ...................................................... 50

b.   Redman And Smith Had Actual Knowledge of Their Expense Reimbursements ........................................................ 53

c.   Denholm Had Actual Knowledge of the Clarabby Transactions and His Own Employment at PBEX ................. 56

(1) The Clarabby Transactions ............................................. 56
(2) Denholm's Moonlighting at PBEX .................................. 58

d.   Armour Had Actual Knowledge of the PT Petroleum Transactions .......................................................................... 60

2.   Redman, Smith, and Denholm Had Personal Responsibility for ProPetro's Internal Controls.................................................... 62

3.   Massive Executive Turnover at ProPetro During the Class Period Supports a Strong Inference of Scienter............................ 64

4.   Defendants' Insider Sales Support a Strong Inference of Scienter ........................................................................................ 69

iii

5.    The Adverse-Interest Exception Does Not Bar Imputing Redman's Knowledge to ProPetro ................................................. 69

6.    Scienter Is Adequately Pleaded for the Filings Signed by Howell ..................................................................................... 71

7.    Defendants' Remaining Arguments Fail ...................................... 72

    a.   Scienter Is Not Undermined Simply Because, in Hindsight, the Fraud "Was Not Worth It" for Defendants. ........................................................... 72

    b.   ProPetro's Extensive Remedial Measures Bolster Scienter ................................................................. 73

C.    THE COMPLAINT ALLEGES LOSS CAUSATION ........................................... 74

VII.    THE COMPLAINT STATES A CLAIM UNDER THE SECURITIES ACT ................. 80

A.    SECTION 11 CLAIMS ARE SUBJECT ONLY TO RULE 8 NOTICE PLEADING ...................................................................................... 80

B.    DEFENDANTS' ARGUMENTS CHALLENGING PLAINTIFFS' SECTION 11 CLAIMS FAIL ........................................................................ 81

VIII.    THE COMPLAINT STATES CLAIMS FOR CONTROL PERSON LIABILITY UNDER BOTH THE SECURITIES AND THE EXCHANGE ACTS ..................................................................................................... 84

CONCLUSION ..................................................................................................... 85

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
 292 F.3d 424 (5th Cir. 2002) ......................................................................................67

*In re Alamosa Holdings, Inc. Sec. Litig.*,
 382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................................................47

*Alaska Elec. Pension Fund v. Asar*,
 768 F. App'x 175 (5th Cir. 2019) ...............................................................................62

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
 915 F.3d 975 (5th Cir. 2019) ......................................................................................49

*In re Alcatel Sec. Litig.*,
 382 F. Supp. 2d 513 (S.D.N.Y. 2005)..........................................................................38

*In re Am. Preferred Prescription, Inc.*,
 1997 WL 158401 (Bankr. E.D.N.Y. Mar. 21, 1997) ...................................................37

*American Pipeline, L.P. Sec. Litig.*,
 307 F.Supp.3d 583 (S.D. Tex. 2018) ..........................................................................42

*In re ArthroCare Corp. Securities Litig.*,
 726 F. Supp. 3d. 696 (W.D. Tex. 2010)..........................................................48, 65, 67

*Bachow v. Swank Energy Income Advisers, L.P.*,
 2010 WL 70520 (N.D. Tex. Jan. 6, 2010) .............................................................48, 49

*In re Banc of California Sec. Litig.*,
 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ..............................................................72

*Barilli v. Sky Solar Holdings, Ltd.*,
 389 F. Supp. 3d 232 (S.D.N.Y. 2019)..........................................................................83

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)......................................................................................................17

*In re Bear Stearns Co., Inc. Sec. Deriv. and ERISA Litig.*,
 763 F. Supp. 2d 423 (S.D.N.Y. 2011)..........................................................................37

*Belmont v. MB Inv. Partners*,
 708 F.3d 470 (3d Cir. 2013)........................................................................................70

*In re Biogen Inc. Sec. Litig.*,
    857 F.3d 34 (1st Cir. 2017)...................................................................................62

*Bondali v. Yum! Brands, Inc.*,
    620 Fed. App'x. 483 (6th Cir. 2015) ...............................................................43, 44

*Brody v. Zix Corp.*,
    2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)......................................................27

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
    137 S. Ct. 2042 (2017)............................................................................................82

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................................................................67

*Chill v. Gen. Elec. Co,*
    101 F.3d 263 (2d Cir. 1996)....................................................................................51

*In re China Valves Tech. Sec. Litig.*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013).....................................................................31

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ..................................................................................70

*City of Pontiac v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014)..............................................................................62, 74

*In re Cobalt Int'l Energy, Inc.*,
    2016 WL 215476 (S.D. Tex. Jan. 19, 2016) .....................................................74, 84

*In re Cognizant Tech Sols. Corp. Sec. Litig.*,
    2018 WL 3772675 (D.N.J. Aug. 8, 2018) ...............................................................45

*Cuvillier v. Taylor*,
    503 F.3d 397 (5th Cir. 2007) ..................................................................................17

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)......................................................................22

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................74, 75, 78

*In re Dynegy, Inc. Sec. Litig.*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ....................................................................80

*In re Dynegy, Inc. Sec. Litig.*,
    226 F.R.D. 263 (S.D. Tex. 2005).............................................................................81

*ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................................33

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................28

*In re Enron Corp.*,
    2003 WL 21418157 (S.D. Tex. Apr. 24, 2003) ........................................................22

*In re eSpeed, Inc. Sec. Litig.*,
    457 F.Supp.2d 266 (S.D.N.Y.2006)...........................................................................78

*FDIC v. Ernst & Young,*
    967 F.2d 166 (5th Cir. 1992) .....................................................................................71

*F.D.I.C. v. Nathan,*
    804 F. Supp. 888 (S.D. Tex. 1992) ...........................................................................71

*In re Fleming Co. Inc. Sec. & Deriv. Litig.*,
    2004 WL 5278716 (E.D. Tex. 2004) .........................................................................80

*In re Fossil, Inc.*,
    713 F. Supp. 2d 644 (N.D. Tex. 2010) ......................................................................50

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) .................................................................53, 81

*Fries v. N. Oil and Gas*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018)..................................................................35, 50

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)........................................................................81

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2014 WL 2815571 (S.D.N.Y. June 23, 2014) .......................................................28, 44

*Greenfield Children's P'ship v. Friendfinder Network, Inc.*,
    590 Fed. Appx. 854 (11th Cir. 2014)........................................................................42

*Griffin v. GK Intelligent Sys., Inc.*,
    87 F. Supp. 2d 684 (S.D. Tex. 1999) ........................................................................85

*Hall v. Rent-A-Ctr., Inc.*,
    2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ..........................................................65

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223 (D.N.J. Apr. 27, 2017) ..........................................................23, 55

*In re Hertz Global Holdings Inc.*,
    906 F.3d 106 (3d Cir. 2018)..................................................................................54, 55

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)..........................................................................................33

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ....................................................................................52, 53

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)............................................................................................. *passim*

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006).........................................................................68

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ........................................................................................18

*KB Partners I, L.P. v Pain Therapeutics, Inc.*,
    2015 WL 7760201 (W.D. Tex. Dec. 1, 2015) ..............................................................18

*Krim v. BancTexas Group, Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ......................................................................................18

*Lee v. Active Power*,
    29 F. Supp. 3d 876 (W.D. Tex. 2014)...........................................................................70

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...................................................................24, 29

*Lewis v. Casey*,
    518 U.S. 343 (1996).......................................................................................................81

*Lewy v. SkyPeople Fruit Juice, Inc.*,
    2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)..........................................................58, 59

*Local 732 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ........................................................................................49

*In re Lone Pine Res., Inc.*,
    2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ..............................................................33

*Lone Star Ladies Inv. Club. v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ....................................................................................80, 81

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................................ *passim*

*Magruder v. Halliburton Co.*,
   350 F. Supp. 3d 452 (N.D. Tex. 2018) ...................................................................35

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .........................................................................55, 73

*McCurdy v. S.E.C.*,
   396 F.3d 1258 (D.C. Cir. 2005).............................................................................57

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................................25, 64

*N. Port Firefighters' Pension v. Temple-Inland, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. 2013) ...................................................................47

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) .........................................................................48, 54

*In re Netsolve, Inc. Sec. Litig.*,
   185 F. Supp. 2d 684 (W.D. Tex. 2001).....................................................................85

*In re OCA Inc. Sec. and Deriv. Litig.*,
   2006 WL 3747560 (E.D. La. Dec. 14, 2006)............................................................22

*One Longhorn Land I, L.P. v. Defendant FF Arabian, LLC*,
   2015 WL 7432360 (E.D. Tex. Nov. 23, 2015) .........................................................85

*Parmelee v. Santander Consumer USA Holdings, Inc.*,
   2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ........................................................53, 75

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................25

*In re Plains All American Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ...............................................................42, 43

*Plymouth Ct. Ret. Sys. v. Patterson Co., Inc.*,
   2019 WL 3336119 (D. Minn. July 25, 2019) .........................................................28

*Prause v. TechnipFMC, PLC*,
   2019 WL 111428 (S.D. Tex. Jan. 18, 2019)............................................................18

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v.
   Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................ *passim*

*R2 Invs. LDC v. Phillips,*
   401 F.3d 638 (5th Cir. 2005) .................................................................................53

*Ramirez v. Exxon Mobil Corp.*,
  334 F. Supp. 3d 832 (N.D. Tex. 2018) ........................................................17, 69, 77

*Ret. Sys. v. Horizon Lines Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009).....................................................................45

*Richman v. Goldman Sachs Group, Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012).................................................................28

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...............................................................76

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ...................................................................18, 52, 67

*Rougier v. Applied Optoelectronics, Inc*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019).....................................................27

*S.E.C. v. China Northeast Petroleum Holdings Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014).............................................................31, 57

*S.E.C. v. Killion*,
  2017 WL 7052310 (S.D. Tex. Mar. 24, 2017)......................................................48

*Schiro v. Comex*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)..................................................................23

*Shivangi v. Dean Witter Reynolds, Inc.*,
  825 F.2d 885 (5th Cir. 1987) .........................................................................60, 61

*In re Signet Jewelers*,
  389 F. Supp. 3d 221 (S.D.N.Y. 2019)......................................................27, 42, 83

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019)..................................................................83

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..................................................................... *passim*

*Spitzberg v. Houston Energy Co.*,
  758 F.3d 676 (5th Cir. 2014) .........................................................................48, 49, 73

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 2d 575 (W.D. Tex. 2014).........................................................52, 65, 67

*Test Masters Educ. Servs., Inc. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) ..............................................................................17

x

*Taylor v. Scheef & Stone, LLP*,
 2020 WL 4432848 (N.D. Tex. July 31, 2020) ......................................................71

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ........................................................................................49, 59, 73

*TSC Indus., Inc. v. Northway, Inc.*,
 426 U.S. 438 (1976) ........................................................................................17, 42, 52

*In re Van der Moolen Holding N.V. Sec. Litig.*,
 405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..................................................................26

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Product Liability Litig.*,
 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...........................................................41

*In re WageWorks Sec. Litig.*,
 2020 WL 2896547 (N.D. Cal. June 1, 2020) ....................................................59, 68

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
 28 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................22

*Westley v. Oclaro, Inc.*,
 897 F. Supp. 2d 902 (N.D. Cal. 2012) .............................................................21, 22

*Zagami v. Natural Health Trends Corp.*,
 540 F. Supp. 2d 705 (N.D. Tex. 2008) ........................................................... *passim*

*In re Zagg, Inc. Sec. Litig.*,
 797 F.3d 1194 (10th Cir. 2015) .......................................................................52, 62

**Statutes**

15 U.S.C. § 78a *et seq.* ...................................................................................... *passim*

17 CFR §229.307 ...................................................................................................6

17 CFR §240.10b-5 .......................................................................................... *passim*

Fed. R. Civ. P. 8 ................................................................................................ *passim*

Fed. R. Civ. P. 9 ..................................................................................................81

Fed. R. Civ. P. 12(b)(6) .........................................................................................17

Fed. R. Civ. P. 15(a)(2) .........................................................................................85

*Sarbanes-Oxley Act*, Pub. L. 107-204, 116 Stat. 745 (2002) ................................ *passim*

**Other Authorities**

Art Berkowitz & Richard Rampell, *Related-Party Transactions Can Be an Investment Red Flag*, WALL ST. J. (Aug. 29, 2002)....................................................................30

Statement of Financial Accounting Standards No. 57, FASB (Mar. 1982)....................................30

RESTATEMENT OF AGENCY, § 5.04 (June 2020)..............................................................................70

Lead Plaintiffs Nykredit Portefølje Administration A/S, Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, Oklahoma City Employee Retirement System, together with additional named plaintiff Police and Fire Retirement System of the City of Detroit (collectively, "Plaintiffs") respectfully submit this omnibus memorandum of law in opposition to defendants' motions to dismiss the Third Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 81) ("Complaint"): Defendant ProPetro Holding Corp.'s Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws (ECF No. 93) ("ProPetro Br."); Defendant Dale Redman's Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws (ECF No. 91) ("Redman Br."); Defendant Ian Denholm's Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws (ECF No. 92) ("Denholm Br."); Defendant Spencer Armour's Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws (ECF No. 90) ("Armour Br."); and Defendant Jeffrey Smith's Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws (ECF No. 89) ("Smith Br.").[1]

## PRELIMINARY STATEMENT

ProPetro is an oilfield services company operating in the Permian Basin that went public in March 2017 through an initial public offering ("IPO"). In connection with the IPO and throughout the Class Period (March 17, 2017 through March 13, 2020), Defendants[2] assured

---

[1] Capitalized terms not defined herein are used as set forth in the Complaint. Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotations have been omitted.

[2] Defendants are ProPetro (or the "Company"), Redman (the former CEO), Smith (the former CFO), Denholm (the former Chief Accounting Officer) and Armour (a member of the Board of Directors, and formerly the Chairman). Redman, Smith, Denholm and Armour are referred to as the "Individual Defendants."

investors that they had instituted and maintained the requisite controls to prevent misconduct and misstatements in their SEC filings.  They represented that all related party transaction were disclosed, and presented to investors a detailed Code of Ethics.  Redman and Smith provided certifications in connection with ProPetro's internal controls and their own purported compliance with the Code of Ethics and Conduct ("Code").

The Complaint here alleges that Defendants made false and misleading statements, and omitted from disclosure materials facts concerning, ProPetro's internal controls, related-party transactions, and compliance with Company's Code.  The Individual Defendants, the senior-most executives of ProPetro who were responsible for protecting and certifying the Company's controls, compliance and disclosures, personally violated the very policies they were charged with installing and upholding.  Defendants' misleading statements on these topics were revealed beginning in August 2019, as investors learned that the Individual Defendants had repeatedly violated the Company's internal controls, policies, and the Code, for their own benefit.  Blame for these problems has been squarely placed at the Individual Defendants' feet:  their own violations reflected a poor "tone at the top" regarding compliance.

Despite these facts, Defendants' briefs suggest Redman, Smith, Armour and Denholm were "doing their best" and their misstatements to investors harmed no one.  This is not reality.

The Complaint's allegations detail Defendants' *admissions* that ProPetro's internal controls suffered from multiple "material weaknesses" (the most severe form of such a deficiency) and that Defendant Redman violated ProPetro's Code by entering into share pledges so he could purchase multi-million-dollar homes.  The Company has similarly *admitted* that Redman, Smith and Armour all entered into undisclosed transactions that violated ProPetro's internal policies regarding related party transactions and/or should have otherwise been disclosed.  Undisclosed

2

transactions between ProPetro and former Chairman Armour's own company totaled over $55 million.  Denholm similarly engaged in related-party transactions totaling over $3.6 million, while also moonlighting as the CFO of another company.  The materiality and need for disclosure of these transactions under the applicable rules and policies is confirmed by the fact that ProPetro has now disclosed them.

Since these previously hidden transactions, internal control weaknesses, and other compliance problems were first disclosed as a result of an investigation by ProPetro's Audit Committee, ***Redman, Smith and Denholm have all "resigned"*** under varying degrees of duress. The SEC is investigating these very issues.  And, critically, the disclosures allegedly revealing the truth concerning the subjects previously misrepresented have ***wiped out $825 million in the Company's market capitalization***.  This massive loss in shareholder value is the clearest indication that, contrary to Defendants' "no big deal" defense, ***shareholders really did care*** about these issues.

In addition to Defendants' generalized efforts to minimize the importance of their obligations under the federal securities laws and SEC regulations, they raise a host of technical and factual arguments that do not require dismissal.  Defendants raise three principal categories of argument directed at Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934. *First,* Defendants attack the falsity of the statements, and whether the statements are actionable or material.  These arguments fail, as the Defendants have admitted falsity regarding the internal control, related-party transaction, and Code of Ethics statements.  Nor are those statements immaterial or puffery.  *Second,* Defendants argue that the Complaint's scienter allegations are inadequate, but Defendants' approach to scienter belies the well-pled facts and invites error by urging the Court to consider the scienter allegations in extreme isolation rather than "holistically"

3

as instructed by the Supreme Court in *Tellabs*. *Third*, Defendants take a few swipes at loss causation, but the Complaint easily meets the Rule 8 notice pleading standard applicable to that element of the Exchange Act claims. *Finally,* in attacking the Complaint's misrepresentation claims under Section 11 of the Securities Act of 1933, which do not require pleading fraud, Defendants recycle their insufficient falsity arguments, wrongly argue that claims brought within the three-year statute of repose period are untimely, and make a standing argument that concedes one of the Plaintiffs has standing.

For the reasons stated below, Defendants' Motions to Dismiss should be denied.

## **FACTUAL BACKGROUND**

**I.      PROPETRO CONDUCTED ITS INITIAL PUBLIC OFFERING IN MARCH 2017**

In 2017, ProPetro, an oilfield services company operating in the Permian Basin, took the opportunity to join many other energy companies in the big leagues of the capital markets.  ¶47.[3] On February 8, 2017, ProPetro filed its first registration statement with the SEC, proposing to list its common stock on the New York Stock Exchange (as amended, the "IPO Registration Statement").  ¶43.  On March 16, 2017, ProPetro announced its IPO of 25 million shares of common stock at $14 per share, raising millions from investors (including Lead Plaintiff Oklahoma Law Enforcement Retirement System).[4]  ¶¶31.  ProPetro completed the IPO on March 22, 2017. ¶44.  Redman, Armour and Smith, realized proceeds of $5.2 million, $5.3 million and $3.1 million, respectively, from shares they sold to investors in the IPO.  ¶234.

---

[3] "¶_" references are to the Complaint.

[4] The underwriters exercised an option to buy over 3.7 million additional shares, which were also offered to the public as part of the IPO.  ¶44.

II.    **AS A PUBLIC COMPANY PROPETRO WAS REQUIRED TO MAINTAIN ADEQUATE INTERNAL AND DISCLOSURE CONTROLS**

It is vitally important for public companies to institute, maintain and adhere to internal controls over financial reporting as well as disclosure controls and procedures to accurately portray themselves to investors.  Numerous statutory, regulatory, and industry standards required ProPetro, as a public company, to institute and maintain such controls as well as disclose to investors the state of those controls. ¶¶62-88.  Thus, ProPetro had a responsibility to its investors to institute robust internal controls and disclosure controls as a public company.

Disclosure controls and procedures mandate that information required to be disclosed under the Securities and Exchange Act of 1934 ("Exchange Act") be communicated to management sufficiently in advance of the company's filing dates to allow time to review the information and decide whether and how to disclose it.  ¶63.  Internal controls over financial reporting are designed by, or under the supervision of, a company's CEO and CFO to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the company's financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). ¶64.  Management must evaluate these controls regularly to determine how effectively they prevent material misstatements of financial statements. ¶68.

