**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| RICHARD LOGAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, ET AL., | |
| Plaintiffs, | Case No. MO:7:19-CV-00217-DC |
| -against- | |
| PROPETRO HOLDING CORP., ET AL., | CLASS ACTION |
| Defendants. | |

**DALE REDMAN'S REPLY BRIEF
TO LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

WINSTEAD PC

300 Throckmorton Street, Suite 1700
Fort Worth, Texas 76102
Tel:  (817) 420-8200
Fax: (817) 420-8281

**TABLE OF CONTENTS**

SUMMARY ............................................................................................................... 1

   I.  ARGUMENTS AND AUTHORITIES............................................................... 2

     A.  Plaintiffs' stock pledge allegations fail to state a claim for securities fraud. ............... 2

     B.  There is no basis to infer scienter or materiality with respect to the expense reimbursements Redman received. .............................................................. 12

     C.  Plaintiffs' internal controls allegations are insufficient to plead a strong inference of scienter. ................................................................................................. 14

     D.  Redman's stock sale during the IPO and resignation are not evidence of scienter. ... 16

  II. RELIEF REQUESTED .................................................................................... 17

CERTIFICATE OF SERVICE ................................................................................ 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ..................................................................................14

*In re AFC Enters. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...................................................................16

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007)....................................................................5, 14

*In re ArthroCare Corp. Secs. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010)....................................................................17

*Bondali v. Yum! Brands, Inc.*,
  620 Fed. Appx. 483 (6th Cir. 2015).......................................................................3, 15

*In re BP P.L.C.*,
  852 F. Supp. 2d 767 (N.D. Tex. 2012) ....................................................................14

*Brody v. Zix Corp.*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ......................................................................3

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................................................................16

*In re Cognizant Tech. Sols. Corp. Secs. Litig.*,
  No. 2:16-cv-06509, 2018 U.S. Dist. LEXIS 137591, 2018 WL 3772675
  (D.N.J. Aug. 8, 2018)................................................................................................5

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009).........................................................................5

*Constr. Laborers' Pen. Trust v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................15

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................................13

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................3, 5

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ..................................................................................14

*Hall v. Rent-A-Ctr., Inc.*,
No. 4:16cv978, 2017 U.S. Dist. LEXIS 205959, 2017 WL 6388742 (E.D. Tex.
Oct. 19, 2017) ...............................................................................................................17

*Hill v. Gozani*,
638 F.3d 40 (1st Cir. 2011)...........................................................................................15

*Ho v. Flotek Indus.*,
248 F. Supp. 3d 847 (5th Cir. 2017) .............................................................................14

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*,
537 F.3d 527 (5th Cir. 2008) ............................................................................11, 15, 16

*Izadjoo v. Helix Energy Solutions Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017) ............................................................................8

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2014) ..........................................................................................8

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..........................................................................................3

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)..............................................................................4

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC
Partners, Inc.*,
No. 15 Civ. 6034 (RJS), 2016 U.S. Dist. LEXIS 136929, 2016 WL 5794774
(S.D.N.Y. Sept. 30, 2016) ..............................................................................................12

*Nathenson v. Zonagen, Inc.*,
267 F.3d 400 (5th Cir. 2001) ........................................................................................11

*Okla. Firefighters Pen. & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. Oct. 6, 2014)..............................................................14

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018), aff'd on other grounds sub nom.,
*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777
F. Appx. 726 (5th Cir. 2019)...............................................................................3, 4, 6, 7

*Prause v. TechnipFMC*,
No. 4:17-CV-02368, 2019 U.S. Dist. LEXIS 44230 (S.D. Tex. Jan. 18, 2019)......................14

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) .....................................................................................1, 10

*Ramirez v. Exxon Mobil Corporation*,
    334 F. Supp. 3d 832, 854 (N.D. Tex. 2018) .................................................................16

*Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009) ............................................................................5

*Richmand v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) .........................................................................3

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ..............................................................................11, 16

*Rougier v. Applied Optoelectronics, Inc.*,
    No. 4:17-cv-2399, 2019 U.S. Dist. LEXIS 199050, 2019 WL 6111516 (S.D.
    Tex. Mar. 27, 2019) ..................................................................................................3

*In re Signet Jewelers*,
    389 F.3d 221 (S.D.N.Y. 2019) ...................................................................................3

*Swabb v. Zagg, Inc. (In re Zagg Secs. Litig.)*,
    797 F.3d 1194 (10th Cir. 2015) ................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................1, 11, 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    MDL No. 2672, 2017 U.S. Dist. LEXIS 1109, 2017 WL 66281 (N.D. Cal.
    Jan. 4, 2017) ............................................................................................................6

**Statutes**

17 C.F.R. § 229.404(a)..................................................................................................13

17 C.F.R. § 229.406(a)-(b)..............................................................................................4

PSLRA ......................................................................................................................5, 12

Securities Act Section 11 ................................................................................................8

Securities Exchange Act Section 10(b)....................................................................2, 6, 8

Defendant Dale Redman files this Reply Brief to Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss [Docket No. 97].

