**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

|  |  |  |
|---|---|---|
| RICHARD LOGAN, individually and on behalf of all others similarly situated, *et al.,* | § § § § § § § § § § § | |
| *Plaintiffs,* | | |
| v. | | Case No. MO:19-CV-217-DC |
| PROPETRO HOLDING CORP., *et al.,* | | |
| *Defendants.* | | |

**DEFENDANT IAN DENHOLM'S REPLY IN SUPPORT OF MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
<u>FEDERAL SECURITIES LAWS</u>**

**BELL NUNNALLY & MARTIN LLP**

Jeffrey J. Ansley
State Bar No. 00790235
jansley@bellnunnally.com
Craig M. Warner
State Bar No. 24084158
cwarner@bellnunnally.com
Parker A. Burns
State Bar No. 24091843
pburns@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
214-740-1400 Telephone
214-740-1499 Facsimile

**ATTORNEYS FOR DEFENDANT
IAN DENHOLM**

**TABLE ON CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   ARGUMENT AND AUTHORITIES.................................................................. 2

   A.  Plaintiffs' Pleadings Related to the Clarabby Transactions Do Not State a Claim
       Against Denholm. ...................................................................................... 2

       1.  Denholm Had No Duty to Disclose the Clarabby Transaction................................. 3

       2.  The Clarabby Transaction was Not Material. ............................................. 4

   B.  Plaintiffs Do Not Plead Any Transaction Between ProPetro and PBEX,
       Let Alone Some Alleged Transaction That Could Plausibly Give Rise to
       A Claim For Securities Fraud Against Denholm................................................ 6

   C.  Plaintiffs Cling to the Tenuous Allegations Concerning Clarabby and PBEX
       Because Plaintiffs Cannot Plead That Denholm Had Knowledge Related
       to the Vast Majority of the Factual Allegations Relied Upon. ..................................... 10

   D.  Plaintiffs' Conclusory Statements Fail to Satisfy their Scienter Pleading Burden
       Under the PSLRA. ...................................................................................... 11

       1.  Plaintiffs Do Not Adequately Plead Scienter regarding PBEX.............................. 12

       2.  Plaintiffs Do Not Adequately Plead Scienter regarding the Clarabby
           Transactions .................................................................................... 13

   E.  Plaintiffs Do Not Adequately Plead Loss Causation Regarding Either the Clarabby
       Transactions or PBEX Under Any Federal Pleading Standard. .................................. 14

III.  CONCLUSION.................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayers v. Johnson*,
   247 F. App'x 534 (5th Cir. 2007) (unpublished) (per curiam) .................................................18

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)......................................................................................................................4

*Callinan v. Lexicon Pharms., Inc.*,
   No. H-19-0301, 2020 WL 4740487 (S.D. Tex. Aug. 14, 2020)...............................................17

*Kaumfan v. Trump's Castle Funding (In re Donald J. Trump Casino Secs. Litig.-*
   *Taj Mahal Litig.)*,
   7 F.3d 357 (3rd Cir. 1993) ..........................................................................................................5

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).....................................................................................................................14

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..........................................................................................................4

*F.D.I.C. v. Conner*,
   20 F.3d 1376 (5th Cir. 1994) ......................................................................................................18

*FindWhat Investor Grp. V. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ..................................................................................................15

*Fries v. N. Oil and Gas*,
   285 F. Supp. 3d 706 (S.D.N.Y. 2018)..................................................................................8, 12, 13

*Glaser v. Enzo Biochem, Inc.*,
   464 F.3d 474 (4th Cir.2006) .......................................................................................................15

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015)  .....................................................................................................15

*In re Herbalife Ltd. Secs. Litig.*,
   No. CV-14-2850 DSF, 2015 WL 12732428 (C.D. Cal. Mar. 27, 2015) ...............................17

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ...............................................................................................5, 6, 9

*Lewy v. SkyPeople Fruit Juice, Inc.*,
   No. 11 Civ. 2700 (PKC), 2012 WL 3957916 (S.D.N.Y. Sept. 12, 2012)...................11, 13, 14

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ......................................................................16, 17

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...................................................................................4

*Oran v. Stafford*,
    226 F.3d 275 (3d. Cir. 2000).......................................................................................4

*Pub. Emp. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v. Amedisys*,
    769 F.3d 313 (5th Cir. 2014) .............................................................................16, 17

*Rosenweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .....................................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................................1

*U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
    336 F.3d 375 (5th Cir. 2003) ...................................................................................18

## Other Authorities

17 C.F.R. § 229.404 .................................................................................3, 4, 12, 14

Defendant Ian Denholm ("Denholm") files this Reply in Support of Motion to Dismiss Third Amended Class Action Complaint For Violations of the Federal Securities Laws (Doc. 92) ("Denholm's Motion to Dismiss").  Denholm replies to Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Doc. 97) (the "Response"), to the extent the Response pertains to Denholm. Denholm requests that the Court dismiss Plaintiffs' claims against Denholm pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## I.    PRELIMINARY STATEMENT

Plaintiffs' Response only serves to reemphasize that their lawsuit, as it pertains to Denholm, is a textbook example of the type of securities case that the PSLRA was enacted to prohibit—generalized accusations of wrongdoing without specific factual allegations to back them up.  In the Response, Plaintiffs fail to meet the basic pleading requirements against Denholm, let alone comport with the "exacting requirements" set forth under the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA.").  Simply put, Plaintiffs do not articulate when and how ***Denholm*** made a fraudulent representation or omission in connection the sale of a security.