Certain disclosure requirements have been codified by Congress, including the Sarbanes-Oxley Act of 2002 ("SOX").  Section 302 of SOX requires that the principal executive officer and principal financial officer of a public company (typically, the CEO and CFO) address in the company's quarterly and annual SEC filings: (1) the material accuracy and fair presentation of the report's disclosures; (2) the establishment and maintenance of disclosure controls and procedures; and (3) deficiencies in, and material changes to, internal control over financial reporting. ¶67.  The

5

officers must certify that they have reviewed the report and that it does not contain any untrue or misleading statements of material fact or omissions.  ¶¶65-67.

The SEC has also promulgated regulations governing disclosure.  Items 307 and 308 of SEC Regulation S-K, 17 CFR §229.307, require that the CEO and CFO provide their conclusions on how effective their disclosure controls and procedures are, and take responsibility for maintaining adequate internal controls.  ¶¶70-71.  Section 404 of Regulation S-K, in addition, requires management and its outside auditor to annually evaluate the effectiveness of the company's internal controls and report to investors.  ¶77.  A statement that such controls are effective necessarily asserts that there are no "material weaknesses."  ¶68.  The Public Company Accounting Oversight Board ("PCAOB") defines a "material weakness" in internal controls as a deficiency," so severe that there is a reasonable possibility that a material misstatement in the company's financial statements will not be prevented or timely detected.  ¶69.

Item 404 also requires a public company to disclose information about any transaction in which it was or is to be a participant where the amount involved exceeds $120,000 and in which any "related person" had or will have a direct or indirect material interest.  ¶77. GAAP too requires such disclosure, and defines "related party transactions" to include those between "an entity and its principal owners[ or] management."  The obligation to identify and disclose related party transactions is a straightforward principle for public companies, including ProPetro.

## III.    DEFENDANTS FALSELY REPRESENTED THAT PROPETRO'S INTERNAL AND DISCLOSURE CONTROLS WERE ADEQUATE

### A.    DEFENDANTS' STATEMENTS ABOUT INTERNAL CONTROLS AND DISCLOSURE CONTROLS

In the IPO Offering Documents, ProPetro stated that it was already "evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission ["COSO"]."  ¶244.  The IPO Offering Documents also said that a failure

6

to maintain adequate internal controls could "materially adversely affect[]" both "the accuracy and timeliness" of its financial statements "and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock." *Id.*

In the Secondary Offering Documents, and in each and every Form 10-Q (quarterly report) and Form 10-K (annual report) filed during the Class Period, Defendants assured investors, and signed certifications, attesting that ProPetro's disclosure controls and procedures were adequate. ¶¶62, 83-88. In ProPetro's Class Period 10-Qs, Defendants stated nothing had occurred that would "materially affect" its internal controls over financial reporting, ¶¶256-57, 271-74, and Redman and Smith specifically certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." ¶¶258, 273. Moreover, the 2018 Form 10-K assured investors that ProPetro "maintained effective internal control over financial reporting," ¶276. Thus, ProPetro, Redman and Smith, knew of their responsibility to institute internal controls and disclosure controls and were aware of their personal responsibility to implement the controls and ensure that they were adhered to. *Id.*

As noted above, ProPetro's IPO Offering Documents indicated it would evaluate its "existing controls against the" COSO standards, which established a widely-adopted set of best practices for internal controls called the "2013 Internal Control-Integrated Framework." ¶72. That framework defines "internal control" as a "process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to, inter alia, reliability of financial reporting and compliance with applicable laws and regulations. *Id.* Subsequent to the IPO, ProPetro assured investors again that it was applying the COSO standards to evaluate its internal controls and further acknowledged

7

that material weaknesses in its internal controls *could* affect the accuracy of its financial statements, undermine investor confidence in the Company, and increase the chances of fraud, loss of customers, and a failure to obtain required financing.  ¶73.  ProPetro, Redman and Smith certified the internal controls as sufficient and compliant with the COSO standards.  ¶¶62, 83-88. Denholm, as the Company's Principal Accounting Officer, was also personally responsible for ensuring the Company's disclosures and controls were followed.  ¶¶113, 226.

B.      DEFENDANTS' STATEMENTS ABOUT RELATED-PARTY TRANSACTIONS

As noted above, SEC rules require public companies to disclose related-party transactions involving amounts over $120,000, and GAAP also requires disclosure of such transactions, i.e., transactions between "an entity and its principal owners, management, or members of their immediate families."  ¶79.  ProPetro repeatedly boasted about its "longstanding customer relationships."  ¶52.  The IPO Offering Documents assured investors, however, that ProPetro's directors would review on at least a quarterly basis "all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions." ¶379.  They further stated that the directors "should consider all of the relevant facts and circumstances available," and listed several relevant factors, including "the terms available to unrelated third parties entering into similar transactions" "the availability of other sources for comparable services," "whether entering into the transaction would be consistent with the code of business conduct and ethics," and "the impact of the transaction on a director's independence."  ¶379.  ProPetro subsequently reiterated multiple times that related party transactions "must *first* be presented to our Audit Committee *for review, consideration, and approval*," and that "[a]ll of *our directors and executive officers are required to report to the Audit Committee chair any such related party transaction*." ¶¶289, 379.

8

C.    DEFENDANTS' STATEMENTS ABOUT PROPETRO'S CODE OF ETHICS

Throughout the Class period, maintained a "Code of Ethics and Conduct" ("Code of Ethics") on its website, ¶92, and in numerous SEC filings it directed investors to the Code. ¶¶298-300. ProPetro assured investors that Defendants Redman, Smith, Denholm, and Armour were all "Covered Parties" under the Code of Ethics and that each was required to execute a "Certification of Compliance" with the Code of Ethics. ¶¶92, 297. Thus, investors were told that Defendants each certified "that. . . any current or prior period of my employment . . . with ProPetro Holding Corp., I have complied fully with all policies and procedures set forth in the . . . Code of Ethics and Conduct and am currently in fully compliance with all such policies and procedures." ¶297.

IV.    IN REALITY, PROPETRO'S INTERNAL CONTROLS WERE MATERIALLY DEFICIENT, ALLOWING FOR ILLICIT TRANSACTIONS

As would be revealed through a host of disclosures from August 2019 through June 2020, Defendants disregarded their duties as officers a public company subject to the rigorous SEC disclosure regime. These issues resulted in part because Denholm, the Chief Accounting Officer, was distracted by his second job as the CFO of another company, PBEX, and was motivated to conceal his own related-party transaction. ¶¶113-121. Without Denholm ensuring compliance with the Company's policies and controls: Redman pledged his entire ownership of the Company to purchase two multi-million-dollar ranches, in flagrant disregard of the Company's Code of Ethics and Insider Trading Compliance Policy (¶222); Redman and Smith helped themselves to a host of improper expense reimbursements totaling over $350,000 (¶¶143, 149, 157-58, 214, 223); and a series of related-party transactions involving the Defendants were concealed from investors (¶¶87-89). These other transactions included $3.6 million of deals involving Denholm's own businesses (¶¶17, 37, 115, 143, 223, 226, 259, 274, 277) as well as over $55 million in business with a company headed by ProPetro's own Chairman (¶¶18, 88, 140, 143, 223, 259, 274, 277).

9

Indeed, even before the Company admitted the pervasive deficiencies in its internal controls, it disclosed on July 12, 2019 that Armour was being replaced as Chairman of the Board and that Board and Audit Committee member Steven Beal had resigned, without explanation. ¶140. On August 1, 2019, ProPetro announced that another Board member—Royce Mitchell— resigned after only five-and-a-half months on the Board. ¶141. These unusual disclosures were soon overtaken by the Company's serial admissions of wrongdoing.

A.    AUGUST 8, 2019 – PROPETRO DISCLOSES THE AUDIT COMMITTEE INVESTIGATION

On August 8, 2019, ProPetro disclosed that the Audit Committee of its Board was in the midst of an internal investigation (the "Investigation"). ¶10. According to ProPetro, this investigation focused initially on the disclosure of certain agreements, but, somehow, "was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest." ¶147. The Investigation had identified approximately $370,000 in expenses improperly (and secretly) reimbursed to senior management "since the Company's initial public offering in 2017," with approximately $346,000 going to Redman and approximately $18,000 going to Smith.[5] ¶149.

ProPetro revealed that its management was "likely to conclude" that its internal controls were deficient, that its disclosure controls and procedures were ineffective, and rose to the "level of a material weakness." ¶150. ProPetro assured investors that it was implementing "*immediate* improvement measures" to address these issues, including "enhancing disclosure controls through the formation of a disclosure committee and the appointment of a Chief Disclosure Officer," and "revising and expanding key Company policies and procedures . . . including with respect to

---

[5] ProPetro has not disclosed the recipient of the remaining $6,000, stating in its dismissal brief only that it was paid to "another ProPetro executive." ECF No. 93, at 22 n.12.

transactions involving related parties or conflicts of interest." ¶151. ProPetro further indicated it "expect[ed] to adopt a formal remediation plan to address internal control and disclosure control deficiencies identified in the review." *Id*. ProPetro also disclosed that it was unable to timely file its quarterly report on Form 10-Q for the second quarter of 2019. ¶152.

ProPetro's stock price took an immediate 26% nose-dive, falling from $17.34 on August 8, 2019 to $12.75 on August 9, 2019, on extremely heavy trading volume, reflecting $460 million in market capitalization. ¶153. Analysts noted the lack of detail in ProPetro's disclosures, and braced for further news. ¶155. Wells Fargo commented that "we have limited insight into the audit committee review and potential board actions." ¶157. Wells Fargo continued: "We view CEO Dale Redman as a critical part of [ProPetro's] success and future prospects . . . , and based on limited disclosures it is difficult to handicap the extent of the 'key person' risk that currently exists." ¶158. JP Morgan echoed this: "Consistent investor feedback indicates that potential loss of CEO Dale Redman is the one that engenders the most concern given [ProPetro's] customer relationship-heavy strategy and his central role at in cultivating them." ¶159. That JP Morgan report further observed that "[f]or now, ProPetro is adamant there is nothing…. Until the process is completed." *Id*.

**B.      AUGUST 30, 2019 – PROPETRO DISCLOSES THE ABRUPT RESIGNATION OF ITS GENERAL COUNSEL**

On August 30, 2019, after the markets had closed, ProPetro announced that Mark Howell, its General Counsel and Corporate Secretary, was resigning effective September 29, 2019. ¶160. The Company's stock price fell 9.2% the following trading day, wiping another $100 million in market capitalization. ¶161. Analysts connected Howell's departure to the Investigation. For instance, Alta Corp. Capital reported that "the Company is currently going through an internal review and audit, and in our review, this resignation should be considered in that context." ¶162.

11

**C.    OCTOBER 9, 2019 – PROPETRO AGAIN ANNOUNCES A LIKELIHOOD OF "MATERIAL WEAKNESSES" IN ITS INTERNAL CONTROLS, DEMOTIONS FOR REDMAN AND SMITH**

Despite ProPetro's promise to complete its Investigation in thirty days, investors next heard from ProPetro approximately five weeks later (and two months after it first disclosed the Investigation), when ProPetro disclosed several important pieces of news on October 9, 2019.  The Company disclosed that factfinding for the Investigation was almost complete, but that it was "continuing to review one or more related party transactions."  ¶164.  The Company further stated that it could not yet file its quarterly report for the second quarter of 2019 (though the third quarter was over by that point), claiming management needed more time to issue its disclosure control certifications.  ¶166.  ProPetro reiterated that it would likely conclude that "one or more material weaknesses . . . resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective."  ¶165.

Moreover, the Company announced that Redman, the CEO, would no longer serve as the "principal executive officer," and thus would no longer be responsible for certifying ProPetro's annual and quarterly reports or overseeing the remediation of the deficiencies identified by the Investigation.  ¶168.  Those duties would be handed over to Philip A. Gobe, who became the Company's Executive Chairman and "principal executive officer," though he joined the Board and replaced Armour as Chairman just three months prior.  *Id.*

In addition, Smith was reassigned from CFO to the newly created role of "Chief Administrative Officer," and Darin G. Holderness was appointed as interim CFO.  *Id.*

Denholm, the Chief Accounting Officer, was resigning from the Company entirely.  *Id.*  ProPetro made public Denholm's separation agreement, which stated that Denholm had "notified the Company of transactions involving Clarabby Development, LLC, Clarabby Holdings, LLC, Conquistador Capital, LLC and Dahlia Development, LLC, Denholm, and Adam Cunyus,"

12

referred to therein as the "Clarabby Transactions." ¶169.  Though ProPetro had earlier claimed that the Investigation factfinding was substantially complete, Denholm's separation agreement obligated him to "assist the Company with respect to its investigation of the Clarabby Transactions," the substance of which the Company did not explain.[6]  *Id*.  Credit Suisse reported that "there is wood to chop on governance to make investors fully comfortable again.  Key items: (1) filing the 2Q 10-Q, (2) define & remediate material weaknesses, and (3) close internal review without incremental issues."  ¶173.

### D.    OCTOBER 18, 2019 – SEC INVESTIGATION IS REPORTED

On October 18, 2019, Reuters reported that the SEC was investigating ProPetro's internal financial controls, disclosures, and financial reporting.  Signaling that ProPetro's material weaknesses were pervasive, this news caused ProPetro's stock price to fall 8.1%.  ¶176.  Analysts deduced that the SEC investigation and the Company's own internal Investigation were connected.

### E.    OCTOBER 31, 2019 AND NOVEMBER 13, 2019 – PROPETRO DISCLOSES DENHOLM'S RELATED PARTY TRANSACTIONS

On October 31, 2019, Culper Research disclosed that several entities tied to Denholm appeared to have engaged in previously undisclosed transactions with ProPetro. ¶¶179-193. Specifically, Clarabby Development, LLC, founded and controlled by Denholm, sold ProPetro at least two properties in 2018.  ¶181.  This news drove down the price of ProPetro's stock by 9.4%, and analysts labeled the Investigation a "farce."   ¶¶184-85.  Outed by Culper Research, the Company made additional disclosures about Clarabby on November 13, 2019.  ¶187.  It filed a Form 8-K, which described that "Entity A," which Denholm and his business partner owned 50-50, loaned $770,000 to "Entity C."  *Id*.  In addition, "Entity B," owned entirely by Denholm's

---

[6] ProPetro claims in its brief that these transactions "netted [Denholm] no personal benefit," but that assertion—for which ProPetro offers no evidence—cannot be credited at the pleading stage.

same business partner, loaned Entity C $57,000. *Id.* Entity C, in turn, using the funds procured from Denholm's and his partner's businesses, used those funds to pay for an iron testing facility that was sold to ProPetro. ¶188. Investors were warned not to rely "on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent registered public accounting firm." ¶190.

F.   MARCH 16, 2020 – REDMAN "RESIGNS" AND HIS VIOLATIONS OF THE CODE OF ETHICS ARE DISCLOSED

On March 16, 2020, ProPetro announced that Redman had entered into two significant pledge share agreements, in violation of underwriter agreements disclosed in the IPO Documents and the Company's Code of Ethics and Insider Trading Compliance Policy. The Company also announced that Redman had resigned. ¶228. Redman left significant compensation, including unvested stock options, on the table in connection with his resignation. *Id.*

First, the Company disclosed for the first time that Redman had pledged every single share of ProPetro stock that he owned, valued at $8 million, as collateral to secure loans to buy the multi-million-dollar "Preston Ranch".[7] ¶104. This was problematic for two reasons. In connection with the IPO, Redman had signed a "lock-up agreement" promising that he would not "offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of shares of Stock of the Company" during the 180 days following the IPO (the "IPO Lock-Up Agreement"). ¶45. The agreement he signed specifically represented that his shares were "free

---

[7] In an argument emblematic of its motion, ProPetro tries to muddy the waters as to exactly how many shares Redman owned and were pledged at the time of the IPO. ProPetro Br. at 18 n.23. But its own exhibit shows there is no contradiction, as it clearly states that Redman's 1,564,669 share ownership total at the time of the IPO included shares "issuable pursuant to options" that had not yet been exercised. Declaration of Kevin T. Abikoff, ECF No. 93-1 ("ProPetro Decl."), Ex. 2 at 112-13 of 169 (table and footnote 6 to same). Redman himself does not bother raising this groundless factual dispute, and *ProPetro has previously admitted* that Redman "entered into a pledge agreement covering *all* of the Company's common stock owned by him at the time." ¶89.

and clear of all liens, encumbrances, and claims whatsoever." *Id.* ProPetro filed the IPO Lock-Up Agreement (*id.*) with its IPO Offering Documents (which Redman himself, as well as Smith and Armour, signed (¶346)), and assured investors that, prior to the IPO, all of its executive officers, and others, would "enter into lock-up agreements with respect to their common stock." ¶237. Investors reading the IPO Lock-Up Agreement would understand that ProPetro's interests were fully aligned with theirs. In addition, ProPetro maintained a Code of Ethics, which included an Insider Trading Compliance Policy and shareholders' agreement, to which Redman was a party. ¶93. The Insider Trading Compliance Policy, referenced in the Company's public filings and published on its website, expressly "prohibit[s] pledging Company securities as collateral to secure loans." ¶94. Redman's share pledge, entered into by Redman himself and related to his own real estate, violated both the IPO Lock-Up Agreement (which Redman himself signed) as the IPO Offering Documents in which the agreement was incorporated, and the Insider Trading Compliance Policy. The Company did not disclose Redman's share pledge until March 16, 2020.

Second, on July 29, 2018, Redman pledged at least 230,000 ProPetro shares as collateral for a $24.8 million personal loan used to purchase the Whitehead Ranch. ¶106. Similar to the Preston Ranch, the share pledge that secured the Whitehead Ranch for Redman also violated the Company's Code of Ethics and Insider Trading Compliance Policy, and also was not disclosed until March 16, 2020. ¶107.

In connection with these disclosures, the Company also announced that Smith—who had already been demoted from CFO to "Chief Administrative Officer"—was receiving another demotion, this time to "special advisor" to ProPetro's new CEO, Philip Gobe. ¶196.

Upon this news, ProPetro's stock price dropped 33.5%. ¶199.

15

### V. PROPETRO ADMITS THAT ITS INTERNAL CONTROL DEFICIENCIES WERE THE RESULT OF "POOR TONE AT THE TOP" FROM REDMAN, SMITH, DENHOLM AND ARMOUR

After having concluded its Investigation, on June 22, 2020, the Company finally filed its Form 10-K for 2019, and revealed the full extent of the problems underlying the Company in a series of shocking disclosures. ¶¶204-219.  Most notably, the Company confirmed "material weaknesses" in its "control environment," and placed the blame squarely on the shoulders of Redman, Denholm and Smith: "[S]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company."  This "*failure to maintain appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances and disclosures.*"  ¶207 (emphasis in original).  Management thus "did not sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," and there was "a general lack of focus on promoting a culture of compliance within the Company."  ¶208.

The Company admitted that it "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions," and admitted that "two related party transactions were entered into that were not identified by the Company's controls and given consideration of appropriate disclosure."  ¶211.  The Company identified the Clarabby Transactions, and also disclosed a related-party transaction involving PT Petroleum LLC, of which Armour was President, amounting to $55 million in 2017 and 2018.  ¶213.

Finally, the Company announced that it was implementing an extensive remediation program to correct the material weaknesses that had resulted in undisclosed related-party and other illicit transactions.  ¶217.  Some highlights of the remediation program include (i) appointment of new executive officers with experience running public companies; (ii) enhanced versions of the Company's polices; (iii) new controls relating to related-party transactions and potential conflicts

16

of interest; and (iv) formation of a disclosure committee with a new Chief Disclosure Officer. These measure, among others, finally allowed investors to breathe a sigh of relief, knowing that they could, at long last, trust ProPetro's public filings.  ¶218.