## SUMMARY

As Redman pointed out in his Motion to Dismiss, Plaintiffs' complaint spans 149 pages yet contains no allegations of insider trading, material misstatements of financial results, or similar facts typically present in a securities fraud case. Instead, Plaintiffs assert securities fraud claims based on the mere existence of deficiencies in ProPetro's internal controls, technical violations of ProPetro's Code of Conduct, and similarly non-fraudulent conduct.

Given the weakness of the complaint, it is not surprising that Plaintiffs' omnibus response fails to rebut the numerous defects raised in Redman's Motion to Dismiss. For example, Plaintiffs allege that Redman committed securities fraud by certifying the adequacy of ProPetro's internal controls after pledging his ProPetro stock in technical violation of ProPetro's Code of Conduct. According to Plaintiffs, they need not allege specific facts indicating Redman, a non-lawyer, had actual knowledge that the stock pledges violated a company policy and that he intended to conceal this violation from investors. Instead, Plaintiffs argue that the Court can infer scienter based solely on the existence of the stock pledge and Redman's signing of the certifications. The legal standard, however, is quite different. These bare bones allegations are insufficient to draw the "cogent and compelling" inference of scienter required by the U.S. Supreme Court. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Even if Redman was aware of the stock pledges when he certified internal controls, "[k]nowledge of an omission does not itself necessarily raise a strong inference of scienter." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005). In effect, Plaintiffs ask the Court to lower the well-settled standard for pleading scienter.

This is only one example of the flawed arguments offered by Plaintiffs in their response. Plaintiffs also argue that materiality is not a basis to dismiss at the pleading stage, contrary to their own case law.  They offer nothing to support their position that Redman fraudulently obtained expense reimbursements.  They have no authority to support their argument that Redman's stock sales during the company's IPO are evidence of securities fraud, a position that has been soundly rejected by courts in cases that do not involve insider trading.

In short, Plaintiffs' response falls flat.  The Court should grant Redman's Motion to Dismiss and dismiss the claims against Redman.

## I.    ARGUMENTS AND AUTHORITIES

As Redman noted in his Motion to Dismiss, Plaintiffs' claims against Redman rest on three core allegations: (1) Redman pledged his ProPetro stock to finance two purchases of real property and allegedly did not disclose those pledges to ProPetro (*see, e.g.*, TAC ¶¶ 236-43, 309); (2) Redman was reimbursed for approximately $346,000 in expenses that ProPetro later determined were not reimbursable business expenses, which Redman immediately repaid upon being informed of ProPetro's decision (*see, e.g.*, TAC ¶¶ 253, 290); and (3) Redman, as CEO, certified that ProPetro's internal and disclosure controls were adequate for periods during which Redman had either pledged shares or received the reimbursement in question (*see, e.g.*, TAC ¶¶ 244-49, 256-64, 268-79).[1]  None of these allegations is sufficient to state a claim for securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5.

**A.    Plaintiffs' stock pledge allegations fail to state a claim for securities fraud.**

1.    <u>Plaintiffs fail to rebut the well-established precedent that violations of a code of ethics rarely support a securities fraud claim</u>.

---

[1]    *See* Dale Redman's Joinder to ProPetro Holding Corp.'s Motion to Dismiss and Motion to Dismiss Third Amended Class Action Complaint and Brief in Support [Docket No. 91] ("Redman MTD").  The term "TAC" refers to Plaintiffs' Third Amended Class Action Complaint for Violations of the Federal Securities Laws [Docket No. 81].

Plaintiffs contend that Redman's failure to disclose his share pledges was a material omission because Redman's share pledges violated ProPetro's Insider Trading Compliance Policy, which is part of ProPetro's Code of Ethics and Conduct ("Code of Conduct"). *See* TAC ¶ 309. But as Redman explained in his Motion to Dismiss, statements in codes of ethics are almost always immaterial as a matter of law. Redman MTD at 7-9. These policies are inherently aspirational and merely "express[] opinions as to what actions are preferable as opposed to implying that all staff, directors, and officers always adhere" to their requirements. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 625-26 (S.D. Tex. 2018), aff'd on other grounds sub nom., *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. Appx. 726 (5th Cir. 2019) (discussing *Bondali v. Yum! Brands, Inc.*, 620 Fed. Appx. 483 (6th Cir. 2015)).