Plaintiffs continue to focus—almost entirely—on Defendants other than Denholm. Innumerable times throughout the Response Plaintiffs refer to their allegations against "Defendants Redman and Smith."  At best, it is possible to decipher three allegations against Denholm: that he was indirectly involved in the "Clarabby Transaction," that he had a part-time job at another company, and that he did not adequately supervise the alleged wrongful acts of his superiors.

- 1 -

For purposes of the Motion only, even accepting Plaintiffs' allegations against Denholm, Plaintiffs fail to connect the dots. Under Rule 9(b) and the PSLRA, it is not sufficient for Plaintiffs to simply throw out accusations of "related-party transactions;" Plaintiffs must articulate with specificity how those allegations supposedly state a securities fraud claim by setting forth each element with particularity, something that Plaintiffs do not and cannot do with respect to Denholm. It is perhaps telling that Plaintiffs rely on commentary from the Wall Street Journal and the Financial Accounting Standards Board in support of their related-party transaction theory against Denholm—authority that is not binding on any court. It is clear that Plaintiffs included Denholm in this lawsuit in an improper attempt to glom him to allegations against others, something the PSLRA does not permit. For all these reasons, Denholm requests that the Court dismiss Plaintiffs' claims against him with prejudice.

## II.    ARGUMENT AND AUTHORITIES

### A.    Plaintiffs' Pleadings Related to the Clarabby Transaction Do Not State a Claim Against Denholm.

Plaintiffs' Response fails to articulate a connection between the Clarabby transaction and a material misrepresentation or omission made in connection with the purchase or sale of a security. Plaintiffs regurgitate the details of the "Clarabby transaction," which ProPetro chose to include on its Form 8-K filed on November 13, 2019. They plead no further context that would render the transaction reportable. Plaintiffs do not plead that Denholm was a legal or beneficial owner of Clarabby at the time of its transaction with ProPetro; that Denholm recognized any gain as a result of the Clarabby transaction; or that the Clarabby transaction caused any loss to the Company or its investors, or, indeed, that it was not positively *beneficial* to ProPetro. Plaintiffs do not even allege that Denholm had any direct involvement in the Clarabby transaction.

Accordingly, the Complaint fails to set forth the allegations necessary to maintain a securities claim against Denholm based upon Clarabby.  Among other things, Plaintiffs must allege that Denholm had a duty to disclose the Clarabby transaction to investors in order to make other representations not misleading; that the omission was material; and that Denholm knew or was reckless in not knowing that failing to disclose the Clarabby transaction would materially mislead investors.  The allegations set forth in the Complaint do not come anywhere close to meeting this standard.

### 1.    *Denholm Had No Duty to Disclose the Clarabby Transaction.*

To support their Section 10(b) claim against Denholm, Plaintiffs implausibly assert that "Denholm does not dispute that he had a material interest in the Clarabby Transactions" and therefore a duty to disclose.  (Doc. 97 at 57).  Plaintiffs make this argument while never addressing—much less seeking to rebut—Denholm's citation of the Code of Federal Regulations, which *itself* does *not* categorize the Clarabby transaction as a reportable transaction in which he held a material interest.  *See* discussion of Instruction 6 to 17 C.F.R. § 229.404. (Doc. 92 at 18).[1] As set forth in Denholm's Motion to Dismiss, in the interest of predictability, the rules for construing whether a "direct or indirect" interest exists are technical in nature.  This transaction falls outside those technical limits for mandatory disclosure, because (even according to the Complaint) Denholm was not a legal or beneficial owner of the entity that engaged in a transaction with ProPetro, and so he never stood to obtain any benefit from it.  A more "minimal standard might bring an overabundance of information within [a court's] reach, and lead management

---

[1] Instruction 6(a) to Regulation Item 404 provides that there is no indirect material interest if the interest arises only: "(i) from such person's position as a director of another corporation or organization that is a party to the transaction; or (ii) from the direct or indirect ownership . . . of less than a ten percent equity interest in another person (other than a partnership) which is a party to the transaction."  *See* 17 C.F.R. § 229.404.  In other words, even if the allegations here were that Denholm was a director and a 9% owner of Clarabby, there would not have been any indirect material interest requiring disclosure. Yet, according to the Complaint and the Form 8-K it relies on, Denholm's connection to Clarabby during the relevant transactions was more attenuated than that.