## ARGUMENT

### I.    THE COMPLAINT STATES A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are "viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).  In ruling on Defendants' motion to dismiss, the Court "must . . . accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand*, 565 F.3d at 232; *accord Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 844 (N.D. Tex. 2018).  Plaintiff need not plead "detailed factual allegations," but merely allegations that, "when assumed . . . true[,] raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007); *In re Cobalt Int'l Energy, Inc.*, 2016 WL 2154476, at \*2-3 (S.D. Tex. Jan. 19, 2016).

#### A.    THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

A statement or omission is false or misleading "as to a material fact" when it misrepresents or omits relevant information and there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The materiality "determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and *these assessments are peculiarly ones for the trier of fact*." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *accord Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365

17

F.3d 353, 362 (5th Cir. 2004) ("A fact is material if there is a 'substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder."). Importantly, the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248.

In arguing that Plaintiffs fail to allege falsity, Defendants principally contend that the omissions and misstatements alleged in the Complaint are not material. Due to its fact-intensive nature, materiality is a determination that is typically reserved for the trier of fact and which cannot be resolved on a motion to dismiss. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) (issues of materiality should be decided by the trier of fact unless the misrepresentations are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality"). For this reason, courts rarely dismiss claims on the basis of materiality at the motion to dismiss phase. *See, e.g., KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 7760201, at *7-8 (W.D. Tex. Dec. 1, 2015) ("[T]he Court cannot say at this stage of the proceedings that these three omissions are so obviously unimportant to a reasonable investor that they are immaterial as a matter of law."); *Prause v. TechnipFMC, PLC*, 2019 WL 111428, at *5 (S.D. Tex. Jan. 18, 2019) (declining to dismiss claims on basis of materiality which is "usually decided by the trier of fact"). "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993)).[8]

---

[8] Defendants also claim that ProPetro was a young company and should be excused from compliance with the rigorous disclosure regime established by the SEC. ProPetro Br. at 8 ("ProPetro was a rapidly growing and successful company that suffered growing pains with respect to a few discrete areas, which were uncovered (and corrected) after an intensive internal review."). But the securities laws do not distinguish between young and mature companies; all who choose

Defendants' position that their statements are immaterial does not comport with their decision to undertake an intensive investigation, led by ProPetro's Audit Committee, of ProPetro's internal controls and disclosure controls and procedures that lasted nearly a year, from August 2019 to June 2020. Nor does it add up that Defendants would choose to disclose the various infractions described in the Complaint if they were immaterial, or to demote Defendants Redman and Smith. If the Company actually thought that its disclosure transgressions were so minor, it would not have seen a need to conduct a complete overhaul of the Company's personnel—appointing new executive officers with "extensive public company experience to improve the tone at the top," enhancing policies, designing more rigid controls, and forming a "disclosure committee," led by a "Chief Disclosure Officer" to improve corporate governance. ¶217.

Further, the steep stock price drops associated with the corrective disclosures belie any notion that the related omissions and misstatements were not material to investors, particularly at the motion to dismiss phase. ¶153 (26% drop after August 8, 2019 disclosure); ¶160 (9.2% drop after August 30, 2019 disclosure); ¶176 (8.1% drop after October 18, 2019 disclosure); ¶185 (9% drop after October 31, 2019 disclosure); ¶199 (33.5% drop after March 16, 2020 disclosure). *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. 2012) (decline in stock price is evidence of materiality).

### 1. Defendants Misrepresented the Condition of ProPetro's Internal and Disclosure Controls

At the heart of the Complaint are Defendants' misrepresentations concerning the adequacy of ProPetro's internal controls and disclosure controls and procedures, which the Company repeatedly assured were adequate in each of its Class Period SEC filings. ¶¶244, 246, 249, 256-

---

to issue their securities to the public must adhere to a rigorous disclosure regime, designed to protect both investors and issuers.

58, 260, 262-64, 269-73, 276, 278, 305-07. ***Defendants concede that the majority of their statements concerning the adequacy of ProPetro's internal and disclosure controls were false***.

      a.     **Defendants' Post-Class Period Admissions Establish Falsity**

The Company has admitted that its internal controls and disclosure controls and procedures were woefully deficient during the Class Period, and thus that the statements below were false. On June 22, 2020 in the final findings from its Audit Committee Investigation, ProPetro identified several material weaknesses in its internal control over financial reporting rendering those controls ineffective. ¶206. Specifically, ProPetro admitted that its "***senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company***," and that this "failure to maintain an appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement and account balances and disclosures." ¶207. The Company further concluded that its management—including Defendants—"did not sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," and that there was "a general lack of focus on promoting a culture of compliance within the Company." *Id.* Among the various weaknesses the Company identified, it admitted that it "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions. As a result, two related party transactions were entered into that were not identified by the Company's controls and given consideration of appropriate disclosure." ¶211. As a result of these material deficiencies, the Company concluded, its executives—including Defendants—engaged in improper related-party transactions, improper expense reimbursements, and benefitted from conflicts interest. ¶¶214-16.

Even before that final admission, as the Company's Investigation progressed, it made a series of disclosures admitting its prior disclosures regarding its controls were false:

20

- On August 8, 2019, the Company disclosed the improper expense reimbursements to Redman and Smith amounting to $370,000. ¶149. The Company also stated that it was evaluating its internal controls would likely conclude there were material weaknesses and deficient controls. As a result, it would overhaul its disclosure regime. ¶¶150-151.

- On October 9, 2019, the Company announced that Denholm, its Chief Accounting Officer, was resigning, ¶168, and that it identified a number of internal control deficiencies. ¶165. It reiterated that there were material weaknesses in its internal controls, and cautioned investors not to rely on its prior financial statements. *Id*.

- On November 13, 2019, the Company shed further light on the related-party transactions among entities owned by Denholm. ¶¶87-89. In connection with this disclosure, the Company again advised that "investors should no longer rely on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent registered public accounting firm included in the 2018 Annual Report. ¶190.

- On March 16, 2019, the Company announced that Redman had violated the Company's Code of Ethics and Conduct and Insider Trading Compliance Policy by pledging all of his ProPetro stock as collateral for personal loans, indicating to the market that ProPetro's internal controls were inadequate to prevent and detect such illicit transactions. ¶197.

- On June 22, 2020, ProPetro identified several material weaknesses in its internal controls and disclosure controls and procedures. ¶¶204-211. It also provided additional details concerning the improper expense reimbursements and ProPetro's transaction with PT Petroleum, Armour's company. ¶¶212-213.

Thus, Defendants' statements concerning ProPetro's internal and disclosure controls were demonstrated to be false through the Company's own admissions.

    b.  **Defendants' Statements Representing the Adequacy of ProPetro's Internal and Disclosure Controls Are Actionable**

Defendants made statements concerning the strength and adequacy of ProPetro's controls and the steps they took to evaluate those controls. In particular, with respect to Defendants Redman and Smith, ProPetro's disclosures in their Class Period Forms 10-K and Forms 10-Q stated that "we have evaluated, under the supervision and with the participation of our management, including our principal executive officer [Redman] and principal financial officer

[Smith], the effectiveness of the design and operation of our disclosure controls and procedures . . . our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level." ¶256; *see also* ¶¶259, 270, 274.  Defendants also stated that ProPetro "maintain[s] disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported." ¶¶256, 269.  Defendants Redman and Smith assured investors in each of ProPetro's Forms 10-Q filed during the Class Period that "[n]o changes in our system of internal control over financial reporting . . . occurred during the quarterly period . . . that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." ¶256.

Contrary to these statements, the Complaint alleges in detail that ProPetro's internal and disclosure controls were woefully deficient throughout the Class Period.  ¶¶15, 88.  Indeed, as explained above, Defendants have admitted that, at the time these statements were made, ProPetro's internal controls suffered from material weaknesses, and that as a result of these deficient controls.  ¶¶223, 247, 279.  Courts have routinely held such statements to be actionable when it is later shown that they were false when made.  *E.g.*, *In re Enron Corp.*, No. 2003 WL 21418157, at *17-19 (S.D. Tex. Apr. 24, 2003) (upholding securities fraud claims regarding defective internal controls and related party transactions against defendants for whom scienter could be established); *In re OCA Inc. Sec. and Deriv. Litig.*, 2006 WL 3747560, at *14 (E.D. La. Dec. 14, 2006) (holding that false statements regarding sufficiency of internal controls were adequately pled); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (internal controls false where complaint alleged consistent failures of controls and ultimate admission of inadequacy); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244

22

(S.D.N.Y. 2012) (upholding allegations that statements concerning adequacy of internal controls were false and misleading in light of company's admission that it had identified material weaknesses).

ProPetro makes a thinly-veiled attempt at challenging the falsity of these statements through arguments that attack only scienter and materiality. *See* ProPetro Br. at 23-24. These arguments fail. ProPetro argues that Defendants' statements cannot be false because the Complaint did not "plead facts showing that management *knew* the controls were insufficient or ignored red flags of such deficiency at the time they made the disclosures and certifications." ProPetro Br. at 23. This is a scienter argument that has no bearing on whether Plaintiffs pled these as actionable false and misleading statements. In any case, as explained in Section VI.B., *infra*, Defendants' statements were made with scienter.

ProPetro relatedly attempts to cabin Plaintiffs' allegations as improper "fraud by hindsight," (ProPetro Br. at 23), but this argument similarly fails. The Complaint contains detailed factual allegations explaining why each of Defendants' statements concerning the adequacy of ProPetro's internal controls was false when made. ¶¶88, 90-1, 112-3, 120, 143-44. Neither of the cases that ProPetro relies on in support of this argument are applicable. In *Schiro v. Comex*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019), the court found that the plaintiffs set forth no allegations that the defendants had reason to believe that the statements concerning internal controls were false when made. *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017), addresses scienter, not falsity, and the plaintiffs there relied only on allegations of mismanagement and an admission of "tone at the top" issues to establish scienter. Neither of these cases are instructive here, where Plaintiffs have set forth myriad detailed allegations of how Defendants were themselves involved in transactions exploiting the lack of controls.

23

ProPetro next argues that Defendants' false statements "did not result in any material misstatements in the Company's financials," suggesting that without a restatement, Defendants' false statements about ProPetro's internal controls cannot be material. *See* ProPetro Br. at 23. This argument is a red herring. Material falsity does not hinge on whether the defective controls resulted in misstated financials, nor is that the only reason investors would find such deficiencies material. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1117 (N.D. Cal. 2017) (rejecting argument that internal control weaknesses were not material because "the mere fact that [the CEO] had engaged in the improper transactions . . . made the adequacy of LendingClub's internal controls material. Reasonable investors would have found it important to know of CEO Laplanche's prior efforts to drive his company's performance with artificially initiated loans, and even more importantly, that LendingClub's internal controls could not effectively curb the artifice."). Further, making this improper materiality determination at the pleading stage would require drawing an inference adverse to Plaintiffs. *See* ProPetro Br. at 23.

### c.      Defendants' SOX Certifications Are Actionable

After taking advantage of ProPetro's deficient internal controls, Defendants Redman and Smith signed certifications assuring investors that ProPetro's controls were sufficient. Specifically, in ProPetro's SEC filings, Defendants Redman and Smith signed SOX certifications, attesting to ProPetro's "effective" internal controls and provided "reasonable assurance" that required disclosures would be made. ¶¶256-57, 260, 270, 272-73, 276. In particular, Defendants stated that they "designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision . . . to ensure that material information . . . is made known to us . . . evaluated the effectiveness of [ProPetro's] disclosure controls and procedures . . . [and] disclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has

24

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]" ¶¶257, 272.  Defendants Redman and Smith also assured investors that they were each ***personally "responsible for establishing and maintaining disclosure controls and procedures*.**"  ¶257; *see also* ¶¶272, 276.  They further assured investors that they had disclosed to the Company's auditors and Audit Committee, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."  ¶¶257-58.

The Complaint alleges that these statements were materially misleading when made because Defendants knew that ProPetro lacked adequate mechanisms to prevent and detect related-party transactions.  Indeed, Defendants have admitted that these statements were false because ProPetro failed to design, implement, and enforce effective internal controls. ¶¶204-18.  Similar statements are routinely found to be actionable.  *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (falsity of SOX certifications pled where complaint alleged "management was well aware of the extensive" bribery scheme); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements.").

ProPetro argues that Defendants' SOX Certifications are not actionable for the same reasons that Defendants' other internal controls statements are not actionable.  *See* ProPetro Br. at 22-24.  Those arguments fail for the same reasons set forth above.  *See* I.A(1)(b), *supra*.

### d.    Defendants' Risk Warnings Are Actionable

Defendants misleadingly warned in the Company's Class Period SEC filings and Offering Documents that "if we fail to continue to comply with the requirements of Section 404 of the Sarbanes-Oxley Act, or if we or our auditors identify and report material weaknesses in internal control over financial reporting, the accuracy and timeliness of the filing of our annual and

quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information." ¶¶246, 278; *see also* ¶244.

The Complaint alleges that these statements were materially misleading when made because ProPetro was not in compliance with Section 404 of SOX at the time these statements were made and the "risk" warned of had already come to pass. ¶¶245, 247, 279. Indeed, to "warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (risk warnings were misleading where traders were presently violating NYSE rules); *see also Lormand*, 565 F.3d at 247 (no "sufficiently meaningful caution about clearly present danger that was materializing").

With respect to the risk factors in the IPO Documents, ProPetro argues that its risk factors are not actionable because they "accurately warned that ProPetro was still in the process of evaluating its controls." ProPetro Br. at 19. This argument misapprehends the standard for falsity—statements can mislead investors even though "literally accurate." *See Lormand*, 565 F.3d at 247. Here, it may have been "literally true" that ProPetro's internal controls would later prove to be deficient; but it was misleading for the Company to suggest at all that its control procedures even potentially could pass muster, when those controls were already proving to be ineffective.

### e.    Defendants' Internal Control Statements in ProPetro's Code of Ethics and Conduct Are Actionable

Defendants made statements in ProPetro's Code of Ethics and Conduct concerning internal controls. In particular, the Code required that Defendants "maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties," and "prohibited [Defendants] from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including other Covered

Parties and the Company's independent auditors, governmental regulators and self-regulatory organizations." ¶305.  The Code also stated that ProPetro's "[CEO] and [CFO] are responsible for implementing and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that" all transactions were appropriately reviewed and disclosed."  ¶306. The Complaint alleges that these statements were materially false and misleading because ProPetro's internal controls were deficient at the time these statements were made, and Defendants, rather than effectively "implementing and maintaining" ProPetro's internal controls, took advantage of their deficiencies as evidenced by Defendants' improper transactions, such as, for example, Redman's undisclosed and undetected 2017 Pledge and 2018 Pledge.  Those pledge agreements were undetected by the Company's internal and disclosure controls, indicating unequivocally that Redman knew that he had purposefully taken advantage of the inadequacies in such controls, rendering statements regarding such controls materially false and misleading.

Defendants argue that statements contained in ProPetro's Code of Ethics and Conduct are inactionable puffery.  ProPetro Br. at 24.  This argument fails.  Statements made in a policy or code of conduct are not immaterial as a matter of law.  Indeed, courts reject such puffery arguments when the statements "could be found to contain material representations and there is nothing vague or merely optimistic about them." *Brody v. Zix Corp.*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006); *see also Rougier v. Applied Optoelectronics, Inc*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (no puffery where truth "conflicted with what a reasonable investor would take from the statement itself"); *In re Signet Jewelers*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (statements in code of conduct are not inactionable puffery).

Courts regularly hold such statements actionable where, as here, they specify practices the company purports to adopt or that purport to reflect the current state of the company (as opposed

27

to being explicitly aspirational).  *See Plymouth Ct. Ret. Sys. v. Patterson Co., Inc.*, 2019 WL 3336119, at *16 (D. Minn. July 25, 2019) (code of ethics and conduct regarding compliance with antitrust laws contained actionable misstatements); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (Code of Conduct statements about independence actionable when company "did not address or manage its conflicts of interest"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) ("repeated assertions about [] strong ethical standards" actionable where they "stand in stark contrast with" reality); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "[w]e have extensive procedures and controls that are designed to address conflicts of interest" actionable when company had "clear and egregious conflicts of interest"); *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 278, 280 (S.D.N.Y. 2012) ("repeated assertions that [issuer] complies with letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest" actionable when alleged conduct "involved both client conflicts and outright fraud"); *Lapin v. Goldman Sachs Group*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) (statements in "business principles" about independence and integrity actionable when company was beset by conflicts).

Defendants also argue that these statements do not "imply that all employees consistently follow the code's requirements."  ProPetro Br. at 21-22, 24.  But as the Fifth Circuit has made clear, the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  *Lormand*, 565 F.3d at 248.  The statements regarding, in particular, Redman and Smith's role in creating and enforcing an internal control environment that would ensure compliance with the Code of Ethics

28

(which Redman personally and knowingly violated), are not the type of "soft" ethical proclamations found inactionable.

### f.    Defendants' Statements in ProPetro's IPO Documents Are Actionable

ProPetro generally challenges the false statements in ProPetro's 2017 IPO Documents. ProPetro Br. at 19-21.  For example, ProPetro points to statements regarding its efforts to comply with Section 404 of SOX, concerning Defendants' duties to evaluate internal controls.   ¶¶244, 246.  As Plaintiffs alleged, these disclosures were false and misleading because they did not inform investors that the Company was *already* suffering from inadequate controls.   ¶¶245, 247. Defendants' only response is to state that it was "not yet required to conduct, and had not yet conducted, an assessment of its controls at the time of either offering."  ProPetro Br. at 20.  But whether or not ProPetro was required to conduct such an assessment is unrelated to the question of whether the controls themselves were adequate, and whether they should have been making statements designed to assure investors that they were.  *See In re LendingClub*, 254 F. Supp. 3d at 1115.   Beyond that, the Complaint pleads that Redman's improper share pledges and certain related-party transactions occurred at the time of or before the IPO, which establishes that ProPetro's internal controls were deficient before and at the time the IPO occurred.  ¶¶104, 245. The defendants in *LendingClub* made similar arguments to Defendants here, which the court summarily rejected.  The court found that "[t]hough LendingClub never directly admitted that the same internal controls existed at the time of the IPO or that those controls suffered from material weaknesses at that time, the specific facts alleged in the complaint corroborate the express allegation to that effect."  *In re LendingClub*, 254 F. Supp. 3d at 1115.

2. **Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions Concerning Defendants' Related-Party Transactions**

ProPetro's materially deficient internal and disclosure controls resulted in the Company's failure to detect and disclose several related-party transactions, as required by Item 404. *Supra* Section VI.A.1.; *see also* ¶77.

The Financial Accounting Standards Board ("FASB") has provided useful guidance on disclosure of related-party transactions, noting that

> [i]f the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control ***could result*** in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises.

Statement of Financial Accounting Standards No. 57 ("FAS 57") ¶4.

FASB noted that "there is a general presumption that transactions reflected in financial statements have been consummated on an arm's-length basis between independent parties. However, that presumption is not justified when related-party transactions exist because the requisite conditions of competitive, free-market dealings may not exist." FAS 57 ¶15. Thus, investment community commentators, including the *Wall Street Journal*, describe related-party transactions as "red flags": "Many in the accounting profession have interpreted this to mean that the concept of materiality when applied to related-party transactions has a different meaning. If the relationship has the *potential* to distort the financial information, it should be disclosed, whether or not there are material amounts involved."[9]

---

[9] Art Berkowitz & Richard Rampell, *Related-Party Transactions Can Be an Investment Red Flag*, WALL ST. J. (Aug. 29, 2002) (emphasis in original).