Plaintiffs argue code of conduct statements are actionable if the provisions at issue "'could be found to contain material representations and there is nothing vague or merely optimistic about them.'" Resp. at 27 (quoting *Brody v. Zix Corp.*, No. 3:04-cv-1931-K, 2006 U.S. Dist. LEXIS 69302, *15, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)). Most of the cases cited by Plaintiffs to support this argument are from outside the Fifth Circuit. And several of them do not involve a code of conduct at all. For example, the quotation from *Brody* refers to puffery in general, not in the context of codes of conduct.[2] The cases that do involve a code of conduct mostly involve a company referencing its code of conduct to directly counter allegations of egregious conduct or to emphasize the importance of ethical conduct to its business. *See, e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (company publicly emphasized its code of ethics in response to allegations that it was participating in a money laundering scheme); *In re Signet*

---

[2]    *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-2399, 2019 U.S. Dist. LEXIS 199050, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019), *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), and *Richmand v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012) also do not appear to involve a code of conduct or similar policy.

*Jewelers*, 389 F.3d 221, 231 (S.D.N.Y. 2019) (company publicly emphasized its corporate non-discrimination policies to counter allegations of "rampant sexual harassment"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (company repeatedly pointed to its code of conduct to emphasize its impartiality and independence in determining credit ratings while simultaneously retaliating against employees who voiced concerns about conflicts of interests and taking other actions that undermined impartiality).

The allegations in this case are quite different. ProPetro did not publicly reference its Code of Conduct in response to allegations of improper conduct to assure investors that everything was fine. Nor did ProPetro repeatedly emphasize its Code of Conduct in securities filings to emphasize that ethical conduct is an integral component of its business. *Cf. Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d at 508-09. Rather, ProPetro merely published the Code of Conduct on its website and generally referenced it in standard securities filings (*e.g.*, stating that it applied to "all of our employees"). TAC ¶¶ 296-300. The only Code of Conduct violation alleged in this case is Redman's violation of the Insider Trading Compliance Policy when he pledged his shares—a purely technical violation since this case does not involve insider trading. This allegation is less noteworthy than those in *Plains All American*, in which statements that a company was committed to compliance with "applicable environmental, health, and safety rules, laws, and regulations" were held to be aspirational and not statements that the company was actually in compliance with pipeline regulations. *See Plains All American*, 307 F. Supp. 3d at 624-26.

In addition, companies are required to post codes of ethics on their websites under 17 C.F.R. § 229.406(a)-(b). Mandatory adoption of a code of ethics does not "imply[] that all staff, directors, and officers always adhere" to that code of ethics. *Id.*, 307 F. Supp. 3d at 625 (internal quotation marks omitted). Otherwise, securities fraud would occur each time a code of ethics is

4

violated.  *See In re Cognizant Tech. Sols. Corp. Secs. Litig.*, No. 2:16-cv-06509 WHW-CLW, 2018 U.S. Dist. LEXIS 137591, *54-56, 2018 WL 3772675 (D.N.J. Aug. 8, 2018); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.,* 686 F. Supp. 2d 404, 415 (D. Del. 2009); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D. Colo. 2007).  In effect, a plaintiff would be excused from demonstrating a "material misrepresentation" in any case involving corporate misconduct, contrary to the heightened pleading standard imposed by the PSLRA.  *Cognizant Tech.*, 2018 U.S. Dist. LEXIS 137591, at *55-56; *see also City of Roseville Emps.' Ret. Sys.*, 686 F. Supp. 2d at 415.  Plaintiffs attempt to distinguish these authorities by arguing that they are inapplicable when defendants "actively violated the Code which they certified they were in compliance with."  Resp. at 45.  But these authorities do not draw this distinction.  On the contrary, *City of Roseville* and *Cognizant* reject securities fraud liability for code of conduct violations altogether.  *See City of Roseville Emps' Ret. Sys.*, 686 F. Supp. 2d  at 415; *Cognizant Tech.*, 2018 U.S. Dist. LEXIS 137591, at *54-56.[3]

For these reasons, Plaintiffs' arguments that technical violations of the ProPetro's Code of Conduct support a claim for securities fraud fall flat.  Plaintiffs' claims based on these allegations should be dismissed.

> 2.      The underwriter contracts annexed to ProPetro's Offering Documents did not make actionable representations to investors.

ProPetro's IPO-Lock Up Agreement and 2017 and 2018 Secondary Offering Documents contain descriptions of agreements with the underwriters of these offerings.  These underwriter

---

[3]      In fact, *Cognizant* distinguished *Eletrobras*, a case relied on by Plaintiffs, because the defendant in that case publicly pointed to its code of ethics in securities filings in response to press inquiries about alleged bribery.  The issue was whether voluntary statements regarding the code of ethics made in response to allegations of bad behavior should be actionable, as opposed to whether violations of a code of ethics should have been disclosed.  *See Cognizant*, 2018 U.S. Dist. LEXIS 137591, at *57 ("The circumstances here are starkly different.  First, the statements in *Eletrobras* were public statements to investors about the Code of Ethics, not statements within the Code itself.  Second, the statements were made in response to pointed press inquiries in an effort to assuage investor concern about alleged bribery.  Courts have consistently limited the reasoning of *Eletrobras* and *Petrobras* to their facts.").

agreements restricted ProPetro's officers and directors from pledging their ProPetro stock for a period of time.  Plaintiffs contend the descriptions of these underwriter agreements amounted to false statements to investors because Redman had, in fact, pledged his stock at the time of the IPO and the Secondary Offerings.  *See, e.g.*, TAC ¶¶ 236-41.