'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988) (quotation omitted).  In sum, the term "material interest" carries a specific legal meaning within the context of 17 C.F.R. § 229.404(a), and Plaintiffs' Complaint does not plead facts adequate to substantiate that meaning.

### 2.     The Clarabby Transaction was Not Material.

The technical limitations of any reporting obligations relating to Clarabby also inform the materiality analysis pertinent to this issue.  Plaintiffs do not seriously dispute that the transactions were quantitatively immaterial, representing 0.4% of ProPetro's property and equipment.  They also offer no rationale for why Denholm's non-existent material interest (for no monetary benefit) in a peripheral facilities acquisition would have been qualitatively material to investors.  Instead, Plaintiffs argue that ProPetro's decision to disclose the transactions, standing alone, proves materiality.  But ProPetro's decision to err on the side of caution by disclosing the matter during litigation does not establish its materiality.  Instead, the breach of a duty to disclose cannot result in liability under Section 10(b) unless the undisclosed fact is ***actually*** material under *Basic*.[2]  485 U.S. at 231. The highly attenuated and speculative nature of any disclosure obligations severely undermines the notion that a reasonable investor would have believed it important (in the total mix of information) to be informed about this relatively minor, beneficial transaction through which Denholm obtained no financial gain.  *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009) (quotation omitted) (affirming dismissal and

---

[2] *See Oran v. Stafford*, 226 F.3d 275, 288 (3d. Cir. 2000) (Alito, J.) (holding that a breach of a disclosure duty under Item 303 of Reg. S-K is not *per se* material for Rule 10b-5 purposes); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5. Such a duty to disclose must be separately shown according to the principles set forth by the Supreme Court in *Basic* and *Matrixx Initiatives*.").

- 4 -

finding omission of related party transactions not material where they represented a "'minute fraction of assets[.]'")

Plaintiffs suggest that *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004), should preclude the Court from seriously examining whether they have adequately pled materiality at this stage.  (Doc. 97 at 31).  But *Kapps* does not support that conclusion.  *Kapps* acknowledges the settled proposition that issues of materiality should generally be decided by the trier of fact, it also ruled that "Appellants claim that materiality should be a question of fact for the jury, but many Section 11 cases have been properly dismissed on the pleadings for lack of materiality."  *See id.* at 216 (equating "materiality" requirement in Section 11 cases to Section 10(b)(5) claims).  In other words, materiality is assessed under Rule 12(b)(6) just like any other fact issue—Plaintiffs' pleadings must adequately set forth facts that, if true, establish materiality.

Indeed, the Fifth Circuit dismissed the complaint on materiality grounds in *Kapps* noting that the challenged statements (about natural gas prices) would have had little impact on a reasonable investor given the "total mix" of information available."  *Id.* at 216.  *Kapps* also cited a number of other cases coming to the same result—for example, *Kaufman v. Trump's Castle Funding (In re Donald J. Trump Casino Secs. Litig.-Taj Mahal Litig.)*, 7 F.3d 357, 371 (3rd Cir. 1993), where the Third Circuit affirmed dismissal of a securities class action on materiality grounds at the Rule 12(b)(6) stage. *Id.* at 215 n.11. The Third Circuit explained, "[W]e must consider an alleged misrepresentation within the context in which the speaker communicated it. Here the context clearly and precisely relayed to the bondholders the substantial uncertainties inherent in the completion and operation of the Taj Mahal. . . .  Within this broad context the [technically inaccurate] statement at issue was, at worst, harmless." 7 F.3d at 371*; see also*

*Rosenweig v. Azurix Corp.*, 332 F.3d 854, 873–74 (5th Cir. 2003) (dismissing on materiality grounds because plaintiffs could not have reasonably relied upon the challenged statements).

There is no exception to the pleading requirements for materiality. Plaintiffs must plead facts adequate to establish a "'substantial likelihood' that a reasonable investor would consider" the statements or omissions at issue to have "'significantly altered the 'total mix' of information'" regarding the value of the underlying stock. *Kapps*, 379 F.3d at 216 (quotation omitted) (emphasis omitted). Plaintiffs do not plead facts adequate to establish a substantial likelihood that any reasonable investor would have considered the Clarabby transactions to have a material effect upon their purchase of ProPetro securities. Indeed, as noted below, publication of the Clarabby transactions caused a substantial ***increase*** in the price of ProPetro stock. There simply is no case made by Plaintiffs that investors would have meaningfully ***discounted*** the value of an investment in ProPetro based upon knowledge about Clarabby. That fact, along with others already summarized, renders the disclosure immaterial.