30

Courts have applied these principles in finding that materiality determinations, already frowned upon at the pleading phase, are even more delicate where related-party transactions are concerned. *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 407 (S.D.N.Y. 2013) (finding omissions concerning related-party transactions were actionable, because it could not conclude "as a matter of law that these omissions 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' particularly in light of the alleged related-party nature of the transaction under Item 404(a)."). Stated differently, "disclosure is the overriding principle" when it comes to related-party transactions. *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008). Further, in the case of related-party transactions, courts sometimes view omissions and misstatements as a whole to determine whether disclosure was required. *See S.E.C. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014) (holding that the number of transactions, and their total value, rendered the omissions material). Even where an individual disclosure transgression might alone be immaterial, taken together, the series of omitted related-party transactions here is material.

> **a.** **Plaintiffs Adequately Allege that Statements Concerning Related-Party Transactions in ProPetro's SEC Filings Were Materially False and Misleading**

Defendants' omissions of related-party transactions rendered several of their statements false and misleading. Specifically, Defendants represented in ProPetro's quarterly and annual filings that "[a]ll related party transactions are immaterial and have not been separately shown on the face of the financial statements." ¶¶265-66, 280-81. ProPetro also made representations concerning related-party transactions in its proxy statements. In particular, in its April 2018 proxy statement, ProPetro listed related-party transactions but omitted several material transactions, as described below. ¶288. Further, the proxy statement explained ProPetro's "policies and

procedures for related party transactions," and explained that any such transaction "must first be presented to our audit committee for review, consideration and approval. All of our directors and executive officers are required to report to the audit committee chair any such related party transaction." ¶¶289, 291. The Complaint alleges that these statements were materially false and misleading because ProPetro failed to disclose that its Defendants were engaging in illicit, concealed related-party transactions.

As a threshold matter, Defendants do not challenge the falsity of their statements in ProPetro's SEC filings that do not relate to specific transactions. *See* ProPetro Br. at 8-18. Instead, Defendants complain that the Complaint "takes an impermissible shotgun approach" to alleging the falsity of these statements. ProPetro Br. at 9. This is wrong. *See* Section IV.A.5, *infra* (regarding "puzzle pleading"). To the contrary, the Complaint alleges that these statements were materially false and misleading because they omitted the related party transactions that Defendants were engaging in and benefitting from when these statements were made.

    **b.**  **Plaintiffs Adequately Allege that the Clarabby Transactions Rendered Defendants' Statements Materially False and Misleading**

The Complaint alleges that Denholm wholly owned an entity called Conquistador Capital, LLC ("Conquistador"), and, along with his business partner Adam Cunyus, shared 50-50 ownership of Dahlia Development, LLC ("Dahlia"). Further, Cunyus wholly owned Clarabby Development, LLC ("Clarabby"). ¶114. During the Class Period, both Dahlia (50% owned by Denholm) and Conquistador (wholly owned by Denholm) loaned Clarabby $770,000 so that it could purchase an iron testing facility that was later leased—***and then sold***—to ProPetro for $2.3 million. ¶¶187-189. (The lease and sale of the iron testing facility are collectively referred to as the "Clarabby Transactions"). Thus, Denholm (through his companies Dahlia and Conquistador),

made it possible for Clarabby (owned by his partner) to procure a facility that was then sold to ProPetro.

ProPetro argues that the Clarabby Transactions were quantitatively and qualitatively immaterial because they did not pertain to ProPetro's core operations.  ProPetro Br. at 10.  Putting aside whether that is true or false, the materiality of the Clarabby Transactions—related-party transactions—must be viewed with a wider lens.  *See supra* IV.A.2.a.[10]  Further, materiality cannot properly be disputed where, as here, the price of ProPetro's stock declined "more than 9%," on what investors viewed as "a negative report questioning business dealings among [ProPetro's] executives and board members."  ¶185.

Most critically, the Company itself concluded that the Clarabby Transactions were material and were required to be disclosed, because it did so on November 13, 2019.  ¶¶187-88.  ProPetro's disclosure of the Clarabby Transactions, coinciding with Denholm's abrupt departure from ProPetro, evidences materiality.  Further, on June 22, 2020, the Company admitted to two related-party transactions "entered into that were not identified by the Company's controls and given the appropriate level of disclosure," referring to the Clarabby Transactions.  ¶¶211-12.

Denholm claims that he had ***no role*** in the Clarabby Transactions because he was not the legal owner of Clarabby, which was the only entity that contracted directly with ProPetro, and the

---

[10] The cases ProPetro relies on are inapposite because they do not address the materiality of related-party transactions.  ProPetro Br. at 9.  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (misstatements concerned real estate loans); *In re Lone Pine Res., Inc.*, , 2014 WL 1259653, at *4-5 (S.D.N.Y. Mar. 27, 2014) (misstatements concerned disruption in pipeline use). And while *ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187,195 (2d Cir. 2009), does concern related-party transactions, that case differs from the present action because plaintiffs had alleged that defendants should have disclosed a related-party transaction which "would have led to a chain reaction" revealing fraudulent activity.  Plaintiffs here do not base their allegations on such attenuations; rather, they allege that the undisclosed related party transactions should have been disclosed as material because they reflected an undisclosed culture of noncompliance stemming from the top.

transaction did not need to be disclosed.  Denholm Br. at 9-12.  But his indirect interest in Clarabby rendered it a related-party transaction, as made clear by Item 404 and ProPetro's own policies. ¶¶77, 97, 251.  Here, Denholm owned and half-owned, respectively, two entities that participated directly in the transaction at issue by loaning Clarabby the funds to purchase the iron testing facility that was later sold to ProPetro.  ¶¶115, 188-89.  In other words, Denholm—through his approval of the loans from Conquistador and Dahlia to Clarabby—had a direct say-so in Clarabby's ability to purchase the iron testing facility, and he was thus standing on both sides of the transactions.  In addition, Clarabby was wholly owned by Denholm's business partner (with whom he co-owned Dahlia), and it strains credulity to conclude he was not conflicted.

> **c.  Plaintiffs Adequately Allege that Defendants' Omissions Concerning PBEX Were Materially False and Misleading**

The Complaint also alleges that during the Class Period, Defendant Denholm—ProPetro's Chief Accounting Officer—was also the Chief Financial Officer at PBEX, LLC ("PBEX"), a Texas company that purchases oil and gas rights.  ¶¶116-117. Denholm's employment at PBEX was never disclosed to investors.  ¶118.  This was important because Denholm, as ProPetro's Chief Accounting Officer, was charged with critical oversight of the internal and disclosure controls that proved to be insufficient.  ¶¶113, 232.  Investors should have been able to evaluate the Company in light of the fact that Denholm was splitting his time with PBEX.

ProPetro argues that there was no duty to disclose Denholm's position as CFO at PBEX, again asserting that such disclosure would be immaterial because Item 404 requires disclosure only of "transactions with the registrant company."  ProPetro Br. at 11-12.  But ProPetro misconstrues the materiality of Denholm's employment at PBEX, which is that it served as a major distraction

from Denholm's responsibilities as the Chief Accounting Officer at ProPetro, which indeed, led to oversights and failures in the Company's internal and disclosure controls.[11]

Denholm also claims that he did not have any duty to disclose his position with PBEX because Plaintiffs did not identify or allege that any improper transaction occurred between Denholm and PBEX.  Denholm Br. at 8.  This also misconstrues the allegations, which is that Denholm was so distracted by his employment at PBEX that he failed to perform the functions of his role as Chief Accounting Officer at ProPetro.  Investors were entitled to know that Denholm's efforts were being shared with PBEX.

Further, Denholm unfairly characterizes the Complaint as "merely assert[ing] that both PBEX and ProPetro are businesses operating in the oil and gas industry in Midland."  Denholm Br. at 8.  The Complaint does much more than that.  It explains that PBEX shares close relationships with ProPetro, including that PBEX's chairman is Wes Perry, who serves on the board of directors of Viper Energy, which controls Diamondback Energy, one of ProPetro's largest customers.  ¶119.  It is not a leap to conclude that Denholm and Perry share a close relationship, which could inure to the benefit of Viper Energy; it is a reasonable inference that the Court must make at this stage.

---

[11] ProPetro and Denholm cite *Fries v. N. Oil and Gas*, 285 F. Supp. 3d 706, 717-720 (S.D.N.Y. 2018) for the proposition that failure to disclosure an executive's employment at a different company is not actionable.  However, there, the court found only that there was no fraudulent intent, not that the omission was not material.  Here, in contrast, Denholm's work at PBEX contributed to the Company's myriad material flaws, and was therefore material.  Similarly, *Magruder v. Halliburton Co.*, 350 F. Supp. 3d 452, 459 (N.D. Tex. 2018), is inapposite because the claims were dismissed as puffery, and did not relate to an executive's employment at a second company.

> **d.     Plaintiffs Adequately Allege that Defendants' Omissions Concerning PT Petroleum Rendered Defendants' Statements Materially False and Misleading**

The Complaint alleges—and ProPetro has admitted—that ProPetro provided services valued at over $55 million to PT Petroleum, LLC ("PT Petroleum") during the Class Period, and that Defendant Armour was the president of PT Petroleum. ¶126. Defendants should have disclosed related-party transactions involving PT Petroleum.  ¶213.  Specifically, ProPetro provided services to PT Petroleum amounting to $16.7 million and $39 million, respectively, during 2017 and 2018.  ¶213.  Defendants were required to disclose these related-party transactions at the time they occurred, but did not do so until ProPetro filed its 2019 Form 10-K addressing the results of the Audit Committee Investigation in June 2020.  *Id*.  The Complaint alleges that ProPetro's failure to disclose its transactions with PT Petroleum rendered its statements about related-party transactions materially false and misleading.  ¶¶253, 267, 281, 290, 304.

ProPetro argues in response that the relationship between ProPetro and PT Petroleum did not have to be disclosed because it was quantitatively immaterial.  ProPetro. Br. at 10.  But materiality is more broadly construed in the context of related-party transactions, and in any event, should not be decided on this motion to dismiss.  Importantly, ProPetro itself admitted it should have disclosed the transactions with PT Petroleum.  ¶¶211-12.

*Zagami*, 540 F. Supp. 2d 705, is instructive.  In that case, the court held that several undisclosed related-party transactions, whose dollar amounts were relatively small, were material and thus actionable.  In so holding, the Court noted that "in some cases[,] the significance of an item may be independent of the amount involved.  For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately even though the dollar amounts are relatively small."  *Id.* at 710.  Thus, "'disclosure is the overriding principle' governing related party transactions, because while they are not 'inherently

bad, they have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial transactions . . . [and] are difficult to measure economically because they may not be comparable[.]'" *Id.* at 711 (quoting *In re Am. Preferred Prescription, Inc.*, 1997 WL 158401, at \*3 n.11 (Bankr. E.D.N.Y. Mar. 21, 1997)); *see also In re Bear Stearns Co., Inc. Sec. Deriv. and ERISA Litig.*, 763 F. Supp. 2d 423, 472 (S.D.N.Y. 2011) ("Under FAS 57, related party transactions were to be evaluated with a high degree of professional skepticism.").

ProPetro's argument that Plaintiffs' allegations concerning the PT Petroleum transactions are speculative because those transactions never "led to any of these harms" posed by related-party transactions also fails. *See* ProPetro Br. at 12. First, this argument ignores the fact that speculative concerns are exactly what related-party disclosure rules are designed to allay. *See* ¶¶246, 278 ("material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and loss of customers"). Related-party disclosures are warranted whenever the relatedness "'*could* result in operating results or financial position of the reporting enterprise [to be] significantly different from those that would have been obtained if the enterprises were autonomous.'" *S.E.C. v. Escala Grp., Inc.* 2009 WL 2365548 (S.D.N.Y. July 31, 2009) (quoting FAS 57). Second, such detail is not required at the pleading stage. Second, ProPetro's argument also suggests that the only way for a concealed related-party transaction to be material is if it causes "harm." *See* ProPetro Br. at 12. The question of whether these transactions were immaterial cannot be determined, as a matter of law, on this pleading motion. Defendants suggest investors do not care whether publicly-traded companies are concealing related-party transactions that benefit management. That proposition is absurd; such misconduct plainly would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Southland*, 365 F.3d at 362.

> **e.     Plaintiffs Adequately Allege that Defendants' Statements and Omissions Concerning Defendants' Improper Expense Reimbursements Were Materially False and Misleading**

ProPetro did not disclose until August 8, 2019, that Smith and Redman had been improperly reimbursed $364,000 for expenses that the Company was not supposed to cover. ¶149. These improper expense reimbursements demonstrated to ProPetro that its internal and disclosure controls were deficient, causing the Company to embark on a serious undertaking to overhaul its entire internal and disclosure control regimen, and, ultimately, to sever its relationship with Redman altogether, and confirm that the deficiencies at the Company were the product of a poor "tone at the top."

ProPetro argues that the Complaint "double-counts" these reimbursements. ProPetro Br. at 13-14. Not so. Instead, ProPetro's own disclosures show that it retroactively changed the reported compensation to reflect, for Redman, an additional $142,570 for 2017 and an additional $285,615 for 2018 and, for Smith, an additional $9,301 for 2017 and $5,845 for 2018. ¶214. These amounts, which do not even include 2019 payments, total far more than the amount of the expense reimbursements ProPetro admitted. From the beginning of the Class Period ProPetro indicated that it would "review" and disclose all "transaction with related persons that are required to be disclosed." ¶251; *see, e.g.,* ¶¶265-66, 280, 289. The Complaint alleges that the $370,000 in compensation, paid principally to Redman and Smith, was subject to that policy, and should have been disclosed. ¶¶253, 267, 281, 290. As a result of the Audit Committee Investigation, the Company acknowledged that Redman and Smith actually received more than $364,000 in expense reimbursements that should have been disclosed. ¶149. There is no double-counting.[12]

---

[12] Defendants cite cases to suggest that the allegations are not well-pled. These cases are inapposite because here, Plaintiff clearly explained why each statement is false. *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2005) (finding that plaintiffs failed to clearly match the alleged misstatements with the legal issues at hand);

Strangely, ProPetro argues that it cannot be held liable for omitting related-party transactions in its quarterly reports because Item 404 only applies to annual reports. ProPetro Br. at 14-15. But *every single one* of its quarterly reports on Form 10-Q issued during the Class Period contained a section listing related-party transactions and stating that "[a]ll related party transactions are immaterial and have not been separately shown on the face of the financial statements." ¶¶265-66. Because it omitted other related-party transactions it had a duty to disclose, ProPetro's statements were false and misleading.

Finally, the weight of the allegations, and ProPetro's own admissions, indicate that improper payments to Redman and Smith were already occurring *before and at the time of* the IPO. ProPetro told investors at the time of the IPO that it was *strengthening* its internal controls. ¶251; *see also* ProPetro Decl., Ex. 1 at 27. Now it asks the Court to presume that the improper reimbursements to its two co-founders only happened after it went public. Moreover, when ProPetro issued revised compensation figures—which reflect an additional $142,570 to Redman for 2017—it notably did *not* limit to it to the post-IPO period. ¶214.

### 3. Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions Concerning Defendant Redman's Undisclosed Share Pledges

ProPetro disclosed for the first time on March 16, 2020 that Redman had entered into two share pledge agreements to procure two multi-million-dollar ranches for his personal use, in violation of the Company's Code of Ethics and shareholders agreement. ¶¶89-108, 197-198. Specifically, during the Class Period, Redman pledged over 600,000 shares of ProPetro stock, worth more than $8 million at the time, as collateral for two personal loans. ¶103. The first share pledge agreement, executed in 2017, represented all of the ProPetro stock he owned at the time. ¶¶103-107.

39

When ProPetro finally disclosed these pledges, it admitted that Redman's pledge agreements violated its "Insider Trading Compliance Policy," which it had adopted in connection with its IPO in March 2017. ¶90. Specifically, the Insider Trading Compliance Policy "prohibits pledging the Company's securities as collateral to secure loans." *Id.* The reason for such prohibition is that pledging one's stock as collateral for loans creates unique and serious conflicts of interest. ¶93. In particular, share pledge agreements can "create[] a situation wherein Redman would benefit from liquidating his ProPetro shares to avoid defaulting on his personal loans, driving down the value of ProPetro's stock to the detriment of ProPetro and its shareholders." ¶102. That is why ProPetro "prohibit[s] pledging Company securities as collateral to secure loans." ¶94. Thus, the Company has characterized Redman's share pledges as "inappropriate conduct," and they eventually led to his separation from the Company. ¶95. The Complaint thus alleges that failing to disclose Redman's pledge agreement was a material omission, and that it should have been disclosed in each of the Company's SEC filings during the Class Period. ¶309.

The Complaint further alleges that Redman's share pledge agreement rendered certain statements false and misleading in the IPO Offering Documents and the 2017 Secondary Offering Documents. Specifically, the IPO Offering Documents represented that "[w]e, all of our directors and executive officers and holders of substantially all of our outstanding common stock will agree not to sell any common stock or securities convertible into or exchangeable for shares of common stock for a period of 180 days from the date of this prospectus." ¶237. They further stated that "[t]he Company and its officers and directors, and holders of substantially all of the Company's common stock have agreed with the underwriters, subject to certain exceptions, not to dispose of or hedge any of their common stock or securities convertible into or exchangeable for shares of common stock[.]" ¶¶237, 239. These statements were false and misleading because, in fact,

40

Redman had already entered into a share pledge agreement, in direct contravention of these statements. ¶240. Finally, the Complaint alleges that the IPO Documents represented that Redman was the beneficial owner of 2.9% of the Company, and the Secondary Offering Documents represented that he owned 1.6% of the Company. But since those shares were subject to the share pledge agreement, investors were misled because they had no way of knowing about the encumbrances on Redman's ownership stake in the Company. ¶¶242-243.

In addition to those specific statements, the failure to disclose the share pledge agreements rendered additional statements false and misleading, including that Redman was in compliance with ProPetro's Code of Ethics and Conduct, the Company's Insider Trading Compliance Policy, and that ProPetro's internal and disclosure controls were adequate. ¶238.

ProPetro has only two defenses to these allegations. *First*, it argues that the statements in the IPO and 2017 Secondary Offering Documents were contained in "lock-up agreements," which are "form agreements supplied as annexes to the offering documents." ProPetro Br. at 16.[13] Because these "inure solely to the benefit of the Underwriters, the Company and the Selling Stockholders," Defendants claim the statements are inactionable. ProPetro Br. at 16. But claims made outside of official regulatory filings are regularly upheld as actionable. In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Product Liability Litigation*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017), the court found that assurances on Volkswagen's emissions compliance stickers, provided to consumers, were actionable under the securities laws. It noted that there is no rule that "*only* market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements under Section 10(b)," and

---

[13] Defendant Redman makes the same argument, which similarly fails. *See* Redman Br. at 9.

concluded that "the Court cannot declare as a matter of law that a reasonable investor would not have considered the emissions stickers on Volkswagen vehicles to be material investing information; such an assessment is 'peculiarly one[] for the trier of fact." *Id.* (citing *TSC Indus.*, 426 U.S. at 450).[14]

ProPetro also argues that it does not matter that the share pledges put Redman in violation of the Company's Code of Ethics, which the Company's SEC filings direct investors to review and which was maintained on the Company's website. ¶91; ProPetro Br. at 16 n.18. Defendants argue that because the Code of Ethics was not specifically incorporated into the Company's SEC filings, the failure to disclose Redman's share pledges are not actionable. *Id.* However, a CEO's violations of a code of conduct and insider trading policy is inarguably material, regardless of where those are posted. *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221 (S.D.N.Y. 2019) (statements regarding code of conduct were actionable as false statements once transgressions were revealed). And as noted, misstatements need not appear in SEC filings to be actionable.[15]

---

[14] The cases ProPetro relies on do not stand for the proposition that a statement in an underwriter agreement can never be actionable. In *Greenfield Children's Partnership v. Friendfinder Network, Inc.*, 590 Fed. App'x 854 (11th Cir. 2014), the misstatements concerned the issue of whether there was a lockup agreement. That is not the case here, where the assurances within the lockup agreement—not to pledge stock—are at issue. Further, in *In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 638 (S.D. Tex. 2018). In that case, the court held that "reasonable investors understand that similar statements [in underwriter agreements] are not affirmative disclosures by a company about its financial health." The statements at issue here differ because they are not descriptions of the company's financial health, but commitments that a particular course of conduct will be followed. Whereas an investor might understand that a qualitative observation about the financial health of the company might be particularized to the specific underpinnings of an underwriter agreement, statements that company's management will not engage in particular illegal and unethical behaviors are not subjective or context-specific.