In reality, these lock-up agreements were boilerplate underwriter contracts supplied as annexes to the offering documents, not statements to the investing public.  *See* Redman MTD at 9-10.  Paragraph 14 of the Underwriting Agreement (to which the IPO-Lock Up Agreement was attached) provides that the Underwriting Agreement "inure[s] solely to the benefit of, the Underwriters, the Company and the Selling Stockholders . . . and no other person shall acquire or have any right under or by virtue of this Agreement."[4]  As Judge Rosenthal stated when analyzing a nearly identical issue, "the fact that the [underwriter] agreements must be filed with the SEC does not make the statements [in those agreements] ones that warrant or guarantee facts to investors." *Plains All. Am.*, 307 F. Supp. 3d at 638.  "Rather, reasonable investors understand that similar statements are not affirmative disclosures by a company about its financial health." *Id.*

Plaintiffs contend that "claims made outside of official regulatory filings are regularly upheld as actionable," yet cite only one case in support of this statement.  Resp. at 41 (citing *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672, 2017 U.S. Dist. LEXIS 1109, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017)).  *Volkswagen* considered whether a car company's emissions compliance stickers could be considered representations to investors.  The court declined to hold that "*only* market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements under Section 10(b)." *Id.* at \*252 (emphasis in original).  The *Plains All American* court declined to extend

---

[4]     Current Report (Form 8-K), Ex. 1.1 ¶ 14 (Mar. 21, 2017); *see also* Current Report (Form 8-K), Ex. 1.1 ¶ 15 (Nov. 6, 2017) (same).

*Volkswagen*'s reasoning to underwriter agreements. *See Plains All. Am.*, 307 F. Supp. 3d at 637. Instead, the court concluded that "[t]he context of the [underwriter agreements] indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public." *Id.* at 638. In reaching this conclusion, the court emphasized the "surrounding caution that the descriptions were made 'solely for the benefit' of the Underwriters and that "no other person shall acquire or have any right under or by virtue of this Agreement." *Id.*

*Plains All American* is far more applicable here than *Volkswagen*. As in *Plains All American*, the statements in the ProPetro underwriter agreements are "representations in contracts between an issuer and an underwriter." *Id.* at 637. Like the underwriter contracts in *Plains All American*, the agreements here contain language stating they "inure[s] solely to the benefit of, the Underwriters, the Company and the Selling Stockholders . . . and no other person shall acquire or have any right under or by virtue of this Agreement."[5] In addition, *Plains All American* arose in the Fifth Circuit, while *Volkswagen* is from the Ninth Circuit.

The IPO-Lock Up Agreement and 2017 and 2018 Secondary Offering Documents made clear to investors that the underwriter contracts were entered into for the benefit of the contracting parties alone. No reasonable investor could have concluded they were representations to the public that ProPetro's officers and directors would not pledge their shares. Plaintiffs' claims based on these allegations should be dismissed.

     3.       <u>Plaintiffs cannot articulate why Redman's alleged failure to disclose stock pledges was a material omission.</u>

---

[5]       Current Report (Form 8-K), Ex. 1.1 ¶ 14 (Mar. 21, 2017); *see also* Current Report (Form 8-K), Ex. 1.1 ¶ 15 (Nov. 6, 2017) (same).

Plaintiff's allegations are insufficient to support a plausible inference that Redman's purported failure to disclose his stock pledges was a material omission.  As an initial point, Plaintiffs incorrectly state that materiality is rarely a basis to dismiss at the pleading stage.  *See* Resp. at 17-19, 24, 42 n.15.  Plaintiffs' own authority states otherwise.  *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2014) ("[A]ppellants claim that materiality should be a question of fact for the jury, but many Section 11 cases have been properly dismissed on the pleadings for lack of materiality."); *see also Izadjoo v. Helix Energy Solutions Grp., Inc.*, 237 F. Supp. 3d 492, 507 (S.D. Tex. 2017) (same).[6]  Materiality is an appropriate basis to dismiss at the pleading stage where, as here, Plaintiffs cannot provide plausible reasons why the alleged omission would have altered the total mix of information available to a reasonable investor.