> **B.      Plaintiffs Do Not Plead Any Transaction Between ProPetro and PBEX, Let Alone Some Alleged Transaction That Could Plausibly Give Rise to A Claim For Securities Fraud Against Denholm.**

Plaintiffs' passing attempt to create an issue out of Denholm's part-time job at PBEX is a glaring example of the fact that, with respect to Denholm, Plaintiffs are trying to connect pieces of a puzzle that simply do not fit together. There is no legal basis for Plaintiffs to proceed with a securities fraud case against Denholm based on the allegation that he was "distracted" from sufficiently supervising Redman and Smith. Plaintiffs' discussion of PBEX amounts to a re-assertion that the mere existence of Denholm's role at PBEX rendered ProPetro's SEC filings inaccurate. *See, e.g.,* (Doc. 97 at 47–48) ("[T]he materiality of Denholm's employment at PBEX . . . is that is served as a major distraction from [his] responsibilities . . . which . . . led to oversights and failures. . . .") Plaintiffs, however, still decline to substantiate this assertion. They do not

point to any transactions between PBEX and ProPetro that would require disclosure to investors due to Denholm's role.[3]  They do not identify any assertion in ProPetro's disclosures that Denholm falsified by his very involvement at PBEX.  And, beyond the conclusory assertion that any-and-all outside interests are unacceptable "distractions" for corporate officers, they still do not identify a single detail in the Complaint explaining *how* Denholm's involvement at PBEX *caused* inaccurate Company reports.  Even now, Plaintiffs do not plead a single discrete incident or mechanism through which Denholm's outside work is alleged to have affected some specific ProPetro duty.  Rather, they ask the Court to conclude that no such details are required. Based on these pale allegations, the Court should not accept that invitation.

As set forth in Denholm's Motion to Dismiss, therefore, Plaintiffs' argument for liability based upon PBEX is not based on any actual related-party transaction or any real conflict between PBEX and ProPetro.  Instead, it amounts to the naked assertion that a securities fraud action against a corporate officer can proceed on the basis of the mere existence of an outside "distraction." Plaintiffs propose that any such distraction converts all subsequent managerial failures into "fraud" through the supposition that they would not have occurred given more monomaniac focus by the officer.

Plaintiffs do not respond to Denholm's highlighting of the deleterious public policy impact that necessarily follows such a novel conclusion.  Again, the expansion of securities fraud liability envisioned by Plaintiffs would inevitably function as a bar to service as a corporate officer for scores of diligent and qualified applicants who, often as a direct consequence of those qualifications, have outside duties or interests—including charity work, religious duties, family

---

[3] Plaintiffs appear to impute a private meaning to the word "transaction." They repeatedly *refer* to PBEX as one of several "transactions" with which Denholm was purportedly involved, but they never allege any actual business between ProPetro and PBEX.  Needless to say, the dictionary definition of the term "transaction" governs its meaning here: "An instance of buying or selling something; a business deal."  Plaintiffs do not plead one involving PBEX.

obligations, service on non-profit or corporate boards, entrepreneurial side ventures, professional writing, reserve military service, and service in part-time state legislatures or town councils. The rule proposed by Plaintiffs would press public companies to exclude such persons from consideration in order to avoid the prospect of costly securities litigation delving into the speculative impact that "distraction" had upon any management shortcomings. Both the corporate world and the investor protections that flow from the presence of qualified corporate oversight would suffer for the loss of diverse perspective and life experience that would result from the standard advocated by Plaintiffs.

Plaintiffs also cite no law in support of their novel proposition. Instead, they quibble with Denholm's citation of *Fries v. N. Oil and Gas*, 285 F. Supp. 3d 706 (S.D.N.Y. 2018). (Doc. 97 at 48). But *Fries* supports Denholm. It is certainly true, as Plaintiffs are forced to admit, that *Fries* found no *scienter* where—as here—the plaintiffs merely alleged the CEO also worked for another company. 285 F. Supp. 3d at 720–22. That alone should be decisive. But *Fries* also reached its scienter conclusion on grounds that cut to the core of Plaintiffs' theory of materiality. Specifically, the court declined to adopt a "distraction" theory similar to the one proposed here, because "it [was] unclear from [p]laintiff's allegations whether Northern Oil's relationship with Dakota Plains was collaborative or created a conflict of interest." 285 F. Supp. 3d at 722. The court further observed that, "[i]ndeed, [p]laintiff states that Dakota Plains is a 'wholly unrelated' transloading company while Northern Oil is a company engaged in the acquisition . . . and production of oil and natural gas properties, *which suggests that there is no inherent conflict in working with the two*." *Id*. at *Id.* at 721 n.6 (emphasis added). Simply put, *Fries* establishes that without an "inherent conflict" between the two companies at issue, the mere fact that a corporate officer holds an outside position simultaneously with his Company work is not actionable as securities fraud. The same

rule should apply here, since Plaintiffs have not attempted to plead facts that establish that an "inherent conflict" existed between PBEX and ProPetro.

Plaintiffs also re-state the identities of persons with common (if attenuated) connections to both PBEX and ProPetro, then misquote Denholm to insinuate that his argument turns upon Plaintiffs failing to assert the existence of such personal connections. (Doc. 97 at 48).[4] Not so. Rather, Denholm's Motion to Dismiss pointed out that in the tightly-knit energy community in Midland, it is axiomatic that many people know each other—and that fact, alone, does not create "a related party transaction or other disclosure obligation[.]" (Doc. 92 at 8). There is no **conflict** articulated in the loose web of personal familiarity referenced by Plaintiffs.[5] The Complaint thus does not plead facts that transform mere association into a reporting duty.