[15] ProPetro also focuses on the misstatements in the beneficial ownership tables, arguing without any support that they were immaterial. ProPetro Br. at 17-18. However, as explained, materiality is not a basis to dismiss at the pleading stage.

Redman sets forth three additional arguments, each of which fail.  *First*, he argues that Plaintiffs do not "articulate why an investor would care that a miniscule percentage of the Company's stock was pledged to financial institutions."  Redman Br. at 5-6.  He relatedly argues that because he did not default on the loans, and because there are no allegations that he was likely to default on his loans, that he was not required to disclose the share pledges.  Redman Br. at 6-7.  These arguments ring hollow.  The materiality of Redman's concealed share pledges lies not in its size relative to the Company's market capitalization, but rather in the fact that Redman was flouting the Company's Code of Ethics and Insider Trading Policy.  The Company agrees, as evidenced by its proscription of *all* such pledge agreements, and not merely those over a certain percentage of the Company's market cap.  ¶94.  Further, Redman conveniently ignores the well-pled allegations in the Complaint explaining "why these non-alleged disclosures would have been material to a reasonable investor."  *See* Redman Br. at 6; ¶¶94-108.

*Second*, Redman argues that statements in ProPetro's Code of Conduct and Insider Trading Compliance Policy are not actionable as a matter of law because they are merely "aspirational," and are thus "immaterial."  Redman Br. at 7-9.  That is incorrect.  Statements in codes of conduct can be actionable, particularly where their specific language is transgressed.  *See* authority cited *supra*, VI.A.3.[16]

---

[16] The cases Redman relies on are inapposite.  They involve codes that "merely 'express[] opinions as to what actions are preferable as opposed to implying that all staff, directors, and officers always adhere' to their requirements." *See* Redman Br. at 9 (citing *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 625 (S.D. Tex. 2018) (discussing *Bondali v. Yum! Brands, Inc.*, 620 Fed. App'x. 483, 490 (6th Cir. 2015)). The codes there, do, in fact, read like aspirational statements of company policy.  In *In re Plains*, the company Code of Conduct stated that the company "supported its commitment to safe and environmentally responsible operations through extensive and ongoing education" and that the company's "commitment [to safe and environmentally responsible operations] also includes compliance with applicable environmental, health, and safety rules, laws, and regulations." 307 F. Supp. 3d at 607.  These statements refer to general "commitments" and compliance with existing rules and regulations and do not reference any

43

While statements in a code of conduct or ethics that are "too open-ended, indefinite, or subjective," such as statements that a company strives to "comply with applicable laws," as in *In re Plains,* 397 F. Supp. 3d at 622-23, 639-40, and statements that are "too general to constitute a guarantee," as in *Bondali*, 620 Fed. App'x at 16 n.18, may not be actionable, highly specific statements that are "directly related to the subject of the fraud" including "representations about . . . purported controls for avoiding conflicts [that are] directly at odds with [a company's] alleged conduct" are actionable. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 PAC, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014). The statements at issue in ProPetro neatly fall into this category. In addition to expressing ProPetro's general "fundamental policy. . . to conduct its business with honesty and integrity in accordance with the highest legal and ethical standard," the ProPetro Code of Ethics independently (a) required that Defendants Redman and Smith, as ProPetro's CEO and CFO, respectively, implement and maintain "a system of internal accounting controls sufficient to provide reasonable assurances" that all transactions were properly executed and recorded; (b) prohibited the Individual Defendants from "willfully, directly or indirectly . . . falsify[ing], or caus[ing] to be falsified, any book, record or account of the Company;" (c) required that the Individual Defendants "comply with the spirit as well as the letter of this Code, and must not attempt to achieve indirectly, through the use of agents or other intermediaries, what is prohibited directly by this Code;" and (d) required that the Individual Defendants "not permit themselves to be placed in a position that might give rise to even the appearance [of] a conflict of interest." ¶¶96, 97, 99.

---

concrete policy or practice. *Id.* at 626. Likewise, in *Bondali*, the statements at issue represent a company commitment to "food safety." *Bondali*, 620 Fed. App'x at 487, 490. But there is no ambiguity here about ProPetro's prohibition of share pledges that Redman entered into, not once, but twice.

44

*Third*, Redman cites to a series of cases alleging that the SEC requirement that companies post codes of ethics makes it impossible that securities fraud occurs each time one is violated. *See* Redman Br. at 8. This argument is inapplicable here because (1) investors were directed to ProPetro's Code of Ethics in several SEC filings and (2) the statements at issue relate to the conduct of individual defendants and the defendants each signed a Certificate of Compliance with the Code of Ethics. First, the code at issue in *In re Cognizant Tech Solutions Corp. Sec. Litig.*, No. 216-CV-06509-WHW-CLW, 2018 WL 3772675, at *18 (D.N.J. Aug. 8, 2018), was an "internal document." By contrast, the ProPetro Code of Ethics was available on the ProPetro website and referenced in several SEC filings. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. at 463 (distinguishing statements in codes of conduct that were referenced by the company in other contexts). Second, Plaintiffs do not allege, as in the cases Defendants cite, that the omission of the Defendants' Code violations made the Code or the announcement of the Code misleading, but that the affirmative statements in the Code itself and the Individual Defendants' affirmative statements that they were adhering to the Code, and specifically to the portions of the Code which applied to them as individuals, were false and misleading because the Individual Defendants actively violated the Code which they certified they were in compliance with. *Cf. City of Roseville Emps.' Ret. Sys. v. Horizon Lines Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) ("Plaintiffs suggest that defendants had a duty to disclose violations of their Code of Ethics, and their failure to do so rendered the Code itself misleading.").

### 4. Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions Concerning Audit Committee Independence

The IPO Offering Documents stated that the Company's statements that it would appoint an audit committee consisting "solely of independent directors" was false and misleading. ¶254. Despite that ProPetro asserted that it would appoint an independent Audit Committee, the

45

Company appointed Alan Douglas to the committee, who as a friend and accountant to Redman, was not an independent director according to the NYSE Listed Company Manual.   ¶254. Defendants dispute that allegation, alluding only generally to the NYSE Listed Company Manual. ProPetro Br. at 22.   In fact, Douglas's relationship to Redman fell within the ambit of non-independence as conceived by the NYSE Listed Company Manual, which does not provide an exclusive and comprehensive list of relationships that would disqualify one from being "independent."   To the contrary, the NYSE Listed Company Manual opines that "[i]t is not possible to anticipate, or explicitly provide for, all circumstances that might signal potential conflicts of interest . . . .   Accordingly, it is best that boards making "independence" determinations broadly consider all relevant facts and circumstances. . . . Material relationships can include . . . accounting . . . and familial relationships, among others. . . *[T]he concern is independence from management.*"   NYSE Listed Company Manual § 303A.02(a) (commentary).   These allegations describe identify ProPetro's statements regarding its Audit Committee as false and misleading.

### 5.      The Complaint Is Not a Puzzle

In an apparent effort to distract from its own wrongdoing, ProPetro argues that Plaintiffs engaged in impermissible puzzle-pleading.  ProPetro Br. at 9.  That is not correct.  The pleading requirements are such that the false statements and the reasons why they are false must be identified with particularity, and for the allegations of scienter to be similarly particularized.  The Complaint follows the format of the best complaints in this field: it has a "Preliminary Statement" summarizing the case (¶¶4-21); a largely chronological "Summary of the Fraud" section containing the overall factual narrative (¶¶41-219); and specific sections setting forth, in detail, additional scienter allegations (¶¶220-34) and Defendants' alleged false statements (¶¶236-308). Each such section is clearly labeled, with subheadings.  The Table of Contents provides a high-level roadmap of this organization.  More specifically, each false statement is clearly identified,

46

with emphasis used to identify the particular misrepresentation in context of longer block quotes, and the reasons demonstrating falsity for each such statement are set forth immediately thereafter. *See, e.g.*, ¶¶236-238. Care was taken to avoid repetition as much as possible while adhering to the particularized pleading requirements, and so references were made to earlier sections that described the overall fraudulent scheme.

ProPetro points to false statements concerning its related-party transactions, and argues that they cannot be false and misleading because the facts underscoring falsity—the improper expense reimbursements, the Clarabby Transactions, and the PT Petroleum transaction—did not occur until after the statements were made. ProPetro Br. at 9-10. However, in the face of the Company's admissions that its defective internal controls resulted from a pervasive and risky "tone at the top" (¶207), coupled with its admission that it was experiencing "growing pains" (ProPetro Br. at 8), it is reasonable to infer that the Company's statements concerning its internal and disclosure controls, as well as its related-party transactions, were false at the time of both the IPO and the Secondary Offerings.

The cases ProPetro cites are inapposite. In *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005), ProPetro Br. at 9, the plaintiff extracted a litany of false statements and then provided just a summary paragraph of why *all* the foregoing statements were false. *Id.* at 857. Here, in contrast, Plaintiffs specified after each false statement exactly why it was false and misleading, and thus no puzzle piecing is required. ¶¶236-308. And in *N. Port Firefighters' Pension v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 739 (N.D. Tex. 2013), ProPetro Br. at 9, the plaintiffs referred generically to "defendants" throughout the complaint, leaving the court to guess who was responsible for which statement. Here, in contrast, the Complaint identifies precisely which Defendants are responsible for which false statements. *See, e.g.*, ¶¶236 (Redman

47

and ProPetro); ¶239 (Redman, ProPetro, Armour and Smith); ¶241 (same); ¶245 (same); ¶246 (Redman, Smith, Denholm and Armour); ¶247 (ProPetro Redman, Smith, Denholm and Armour); ¶252 (same); ¶256 (Redman and Smith); ¶257 (same); ¶261 (Denholm); ¶268 (Redman, Smith, Denholm and Armour); ¶272 (Redman and Smith).[17]

### B.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Scienter is a mental state that encompasses *both* intentional misconduct and severe recklessness. *Spitzberg v. Houston Energy Co.*, 758 F.3d 676, 684 (5th Cir. 2014) (recklessness established where "danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious the defendant must have been aware of it."); *see also Southland*, 365 F.3d at 366 (citing *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981)); *Bachow v. Swank Energy Income Advisers, L.P.*, 2010 WL 70520 (N.D. Tex. Jan. 6, 2010) ("Scienter is properly pled where it is alleged that a defendant knowingly or recklessly made statements to the market while aware of facts that, if not disclosed, would render those statements misleading.") (citing *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696-97 (5th Cir.2005)).    "Both intent and 'severe recklessness' are sufficient to satisfy the substantive scienter requirement."    *In re ArthroCare Corp. Securities Litig.*, 726 F. Supp. 3d. 696, 711 (W.D. Tex. 2010) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407-08 (5th Cir. 2001)).

A plaintiff can plead scienter by raising a strong inference that the defendant acted with severe recklessness. *Spitzberg*, 758 F.3d at 683; *see also Nathenson*, 267 F.3d at 410

---

[17] Denholm argues that Plaintiffs "fail[] to attribute any specific statements to him," Denholm Br. at 6, but the Complaint specifically alleges that Denholm signed ProPetro's quarterly reports for the third quarter of 2017, the first, second, and third quarters of 2018, and first quarter of 2019 (¶260); its annual reports for 2017 and 2018 (¶268); and the 2017 Secondary Offering Documents (¶246), the 2018 Secondary Offering Documents (¶249).  That is all that required to find that Denholm "made" the statements therein.  *S.E.C. v. Killion*, 2017 WL 7052310, at *6-7 (S.D. Tex. Mar. 24, 2017) (discussing *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)).

(circumstantial evidence can establish scienter). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. 308, 324 (2007). Instead, a scienter inference is "strong" when it is as likely as any other inference. *Id*. "[A] tie favors the plaintiff." *Spitzberg*, 758 F.3d at 686.[18] A plaintiff may establish scienter without alleging motive, even when reasonable, nonculpable inferences exist. *Tellabs*, 551 U.S. at 325. However, "motive and opportunity may meaningfully enhance the strength of the inference of scienter." *Nathenson,* 267 F. 3d at 412.

In evaluating scienter, "courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true." *Tellabs,* 551 U.S. at 309. The question is "whether all of the facts alleged, *taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard*." *Id*. at 322-23; *see also Bachow*, 2010 WL 70520, at * 6 ("[T]he court considers the plaintiff's evidence of scienter cumulatively.").

---

[18] Defendants' cases regarding the scienter standard do not support dismissal, as the Complaint satisfies the standards expressed. For example, *Alaska Elec. Pension Fund v. Flotek Indus., Inc.,* 915 F.3d 975, 983 (5th Cir. 2019) (ProPetro Br. at 25) supports Plaintiffs, as the Court articulated a standard that is satisfied here, holding that scienter **would be established** by allegations indicating the defendants knew or should have known of information at odds with their public statements. *See Flotek*, 915 F.3d at 983 (Plaintiffs "fail[ed] to allege that [defendant] knew of this lack of quality control at the time he made the statement, or that it would have been so obvious that he should have known."). No such failure is present here. In *Local 732 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016) (ProPetro Br. at 26), the plaintiff relied entirely on general allegations about the importance of the subject matter to the company—there were no allegations tying the individual defendants to the matters misrepresented in public statements. *Diodes,* 810 F.3d at 957 (recognizing scienter established by allegations that "the misrepresented or omitted information at issue *would have been* readily apparent to the speaker.") Defendants' other cases similarly fail to establish a basis for dismiss.

### 1.  Defendants' Exploitation of ProPetro's Deficient Internal Controls Supports a Strong Inference of Scienter

Each of the Individual Defendants is alleged to have been personally involved in transactions that ProPetro was required by SEC rules to disclose, but did not.  All of these transactions were also subject to internal ProPetro policies that were violated, with the exception of Redman's and Smith's illegitimate expense reimbursement, because ProPetro had no expense policy whatsoever.  These allegations establish scienter for each of the Individual Defendants, as each actually knew or was severely reckless in not knowing about fundamental deficiencies in ProPetro's internal controls and disclosure controls.  *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 652 (N.D. Tex. 2010) (defendants' knew of misrepresented information due to personal involvement).

### a.  Redman Had Actual Knowledge of His Own Undisclosed Share Pledges

There is no dispute that: (1) Redman pledged all of his ProPetro stock two months before the IPO (which pledge remained in effect at the time of the IPO and afterwards); (2) Redman personally signed the IPO Lock-Up Agreement representing that he had not encumbered his ProPetro shares and that he would not do so for 180 days following the IPO; (3) ProPetro's own policies, which were publicized to investors, explicitly "prohibit[ed] pledging the Company's securities as collateral to secure loans"; and (4) Redman personally executed a certification that he had complied fully with those policies.  ¶¶90-94.  Thus, there is no dispute that Redman violated the IPO Lock-Up Agreement that he signed and that was filed with the SEC as an attachment to IPO Offering Documents (which he also signed), and that he violated ProPetro's own internal policies, which he personally certified he did not violate.[19]

---

[19] Defendants lean heavily on *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194 (10th Cir. 2015), where the court found the defendant had no reason to think his share pledges were prohibited for the simple reason that *they were not*.  Unlike the case at bar, in *Zagg* there was neither a corporate policy barring pledges nor a contract that explicitly forbade pledging.  *Id*. at 1204.  Here, the

Both ProPetro and Redman concede that "Redman may have been aware that the pledges violated ProPetro policies or the lockup agreements." ProPetro Br. at 30.[20]  In the face of this, ProPetro offers the conclusory argument that Redman did not "deliberately" hide his share pledges from shareholders, before quickly pivoting to distance itself from Redman's clear culpability.  *Id*.  Given that Redman signed documents acknowledging he could not pledge his shares, and also signed documents pledging those shares, these allegations give rise an inference that Redman was at a minimum ***severely*** reckless.

ProPetro and Redman suggest that Redman was not explicitly aware that investors would find it important that he, the CEO, was in violation of ProPetro's code of conduct and had breached a contractual agreement with the Company's underwriters.  But it is not Defendants' prerogative to determine what is material to investors.  Materiality is determined from the perspective of a reasonable investor, *TSC Indus.*, 426 U.S. at 450, and should not be conflated with scienter, *Lormand*, 565 F.3d at 253-54 (sustaining scienter allegations over argument that defendants "did not intend to deceive the public because they believed the information as not material or otherwise subject to public disclosure"); *see also Zagami*, 540 F. Supp. 2d at 713 (rejecting defendants'

---

existence of such documents establish Redman's knowledge of his pledges and their impropriety, as well as a motive not to disclose them.  Moreover, unlike *Zagg*, where the defendant disclosed the pledges in his own SEC filings at the "first appropriate opportunity," *id.*, Redman himself never admitted to the pledges – *ProPetro* was forced to do so over three years after the first pledge agreement in January 2017.  Likewise, in *Fries*, the Court did not even find that there *was* a code of conduct violation.  285 F. Supp. 3d at 719.  Here, ProPetro conceded that Redman violated both ProPetro's code of conduct, his personal certification of compliance with that code, and a contract with the IPO underwriters.  And in *Chill v. Gen. Elec. Co.*, the misconduct was committed by a trader at a subsidiary of the defendant company – not the CEO who personally made misstatements.  101 F.3d 263, 265 (2d Cir. 1996).

[20] Redman "incorporates by reference" ProPetro's "entire motion," with the sole "exception of ProPetro's arguments regarding the adverse interest exception."  Redman Br. at 3.  ProPetro's concession that Redman had knowledge of his share pledges was made in the context of arguing that Redman lacked scienter, not that the adverse interest exception bars imputation to ProPetro.

51

argument that allegations did not "adequately demonstrate that [defendants] knew the transactions were material").[21]

Redman also argues that because he personally benefitted from the share pledges by securing loans for lavish real-estate purchases, Plaintiffs are relying on "speculative" motive and opportunity allegations.[22]  First, Plaintiffs do not speculate that "Redman concealed the pledges to facilitate private real estate transactions."  Redman Br. at 11.  It is an objective fact that the pledges facilitated the transactions, and the pledges were contrary to public disclosures.  ProPetro concedes this.  Second, Plaintiffs do not need to rely on motive and opportunity allegations because there is clear evidence of Redman's personal knowledge of the pledge agreements, the IPO Lock-Up Agreement, and ProPetro policies that explicitly prohibited his pledges.  Third, motive and opportunity allegations, where present, *support* scienter, and Redman had a strong motive to conceal his share pledges because they violated ProPetro rules and would have likely been unwound if disclosed.  *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 2d 575, 601 (W.D. Tex. 2014) (fee structure provided motive to misrepresent life expectancy calculations for insurance portfolio).  Moreover, since Redman's pledges violated the IPO Lock-Up Agreement, the underwriters could have walked away from the IPO or demand they be unwound—disrupting ProPetro's first public offering.  The pledges contradicted Redman's and ProPetro's public

---

[21] Moreover, ProPetro has conceded that Redman's share pledges were "subject to public disclosure."  *Lormand*, 565 F.3d at 253-54; *see also* ¶¶89-90.