Turning to the substance of the materiality issue, Plaintiffs allege that Redman's supposed failure to disclose the pledges created a false impression that ProPetro's officers were in compliance with the IPO Lock-Up Agreement, Code of Conduct, Insider Trading Compliance Policy, and 2017 and 2018 Offering Documents.  *See, e.g.*, TAC ¶¶ 222, 236-41, 309.  But Plaintiffs fail to explain why these pledges would have been "viewed by the reasonable investor as having significantly altered the total mix of information made available?"  *See Helix Energy*, 237 F. Supp. 3d at 507 (citing *Kapps*, 379 F.3d at 213-14) (internal quotation marks omitted).  The closest Plaintiffs get is a speculative allegation that a share pledge "might" incentivize an officer to liquidate his stock to avoid defaulting on personal loans, thereby putting negative pressure on the stock price.  *See* TAC ¶ 102.  But the 371,200 shares Redman pledged in 2017 comprised less than 1% of total shares offered to the investing public, meaning that a reasonable investor would not have considered the theoretical possibility of a bank seizing such a minimal amount of stock

---

[6]    *Helix Energy* involved claims under Section 10(b) of the Securities Exchange Act, while *Kapps* involved claims under Section 11 of the Securities Act.  Materiality is an element of both Section 11 and Section 10(b) claims.

to be a material fact.[7]  There is no allegation that Redman defaulted on personal loans, that Redman sold shares to avoid defaulting, or that Redman lacked other assets sufficient to satisfy the real estate loans.  There is no allegation that the stock pledges affected his conduct whatsoever.

Plaintiffs argue that ProPetro's decision to conduct an internal investigation, and the remedial measures taken in response to its findings, make clear that any purported omissions were material.    Resp. at 19.   But neither the commencement of the investigation in 2019, nor the remedial measures taken in 2019 and 2020, have any bearing on the issue of whether disclosing Redman's pledges in 2017 and 2018 would have altered the total mix of information for a reasonable investor at that time.  ProPetro commenced the internal investigation in 2019 to review the disclosure of contracts with AFGlobal Corporation to purchase Durastim hydraulic fracturing fleets, not to investigate Redman's share pledges or expense reimbursements.  *See* TAC ¶ 147.[8] That the internal investigation was initiated to review the disclosure of contracts is not evidence one way or another regarding whether Redman's failure to disclose his stock pledges was a material omission.  Similarly, ProPetro's appointment of new executive officers and formation of a disclosure committee say nothing about whether a reasonable investor would have considered pledges of less than 1% of ProPetro's stock to be important.[9]

Plaintiffs also argue that "[t]he materiality of Redman's concealed share pledges lies not in its size relative to the Company's market capitalization, but rather in the fact that Redman was flouting the Company's Code of Ethics and Insider Trading [Compliance] Policy."  Resp. at 43. This statement is pure hyperbole.   There are no facts suggesting that Redman was "flouting"

---

[7]        *See* ProPetro's IPO Prospectus, at p. 103 (Mar. 16, 2017) (listing ProPetro's beneficial ownership).
[8]        The language from the August 8, 2019 Form 8-K quoted in the TAC states that the investigation was later expanded to include expense reimbursements and related party transactions, not commenced as a result of these issues.
[9]        Plaintiffs' other argument that stock price drops support materiality conflates materiality with loss causation. Moreover, just because the stock price fell after ProPetro made a corrective disclosure does not mean that investors would have considered the disclosure material had it been made earlier.

anything.  More plausibly, Redman, a busy non-lawyer executive, was unaware that ProPetro's

policies prohibited pledging the minimal amount of stock he owned.  Absent any trace of

fraudulent intent, it is unclear why a reasonable investor would consider this issue to be highly

important.  Similarly, Plaintiffs fail to explain why a reasonable investor would consider a

technical violation of the Insider Trading Compliance Policy—without any insider trading having

occurred—to alter the total mix of information with respect to ProPetro.  As discussed above in

Section I.A.1, code of conduct violations rarely support a claim for securities fraud.

Neither of Plaintiffs' arguments supports a plausible inference that their stock pledge

allegations satisfy the materiality.[10]  Plaintiffs' securities fraud claims based on these allegations

should be dismissed.

4.    Plaintiffs' stock pledge allegations do not permit a cogent and compelling inference of scienter.

Finally, Plaintiffs' stock pledge allegations do not permit the cogent and compelling

inference of scienter required by the U.S. Supreme Court.  In his Motion to Dismiss, Redman

pointed out that there are no facts whatsoever suggesting he concealed his stock pledges to mislead

investors.  Redman MTD at 12.  In response, Plaintiffs argue that because Redman pledged his

shares and also signed documents acknowledging he could not pledge his shares, he must have

knowingly intended to mislead investors when he signed the latter documents.  *See* Resp. at 51;

*see generally id.* at 50-53.  This fact is not strong evidence of fraud under Fifth Circuit precedent,

regardless of Redman's knowledge of the stock pledges.  *See R2 Invs. LDC v. Phillips*, 401 F.3d

638, 644 (5th Cir. 2005) ("Knowledge of an omission does not itself necessarily raise a strong

inference of scienter.").  There is no evidence that Redman, a busy executive, actually knew his

---

[10]    Plaintiffs also state on page 43 of their Response that paragraphs 94-108 of the TAC contain "well-pled allegations" explaining why the alleged stock pledge omissions would have been material.  But those paragraphs of the complaint do not contain any allegations beyond those addressed in this Reply Brief.

stock pledges violated ProPetro's Insider Trading Compliance Policy or that he deliberately concealed the pledges from ProPetro. The Court must consider "plausible nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 323-24. The far more plausible scenario is that Redman, a non-lawyer, did not realize his stock pledges violated these policies when he signed his certifications.