Even were that not so, Plaintiffs must also plead facts adequate establishing a "'substantial likelihood' that a reasonable investor would consider" the statements or omissions at issue to have "'significantly altered the total mix of information'" regarding the value of the underlying stock. *Kapps*, 379 F.3d at 216 (quotation omitted) (emphasis omitted). In the absence of a conflict, a transaction, or some other reporting obligation (none of which are pled), there is no case that Denholm's association with PBEX is a fact that would have impacted a reasonable investor in this way.

---

[4] Specifically, Plaintiffs artificially limit Denholm's argument to claim that Plaintiffs "merely assert that both PBEX and ProPetro are businesses operating in the oil and gas industry in Midland." (Doc. 97 at 48). But this synopsis does too much violence to Denholm's argument, which is that "Plaintiffs merely assert that both PBEX and ProPetro are businesses operating in the oil and gas industry in Midland, *and thus, there are persons with connections to both*." (Doc. 92 at 15) (emphasis added). Denholm did not deny that the companies have personal connections; his point is rather that, in the Midland energy sector, such personal connections are common and unremarkable absent detailed pleadings establishing a related-party transaction or an actual conflict of interest.

[5] Plaintiffs mention that Denholm's speculative relationship with someone named "Wes Perry" *may* have been good for "Viper Energy." (Doc. 97 at 48). They do not explain what Viper Energy is or facts showing why the relationship might be *bad* for ProPetro. The Complaint is similarly vague and unsubstantial, asserting only that Viper Energy owns one of ProPetro's customers. (Doc. 81 at 44–45). But if there were a conflict of interest or a related-party transaction in there somewhere, Plaintiffs surely would have pled it. They instead are throwing string at the bulletin board to see whether a coherent picture forms. That is not adequate for pleading securities fraud.

**C.    Plaintiffs Cling to the Tenuous Allegations Concerning Clarabby and PBEX Because Plaintiffs Cannot Plead That Denholm Had Knowledge Related to the Vast Majority of the Factual Allegations Relied Upon.**

Only a sliver of the allegations in the Complaint even purport to relate to Denholm—those pertaining to Clarabby and PBEX. It is perhaps unsurprising that Plaintiffs cling to those allegations, because these are the only areas where it is conceivable for Plaintiffs to arguably plead that Denholm had any knowledge of the underlying facts. In particular, the Response consistently fails to connect Denholm to its repeated incantations of "Redman and Smith." (Doc. 97 at 51–52, 57, 66–69, 75–76, 89). The Response also provides no legal authority for the far-fetched proposition that Plaintiffs can proceed with a securities fraud case *against Denholm* based on the allegation that he was "distracted" from sufficiently supervising his bosses regarding matters that Plaintiffs themselves allege were kept carefully secret by the CEO and CFO from others at the Company.

Throughout the Response, Plaintiffs rely upon the accusation that ProPetro had a poor "tone at the top." (Doc. 97 at 15, 29, 32–33, 36, 51, 60, 97). But the "tone at the top" argument does not constitute the level of particularity required by the PSLRA and Rule 9(b). Indeed, the "tone at the top" argument tilts more towards a basic negligence allegation as opposed to the requisite scienter required to maintain a case for securities fraud. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"). In any event, this allegation should not apply to Denholm at all, who was not at "the top"—he was rather a junior executive in a role subordinate to the CEO and CFO. (Doc. 81 ¶ 37). It is illustrative that while Plaintiffs rely extensively on SOX disclosures, they admit that SOX disclosure requirements only apply to the CEO and CFO—not to Denholm. (Doc. 97 at 75–77).

- 10 -

For purposes of a securities claim, the question is not whether there were issues with the internal controls at ProPetro. Plaintiffs' claim against Denholm rests upon the unsubstantiated notion that he knew (or was reckless in not knowing) there were "material weaknesses" relating to the alleged actions of Redman and Smith, and that *Denholm* tried to conceal those weaknesses from investors. Yet the Plaintiffs' elaboration of their claims against Redman and Smith depends upon the notion that the CEO and CFO successfully *hid their actions* from the Company. (Doc. 97 at 23, 64). Indeed, the Complaint and the Response focus intensely upon issues which simply have nothing to do with Denholm, and which were only discovered as the result of a years-long internal investigation by singularly motivated outside counsel, namely, the alleged: (1) expense reimbursements paid to Redman and Smith; (2) stock sales and pledges of Redman and Smith; and (3) related-party transactions of Redman and Smith. Plaintiffs plead no facts that establish that Denholm in particular was derelict in failing to pierce these alleged deceptions; and they certainly do not plead (with specificity under Rule 9(b)) that Denholm made any representations or omissions relating to these undiscovered issues. Instead, Plaintiffs offer only the conclusory opinion that Denholm would have caught these issues but for his alleged "distraction." Plaintiffs' half-hearted, bank-shot claims against Denholm for the alleged actions of his bosses are not adequately pled, and do not add up to viable cause of action against him. Instead, they are the exact type of unsupported and passing allegations that the heightened pleading requirements of the PSLRA are intended to exclude.