[22] ProPetro does not bother arguing that Redman lacked a motive to conceal his pledges.  Redman makes an attempt, but his supposed authorities betray him.  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) simply found that a desire to keep stock prices high, and stock sales that were not unusual, did not establish a motive in that case.  And in *Rosenzweig*, 332 F.3d at 867-68, scienter was not sufficiently alleged because, *inter alia*, the plaintiffs relied on a post-hoc report to show knowledge—not documents personally executed by the defendants at or before the time of the misstatements contradicting those executed documents.

statements to investors.  The Complaint also alleges that Redman lost his job—and ProPetro its

CEO—once ProPetro was compelled to acknowledge the pledges publicly.

Redman resorts to mischaracterizing his *verboten* pledges as "'accounting irregularities.'"

Redman Br. at 18 (quoting *Shaw*, 537 F.3d at 545).[23]  This is not a semantic game:  Redman agreed

not to pledge stock, represented his stock was unencumbered, and certified that he was complying

with a Code of Conduct that prohibited stock pledging.  Yet, he pledged his stock repeatedly to

buy expensive real estate.  Spotting the contradiction did not require expert judgment to apply

labyrinthine accounting standards.  *Parmelee v. Santander Consumer USA Holdings, Inc.*, 2018

WL 276338, at *6 (N.D. Tex. Jan. 3, 2018) (simplicity of standards supports scienter).[24]  These

allegation support a strong inference of scienter.

        **b.**        **Redman and Smith Had Actual Knowledge of Their Expense Reimbursements and Undisclosed Related-Party Transactions**

As ProPetro first disclosed on August 8, 2019, Redman and Smith each personally received

thousands of dollars in improper reimbursements since the IPO.  In the case of Redman, ProPetro

announced that this totaled more than $346,000 in less than three years.  ¶149.  ProPetro *also*

---

[23]  In *Shaw*, which involved accounting for acquisitions and long-term contracts, there were no allegations that the individual defendants were themselves involved in misconduct, nor any "mea culpa from the company in the form of acknowledged wrongdoing," 537 F.3d at 535, whereas ProPetro has admitted pervasive wrongdoing by its former executives and parted ways with them. ¶¶90-94, 164-169, 206-208.  *In re Franklin Bank Corp. Securities Litigation*, 782 F. Supp. 2d 364, 382 (S.D. Tex. 2011), also involved alleged accounting violations, and the court found scienter lacking where there were no allegations that the individual defendants had improper motives or were personally involved in misconduct (indeed, the plaintiff alleged that the CEO was insistent on proper internal controls).  *In re Plains* also did not involve allegations directly implicating the individual defendants, and the court declined "to infer scienter based on a combination of corporate office and generalized access to reports to corporate information." 307 F. Supp. 2d at 542 (S.D. Tex. 2018).

[24]  Moreover, Redman's share pledges pre-dated the statements that misleadingly omitted them, unlike the allegations in *R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005), where scienter was not established by the defendants' alleged knowledge of an equivocal body of facts that might or might not have affected the company's *future* ability to complete a transaction.

retroactively revised compensation disclosures for Redman to reflect an additional $142,570 for 2017 and an additional $285,615 for 2018. ¶214.[25] ProPetro also retroactively revised Smith's compensation figures to include an additional $9,301 for 2017 and $5,845 for 2018. *Id.* Defendants quibble with the exact numbers, but do not dispute that Redman and Smith—the Company's co-founders—personally received thousands of unreported and improper payments from the Company.[26]

ProPetro conceded these payments were improper and compelled Redman and Smith to reimburse the Company hundreds of thousands of dollars. The fact that ProPetro did not even *have* an employee expense reimbursement policy contributes to, rather than undermines (as Defendants propose, *see, e.g.*, Smith Br. at 13) the inference of scienter for Redman and Smith. Each of them personally certified the adequacy of ProPetro's internal controls despite the total absence of a policy governing the thousands in improper payments they received. That ProPetro compelled both Smith and Redman to pay the money back even is clear evidence that the payments they received were facially illegitimate.

Defendants rely on cases that find "conclusory allegations of state of mind" insufficient to establish scienter, ProPetro Br. at 29, though those cases are entirely inapposite. In *Nathenson*, the court found that there *was* a strong inference of scienter as to the company's CEO because of his position, the importance of the matter to the company and its shareholders, and the fact that

---

[25] These additional amounts total $428,185 for 2017 and 2018 alone, far more than $346,000. Redman shies away from this discrepancy, while ProPetro accuses Plaintiffs of "double-counting," ignoring the fact that its *own* retroactive revisions total far more than $346,000.

[26] ProPetro also disputes allegations regarding a previously-concealed related party transaction, confusingly suggesting that the *partner* of its former executive officer (*not* the officer himself) reimbursed ProPetro $150,000, yet these amounts were included in ProPetro's own executive compensation figures. *See* ProPetro Br. at 21 n.11.

statements were specifically attributable to him. 267 F.3d at 407-08, 425.[27] Plaintiffs in this case do not need to rely on "conclusory allegations" to suggest knowledge. That Redman and Smith knew of improper employee reimbursements is established by the fact that they *personally received those reimbursements*. And their knowledge that ProPetro had no employee expense review and approval policy at all is established by the fact that they each repeatedly submitted reimbursement requests and certified that they had assessed ProPetro's internal controls. Both things cannot be true, and Defendants capitalization on the absence of such a policy reflects their knowledge of the deficiencies.

Smith posits that his admitted knowledge of receipt of improper payments does not matter because it was not a lot of money to him. Smith Br. at 14. This *post hoc* logic ignores the facts (1) that, as evidenced by multiple analyst reports, investors would find it material that ProPetro's CFO was personally receiving improper expense reimbursements while assuring them that he had evaluated and certified the adequacy of the Company's internal controls, ¶¶154-59, and (2) that his years-long concealment of his own improper reimbursements could—and did—cost him his job, ¶¶194-98. Smith's after-the-fact, self-serving argument that his misconduct was "not worth it" does not detract from his knowledge or recklessness and the attendant strong inference of scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

---

[27] In a footnote (ProPetro Br. at 29 n.36), ProPetro seeks support from *In re Hertz Global Holdings Inc.*, 906 F.3d 106 (3d Cir. 2018). But that case involved complex accounting rules for "un-invoiced non-fleet vendor obligations, capitalization and timing of depreciation for non-fleet capital, accruals for customer rewards programs, and reserve estimates associated with allowances for doubtful accounts, among others." *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *6. The plaintiff there failed to connect an allegedly inappropriate "tone at the top" with the specific accounting violations that occurred. *Hertz*, 906 F.3d at 117. Here, each Defendant was involved in straightforward examples of undisclosed misconduct and cannot disclaim actual knowledge of that misconduct.

55

In a related argument, Smith proposes that his personal stake in six other companies, including companies in the Permian Basin oil business, is not relevant to his consistent failure to ensure the Company appropriately disclosed its related-party transactions during the Class Period. Smith Br. at 12-13.[28]  That would be illogical even were it not alleged (1) that *every single one* of those companies is also connected to another Defendant[29] and (2) "South of the Border Materials, LLC" (which was created by Smith, Redman, and other ProPetro employees) lists ProPetro's telephone number as its own.[30]  Smith cannot disclaim knowledge that ProPetro's management was deeply entangled in other companies in the Permian Basin oil business, which contributes to the inference that he signed off on ProPetro's financial disclosures and internal controls certifications with scienter.

### c.   Denholm Had Actual Knowledge of the Clarabby Transactions and His Own Employment at PBEX

Denholm, like other Defendants, was personally involved in more than one of the transactions underlying Defendants' material misstatements.

### (1)   The Clarabby Transactions

On October 31, 2019, before any admission from any Defendant on the subject, the Culper Report informed the market that ProPetro was investigating the Clarabby Transactions, specifically that Defendant Denholm was a founder and controlling member of one of the Clarabby

---

[28] Smith also asks the Court to take notice of the truth of documents that are neither referenced in the Complaint nor subject to judicial notice, which is improper. Smith Br. at 12-13. *See, e.g., Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 603 (W.D. Tex. 2014).

[29] In addition to those six companies, ProPetro rents equipment from another business owned by Redman and Smith.  ¶124.

[30] Smith also asks the Court to believe that the Jeff Smith listed as a member of Energy Entrepreneur Fund 1, LLC (along with Redman, Denholm, and Armour) and of Lore Venture Group LLC (as one of two members along with Redman), ¶127, is in fact a different Jeff Smith. Smith Brief at 13.  Smith provides no evidence, nor would it be properly considered on this motion.

entities, and that that entity had sold at least two properties to ProPetro in 2018.  ¶¶179-182.  Only after that, on November 13, 2019, did ProPetro disclose the Clarabby Transactions and admit they constituted related-party transactions valued at approximately $3.6 million.  ¶¶187-190.  Denholm does not dispute that he had a material interest in the Clarabby Transactions: two companies that Denholm owned 100% and 50% of, respectively, put up the money for Clarabby to enter into transactions whereby ProPetro paid out well over $3 million.  "While related-party transactions are not per se unlawful," they are viewed "with 'extreme skepticism,' especially when they go undisclosed."  *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (quoting *McCurdy v. S.E.C.,* 396 F.3d 1258, 1261 (D.C. Cir. 2005)).

Defendants argue that the Clarabby Transactions do not support an inference of scienter as to Denholm because he "had no incentive to hide that transaction."  ProPetro Br. at 27; *see also* Denholm Br. at 27.[31]  Setting aside what *incentive* may have existed, Denholm *knew* he entered into the transactions, and he either *knew they needed to be disclosed* or, as the Chief Accounting Officer, was *severely reckless* in not knowing that.  This at least as compelling as any innocent inference and it supports scienter.

Specifically, since Denholm's duties encompassed internal and disclosure controls, the strongest inference is that he was aware that the Clarabby Transactions—which far exceeded the $120,000 threshold applied by both the SEC and ProPetro itself—should have been disclosed both internally and publicly.[32]  The Clarabby Transactions involved $3.6 *million*.  Indeed, ProPetro regularly disclosed related-party transactions that involved smaller amounts than the Clarabby

---

[31] ProPetro attempts to minimize the issue by referring to a single "transaction," despite the earlier admission that ProPetro entered into multiple Clarabby transactions.

[32] Denholm's defense that he "has not been a ProPetro officer since Fall 2019" is an unsuccessful attempt to spin his abrupt resignation in his favor.  *See* Denholm Br. at 21.

Transactions.  ProPetro Decl., Ex. 1 at F-27 (listing $18,000 in receivables from related parties); s*ee also* ¶123; *Zagami*, 540 F. Supp. 2d. at 713 ("repeated disclosure of . . . small transaction raises a strong inference that [defendants] knew that the related-party transactions at issue in this case were material as well").  These allegations are sufficient to support a strong inference that Denholm "understood the nature of these transactions and that they should have been disclosed." *Zagami*, 540 F. Supp. 3d at 713.

Moreover, Defendants' suggestion that Denholm did not realize the transaction had to be disclosed to investors skips a step: given the approval process ProPetro described, and the fact that ProPetro had to contractually obligate Denholm to provide information about the Clarabby Transactions, the strongest inference is that Denholm did not follow ProPetro's own policies in connection with the Clarabby Transactions (and neither the Company nor the Audit Committee otherwise detected his involvement in them).

That Denholm's "incentive" point fails is evidenced by the fact that he *lost his job* after the Clarabby Transactions came to light, and the explicit reference to those transactions in his separation agreement further indicates that that was why he was terminated.  Furthermore, his undisputed material interest in the Clarabby Transactions permits the Court to draw the reasonable inference that Denholm derived a benefit from them.[33]  *See also supra* Section IV.B.3.

### (2)    *Denholm's Moonlighting at PBEX*

As to the undisputed fact that Denholm was the Chief Financial Officer of another oil company in Texas—PBEX—during the Class Period, ProPetro claims it had no idea.  This is

---

[33] Thus, the reasoning in *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012), does not apply. There, the defendants had no interest in the transaction either when it was entered into or when it was consummated.  Moreover, there "the defendants themselves admitted their mistake." 2012 WL 3957916, at *19.  ProPetro did not acknowledge the Clarabby Transactions until the Culper Report forced its hand.

sufficient to establish that Denholm had a motive not to disclose his PBEX employment to ProPetro investors. This further supports scienter.

Denholm argues that the fact that he concealed his role as CFO at another company while serving as CAO at ProPetro suggests "mere mismanagement" rather than scienter, and that Denholm simply concluded that disclosure of this second role was not necessary. *See* Denholm Br. at 19. In light of the facts alleged in the Complaint, this argument is unavailing. The Complaint alleges that while engaging in related-party transactions and secretly serving as the CFO of another company, Denholm signed ProPetro's quarterly SEC filings representing the adequacy of the Company's internal controls and the truth of its disclosures. ¶¶113-121, 224, 226. The Complaint alleges further that Denholm was forced to resign during the pendency of the Audit Committee Investigation, and that the Investigation ultimately concluded that "tone at the top" contributed to severe control deficiencies at the Company. ¶¶206-207, 231. *See In re WageWorks Sec. Litig.*, 2020 WL 2896547, at *7 (N.D Cal. June 1, 2020) (scienter where investigation found that "senior management" failed to communicate key information, and "[h]ad the reporting error stemmed from a mere . . . failure at oversight, WageWorks would not have identified management's failure to communicate information as a key reason for the false financial reports"). In light of these facts, the inference of scienter is at least as compelling as the competing, non-fraudulent inference. *See Tellabs,* 551 U.S. at 322-23.

Denholm also suggests that scienter cannot be established as to Denholm's role at PBEX because those allegations do not rise to the level of related-party transactions. Denholm Br. at 19 (citing *Lewy*, 2012 WL 3957916, at *20). *Lewy* is inapposite. There, the court was discussing a commitment to a *proposed* transaction rather than any actual reality. 2012 WL 3957916, at *3. Further, Denholm's suggestion that the *Lewy* court declined to find scienter because of the

uncertainty of the existence of related-party transactions is highly misleading. Instead, the court simply found that in light of the facts there, even if there were related-party transactions, there was no sufficiently strong inference of scienter. *See id.* at *19. To the contrary, the Complaint sets forth allegations detailing the improper nature of Denholm's involvement with PBEX and his failure to disclose it. ¶¶113-121.

### d. Armour Had Actual Knowledge of the PT Petroleum Transactions

Defendant Armour's principal scienter defense is that he did not know that $55 million of transactions between his company and ProPetro had to be disclosed. Armour Br. at 7. Even were that true, it merely establishes his severe recklessness. Armour does not dispute that, while Chairman of ProPetro and President of PT Petroleum, he had contemporaneous knowledge of multi-million-dollar transactions between the two companies. Nor does he dispute that the SEC required disclosure of related-party transactions involving over $120,000 (¶77) and that ProPetro had a policy requiring that the audit committee of its Board (*the same Board that Armour chaired*) review and approve related-party transactions exceeding that same $120,000 threshold (¶289). Armour cannot deny these facts—he signed the 2018 Secondary Offering Documents that described ProPetro's review process for related-party transactions (¶¶249, 289), as well as SEC filings that disclosed related-party transactions involving far less money than the transactions between ProPetro and PT Petroleum. ¶268.[34] Armour did not simply have "knowledge of omitted facts," he was also aware, or severely reckless for not being aware, of ProPetro's duty to disclose those omitted facts. *Cf. Shivangi v. Dean Witter Reynolds, Inc*., 825 F.2d 885, 889 (5th Cir. 1987).

---

[34] By contrast, in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.* the allegations did not even establish that the "technical GAAP violations" were improper. 540 F.3d 1049, 1069 (9th Cir. 2008).

Armour also seeks to substitute his own view of the materiality of related-party transactions for those of the SEC and ProPetro itself, calculating the percentage of ProPetro's revenues that the PT Petroleum transactions involved. That calculation is irrelevant: ProPetro had an affirmative duty under Item 404 to disclose the PT Petroleum transactions in the annual reports that Armour himself signed. ¶77. And, in fact, the Audit Committee Investigation ultimately resulted in the disclosures of these transactions. Thus, this is entirely different from *Shivangi*, where the defendants proved at trial that they "fully disclosed all that the SEC specifically requires." 825 F.2d at 889. Here, the materiality of the wrongfully-omitted information to investors is a question that cannot be resolved at this stage. Moreover, in light of the magnitude of the transactions (for 2018, *325 times* the reporting threshold), Armour's singular role as Chairman of ProPetro's Board, the undisputed breakdown in ProPetro's internal controls, and the well-recognized risks posed by related-party transactions, materiality is sufficiently pleaded.

Finally, though Plaintiffs do not have to allege motive, the allegations show that Armour was motivated to conceal from investors that his transactions violated internal policies and to present ProPetro's internal controls as robust. ProPetro eventually disclosure that "[s]ubsequent to the issuance of the consolidated financial statements for the year ended December 31, 2018," it "identified" the PT Petroleum transactions in 2017 and 2018. The clear inference is that ProPetro's Board did not review and approve the transactions as required by the policy it described to investors. The incentive not to acknowledge that the PT Petroleum transactions were entered into in violation of clear corporate policies is sufficient motive to establish Armour's scienter.[35]

---

[35] The fact that ProPetro disclosed that Armour was president does not excuse their failure to disclose the PT Petroleum transactions. Nowhere does Item 404 say disclosing other management positions is enough, and its purpose is to encourage disclosure so investors can make informed decisions.

e.     **Defendants' Related-Party Transactions Are Not Based on "Hindsight"**

ProPetro's argument that Plaintiffs allege "fraud by hindsight" is betrayed its own concessions and authorities. *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 43-44 (1st Cir. 2017) (scienter not established by sales decline that occurred after the alleged misstatements about sales); *see also Owens v. Jastrow* ("Each 'red flag' is alleged to have become knowable only" after most alleged misstatements, and each was "disclosed promptly."); *City of Pontiac v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014) ("In essence, plaintiffs allege that defendants *should have* predicted the impairment of the highly-rated (i.e., AAA-rated) assets.") (emphasis in original).  And in *Zagg*, there were no alleged corporate policies regarding the underlying conduct, whereas here share pledges were entirely prohibited (¶90) and related-party transactions were required to be reviewed and approved by the Audit Committee (¶¶251, 289).  Moreover, as already discussed (*see supra* IV.B.1.b), the fact that ProPetro compelled Redman and Smith to repay hundreds of thousands of dollars in improper reimbursements even though no explicit policy was violated is strong evidence that the expenses were facially illegitimate.

2.     **Redman, Smith, and Denholm Had Personal Responsibility for ProPetro's Internal Controls**

Redman and Smith's scienter is bolstered by their repeated execution of SOX certifications stating that they had designed, or caused to be designed, disclosure controls and procedures "to ensure that material information . . . is made known to us," and that they had "evaluated" those controls and procedures and deemed them effective.  These SOX certifications are probative of scienter because both Redman and Smith, by virtue of their personal involvement in internal control violations, knew, or had reason to knew or suspect, that ProPetro's disclosure controls were ineffective.  *Cf. Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019) (SOX certifications are probative of scienter if officer had reason to know or suspect that financial

62

statements were false or misleading).  Plaintiffs need not rely on "red flags" that might suggest the falsity of ProPetro's public statements.  Redman and Smith were each personally aware of facts that contradicted their multiple positive evaluations of ProPetro's internal controls before responsibility for those evaluations was taken away from them.