Nor do Plaintiffs' allegations support an inference of severe recklessness. In the scienter context, the term is "limited to highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). That a non-lawyer executive pledged shares and plausibly did not realize it violated a company policy is not an extreme departure from the standards of ordinary care. As the Tenth Circuit explained in a similar case involving a share pledge, courts should not credit bare assumptions that executives "read and prepared the disclosures, and knew the omission would mislead investors." *Swabb v. Zagg, Inc. (In re Zagg Secs. Litig.)*, 797 F.3d 1194, 1204 (10th Cir. 2015) (dismissing fraud claim relating to CEO's undisclosed pledge of shares for lack of scienter).

Plaintiffs also contend that motive and opportunity allegations can support a scienter finding. Resp. at 52-53. This argument misses the point. Redman has not argued that motive and opportunity allegations can never be relevant to a scienter analysis. But motive and opportunity allegations alone are insufficient for the Court to draw a "cogent and compelling" inference of scienter. Indeed, alleging a "possible" motive for an omission fails to meet the high bar for scienter. *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 543-44 (5th Cir. 2008); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003). Plaintiffs ask the Court to draw a "strained and tenuous inference" based on the mere existence of stock pledges that Redman had a motive to conceal (and intentionally did conceal) these pledges from investors.

11

There is no evidence Redman concealed anything or took any other deliberate actions to mislead anyone.   Plaintiffs' motive and opportunity allegations are speculative at best and do not demonstrate scienter.

For these reasons, Plaintiffs' stock pledge allegations do not permit a plausible inference of scienter, much less the cogent and compelling inference required by the U.S. Supreme Court. Plaintiffs' claims based on these allegations must be dismissed.

**B.      There is no basis to infer scienter or materiality with respect to the expense reimbursements Redman received.**

Plaintiffs' allegations concerning Redman's expense reimbursement—which Redman repaid in full—are even less compelling than their stock pledge allegations.   To start, it is unclear why Plaintiffs argue that expenses were improperly reimbursed prior to the IPO.   The securities filings quoted in the TAC make clear that the expenses were reimbursed after the IPO, not before. *See, e.g.*, TAC ¶ 149.   Expenses yet to be incurred could not have been disclosed in the IPO Offering Documents.   Plaintiffs perplexingly state that ProPetro and Redman are asking the Court to "presume that the improper reimbursements to its two co-founders only happened after it went public." Resp. at 39.   Not so.   Plaintiffs have simply failed to plead that expenses were improperly incurred prior to the IPO.[11]

Second, Plaintiffs argue that Redman's receipt of the reimbursements in question, and the purported absence of an official ProPetro employee expense reimbursement policy, is sufficient to infer scienter.   Resp. at 53-55.   These allegations are hardly sufficient to permit the "cogent and

---

[11]      Plaintiffs also fail to specify when the expense reimbursements should have been disclosed, making it impossible to determine which securities filings were affected by the alleged non-disclosures.   This broad, shotgun approach to pleading does not satisfy the PSLRA's stringent requirements. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 U.S. Dist. LEXIS 136929, *52-53, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) (allegation that failed to specify the year that expenses should have been reported as compensation was insufficiently pled under the PSLRA).

compelling" inference required by the U.S. Supreme Court.  *Tellabs*, 551 U.S. at 324.  The TAC contains no facts regarding Redman's state of mind concerning the reimbursements, let alone facts suggesting Redman intended to hide the reimbursement from shareholders.[12]  Plaintiffs argue that the fact "[t]hat ProPetro compelled both Smith and Redman to pay the money back even is clear evidence that the payments they received were facially illegitimate."  Resp. at 54.  But the inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Redman's repayment of expenses says nothing about whether they were fraudulently incurred.  Expenses may need to be paid back for a number of reasons, such as an honest mistake.  Indeed, ProPetro's August 8, 2019 Form 8-K identified "inadequate documentation" as the sole reason the expenses were required to be repaid.  The far and away most plausible explanation for the expense reimbursement is that both Redman and ProPetro believed it was owed at the time it was paid.  Plaintiffs' position is not only unsound legally, but also bad policy that could result in public company officers being sued for securities fraud any time reimbursement is paid by mistake.