### D.     Plaintiffs' Conclusory Statements Fail to Satisfy their Scienter Pleading Burden Under the PSLRA.

Plaintiffs' "'complaint will survive . . . *only if* a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL

- 11 -

3957916, at *15 (S.D.N.Y. Sept. 12, 2012) (quoting *Tellabs*, 551 U.S. at 323) (alteration in original) (emphasis added).  The Complaint cannot meet this standard, and the Response does not rectify that failure.

### 1.    *Plaintiffs Do Not Adequately Plead Scienter Regarding PBEX.*

Denholm's work with PBEX does not raise a compelling inference of scienter.  Rather, the opposing inference is more compelling--that Denholm did not disclose his work with PBEX because he reasonably believed he had no affirmative duty to do so under Item 404, and did not see any inherent conflict in his two roles.

Plaintiffs' key argument for scienter is that ProPetro "had no idea" that Denholm had a role with PBEX.  (Doc. 97 at 71).  Plaintiffs assert that alone, this is sufficient to plead scienter by showing Denholm had a "motive" to not disclose the outside role.  *Id.* at 71–72.  But that is conclusory and circular reasoning. Plaintiffs are merely arguing that because Denholm allegedly did not share the information, he therefore had a motive not to share the information.  Moreover, a "motive" without an obvious duty to disclose *and* a guilty mind does not constitute scienter and, absent such a duty, is irrelevant to the Court's analysis under the PSLRA.  Further, the mere fact that ProPetro did not know a fact about Denholm does not establish any of these things.  Denholm is not required to disclose information absent an affirmative duty to disclose—which Plaintiffs have not adequately pled.  Moreover, Plaintiffs do not plead any reason that Denholm should have known that disclosing his work with PBEX was mandatory—no conflict with ProPetro, no public statement it rendered false, and no transaction between the two companies.  Without such details, there is no basis for the assertion that Denholm *should have known* he had a mandatory obligation to disclose the facts about PBEX.

Indeed, a careful reading of recent precedent on this issue establishes that Denholm had *no* such obligation.  *See Fries*, 285 F. Supp. 3d at 722.  Plaintiffs attempt to distinguish *Fries,* but

- 12 -

those efforts are unavailing.  In *Fries*, the court concluded that plaintiffs failed to state a claim based on allegations that the Company's CEO did not disclose that he was simultaneously working a second job at another company.  *See* 285 F. Supp. 3d at 722.  In other words, the plaintiffs in *Fries* brought the same "abdication of responsibility" or "distraction" claim as Plaintiffs here.  But *Fries* rejects such claims, in part because the distraction theory "do[es] not establish fraudulent intent."  *Id*.  As in *Fries*, so in the instant case:  There is no scienter because Plaintiffs do not plead grounds that would render it unreasonable for Denholm to believe **"that there is no inherent conflict in working with the two"** companies at issue.  *Id.* at 216 n.6 (emphasis added).

### 2. Plaintiffs Do Not Adequately Pled Scienter Regarding the Clarabby Transactions.

Plaintiffs argue for scienter for the Clarabby transactions through a series of conclusory statements not supportable by their pleadings.  For example, they argue there is "strong circumstantial evidence" for scienter by stating that Denholm "*knew*" he entered into the Clarabby transactions and either "*knew they needed to be disclosed*" or was "*severely reckless.*"  (Doc. 97 at 70) (emphasis in original).  But this begs to questions.  First, Denholm did *not* know that "he entered" the Clarabby transactions because *he did not enter those transactions,* even according to the details of Plaintiffs' Complaint.  (*See* Doc. 81 ¶¶ 187–89; Doc. 92. at 17–19).  Plaintiffs do not allege that Denholm was a member of Clarabby at the time the transactions or that he obtained any benefit from the transactions.  The technical rules governing related-party transactions, thus, did not mandate disclosure.

Second, and more fundamental, even if Plaintiffs could inch across the finish line on the highly-technical and opaque question of whether disclosure was required, the closeness of that question, and the attenuated and indirect nature of the Clarabby transactions themselves, eviscerate the notion that Denholm acted with a knowing or reckless mind.  *See Lewy*, 2012 WL 3957916, at

- 13 -

*19–20 (finding that the "tenuousness of the argument that disclosure was required" cut against an inference of scienter as "[t]he inference that [the company] intended to deceive stockholders is not as strong as the inference that [it] overlooked that the Series B Purchase Agreement created a related-party transaction, if it indeed did so.")