Redman argues that the lack of internal controls in and of itself does not give rise to a strong inference of scienter.  Redman Br. at 16.  This argument ignores the myriad allegations in the Complaint detailing how Defendants—including Redman—exploited the deficiencies in ProPetro's internal controls to engage in and conceal related-party transactions, and how the Company's Audit Committee ultimately concluded that material deficiencies existed in ProPetro's internal controls driven by an improper "tone at the top" and "culture of noncompliance."  ¶¶206-207.  Specifically, ProPetro admitted that its "failure to maintain an appropriate tone at the top had a pervasive impact," ¶207, that its management "did not sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," and that there was "a general lack of focus on promoting a culture of compliance within the Company," ¶208.  These admissions negate Redman's argument and support a strong inference of scienter.

Smith also argues that his responsibility for monitoring ProPetro's controls and related SOX certifications do not contribute to a strong inference of scienter,  Smith Br. at 15, and that the Complaint alleges no facts showing that Smith had knowledge of falsity when certifying ProPetro's controls, *id.* at 16.  First, Smith's argument ignores that for purposes of scienter, recklessness is enough.  The Complaint has, at a minimum, established Smith's recklessness.  Second, this argument also ignores ProPetro's admissions about the falsity of those statements, and the Audit Committee's conclusion and ProPetro's ultimate admission that management—including Smith—contributed to the material weaknesses in ProPetro's

controls. *See Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1189 ("For [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements.").

Moreover, though Denholm did not execute SOX certifications, as Chief Accounting Officer from August 2017 until his October 2019 resignation, he was directly responsible for maintaining, applying, monitoring, and improving the Company's internal and disclosure controls. His responsibility for the Company's controls contributes to a strong inference that he was aware they were either nonexistent or failing. Denholm himself was involved in undisclosed related-party transactions, and thus had reason to know that because ProPetro "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions," ¶211, other related-party transactions (such as those with PT Petroleum) have easily been concealed without the required investor disclosures.

### 3.    Massive Executive Turnover at ProPetro During the Class Period Supports a Strong Inference of Scienter

Redman's, Smith's, Armour's, and Denholm's resignations and demotions, the resignation of General Counsel Mark Howell, and the reshuffling of ProPetro's Audit Committee just before the announcement of the Audit Committee Investigation all support a strong inference of scienter. All of these personnel changes are clearly connected to discovery of ProPetro's internal control problems, related-party transactions and/or violations of the Company's code of conduct and ethics—the subjects of the alleged fraud—making their circumstances highly suspect and not susceptible to Defendants' efforts at benign explanation or mere coincidence.

Defendants' arguments are both divorced from the facts and rest on the self-serving proposition that resignations and departures can *never* support an inference of scienter. Armour Br. at 9; Denholm Br. at 22; Smith Br. at 10-11; Redman Br. at 19. Not so. Courts in the Fifth Circuit have held that where specific evidence indicates that the resigning officials knew of

64

fraudulent activity, those resignations may support an inference of scienter. *See In re ArthroCare*, 726 F. Supp. 2d at 725.[36]  Particularly where terminations or resignations are accompanied by allegations of wrongdoing that connect defendants with the fraud, such departures will support a strong inference of scienter. *See Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *34 (E.D. Tex. Oct. 19, 2017) (sudden terminations of defendants, coupled with an acknowledgment by the Company after the Class Period that company's "operational challenges" were "exacerbated under the previous management regime" contributed to inference of scienter).

The allegations in the Complaint do not rely on the "mere" occurrence of multiple demotions and resignations to establish scienter, but rather explain in detail how those departures are connected to the alleged fraud, including in some instances by the Company's own admission. ¶¶139-42, 149-56, 228, 230, 231.  This is akin to the facts in *Rent-A-Center*, where the court found that defendants' resignations supported an inference of scienter in light of a post-class period admission from the company that the "previous management" regime contributed to challenges faced by the company.  2017 WL 6398742, at *34.

To start, ProPetro has blamed its former management for the Company's severe internal control deficiencies and resulting inappropriate transactions, admitting that its senior management "did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company," and that the "*failure to maintain an appropriate tone at the top had a pervasive impact*, resulting in a risk that could have impacted *virtually all* financial statement account balances and disclosures."  ¶¶15, 206, 253, 301, 362.  It

---

[36] Even Defendants' authorities acknowledge this.  *Hertz,* 905 F.3d at 118 ("The departure of corporate executive defendants is a factor that can strengthen the inference of scienter.").

is in the midst of these findings that Defendants Redman and Denholm departed the Company, Smith was stripped of his role as CFO, and Armour was replaced as Chairman. ¶¶140, 230, 349.

First, Redman's resignation followed multiple disclosures directly connecting him to the alleged fraud. ¶¶35, 89, 194-203, 228. The Complaint alleges that Redman's resignation was announced at the same time as disclosure of Redman's improper share pledges, which objectively violated multiple agreements he personally signed and the Company's Code of Ethics. Redman, like Smith and Denholm, was personally responsible for certifying the Company's internal controls, which the Company *admits* suffered multiple material weaknesses, and which were adversely affected by those executives' failure to set the appropriate "tone at the top." ¶¶15, 208, 221. His resignation also followed the Board stripping him of responsibility for certifying the accuracy of ProPetro's public SEC filings. ¶¶227, 228. These facts, combined with the fact that Redman forfeited a significant amount of compensation in connection with his resignation, demonstrate that his resignation *was* a result of his role in the fraud. ¶¶35, 89, 194-203, 228. The alternative explanation—that Redman's resignation was a mere coincidence or unrelated to the admissions that the Company's prior statements were untrue is neither plausible nor supported by any facts alleged in the Complaint. For example, if not for his role in the conduct at issue here, why would Redman, the founder and "key man" at ProPetro, give up compensation? These facts cannot be stripped from the Complaint, or reality, based on the Defendants' implausible, counterfactual *ipse dixit* that Redman's resignation was unrelated to the alleged fraud.[37]

---

[37] Moreover, ProPetro's argument that the resignations of its top leadership had no connection to their admitted misconduct is contradicted by its own attempt to pin blame on Redman. ProPetro Br. at 31 (arguing that Redman acted adversely to ProPetro).

In the cases Redman cites, the plaintiffs set forth no allegations that the defendants had knowledge of the fraud at the time of their departures. *See* Redman Br. at 19.[38] This is in stark contrast to the Complaint here, which pleads that Redman had knowledge of the falsity of his statements and that he took advantage of ProPetro's deficient internal controls for his personal benefit. ¶¶102, 223, 225, 234, 245, 253.

Second, the Complaint similarly alleges that Smith was stripped of his responsibility for certifying ProPetro's financial statements and was responsible for the poor "tone at the top," which supports a strong inference of scienter. ¶¶227-28. His demotion came at the same time that the Company disclosed the Audit Committee Investigation and its early finding that Smith benefitted from improper related-party transactions. ¶¶139-40, 230. Smith was then demoted a second time from his executive post entirely, foregoing significant amounts of compensation. ¶¶8, 36, 229. Specifically, Smith was cut out of ProPetro's incentive compensation and cash bonus plan. ¶229. These serial demotions, coupled with Smith's foregone compensation, suggest that there was intentional misconduct implicating Smith and support a strong inference of scienter. *Id.*[39]

Third, Defendant Denholm suddenly resigned "at the request of the Company" during the pendency of the Audit Committee Investigation. ¶231. The announcement of Denholm's

---

[38] *See Rosenzweig v. Azurix Corp.*, 332 F.3d at 867 (summarily reasoning that the resignations were "probative only of the fact that the company was failing," which Defendants do not contend here); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 478 (S.D. Tex. 2016); *In re ArthroCare*, 726 F. Supp. 2d at 724-25. Further, *ArthroCare* recognizes that there are, in fact, circumstances under which departures can be probative of scienter: where facts are set forth—like they are here—that the departure was connected to the underlying fraud. *Id.* at 724-25.

[39] Defendant Smith's cases are inapposite. In *Southland*, 365 F.3d at 382-83 (5th Cir. 2004), the plaintiffs failed to set forth any allegations connecting the resignations to the underlying fraud. Similarly, in *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002), the court found that "nothing in the complaint points to any information that would indicate that either the resigning officials, their replacements or other defendants knew of any accounting irregularities or that such irregularities were the reason for their resignations."

67

resignation was accompanied by a statement that Denholm had notified ProPetro of previously undisclosed transactions that the Company was continuing to investigate. ¶353. Denholm, as Chief Accounting Officer, was personally responsible for administering the accounting and controls over the very policies he allegedly manipulated be entering into related-party transactions totaling over $3.5 million. ¶¶186-190. Denying that these actions are "connected" to his resignation is not plausible. The timing and circumstances of Denholm's resignation coupled with the fact that he was effectively forced out supports a strong inference of scienter. *See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (termination "for cause" supported strong inference of scienter).

Fourth, in addition to the demotion and replacement of ProPetro's three most senior executives, ProPetro made significant Board changes, including replacing Armour as Chairman of the Board, immediately prior to the announcement of the Audit Committee Investigation. This supports a strong inference of scienter. *See WageWorks, Inc*., 2020 WL 2896547, at *6 (scienter where defendants' resignations were announced in the same press release that announced the need for a restatement and finding that "the use of the same statement and the close temporal proximity to the initial revelations weigh against an innocent inference"). The Complaint alleges that less than one month before disclosing that the Audit Committee Investigation had *already* completed "[s]ubstantial work" (and was expected soon to be finished), ProPetro replaced Defendant Armour as Chairman of the Board. ¶147.[40] Additionally, two members of the Audit Committee—Steven Beal and Royce Mitchell—unexpectedly resigned. ¶¶19, 140, 142, 230. Given the nature and

---

[40] Armour's proposed innocent inference that he simply "resigned to make room for Phillip Gobe, who has extensive experience with publicly traded companies," Armour Br. at 10, falls flat in light of Armour's undisputed material interest in the undisclosed PT Petroleum transactions.

findings of the Audit Committee Investigation, these sudden Board changes support a strong inference of scienter.  ¶230.

### 4.   Defendants' Insider Sales Support a Strong Inference of Scienter

Contrary to Defendants' arguments, Defendants' insider selling supports a strong inference of scienter.  *See* Smith Br. at 7-10; Armour Br. at 10-12; Redman Br. at 19-20.  The Complaint alleges that during the Class Period, Defendant Redman sold more than 370,000 shares of ProPetro stock for proceeds of nearly $5.2 million, Defendant Smith sold over 220,000 shares of ProPetro stock for proceeds of over $3.1 million, and Defendant Armour sold 81,106 shares of ProPetro stock for proceeds of over $1.1 million, and sold an additional 225,100 shares of ProPetro stock throughout the Class Period, garnering additional proceeds of over $4.2 million.  These stock sales are suspicious in amount and add to the inference of scienter when viewed holistically with the other facts alleged in the Complaint.  In any event, plaintiffs are not required to allege insider trading for a finding of scienter.  *See Ramirez*, 334 F. Supp. 3d at 854.

### 5.   The Adverse-Interest Exception Does Not Bar Imputing Redman's Knowledge to ProPetro

ProPetro concedes that all of the Individual Defendants' knowledge can be imputed to it, with one exception: Redman's knowledge of his share pledges.  But black-letter law and courts in the Fifth Circuit, including Defendants' own authorities, require that Redman's knowledge be imputed to ProPetro. Redman acted with both actual and apparent authority when he made material misstatements to investors, and ProPetro derived benefits from those misstatements. As the Restatement explains, "notice is imputed to the principal of facts known to the agent, although the agent takes action intending to benefit only the agent or another person, when necessary to protect

the rights of a third party who dealt with the principal in good faith."  RESTATEMENT OF AGENCY, § 5.04 (June 2020).[41]

ProPetro argues that "Redman was acting 'for his own personal benefit'—in connection with personal real-estate transactions—and 'to the detriment of ProPetro,'" and thus that imputation is barred.  ProPetro Br. at 31.  This argument misapprehends the law.  Plaintiffs' claims arise from Defendants' material misstatements, not their underlying conduct, and Redman's misstatements did in fact benefit ProPetro.  Admitting Redman's misconduct in the IPO Offering Documents would have imperiled the IPO.  Instead, ProPetro raised millions from investors for its operations and thus benefitted.[42]

This reasoning extends to later misstatements concerning (or omitting) Redman's pledges. "While certainly benefitting himself . . . with his deceit," misstatements about Redman's pledges "also benefitted [ProPetro] in its efforts to bolster its perception in the eyes of investors."  *Lee v. Active Power*, 29 F. Supp. 3d 876, 885 (W.D. Tex. 2014); *see also Zagami*, 540 F. Supp. 2d at 714 (allegations that corporate officers "engaged in related-party transactions that required disclosure does not" permit the corporation to disclaim imputation of the officers' knowledge) (citing RESTATEMENT (SECOND) OF AGENCY §282(1) (June 2020)).

Indeed, the eventual disclosure of those pledges harmed ProPetro by exposing it to liability. ¶199 (ProPetro stock price fell 33.5% upon disclosure of Redman's pledges).  If that harm sufficed

---

[41] *See also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) ("The complaint alleges that third-party shareholders understandably relied on Chan's representations, which were made with the imprimatur of the corporation that selected him to speak on its behalf and sign SEC filings."); *Belmont v. MB Inv. Partners*, 708 F.3d 470, 479 (3d Cir. 2013).

[42] Defendants' first misstatements regarding Redman's stock ownership were made in the IPO Offering Documents.  However, ProPetro's adverse-interest argument has no bearing on Plaintiffs' Securities Act claims arising from the IPO Offering Documents, as those claims have no scienter requirement.

to prohibit imputation, scienter would not have been imputed in the cases cited by ProPetro.  In *Southland*, the Fifth Circuit did impute to the defendant company the knowledge of executives who allegedly conducted a "fraudulent scheme to deceive investors about the company's performance for the purpose of inflating the price of . . . stock *for their own financial benefit*."  365 F.3d at 360.  And in *FDIC v. Ernst & Young*, an auditor liability case, the court imputed to the corporation the knowledge of an executive who allegedly falsified records and misapplied corporate funds. 967 F.2d 166, 171 (5th Cir. 1992).  Lastly, *Barrett v. PJT Partners* counsels that ProPetro cannot disclaim Redman's knowledge given that Redman himself, in his capacity as CEO, made statements to the market, unlike the lower-level employee in that case.  2017 WL 3995606, at *8 (S.D.N.Y. Sept. 9, 2017) ("The determinative question is whether [employee] was involved in formulating [company's] internal controls or its disclosure of those policies to the market.").[43]

### 6.      Scienter Is Adequately Pleaded for the Filings Signed by Howell

Defendants cannot escape liability for misstatements in ProPetro's August 16, 2017 Form 8-K or its proxy statements simply because its fired General Counsel, Mark Howell, was the only one who personally signed those filings.  In the Fifth Circuit, scienter may be established by "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, *or who furnish information or language for inclusion therein, or the like*)."  *Southland,* 365 F.3d at 366.  That rule survives *Janus*, 564 U.S. 135.  *See Active Power*, 29 F. Supp. at 882-83.  It does not if only Howell signed those

---

[43] Finally, because ProPetro's adverse-interest defense, if credited (it should not be), raises a factual dispute, "this question may be better decided in the context of a summary judgment motion." *Taylor v. Scheef & Stone, LLP*, 2020 WL 4432848, at *3 (N.D. Tex. July 31, 2020) (quoting *F.D.I.C. v. Nathan*, 804 F. Supp. 888, 894-95 (S.D. Tex. 1992)).

filings, given that Plaintiffs have established scienter for Individual Defendants who "order[ed] or approve[d] it or its making or issuance, or who furnish[ed] information or language for inclusion therein, or the like." *Southland,* 365 F.3d at 366.

Plaintiffs plausibly allege that the Individual Defendants, the most senior directors and officers at the Company, had authority over the contents or issuance of the proxy statements. ¶330. The direct link between the alleged misstatements in these proxy statements and the admitted misconduct of each Individual Defendants strengthens the allegations of their authority. Moreover, each proxy statement stated that it reported beneficial ownership of ProPetro stock based on information "furnish[ed]" by such owners—including Redman. ¶242. *See In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017) (scienter where executive signed proxy with misleading statements).

ProPetro's August 16, 2017 Form 8-K was issued for the purpose of announcing that Defendant Denholm had been promoted to Chief Accounting Officer, and it falsely and misleadingly stated that Denholm had "no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K." ¶284. The 8-K was specifically about Denholm and necessarily relied on information "furnish[ed]" by him." *Southland*, 365 F.3d at 366-67.

### 7. Defendants' Remaining Arguments Fail

#### a. Scienter Is Not Undermined Simply Because, in Hindsight, the Fraud "Was Not Worth It" for Defendants.

Each of the Individual Defendants was personally involved in transactions that benefitted them, that violated ProPetro's internal controls, and that were not disclosed to investors. Defendants argue that these benefits were too small to justify the risks they took. Armour Br. at 7-8; Redman Br. at 13; Denholm Br. at 19-20; Smith Br. at 12. But Plaintiffs need not establish

72

motive—scienter can be established through knowledge or severe recklessness—or that Defendants' violation of the securities laws was wise.  Indeed, severe recklessness is inherently unwise.  *Tellabs*, 551 U.S. at 325 ("absence of a motive allegation is not fatal"); *see also Spitzberg*, 758 F.3d at 685 ("Even in Defendants[] were unable to benefit financially from their alleged misrepresentations . . . , such misrepresentations would still be severely reckless and dangerous to investors.").  At the time of the actionable misstatements, it is possible that the Defendants did not anticipate that they would be repeatedly demoted or lose their jobs entirely.  *See Makor Issues & Rights*, 513 F.3d at 710 (defendants' arguments against scienter "confuse[d] expected with realized benefits").  Defendants' hindsight-based argument that misleading investors ultimately was not worth it to them is entirely consistent with scienter.  Indeed, scienter can be adequately pleaded without *any* motive allegations whatsoever.

> **b.    ProPetro's Extensive Remedial Measures Bolster Scienter**

Defendants also claim that ProPetro's "remedial measures"—a near-total turnover in its executive leadership and a months-long internal investigation that nearly led to the delisting of ProPetro's stock—do not contribute to an inference of scienter.  As set forth above, *see supra* Section IV.B.3, the circumstances of the resignations and demotions of the Individual Defendants, each of whom is linked to internal controls violations, is strongly probative of scienter.  Moreover, ProPetro's argument that the prolonged length of its internal investigation suggests non-culpable inferences strains logic.  When ProPetro first disclosed the Investigation on August 8, 2019, it told investors it expected to complete the Investigation within thirty days.  ¶147.  Despite mounting investor concern (*see, e.g.*, ¶159, "overhand to persist until the process is completed;" ¶163, "until the dust settles with the investigation, it's hard to advocate buying the stock;" ¶173, "there is wood to chop on governance to make investors fully comfortable," ¶202 "expect shares to remain under significant pressure"), the Company did not finish the Audit Committee Investigation—or file its

quarterly report for the second quarter of 2019—until June 22, 2020, and did not become fully current in its reporting obligations until July 2, 2020, less than two weeks before its extended delisting deadline.  ProPetro's need to conduct a nearly year-long investigation to "avoid the publication of inaccurate filings," ProPetro Br. at 36, is probative of the pervasive nature of the Company's internal control violations during the Class Period.[44]

### C.   THE COMPLAINT ALLEGES LOSS CAUSATION

The Complaint adequately leads loss causation, which is subject only to Rule 8's notice pleading standard. *Pub. Emps. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v.Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014); *Lormand*, 565 F.3d at 239.  Thus, a complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc.   v. Broudo*, 544 U.S. 336, 346 (2005) (citation omitted); *accord Amedisys*, 769 F.3d at 320.  Plaintiffs must only establish at the pleading stage that it is *more probable than not* that it was the corrective disclosure . . . that caused at least a 'substantial' amount of price drop.  *Id.*; *see also In re Cobalt*, 2016 WL 215476, at \*6 (loss causation where "factfinder could reasonably infer that it is more probable than not that the corrective disclosures caused at least a substantial portion of these episodes of price decline.").  Courts must properly consider facts alleging loss causation collectively and in the light most favorable to the plaintiff.  *Amedisys*, 769 F.3d at 324.