Third, Plaintiffs still have not explained why failing to disclose the expense reimbursement (which Redman believed at the time to be appropriate) was a material omission.  The $346,000 amount accounts for only 2.5% of Redman's compensation during the period in question, 0.18% of ProPetro's total net income for 2017 and 2018, and less than 0.02% of ProPetro's total expenses for 2017 and 2018.[13]  Failing to disclose such a tiny percentage of expenses could not have altered the "total mix" of information available to investors. [14]

---

[12]     As noted in Redman's Motion to Dismiss, the TAC also contains no allegation that the expense reimbursement exceeded $120,000 in any year during the Class Period, which would have required disclosure under Regulation S-K.  *See* 17 C.F.R. § 229.404(a).  Instead, Plaintiffs group together expense reimbursements over a three-year period.

[13]     *See* ProPetro Holding Corp., Annual Report (10-K), at 52 (Mar. 27, 2018).

[14]     *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (citing to SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 45,151, which states that a numerical

For these reasons, Plaintiffs have failed to sufficiently plead materiality and scienter with respect to the reimbursed expenses.  Their securities fraud claims based on these allegations should be dismissed.

**C.    Plaintiffs' internal controls allegations are insufficient to plead a strong inference of scienter.**

Plaintiffs' final allegation against Redman is that he signed SOX certifications and other filings assuring investors of the effectiveness of internal controls despite being aware of deficiencies at the time of the IPO, the 2017 Secondary Offering, and later periodic filings.[15]  As noted in Redman's Motion to Dismiss, an allegation that internal controls were deficient is not, by itself, sufficient to plead scienter.[16]  Rather, Plaintiffs must allege Redman had "actual knowledge of corporate deficiencies." *Andropolis*, 505 F. Supp. 2d at 679-80 (collecting cases).  To meet this standard, "courts generally require direct evidence of knowledge or strong circumstantial evidence of willful blindness." *Id.* at 679.  "[M]ost courts that have made a finding of actual knowledge have based that finding, in large part, on internal documents clearly laying out the corporate deficiencies about which the defendant is charged with having actual knowledge." *Id.* at 680; *see also In re BP P.L.C.*, 852 F. Supp. 2d 767, 819 (S.D. Tex. 2012) (granting motion to dismiss because "it is more likely that [defendants' misstatements] . . . are  evidence of careless mistakes

---

threshold, "such as 5%, may provide the basis for a preliminary assumption that … a deviation of less than the specified percentage with respect to a particular item … is unlikely to be material"); *see also Prause v. TechnipFMC*, No. 4:17-CV-02368, 2019 U.S. Dist. LEXIS 44230, *12 (S.D. Tex. Jan. 18, 2019).

[15]    *See* TAC ¶¶ 224-25, 244-49.

[16]    *Ho v. Flotek Indus.*, 248 F. Supp. 3d 847, 858 (5th Cir. 2017); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 253-54 (5th Cir. 2003) (characterizing internal control allegations as "allegations of mismanagement" rather than of "severe recklessness by [the individual defendants]" and affirming dismissal); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-32 (5th Cir. 2002) (stating internal control deficiencies were insufficient to give rise to inference of fraud or severe recklessness); *Okla. Firefighters Pen. & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. Oct. 6, 2014) ("Mere allegations that Ixia had deficient internal controls are insufficient to give rise to a strong inference of scienter.").

at the management level" and therefore "do not give rise to the required strong inference of corporate scienter").

According to Plaintiffs, Redman's stock pledge and receipt of reimbursement, coupled with ProPetro's statements that there was not an appropriate "tone at the top" and its management "did not sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," are sufficient to support a strong inference of scienter. Plaintiffs argue they "need not rely on 'red flags' that might suggest the falsity of ProPetro's public statements [because] Redman and Smith were each personally aware of facts that contradicted their multiple positive evaluations of ProPetro's internal controls before responsibility for those evaluations was taken away from them." Resp. at 63. But red flags are exactly what Plaintiffs must allege since Plaintiffs include no specific facts indicating Redman had actual knowledge of internal controls deficiencies. *See Shaw*, 537 F.3d at 545. Mere allegations that Redman pledged his stock—with no evidence he was actually aware the pledges might violate the lock-up agreements or Code of Conduct—do not permit a plausible inference of scienter. Nor do allegations that Redman received reimbursement for expenses that were later determined to be non-reimbursable. At most, these allegations suggest that Redman, a busy non-lawyer executive, overlooked some relatively minor compliance issues.

Plaintiffs also fail to rebut Redman's argument that Plaintiffs have not alleged specific facts suggesting the risk of a material misstatement due to defective internal controls was a known risk or that even the level of risk was known. A failure to disclose an unknown risk, or to disclose the severity of a risk where the level of risk is unknown, is insufficient to plead a securities fraud claim. *See Bondali*, 620 Fed. Appx. at 491; *Hill v. Gozani*, 638 F.3d 40, 59-60 (1st Cir. 2011); *Constr. Laborers' Pen. Trust v. CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020).[17]

---

[17]    Nor do Plaintiffs provide a credible response to the point that ProPetro adequately disclosed the overall risk of deficient internal and disclosure controls to investors. ProPetro's IPO Documents and the 2017 Secondary Offering

15

For these reasons, Plaintiffs' internal control allegations do not permit the "cogent and compelling" inference of scienter required by the U.S. Supreme Court in *Tellabs*. These claims should be dismissed.