Plaintiffs attempt to distinguish *Lewy* on the grounds that it related to a "*proposed*" transaction rather than "an actual reality."  (Doc. 97 at 72–73) (emphasis in original).  But the Yingkou transaction at issue in *Lewy* was an "actual reality" as it was not just proposed, but rather, a "consummated" transaction, for months before it was eventually disclosed in 2010.  *See Lewy*, 2012 WL 3957916, at *3 (alteration in original) ("[M]anagement determined that the acquisition of Yingkou that was consummated in November 25, 2009 was a related party transaction . . . .").  Further, it is not clear why *Lewy*'s scienter analysis would be affected by the status of consummation, and Denholm sees no reason why it would be.  SEC Regulation S-K—the basis for any disclosure obligation—applies equally to *consummated* transactions as to "any currently *proposed* transaction[.]"  *See* 17 C.F.R. § 229.404(a) (emphasis added).  *Lewy's* analysis turns, rather, on the intuitive fact that innocent mistakes regarding disclosure are especially likely when the grounds that a transaction requires mandatory reporting are tenuous or debatable.  There is no question that would be the case here (even if a disclosure obligation technically existed) on precisely the same grounds as proved decisive in *Lewy*.

### E.    Plaintiffs Do Not Adequately Plead Loss Causation Regarding Either the Clarabby Transactions or PBEX Under Any Federal Pleading Standard.

Plaintiffs fail to sufficiently plead loss causation for their specific allegations against Denholm (Clarabby and PBEX) under either Federal Rules of Civil Procedure 8 or 9.  Indeed, Plaintiffs argue that the historical *increase*—not decrease—in the ProPetro stock price following the November 13, 2019, Clarabby disclosures is somehow "a fact question concerning what the

market knew." (Doc. 97 at 92).  But governing precedent for fraud-on-the-market securities claims is not so complicated.  The Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), "requires plaintiffs to plead loss causation by alleging that *the stock price fell* after the truth of a misrepresentation about the stocks was revealed . . . .").  *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 477 (4th Cir. 2006) (emphasis added) (citing *Dura*, 544 U.S. at 342).  "[T]he amount of inflation caused by a false statement is the difference between the stock price after the false statement and what it would have been had the statement reflected the truth," as measured by the "*net sum of price declines* due to corrective disclosures." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 417 (7th Cir. 2015) (emphasis added). "The stock price [is] overpriced by ***that amount*** prior to [the] disclosur[e]." *Id.* (emphasis added).

In other words, "loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud (*i.e.*, even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?"  *FindWhat Investor Grp. V. FindWhat.com*, 658 F.3d 1282, 1312 (11th Cir. 2011) (citing *Dura*, 544 U.S. at 347).  After an actionable corrective disclosure, "investors who purchased at inflated prices (and who still hold their stock) will suffer economic loss, because *they will no longer be able to recoup* the inflationary component of their purchase price by reselling their stock in the newly calibrated marketplace."  *Id.* at 1315–16 (emphasis added) (citing *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010)).  In other words, the stock price will have declined.

Key to this analysis is the fact that Plaintiffs' claims are brought on behalf of a putative class claiming that *it lost money* as a result of Denholm's actions, because the true value of ProPetro stock was inflated due to investors' ignorance *about Clarabby or about PBEX*.  If that

- 15 -

were so regarding Clarabby, any losses resulting from the disclosure of Clarabby to the investing public would have been suffered between November 14, 2019, (when the stock rose from $7.34 to $7.74) and January 6, 2020, (when the stock reached $11.97, before declining due to general issues with the oil and gas industry and then due to COVID). (Docs. 92-1, 92-2, & 92-3). Plaintiffs' grasping for an issue cannot change the judicially-noticeable fact that any investor who owned ProPetro stock before the November 13, 2019, disclosures saw his or her investment *increase in value* on that day, on the next day, and for the next two months. As a simple matter of historical record, investors suffered no losses resulting from the disclosure.

Nor can Plaintiffs seriously dispute that November 13, 2019, is the effective date of the relevant Clarabby disclosure. In fact, in their attempt to show that the Clarabby matter is material, Plaintiffs positively assert that this is so. (Doc. 97 at 46) ("[T]he Company itself concluded that the Clarabby transactions were material and were required to be disclosed, *because it did so on November 13, 2019.*" (emphasis added).

To the extent Plaintiffs insinuate that "losses" should be calculated based upon an earlier date, Plaintiffs are trying to have their cake and eat it. They know the Culper report and earlier, generalized statements about Denholm were not new and specific disclosures *regarding Clarabby* that could ever constitute a correction adequate to establish the existence of a material misstatement. So for purposes of arguing materiality, they assert the Company's disclosure was on November 13. (Doc. 97 at 46). Then they turn on a dime, arguing that perhaps the earlier statements should count after all, since the November 13, 2019, disclosures leave them no losses to collect. (Doc. 97 at 91).

The Court need not participate in this shell game. It is plain from Plaintiffs' Complaint that, on the merits, the October 31, 2019, Culper report was "based on public information." (Doc.