---

[44] The earnings delays in *City of Pontiac Gen. Emps. Ret. Sys. v. Asar*, 2016 WL 1322484, at \*12 (W.D. Tex. Apr. 1, 2016) were found to suggest a "desire to avoid inaccurately certifying financial results," but ProPetro's delays did not begin until ***after*** the fraud began to be exposed.  ¶¶146, 190, 191, 204.

Relying on *Dura,* the Fifth Circuit explained in *Lormand* and *Amedisys* that to establish proximate causation, the plaintiff must allege that when the "relevant truth" about the fraud began to leak out, it caused the stock price to depreciate and thereby proximately cause the plaintiff's economic loss. *Lormand*, 565 F.3d at 255 (citing *Dura*, 544 U.S. at 342). Thus, plaintiffs need only allege that the truth that emerged was "related to" or "relevant to" the defendants' fraud and earlier misstatements. *Amedisys*, 769 F.3d at 320. The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true. *Id.* It *does not need to mirror* the earlier representation. *See id.*

The Fifth Circuit is also clear that the truth can be gradually perceived in the marketplace through a series of partial disclosures rather than one corrective disclosure. *Lormand*, 565 F.3d at 261. Courts "view[] these partial disclosures collectively and consider[] them as a whole to determine when cumulative facts support a corrective disclosure that meets the loss causation pleading standard, even though one of those facts on its own might be insufficient to plead loss causation." *Parmelee*, 2018 WL 276338, at *6 (loss causation where complaint alleged that defendant "released multiple partial disclosures which culminated in a corrective disclosure," including a resignation, the announcement of the delay in filing a Form 10-K and that the SEC had an open comment letter on the previous year's fiscal report, and a final announcement that the company was changing certain accounting methods) (citation omitted); *see also Amedisys,* 769 F.3d at 326 ("Where the Complaint sets forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in Amedisys stock value, and in the absence of any other contravening negative event, the plaintiffs have complied with *Dura's* analysis of loss causation.").

*August, 8, 2019.*  Defendants advance of a series of flawed arguments as to why Plaintiffs' alleged corrective disclosures fail.  First, Defendants argue that loss causation is not pled for ProPetro's August 8, 2019 disclosure of the Investigation into improper expense reimbursements and related-party transactions involving Redman and Smith because the disclosure "stated that the Audit Committee had not uncovered any undisclosed related-party transactions" and because Plaintiffs cannot attribute the entirety of the stock price decline to the announcement of the Investigation.  ProPetro Br. at 39-40.  Defendants essentially argue for a fact-for-fact "mirror image" disclosure, which is not required in this Circuit.  *See Amedisys*, 769 F.3d at 320.  The Complaint alleges that, through this disclosure, the market learned for the first time that the Company was investigating the potential for related party and other illicit transactions, and that based on the still-ongoing Investigation, the Audit Committee would likely conclude that ProPetro's internal controls suffered from material weaknesses.  ¶¶10, 150, 165, 352.  These disclosures offered "new" information that called into question whether their prior statements were accurate and complete.

Defendants' suggestion that the reason for the stock price decline must be pinpointed and disaggregated from other potential causes is a highly fact-specific question inappropriate at the motion to dismiss stage.  *See* ProPetro Br. at 40; *see, e.g.*, *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").

*August 30, 2019.*  Defendants next argue that ProPetro's August 30, 2019 announcement that its general counsel, Mark Howell, had resigned cannot be corrective because "Plaintiffs have not otherwise linked Howell to the matters at issue in the TAC in any way."  ProPetro Br. at 40-41.  This argument ignores the well-pled allegations in the Complaint, specifically that Howell's

resignation came in the wake of the Audit Committee Investigation, revealed further complications from that Investigation, with analysts confirming that Howell's "resignation should be considered in [the] context" of that Investigation.  ¶162.

*October 18, 2019.*  Defendants argue that the October 18, 2019 Reuters article reporting that the SEC had commenced an investigation into ProPetro's internal financial controls, disclosures, and financial reporting cannot be corrective because the disclosure of an SEC investigation can never be a corrective disclosure.  ProPetro Br. at 41-42.  The Fifth Circuit has rejected this argument and called a bright line rule that "government investigations can never constitute a corrective disclosure in the absence of discovery of actual fraud" to be "overly rigid." *Amedisys*, 769 F.3d at 324-25.  Specifically, "to require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." *Id.*  "A corrective disclosure can come from any source, and can take any form from which the market can absorb [the information] and react . . . so long as it "reveal[s] to the market the falsity" of the prior misstatements.  *Id.* at 322-25 (considering a *Wall Street Journal* article as a corrective disclosure and stating government investigations into suspected fraud "must be viewed together with the totality of the other alleged partial disclosures."); *Ramirez*, 334 F. Supp. 3d at 859 (noting that "the Fifth Circuit has considered both news articles that reveal information to the marketplace and government investigations of suspected fraud in the total mix of information to determine whether the alleged partial disclosures cumulatively plead loss causation").

Defendants relatedly argue that the market already knew through prior disclosures that ProPetro was likely to "find financial and disclosure control deficiencies and was investigating expense reimbursements and related party transactions," so the announcement of a SEC

77

investigation did not reveal anything more.  ProPetro Br. at 41.  This is a factual argument about what the market believed, based on Defendants' supposition rather than anything alleged in the Complaint.  It is both unsupported by the Complaint's allegations and procedurally inappropriate.  Defendants are asking this Court to draw inferences adverse to Plaintiffs concerning what the market knew, which is inappropriate at the motion to dismiss stage.  *See Amedisys*, 769 F.3d at 320.  Moreover, the Complaint alleges that the announcement of the SEC investigation signaled to the market how serious the issues were and that ProPetro's stock price declined in response.  ¶¶174-79.

*October 31, 2019.*  Defendants next assert that the Culper report issued on October 31, 2019 cannot serve as a corrective disclosure because it is based on public information and "did not reveal previously-concealed truths to the market."  ProPetro Br. at 42-43; Denholm Br. at 24-26.  First, Defendants focus on the inclusion of Denholm's resignation (disclosed on October 9, 2019) and his involvement with the previously-undisclosed Clarabby Transactions in the Culper Report.  However, the Complaint is clear that the Culper Report provided information far beyond that concerning Denholm and the Clarabby Transactions, specifically that Defendants and other ProPetro executives and Board members were the founders of, or were otherwise linked to, numerous other companies in the oil and gas industry.  ¶¶179-87.  Second, the Fifth Circuit has previously held that corrective disclosures can come in many forms.  *See, e.g.*, *Lormand*, 565 F.3d at 264 (quoting *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 297 & n. 237 (S.D.N.Y.2006) ("*Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.")).  Third, even if certain information in the Culper Report was previously available, this does not preclude it from serving as a corrective disclosure.  *Amedysis*, 769 F.3d at 323 ("At the pleading stage, . . . the WSJ Article should [not] be justifiably

pushed aside simply because the data it was based upon may have been technically available to the public, given that the raw data itself had little to no probative value in its native state.").

Denholm also argues with respect to the Culper Report that there cannot be loss causation because ProPetro's stock price increased after the Company disclosed the transactions on November 13. Denholm Br. at 24-25; *see* ¶¶187-88. This is both a fact question concerning what the market knew and a materiality argument inappropriate for resolution on a motion to dismiss.

***March 16, 2020.*** Finally, Defendants argue that ProPetro's March 16, 2020 disclosure cannot serve as a corrective disclosure. ProPetro Br. at 43-44. On March 16, 2020, ProPetro disclosed that Redman was resigning and forfeiting several million dollars of compensation, and that Smith was again being demoted from his executive post entirely and would similarly give up incentive compensation that he had been previously entitled to. ¶¶89, 194-96. ProPetro simultaneously disclosed that the Investigation uncovered that Redman, on at least two occasions and in violation of the Company's Code of Ethics and Conduct, Insider Trading Compliance Policy, several underwriting agreements, and the shareholders' agreement effective in January 2017, entered into pledge agreements covering, at times, all of Redman's ProPetro stock as collateral for personal loans. The same Form 8-K reported that Redman, in addition to the pledges, "engaged in other inappropriate conduct in connection with these personal loans." ¶¶90, 197.

Defendants argue specifically that Plaintiffs "ignore" the fact that COVID-19 was impacting the market, but Plaintiffs do not need to disaggregate macro-economic effects at the pleading stage. *See Amedisys*, 769 F.3d at 320.

***Other Disclosures.*** Defendants argue that the Complaint fails to allege loss causation for the allegations related to Denholm's moonlighting at PBEX and Armour's role at/ProPetro's transactions with PT Petroleum. ProPetro Br. at 43; Armour Br. at 13. Contrary to Defendants'

argument that these omissions were never corrected or revealed to the market, the Complaint alleges that the issues with Denholm's failure to execute his duties as CAO and additional related party transactions, were previously corrected and revealed to the market when Denholm and Armour were resigned and demoted, respectively, and when the Company admitted the existence of its internal control weaknesses. ¶¶17, 18, 38, 113-121, 126, 127, 140, 213, 223, 281, 304, 368.[45]

## II.   THE COMPLAINT STATES A CLAIM UNDER THE SECURITIES ACT

### A.   SECTION 11 CLAIMS ARE SUBJECT ONLY TO RULE 8 NOTICE PLEADING

"Section 11 imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Fleming Co. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *44 (E.D. Tex. 2004). Thus, to state a claim under Section 11, plaintiffs "need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at *44 (citing *Lone Star Ladies Inv. Club. v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001)).

Unlike claims arising under Section 10(b)(5) of the Exchange Act, Section 11 claims need only satisfy the general pleading standard of Rule 8 of the Federal Rules of Civil Procedure. *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. at 382; *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 827 (S.D. Tex. 2004) ("Because Lead Plaintiff has alleged that the § 11 claims asserted in this action sound only in strict liability and negligence, they are subject to the notice pleading standard of Rule 8(a)."). Thus, "Section 11 does not require a plaintiff to plead or prove scienter. . . Congressional policy underlying section 11 was to create liability regardless of fault." *Fleming Cos.*, 2004 WL 5278716, at *45.

---

[45] The same is true for the Company's June 22, 2020 filing providing details that were consistent with the Company's prior disclosures that it suffered from multiple material weaknesses in its internal controls. ProPetro Br. at 40, n. 41.

Defendants argue that Plaintiffs' Section 11 claims are subject to Rule 9(b)'s heightened standard for pleading fraud-based claims. ProPetro Br. at 45. However, Plaintiffs specifically alleged that their Section 11 claims do not sound in fraud. ¶343. This statement is "sufficient to disavow a pleading of fraud for purposes of Rule 9(b)." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d at 403; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (applying Rule 8 pleading standards to Section 11 claims where plaintiffs specifically disclaimed reliance on fraud). Further, even if a complaint does not meet the heightened standard for fraud, a court should still analyze whether a non-fraudulent claim was stated. *Lone Star Ladies*, 238 F.3d at 369 (finding that a complaint that expressly stated it did "not assert that defendants are liable for fraudulent or intentional conduct and disavow[ed] and disclaim[ed] any allegation of fraud" was not subject to heightened pleading standards). Therefore, Plaintiffs' Section 11 claims are not subject to the heightened pleading standards in Rule 9(b).

**B.    DEFENDANTS' ARGUMENTS CHALLENGING PLAINTIFFS' SECTION 11 CLAIMS FAIL**

Defendants do not meaningfully challenge Plaintiffs' Section 11 claims. First, ProPetro argues that only one Plaintiff—Oklahoma Law Enforcement Retirement System ("OLERS")—has standing to assert the Section 11 claim. ProPetro Br. at 45-46. But that is enough. OLERS has standing to assert Section 11 claims and it has been appointed to do so on behalf of the proposed class. OLERS thus has standing to represent all similarly situated investors. *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 274 (S.D. Tex. 2005) ("[T]he propriety of awarding classwide relief . . . does not require a demonstration that some or all of the unnamed class could themselves satisfy standing requirements for named plaintiffs.") (citing *Lewis v. Casey*, 518 U.S. 343 (1996)).

Second, ProPetro argues that Plaintiffs' Section 11 claims based on Redman's share pledges and the PT Petroleum transaction are barred by the statute of repose because they were

81

made more than three years after ProPetro filed the IPO Offering Documents in which Plaintiffs allege Defendants made false and misleading statements.  ProPetro Br. at 46-47.  This argument fails.  The statute of repose begins to run on "the date of the last culpable act or omission of the defendant."  *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017).  Here, the statute thus runs from "defendant's last culpable act (the offering of the securities)."  *Id.* at 2049.

The "culpable act" was ProPetro's March 16, 2017 IPO, when the IPO Offering Documents were made effective.  Those documents contained false and misleading statements as detailed above.  These statements were alleged to be false in Plaintiffs' Amended Class Action Complaint, which was filed on February 13, 2020, less than three years following the IPO and indisputably within the statute of repose period.  *See* ECF No. 55, ¶¶169-170 (alleging statements concerning internal and disclosure controls were false and misleading); ¶176 (alleging statements concerning related-party transactions were false and misleading).  Identical statements were alleged to be false and misleading in the Complaint, which was amended to include additional facts supporting those Section 11 claims.  *See* ¶¶244, 251 (identifying statements concerning internal and disclosure controls to be false and misleading identical to those in complaint filed on February 13, 2020).

Plaintiffs' allegations about Redman's share pledges and the PT Petroleum transactions in the Complaint do not give rise to a new or separate "claim."  The claim is that certain statements made in the IPO Offering Documents were false and misleading, creating Section 11 liability.  That claim was timely made and those statements were timely alleged false and misleading.  Facts concerning Redman's share pledges and the PT Petroleum transaction simply provide additional evidence of the falsity of those statements, but are not separate claims in and of themselves.  *See* ¶245 (explaining that Redman's share pledges is one of many facts that render statements in the IPO Documents about ProPetro's internal controls false and misleading); ¶253 (explaining that the

82

PT Petroleum transaction is one of many facts that render statements in the IPO Offering Documents about ProPetro's related-party transactions false and misleading). Thus, the Court may properly consider these allegations in determining whether Defendants' statements in ProPetro's IPO Offering Documents are materially false and misleading.

The cases Defendants cite in support of its argument are inapposite. *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 264 (S.D.N.Y. 2019), is not "analogous" as Defendants suggest—there, the plaintiffs sought to add claims and misstatements in their amended complaint, rather than merely add support for previously-pled claims, as Plaintiffs here have done. *See id.* at 264; *see also* ProPetro Br. at 47 (citing *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 392 (S.D.N.Y. 2019) (statute of repose bared previously unasserted claims and claims based on statements or omissions not asserted in a previous complaint). Plaintiffs brought their Section 11 claim within the repose period, and neither added claims nor additional misstatements thereafter. That Plaintiffs added additional related-party transactions providing support for claims they already brought based on misstatements they already alleged as false does not then bar those same misstatements under the statute of repose.

Third, ProPetro recycles and summarizes its arguments that Plaintiffs alleged no actionable misstatements or omissions. ProPetro Br. at 48-49. These fail for the reasons explained *supra* Section IV.A.1. ProPetro also argues that claims regarding related-party transactions and internal control deficiencies are "fraud by hindsight" in the Section 11 context, since the conduct that rendered these assurances false occurred many months later. ProPetro Br. at 48. However, Defendants admitted that their internal controls were weak and deficient, and there are no allegations that those controls deteriorated between the IPO and 2018, when ProPetro has ***admitted*** they suffered from several "material weaknesses." ¶190. These problems were not minor

deficiencies that arose only surrounding the discovery of the related-party transactions or Redman's share pledge agreement.  Rather, the Company has admitted that "senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company."  ¶207-08.  Instead, there was a "failure to maintain appropriate tone at the top" which "had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances and disclosures."  ¶207. Further, ProPetro's management did not "sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," and there was "a general lack of focus on promoting a culture of compliance within the Company."  ¶208.  This poor "tone at the top" did not develop overnight immediately preceding the related-party transactions and other misconduct that surfaced.  Rather, it pre-existed the public trading of ProPetro's stock, and thus statements regarding the adequacy of ProPetro's disclosure and internal controls, or ProPetro's related-party transactions, in the IPO Documents were false at the time they were made.

### III. THE COMPLAINT STATES CLAIMS FOR CONTROL PERSON LIABILITY UNDER BOTH THE SECURITIES AND THE EXCHANGE ACTS

Defendants Smith, Denholm, and Armour each advance disingenuous arguments that the Complaint fails to allege that they were "control persons" under Section 20(a) and Section 15. Armour Br. at 14; Denholm Br. at 27; Smith Br. at 6.  As an initial matter, as set forth in detail herein, the Complaint adequately states primarily violations of Section 10(b) and Section 11.

The Fifth Circuit appl[ies] a "a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability."  *See In re Cobalt*, 2016 WL 215476, at *11 (finding "persuasive the reasoning of district courts in the Fifth Circuit that 'apply a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability" under Section 15); *One Longhorn Land I,*

84

*L.P. v. Defendant FF Arabian,* LLC, 2015 WL 7432360, at \*2 (E.D. Tex. Nov. 23, 2015) (same for Section 20(a)).

The Complaint easily satisfies this standard, alleging that Defendants, the most senior officers at ProPetro made and signed false statements, and had the power to control—and did control—the activities alleged to be fraudulent. *E.g., In re Netsolve, Inc. Sec. Litig.,* 185 F. Supp. 2d 684, 699 (W.D. Tex. 2001) (sustaining allegations that "defendants . . . had actual power or influence over NetSolve's corporate activities and policies, and over the activities alleged to be fraudulent."); *Griffin v. GK Intelligent Sys., Inc.,* 87 F. Supp. 2d 684, 689 (S.D. Tex. 1999) (defendants included vice president, chief financial officer and chief administrative officer "had actual power or influence over GK and the ability to control corporate policy").

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motions to dismiss should be denied.  Should the Court dismiss the Complaint, it should permit Lead Plaintiffs to amend their allegations.  Fed. R. Civ. P. 15(a)(2) ("The Court should freely give leave when justice so requires.").

Dated: September 30, 2020

By: */s/ Daniel L. Berger*

**GRANT & EISENHOFER P.A.**
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jeroen van Kwawegen
James A. Harrod

85

Brenna Nelinson
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jeroen@blbglaw.com
jim.harrod @blbglaw.com
brenna.nelinson@blbglaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

**MARTIN & DROUGHT, P.C.**
Gerald T. Drought
State Bar No. 06134800
Federal Bar No. 8942
Frank B. Burney
State Bar No. 03438100
Bank of America Plaza, 25th Floor 300
Convent Street San Antonio, Texas 78205
Telephone: (210) 227-7591
Facsimile: (210) 227-7924
gdrought@mdtlaw.com
fburney@mdtlaw.com

*Liaison Counsel for Plaintiffs*

**CLARK HILL PLC**
Ronald A. King
212 E. Cesar Chavez Ave
Lansing, MI 48906
Telephone: (517) 318-3015
Facsimile: (517) 318-3068
rking@clarkhill.com

*Counsel for Plaintiff Police and Fire Retirement System of the City of Detroit*

86

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2020, I electronically filed the foregoing by using the court's CM/ECF system. Per agreement among the parties, all parties will be served by the CM/ECF system.

By: __*/s/ Daniel L. Berger*__
Daniel L. Berger