**D.      Redman's stock sale during the IPO and resignation are not evidence of scienter.**

Plaintiffs continue to contend that Redman and other Defendants who sold stock in the IPO were motivated to make "misleading statements" in the IPO Offering Documents to pump up their stock price and receive more money from the sale. Resp. at 69. In fact, selling stock during an IPO is not probative of scienter without a credible insider trading allegation.[18] Plaintiffs cite no authority for their position, other than pointing to *Ramirez v. Exxon Mobil Corporation* for the proposition that "plaintiffs are not required to allege insider trading for a finding of scienter." Resp. at 69 (citing 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018)). As noted in *Ramirez*, "[w]hile a plaintiff is not required to allege insider trading to plead scienter, the lack of insider trading does weigh against a finding of scienter." Similarly, the lack of insider trading in this case weighs against Plaintiffs' securities fraud claims. The timing of this sale does raise a cogent and compelling inference of scienter.

Plaintiffs also continue to point to Redman's March 2020 resignation from his position as CEO as evidence that he engaged in securities fraud. Numerous courts have rejected attempts to rely on an officer's resignation to prove scienter.[19] Plaintiffs contend that "where terminations or

Documents explained to investors that ProPetro was not yet required to review, and had not yet reviewed, its internal controls at the time of either offering—a fact that significantly undermines any argument that a reasonable investor could have interpreted these offering documents to state that ProPetro's controls were adequate at that time. *See* Form S-1 (Feb. 8, 2017) at p. 52; Form S-1 (Nov. 2, 2017) at p. 44; Prospectus (Mar. 16, 2017) at p. 28.

[18]      *See In re AFC Enters. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) ("It is not uncommon or otherwise suspicious to sell stock in association with a public offering; indeed, the sale of stock is often the point of the offering."); *see also Carlton*, 184 F. Supp. 3d at 480 ("[C]ourts 'will not infer fraudulent intent from the mere fact that some officers sold stock.'" (quoting *Shaw*, 537 F.3d at 543)).

[19]      *See, e.g.*, *Rosenzweig*, 332 F.3d at 867 ("[T]he successive resignations of key officials . . . is more likely probative only of the fact that the company was failing."); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 478 (S.D. Tex.

resignations are accompanied by allegations of wrongdoing that connect defendants with the fraud, such departures will support a strong inference of scienter." Resp. at 64-65 (citing *In re ArthroCare*, 726 F. Supp. 2d at 725 and *Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978, 2017 U.S. Dist. LEXIS 205959, 2017 WL 6388742 (E.D. Tex. Oct. 19, 2017)).  But as the *ArthroCare* court stated, even where an executive resigns as a result of an investigation, the resignation is more likely to be the result of negligent conduct rather than fraud:

> Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis. . . . [I]t would not be irregular or unusual for an executive who was merely negligent--as opposed to fraudulent or severely reckless--to leave in the wake of the discovery of substantial accounting errors and irregularities spanning almost four years.  Thus, the resignations in this case bear little, if at all, on the scienter analysis.
>
> *ArthroCare*, 726 F. Supp. 2d at 724-25.

This analysis is hardly surprising.  Most executives who resign amid an internal investigation have not intended to deceive investors.  Redman's resignation is not probative of scienter and does not support Plaintiffs' claims for securities fraud.

## II.    RELIEF REQUESTED

For these reasons and for the reasons set forth in Redman's Motion to Dismiss and ProPetro's Motion to Dismiss the Third Amended Complaint for Violations of the Federal Securities Laws, Redman requests that the Court dismiss Plaintiffs' claims against Redman. Redman further requests that the Court grant any other relief to which he may be entitled.

---

2016) ("Executive resignations are generally unavailing as proof of the commission of fraud.") (internal quotation marks omitted); *In re ArthroCare Corp. Secs. Litig.*, 726 F. Supp. 2d 696, 724-25 (W.D. Tex. 2010) (same).

Dated: October 30, 2020

WINSTEAD PC


/s/ Toby M. Galloway
Toby M. Galloway
State Bar No. 00790733
tgalloway@winstead.com
Matthias Kleinsasser
State Bar No. 24071357
mkleinsasser@winstead.com
Jamie M. Lacy
State Bar No. 24099874
jlacy@winstead.com
300 Throckmorton Street, Suite 1700
Fort Worth, Texas 76102
Tel:  817-420-8200
Fax:  817-420-8201

**COUNSEL FOR DEFENDANT**
**DALE REDMAN**


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on October 30, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter.

/s/ Toby M. Galloway
Toby M. Galloway

18