81 ¶180).  "[T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."  *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (collecting cases).  Plaintiffs cite *Pub. Emp. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v. Amedisys*, 769 F.3d 313, 323 (5th Cir. 2014), for the proposition that technically public data can form the basis of a corrective disclosure in certain circumstances.  But *Amedisys* turned upon the "hidden meaning of . . . . Medicare data that required expert analysis, [when] . . . the data itself is only available to a narrow segment of the public and not the public at large."  *Id*.  Federal courts have distinguished *Amedisys* when the information at issue "could easily be calculated from the information [earlier] disclosed."  *See Callinan v. Lexicon Pharms., Inc*., No. H-19-0301, 2020 WL 4740487, *18 (S.D. Tex. Aug. 14, 2020); *see also In re Herbalife Ltd. Secs. Litig.*, No. CV-14-2850 DSF, 2015 WL 12732428, *3 (C.D. Cal. Mar. 27, 2015) ("The [*Amedisys*] WSJ article materially differs from the multiple . . . presentations at issue here.  Each presentation was based on publicly available information and, unlike in *Amedisys*, [Plaintiffs] provid[e] no basis to conclude that [their] conclusions required expert analysis or that the underlying information was not available to the public.")

Here, the Complaint does not contain facts analogous to *Amedisys*. Instead, it stipulates that the information incorporated into the Culper report was "based on public information."  (Doc. 81 ¶ 180).  The Culper report was thus a classic example of a short-seller opinion sheet, wherein "the only thing actually disclosed to the market when the opinion is released *is the opinion itself,* and such an opinion, standing alone, cannot 'reveal[ ] to the market the falsity' of a company's prior factual representations."  *Meyer*, 710 F.3d  at 1199 (alteration in original)(emphasis in original) (quoting *FindWhat,* 658 F.3d at 1311 n.28).

The only plausible alternative date for the Clarabby corrective disclosure is therefore October 9, not October 31, 2019.  October 9 was the date of ProPetro's initial mention of the Clarabby issue in a Form 8-K report. That report alerted the public to Denholm's departure from the Company.  The better view is that this disclosure is not a functional corrective disclosure, as it did not reach any conclusions about Clarabby or provide any detail. Instead, it merely stated that the Company was investigating the matter. This analysis would apply with equal force to October 9, 2019, however, as ProPetro's stock price rose from $7.90 on October 9, 2019, to $9.44 the following day, and eventually rose above $11.00 by the end of 2019. (*See* Docs. 92-1, 92-2, & 92-3).  As with November 13, 2019, therefore, an investor who owned ProPetro shares prior to October 9, 2019, saw the value of his investment *increase*, not decrease, during the time period reasonably connected to the disclosure—both short-term and long-term.  Even if the Culper opinions put a temporary lull into this rally, the overall effect (if any) of the Clarabby disclosures from October 2019 through January 2020 was an ***increase*** in investor value.

This analysis applies with even more force to PBEX, for which no corrective disclosure exists and for which Plaintiffs have pled no plausible connection to any loss suffered by investors. Certainly loss causation can be a complex topic in some circumstances. But when basic mathematics and historical records establish that the relevant investments were more valuable *after* the "corrective" disclosures than before, it is safe to conclude that Plaintiffs fail to plead an essential element of their claim.  Accordingly, Plaintiffs' cannot sustain their claims relating to Clarabby and PBEX against Denholm.

## III.  CONCLUSION

Plaintiffs' claims against Denholm should be dismissed with prejudice because Plaintiffs have had three opportunities to amend, and the continued insufficiency of Plaintiffs' claims against Denholm, coupled with Plaintiffs' inability in the Response to articulate any cognizable claim

- 18 -

against Denholm, establishes that further amendment would be futile. *See U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (citation omitted); *F.D.I.C. v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994) (citation omitted) ("leave to amend need not be granted when it would be futile to do so."). Plaintiffs again fail to allege a single instance in which Denholm allegedly made a specific representation or omission in connection with the sale of a security. Because Plaintiffs have not been able to allege sufficient facts to meet the pleading requirements after multiple opportunities to amend, under the circumstances, the claims against Denholm should be dismissed with prejudice. *See Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'") (*quoting Martins Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999)).

Accordingly, Denholm requests that the Court dismiss Plaintiffs' claims against him with prejudice and without granting leave to amend.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

*/s/ Jeffrey J. Ansley*
Jeffrey J. Ansley
State Bar No. 00790235
jansley@bellnunnally.com
Craig M. Warner
State Bar No. 24084158
cwarner@bellnunnally.com
Parker A. Burns
State Bar No. 24091843
pburns@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
214-740-1400 Telephone
214-740-1499 Facsimile

**ATTORNEYS FOR DEFENDANT
IAN DENHOLM**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically to all counsel of record on the 30th day of October, 2020, via the Court's CM/ECF system.

*/s/ Craig M. Warner*
Craig M. Warner