UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | |
|---|---|
| RICHARD LOGAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, ET AL., <br><br> Plaintiffs, <br><br> -against- <br><br> PROPETRO HOLDING CORP., ET AL., <br><br> Defendants. | Case No. MO:7:19-CV-00217-DC <br><br> CLASS ACTION |

## DEFENDANT PROPETRO HOLDING CORP.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

HUGHES HUBBARD & REED LLP

1775 I Street, N.W.
Washington, D.C. 20006-2401
Tel: 202-721-4600
Fax: (202) 721-4646

CONTENTS

PRELIMINARY STATEMENT..............................................................................................................1

ARGUMENT.........................................................................................................................................2

    I.    Plaintiffs' Section 10(b) Claims Should be Dismissed ...................................................2

        A.    Plaintiffs Ignore the Relevant Pleading Standard.....................................................2

        B.    Plaintiffs Fail to Plead Materially False Statements or Omissions.......................3

        C.    The TAC Lacks Particularized Allegations Warranting a
            "Strong Inference of Scienter".....................................................................................14

        D.    Plaintiffs Do Not Adequately Plead Loss Causation.............................................23

    II.    Plaintiffs' Section 11 Claims Should Also Be Dismissed ............................................29

        A.    Alleged Misstatements Concerning the Share Pledge and PT Petroleum are
            Barred by the Statute of Repose .................................................................................30

        B.    Alleged Omissions of "Related Party Transactions" are Not Actionable
            Because the Transactions Post-Date the Information in the IPO Documents.................32

        C.    Alleged Misstatements Concerning Related Party Controls are Not Actionable ..............32

        D.    Alleged Misstatement Concerning Audit Committee Independence is
            Not Actionable .................................................................................................................33

        E.    Alleged Misstatements Concerning Risk Factors are Not Actionable ................................33

CONCLUSION....................................................................................................................................35

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Arbitrage v. Tchuruk Plaintiffs Grp.*,
   291 F.3d 336 (5th Cir. 2002)........................................................................................................4

*Alaska Elec. Pension Fund v. Asar*,
   768 F. App'x 175 (5th Cir. 2019) ......................................................................................... 19, 20

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
   915 F.3d 975 (5th Cir. 2019)............................................................................................14, 15, 17

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019)......................................................................................31

*Barrett v. PJT Partners Inc.*,
   No. 16-CV-2841 (VEC), 2007 WL 3995606 (S.D.N.Y. Sept. 8, 2017)............................................18

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................................6

*Bastian v. Petren Res. Corp.*,
   892 F.2d 680 (7th Cir. 1990).....................................................................................................27

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) ..........................................................................................................9

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)..................................................................................................................28

*Boca Raton Firefighters v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012)....................................................................................................5

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ..............................................................................................11

*Brody v. Zix Corp.*,
   No. 3:04-CV1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ..............................................12

*In re China Valves Tech. Sec. Litig.*,
   979 F. Supp. 2d 395 (S.D.N.Y. 2013)..........................................................................................9

*In re Cobalt Int'l Energy, Inc.*,
   2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ...............................................................................2, 3

*Cuvillier v. Taylor*,
   503 F.3d 397 (5th Cir. 2007)................................................................................................2, 3

*In re Dell Inc., Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) ........................................................................ 21, 25

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012).................................................................................13

*Dura Pharms. Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................................28

*ECA & Local 134 v. JP Morgan*,
   553 F.3d 187 (2d Cir. 2009) ..............................................................................................6, 7

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017).................................................................................12

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
   905 F.3d 892 (5th Cir. 2018)....................................................................................23, 27, 28

*In re Enron Corp.*,
   No. Civ.A. H-01-3624, 2003 WL 21418157 (S.D. Tex. Apr. 24, 2003) ...........................13

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019).................................................................................9

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................................11

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009).......................................................................................... 14, 17

*In re Francesca's Holdings Corp. Sec. Litig.*,
   Nos. 13-cv-6882 (RJS), 13-cv-7804 (RJS),
   2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015).....................................................................7

*Fries v. N. Oil & Gas, Inc.*,
   285 F. Supp. 3d 706 (S.D.N.Y. 2018).......................................................................... 5, 6, 17

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   No. 10 Civ. 3461 (PAC), 2014 WL 2815571 (S.D.N.Y. June 23, 2014).............................12

*Greenfield Child.'s P'ship v. Friendfinder Networks, Inc.*,
   590 F. App'x 854 (11th Cir. 2014) ......................................................................................8

*Hall v. Rent-A-Center, Inc.*,
   No. 4:16CV978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017),
   *report and recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) ..............................21

*In re Herbalife, Ltd. Sec. Litig.*,
  No. CV 14-2850 DSF, 2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ........................................ 23, 26

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ....................................................................................................20

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ...................................................................................................20

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) .....................................................................................................4

*Lapin v. Goldman Sachs Grp.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ......................................................................................13

*Lee v. Active Power, Inc.*,
  29 F. Supp. 3d 876 (W.D. Tex. 2014) ......................................................................................19

*In re LendingClub Sec. Litig.*,
  254 F. Supp. 3d 1107 (N.D. Ca. 2017) .......................................................................11, 14, 34, 35

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .....................................................................................................27

*Lewy v. Skypeople Fruit Juice, Inc.*,
  No. 11-CV-2700 (PKC), 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) .................................. 16, 17

*Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ..................................................................................... 3, 14, 15

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) .............................................................................................. 29, 30

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013) .......................................................................................31

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...........................................................................................*passim*

*Markman v. Whole Foods Mkt., Inc.*,
  No. 1:15-CV-681-LY, 2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) .....................................6

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ...................................................................................................20

*In re Maxim Integrated Prods., Inc.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) ....................................................................................25

*Melder v. Morris,*
    27 F.3d 1097 (5th Cir. 1994).................................................................................................29

*Meyer v. Greene,*
    710 F.3d 1189 (11th Cir. 2013) ...................................................................................... 25, 26

*Middlesex Ret. Sys. v. Quest Software Inc.,*
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...............................................................................14

*In re Moody's Corp. Sec. Litig.,*
    599 F. Supp. 2d 493 (S.D.N.Y 2009).....................................................................................12

*Nathenson v. Zonagen Inc.,*
    267 F.3d 400 (5th Cir. 2001)..................................................................................................16

*N. Collier Fire Control & Rescue,*
    No. 15 CIV. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ............................4

*In re NVIDIA Corp. Sec. Litig.,*
    768 F.3d 1046 (9th Cir. 2014) .................................................................................................6

*In re OCA, Inc. Sec. & Derivative Litig.,*
    No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) .................................................13

*In re Odyssey Healthcare, Inc. Sec. Litig.,*
    424 F. Supp. 2d 880 (N.D. Tex. 2005)..................................................................................24

*Oran v. Stafford,*
    226 F.3d 275 (3d. Cir. 2000)...................................................................................................6

*Owens v. Jastrow,*
    789 F.3d 529 (5th Cir. 2015)..................................................................................................22

*In re Petrobras Sec. Litig.,*
    116 F. Supp. 3d 368 (S.D.N.Y. 2015).....................................................................................14

*In re Plains All Am. Pipeline, LP Sec. Litig.,*
    245 F. Supp. 3d 870 (S.D. Tex. 2017),
    *aff'd sub nom. Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, LP,*
    777 F. App'x 726 (5th Cir. 2019) (per curiam) ...................................................................11

*In re Plains All American Pipeline,*
    307 F. Supp. 3d 583 (S.D. Tex. 2018),
    *aff'd sub nom. Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, LP,*
    777 F. App'x 726 (5th Cir. 2019) (per curiam) ......................................................... 8, 12, 29

*Plotkin v. IP Axess Inc.,*
    407 F.3d 690 (5th Cir. 2005)....................................................................................................3

*Plymouth Cnty. Ret. Sys. v. Patterson Cos.*,
   No. 18-cv-871, 2019 WL 3336119 (D. Minn. July 25, 2019)................................................13

*Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, LP*,
   777 F. App'x 726 (5th Cir. 2019) (per curiam) ........................................................ 8, 11, 29

*Police & Fire Ret. Sys.of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................................24

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014)..............................................................................23, 25, 26, 27

*Ramirez v. Exxon Mobil Corp.*,
   334 F. Supp. 3d 832, 858 (N.D. Tex. 2018) .........................................................................25

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)...................................................................................12

*Roebuck v. Dothan Sec., Inc.*,
   515 F. App'x 275 (5th Cir. 2013) .........................................................................................19

*Rok v. Identiv, Inc.*,
   No. 15-CV-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017),
   *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018).......................4, 14, 16, 20

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003)..............................................................................................4, 5

*Rougier v. Applied Optoelectronics, Inc.*,
   No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)......................................12

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
   No. 07 Civ. 11086(DAB), 2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011).........................27

*Shivangi v. Dean Witter Reynolds, Inc.*,
   825 F.2d 885 (5th Cir. 1987)................................................................................................14

*In re Signet Jewelers*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019)...................................................................................12

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017)...................................................................................31

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ...................................................................................................12

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y. 2019)...................................................................................31

*In re Sourcecorp Sec. Litig.*,
No. 3:04-CV-2351-N, 2006 WL 8439544 (N.D. Tex. June 6, 2006)................................................19

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F. 3d 353 (5th Cir. 2004) ............................................................................................... 18, 19

*Stephens v. Uranium Energy Corp.*,
No. CV H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016)....................................................1, 6

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d. Cir. 2015) ....................................................................................................6, 27

*Takata v. Riot Blockchain, Inc.*,
Case No. 18-cv-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020) ....................................................32

*Tellabs, Inc. v. Maker Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................................................14

*Truk Int'l Fund LP v. Wehlmann*,
737 F. Supp. 2d 611 (N.D. Tex. 2009),
*aff'd*, 389 F. App'x 354 (5th Cir. 2010) ..................................................................................3, 7

*United Food and Com. Workers Union v. Zuckerberg*,
C.A. No. 2018-0671-JTL, 2020 WL 6266162 (Del. Ch. Oct. 26, 2020)..............................................9

*In re Volkswagen "Clean Diesel" Mktg, Sales Pracs., & Prod. Liab. Litig.*,
MD No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017)..................................................9

*In re WageWorks, Inc., Sec. Litig.*,
No. 18-CV-01523-JSW, 2020 WL 2896547 (N.D. Cal. June 1, 2020) ...............................................20

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................................13

*Zagami v. Nat. Health Trends Corp.*,
540 F. Supp. 2d 705 (N.D. Tex. 2008)......................................................................................7

**Statutes and Rules**

Private Securities Litigation Reform Act, Pub. L. 104-67, 109 Stat. 737 (1995)
(codified as amended in scattered sections of 15 U.S.C.) ........................................................... 1, 3, 34

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ...................................... *passim*

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k ............................................................. *passim*

Section 404 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7262 .................................................. 10, 11

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ....................................................................................... 3

DEL. CODE ANN. tit. 8, § 141(a) (West 2020) ............................................................................... 10

Fed. R. Civ. P. 8 ...................................................................................................................... 29, 30

Fed. R. Civ. P. 9(b) ................................................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 4

**Miscellaneous**

NYSE Listed Company Manual 303A.02(b) ................................................................................... 9

SEC Financial Reporting Manual 4310.6 ..................................................................................... 10

ProPetro Holding Corp. ("ProPetro" or the "Company") respectfully submits this Reply in Support of its Motion to Dismiss ("MTD") the Third Amended Complaint ("TAC").

## **PRELIMINARY STATEMENT**

Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Opp.") attempts to accomplish with legal contortions what it could not with well-pled facts—manufacture a fraud case out of disparate control breakdowns and disclosure errors discovered after an appropriately thorough internal review.  Plaintiffs repeatedly ask this Court to hold their claims to lower standards than the law demands.  This Court is under no duty to entertain their supplications.  In the Fifth Circuit, courts apply pleading standards "with bite and without apology."[1]

*First*, Plaintiffs flatly ignore the heightened pleading standards applicable to Section 10(b) claims.  Without even acknowledging the existence, much less critical applicability, of the PSLRA and Rule 9(b) to their fraud claims under Section 10(b), Plaintiffs claim without legal foundation that they need not "plead detailed factual allegations."  Opp. at 17.  Plaintiffs obfuscate the standard to hide the reality that they have utterly failed to plead their fraud claims with the particularity required.

*Second*, Plaintiffs ask the Court to defer consideration of materiality to a later stage of litigation.  The reason is clear: Plaintiffs' claims rest on allegations that courts routinely recognize as immaterial and dismiss as matters of law.  ProPetro never was required to restate its financial statements but rather disclosed a series of documentation errors, technical oversights, and management misjudgments that cannot properly be characterized as the sort of misstatements or omissions that can support a securities fraud claim.

*Third*, Plaintiffs ask the Court to rewrite the scienter standard to encompass mere awareness of transactions, rather than intent to deceive through misstatement or nondisclosure.  Plaintiffs' motivation is apparent: Plaintiffs' allegations serially fail to establish that Defendants knew or were

---

[1] *Stephens v. Uranium Energy Corp.*, No. CV H-15-1862, 2016 WL 3855860, at *9 (S.D. Tex. 2016).

severely reckless in not knowing that their acts would mislead the market.  Moreover, Plaintiffs' allegations (individually or collectively) never meaningfully coalesce into a coherent fraud, much less one that can effectively compete with the more compelling notion that the allegations at most paint a picture of inexperience and selective mismanagement.

*Fourth*, Plaintiffs cherry pick moments in time when ProPetro's stock dropped to weave together purported "corrective disclosures" to attempt to plead loss causation.  Plaintiffs ask the Court to ignore both the content and sources of those disclosures, as well as their lack of relevance to the claims pled.  Resort to this sort of opportunistic approach does not satisfy Plaintiffs' burden.

*Fifth*, Plaintiffs ask the Court to ignore their own theory of the case to avoid the requirement that they plead their Section 11 claims with the particularity required of Rule 9(b).  But even a lower pleading standard would not mask the deep flaws in their Section 11 pleadings: several of the claims are time barred, other claims are temporally impossible, and other claims are rooted in disclosures or omissions that are correct or mere puffery.

Properly viewed, the claims here are exactly the sort of speculative, predatory claims the securities laws are written to deter.  Errors and mismanagement at newly-public companies are not uncommon, but they are also not fraud.  For these and other reasons discussed herein, the Court should dismiss the TAC with prejudice.

## ARGUMENT

### I.    Plaintiffs' Section 10(b) Claims Should be Dismissed

#### A.    Plaintiffs Ignore the Relevant Pleading Standard

Plaintiffs contend that they "need not plead detailed factual allegations, but merely allegations that when assumed true, raise a right to relief above a speculative level."  Opp. at 17. This is erroneous and misleading to the Court.  Plaintiffs cite two cases, *Cuvillier v. Taylor*, 503 F.3d 397 (5th Cir. 2007), and *In re Cobalt International Energy, Inc.*, 2016 WL 215476 at *2-3 (S.D. Tex. Jan.

19, 2016), for this proposition. *Cuvillier* is not a securities case, but a Section 1983 case. *Cobalt* is a securities case, but stands for exactly the opposite of what Plaintiffs say.[2]

Contrary to Plaintiffs' contention, Rule 9(b) and the PSLRA—neither of which garners a mention in Plaintiffs' entire discussion of its Section 10(b) claims—impose heightened pleading standards and require a plaintiff to specifically plead each of "the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). In addition, the PSLRA requires that "for each act or omission alleged to be false or misleading[,] plaintiffs must state with particularity facts giving rise to a *strong inference* that the defendant acted with the requisite state of mind [*i.e.,* scienter]." *Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (quotations omitted and emphasis added). Plaintiffs cannot escape these requirements by pretending they do not exist.

**B.** **Plaintiffs Fail to Plead Materially False Statements or Omissions**

Plaintiffs' Section 10(b) and Rule 10b-5 claims are rooted in a series of discrete disclosure errors and control breakdowns identified by ProPetro during a searching internal review. These matters, largely relating to documentation errors, technical rules, and obscure contractual provisions, never required a restatement of ProPetro's financials, and Plaintiffs' claims of fraud should be dismissed for failure to plead materially false statements or omissions.[3]

---

[2] *In re Cobalt Int'l Energy Inc.*, No. CV H-14-3428, 2016 WL 215476, at *3 (S.D. Tex. Jan. 19, 2016) (applying PSLRA heightened standards to 10(b) claim elements of materiality and scienter).

[3] Plaintiffs argue that because ProPetro undertook an extensive internal review, made management changes, and suffered a stock market price decline, there *must have been* material misstatements. Opp. at 19. Forgetting the inherent flaws in the approach overall, the fact that the Board took its fiduciary responsibilities seriously and conducted a probing review, was transparent in its findings, and made management changes reveals nothing more than the Board's appropriate prerogative to move the Company in a new direction. These are not the hallmarks of fraud, nor admissions of materiality. So too, a stock price decline, without more, does not demonstrate materiality. *See Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 624-25 (N.D. Tex. 2009), *aff'd*, 389 F. App'x 354 (5th Cir. 2010).

4

Plaintiffs attempt to defer consideration of materiality to summary judgment or trial. But Plaintiffs' contention that "[m]ateriality is not a basis to dismiss at the pleading stage" (Opp. at 42 n.15) is simply wrong and has been rejected by the Fifth Circuit. *See ABC Arbitrage v. Tchuruk Plaintiffs Grp.*, 291 F.3d 336, 359 (5th Cir. 2002) ("Plaintiffs argue that it is improper for a court deciding a Rule 12(b)(6) motion to dismiss a complaint on the basis of materiality. We cannot agree with this assertion, so broadly cast.").[4] Each of the following categories of allegations can and should be found immaterial as a matter of law.[5]

*Expense Reimbursements*: Plaintiffs take pains to revise the muddled allegations contained in the TAC regarding the improperly reimbursed expenses. They neglect, however, to provide any cogent rationale for why the reimbursements are material. In *North Collier Fire Control & Rescue*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *15 (S.D.N.Y. Sept. 30, 2016), the court dismissed as immaterial claims regarding improper expense reimbursements that increased the CEO's pay by 10.2%—over three times the magnitude of Redman's expenses and over 51 times the magnitude of Smith's. Plaintiffs do not attempt to distinguish *North Collier*. In fact, Plaintiffs do not cite a single case in the entirety of their argument on this issue. Opp. at 38-39.[6]

Instead, Plaintiffs argue that the expenses are material because they prompted an internal

---

[4] Plaintiffs also cite *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) and *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) on this point. Opp. at 18. Notably, both decisions affirmed dismissals for failure to plead materiality.

[5] Plaintiffs largely ignore the numerous deficiencies Defendants identified in the TAC related to falsity. For example, Plaintiffs apparently do not contest that: (i) all claims regarding Clarabby related to 2017 and 2019 filings must be dismissed because the transaction occurred in 2018; (ii) all claims related to PBEX before October 2017 and after May 2018 must be dismissed because there is no allegation Denholm worked at PBEX outside that period; and (iii) ProPetro adopted a Code of Ethics and related party controls as it stated it would. *See* MTD at 9, 11, 21-22.

[6] *See also Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *5-9 (N.D. Cal. Jan. 4, 2017) (finding improperly reimbursed executive expenses were immaterial and did not render false statements regarding internal controls), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) (Mem.).

investigation that found control deficiencies and ultimately led to management changes.  Opp. at 38.  This characterization is erroneous on its face; the TAC itself states that the internal review began not with the expense reimbursements, but with the DuraStim purchase contracts that are not at issue here.  TAC ¶ 147.  Plaintiffs also distort the materiality standard.  The question is whether there is a *substantial likelihood* a reasonable investor would view the omitted fact as *significantly* altering the total mix of information, *see Rosenzweig*, 332 F.3d at 865, not whether a series of attenuated consequences and later discoveries might do so.  There is no materiality by "butterfly effect."[7]

    *Related Party Transactions*:  Plaintiffs allege that various disclosure errors concerning related party transactions were material based on arguments that either ignore their own pleadings or distort the relevant caselaw.

    *First*, as to Denholm's alleged "moonlighting" at PBEX, Plaintiffs helpfully clarify that their allegation is that, "Denholm was so distracted by his employment at PBEX that he failed to perform the functions of his role as Chief Accounting Officer at ProPetro."  Opp. at 35.  This is exactly why the claim must be dismissed.  Allegations of corporate mismanagement are not actionable under 10(b).  *See, e.g., Boca Raton Firefighters v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (Section 10(b) does not reach mere "instances of corporate mismanagement.").  Plaintiffs attempt to distinguish *Fries v. Northern Oil & Gas, Inc.*, 285 F. Supp. 3d 706 (S.D.N.Y. 2018), which dismissed claims that a CEO neglected his work in favor of his undisclosed position at another company, claiming that the *Fries* "court found only that there was no fraudulent intent, not that the omission was not material."  Opp. at 35 n.11.  Plaintiffs appear to have ignored the court's bolded heading that reads, "Plaintiff Fails to Allege Misstatements or Omissions of Material Fact."  *Fries*, 285 F. Supp. 3d at 717.  *Fries* is

---

[7] Plaintiffs also erroneously claim that ProPetro can be held liable for not disclosing the reimbursements in its Forms 10-Q, because ProPetro disclosed other related party transactions in those filings.  Opp. at 39.  Plaintiffs overlook that those other transactions were not expense reimbursements, which the accounting rules exempt from quarterly disclosure.  MTD at 14 n.13.

directly on point.

*Second*, regarding the Clarabby Transaction, Plaintiffs offer no rejoinder to Defendants'

argument that the transactions were quantitatively immaterial, representing 0.4% of ProPetro's

property and equipment.  Nor do Plaintiffs offer any persuasive rationale for why Denholm's

indirect interest (for no financial benefit) in a minor facilities purchase would have been qualitatively

material to investors.  Instead, Plaintiffs offer the conclusory logic that ProPetro's decision to

disclose the transactions itself proves materiality.  This is incorrect.  Regardless of ProPetro's

disclosure choice, liability under Section 10(b) only arises if the fact is material under *Basic Inc. v.*

*Levinson*, 485 U.S. 224 (1988).[8]  Indeed, as discussed in detail in Denholm's Motion to Dismiss,

whether the transactions were ever required to be disclosed is a highly technical matter on which

reasonable minds can disagree.  Denholm Br. at 9-12.  In any case, Plaintiffs fail to plead or argue

why a reasonable investor would have believed it important (in the total mix of information) to be

informed about this relatively minor transaction in which ProPetro's then-CAO had indirect

involvement for no financial gain.  *See ECA & Local 134 v. JP Morgan*, 553 F.3d 187, 202 (2d Cir.

2009) (affirming dismissal and finding omission of related party transactions not material where they

represented a "minute fraction of assets").[9]

---

[8] *See Stephens*, 2016 WL 3855860, at *21 (finding alleged Item 404 omission not material); *see also Oran v. Stafford*, 226 F.3d 275, 288 (3d. Cir. 2000) (Alito, J.) (holding that a breach of a disclosure duty under Item 303 of Reg. S-K is not *per se* material for 10b-5 purposes); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir.  2014) ("[A] duty to disclose must be separately shown according to the principles set forth by the Supreme Court in *Basic* and *Matrixx Initiatives*."); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d. Cir. 2015) ("[S]uch an omission is actionable only if it satisfies the materiality requirements outlined in [*Basic*]."); *Markman v. Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016) (adopting the *NVIDIA* standard). Although the latter cases dealt with disclosure under Item 303, not Item 404, their logic is equally applicable to Item 404.

[9] Plaintiffs attempt to distinguish *ECA* on the grounds that it involved an allegation that disclosing the transaction would have led to the revelation of fraudulent activity, while Plaintiffs' complaint alleges that disclosing the transactions would have revealed an "undisclosed culture of noncompliance" at ProPetro.  Opp. at 33 n.10.  This is hardly a meaningful distinction, and it would

Plaintiffs also contend that "materiality cannot properly be disputed" because ProPetro's share price fell when the Culper Report was released. Opp. at 33. Evidence of stock price movement is not determinative of materiality. *See Truk Int'l Fund LP*, 737 F. Supp. 2d at 624-25. Furthermore, the Culper Report addressed more than the Clarabby Transaction, and thus it would be mistaken to attribute the market reaction to any one particular allegation contained therein.[10]

*Third*, Plaintiffs do not plead why it would "significantly alter the total mix of information made available" to investors to know that 2.5% of ProPetro's revenues came from a related party, PT Petroleum. *See ECA & Local 134*, 553 F.3d at 202 (affirming dismissal where undisclosed related party transactions were immaterial); *see also In re Francesca's Holdings Corp. Sec. Litig.*, Nos. 13-cv-6882 (RJS), 13-cv-7804 (RJS), 2015 WL 1600464 at *16 (S.D.N.Y. Mar. 31, 2015) ("In the face of $79 million in reported revenue during [Q1 2013], the mere relatedness of a party supplying $250,000 worth of inventory could hardly be considered a material fact significant in relation to investment decisions."); MTD at 12-13.

Plaintiffs' argument that the omission was material because investors obviously "care whether publicly traded companies are concealing related party transactions that *benefit* management" misses the mark. Opp. at 37 (emphasis added). Nowhere in the TAC or in their brief do Plaintiffs allege with any specificity that the PT Petroleum transaction personally benefited any member of ProPetro management. Indeed, here PT Petroleum was purchasing services *from* ProPetro. By contrast, in *Zagami v. Natural Health Trends Corp.* (cited in Opp. at 36-37), the investors pointed to specific evidence that $2.5 million of commissions the company (NHTC) paid to a marketing firm "ultimately reached" two executives of NHTC. *See* 540 F. Supp. 2d 705, 710 (N.D. Tex. 2008).

appear to cut against Plaintiffs regardless, as the disclosures in *ECA* (which were found not material) could have revealed a more severe issue.

[10] Plaintiffs appear to concede that many of the challenged misstatements regarding Clarabby fail as a matter of chronology.

Rather than confront the fundamental issue of materiality head on, Plaintiffs spend much of their discussion of the PT Petroleum sales arguing against a straw man. Defendants do not contend that the PT Petroleum sales did not need to be disclosed. Opp. at 36. The issue is whether the omission was material. It was not.

*Share Pledge*: Plaintiffs' claims regarding both the lock-up agreements and the beneficial ownership tables are consistent with those dismissed in *Greenfield Children's Partnership v. Friendfinder Networks, Inc.*, 590 F. App'x 854 (11th Cir. 2014), and *In re Plains All American Pipeline*, 307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd sub nom. Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, LP*, 777 F. App'x 726 (5th Cir. 2019) (per curiam). Plaintiffs' attempts to distinguish these cases rest on basic misreading of the decisions. Contrary to Plaintiffs' contention, *Greenfield* does not concern whether a lock-up agreement existed, but whether (as here) it was followed. Opp. at 42 n.14. While the *Greenfield* plaintiffs pled that defendants breached the lock-up agreement, the claim failed nonetheless because the "prospectus did not address, much less guarantee" that the agreement would be enforced. 590 F. App'x at 856. So too here.

Plaintiffs' description of *In re Plains* is also incorrect. *In re Plains* held that statements in an underwriting agreement were not actionable because "[t]he context of the statements indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public." *In re Plains*, 307 F. Supp. 3d at 638. Plaintiffs seize on the court's mention of "the company's financial health" to differentiate the statements at issue in that case from those at issue here, because, they argue, the statements at issue in *Plains* were "subjective and context specific." Opp. at 42 n.14. The statements at issue in *Plains* did not address the company's subjective financial health, however, but rather its compliance with laws, regulations, and financial agreements. *In re Plains*, 307 F. Supp. At 636. Such statements are no more subjective and context-specific than those at issue here.

Finally, Plaintiffs cite *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Product Liability Litigation*, MD No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017), for the proposition that statements made "outside of official regulatory filings are regularly upheld as actionable." Opp. at 41-42. Defendants, of course, do not argue that no statement outside of a regulatory filing can *ever* be actionable, but that the nature of the statement bears on its materiality and falsity. As explained in *In re Facebook, Inc. Securities Litigation*, the *Volkswagen* decision concerned reliance, not materiality or falsity.[11]

*Independence*: Plaintiffs argue that ProPetro's statements regarding its intent[12] to adopt an independent Audit Committee are fraudulent because Douglas was a "friend and accountant" to Redman. Opp. at 45-46. Plaintiffs cite no case finding an independence violation on so minimal a basis. Indeed, Delaware law has long held that mere friendship is not enough to impugn independence. *See Beam v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004) (providing overview of case law on this subject); *see also United Food and Com. Workers Union v. Zuckerberg*, C.A. No. 2018-0671-JTL, 2020 WL 6266162 (Del. Ch. Oct. 26, 2020). Even if one were to give weight to these threadbare connections, the allegation fails nonetheless.[13] The factors contemplated by the Listed Company Manual are for *the Board* to consider in its discretion.[14] Plaintiffs never allege that the Board did not

---

[11] *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 n.5 (N.D. Cal. 2019) ("For this reason, Plaintiffs['] use of [*In re Volkswagen*] is also misplaced. That case assessed whether stickers were addressed at consumers, rather than the investing public, in a *reliance* argument.").

[12] Representations regarding *intent* do not become false even if, *arguendo*, the company fails to follow through on its intended course of conduct. *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 412 (S.D.N.Y. 2013).

[13] Indeed, Defendants are not aware of *any* securities fraud action based on an allegation of a violation of Section 303 of the NYSE Listed Company Manual, which is focused on the relationship between an accountant and a subject company. NYSE Listed Company Manual 303A.02(b).

[14] NYSE Listed Company Manual 303 states that "No director qualifies as 'independent' unless the board of directors affirmatively determines that the director has no material relationship with the listed company." NYSE Listed Company Manual 303A.02(a).

weigh the relevant factors or did not in good faith determine Douglas to be independent.[15]  Plaintiffs seek to override the Board's determination with their own—contrary to the fundamental principle that corporate governance is left to a company's board absent a fiduciary violation.[16]

*Risk Warnings*:  Plaintiffs claim that ProPetro's risk factors regarding internal controls and compliance with Section 404 of SOX in its IPO Documents, 2017 Secondary Offering Documents, and 2018 Form 10-K were materially misleading because, they allege, the Company's internal controls were already suffering from a material weakness and it was already violating SOX 404 when it issued these warnings.[17]  *See* Opp. at 25-26; TAC ¶¶ 244-47, 278-79.

None of these risk factors were false or misleading.  With regard to the IPO and 2017 Secondary Offering, Plaintiffs fail to allege with particularity that ProPetro's controls were suffering from a material weakness at the time of the offerings, relying as they do predominantly on alleged control breakdowns that post-dated both of those filings.  *See* TAC ¶¶ 245, 247; *infra* II.B.[18] ProPetro also could not possibly have been in violation of Section 404 at the time of the IPO or 2017 Secondary because ProPetro was not required to undertake a Section 404 assessment until its second annual report after the IPO, well-after the 2017 Secondary Offering.[19]  But even more fundamentally, these risk factors were not false or misleading because they clearly warned investors

---

[15] *See, e.g.*, Ex. 29, ProPetro 2019 Annual Report (Form 10-K) at 139 (June 22, 2020) ("Our Board has undertaken a review of the independence of each of our directors and has affirmatively determined that each of Messrs. Best, Blackwell, *Douglas*, Moore and Ms. Choka are '*independent,'* as *defined by the NYSE rules*.") (emphases added).

[16] *See* DEL. CODE ANN. tit. 8, § 141(a) (West 2020).

[17] Plaintiffs' contention that the "securities laws do not distinguish between young and mature companies," (Opp. 18 n.8), is incorrect as specified under the JOBS Act.  *See* MTD at 20 nn.24-26.

[18] Aside from the same factors that supposedly established a material deficiency at the time of the IPO, Plaintiffs also allege that ProPetro's failure to disclose Denholm's employment at PBEX also establishes a material deficiency in ProPetro's controls at the time of the 2017 Secondary Offering. *See* TAC ¶ 247.  But ProPetro had no obligation to disclose Denholm's alleged employment at PBEX and thus this alleged omission cannot demonstrate a control shortcoming.  *See* MTD at 11.

[19] *See* 15 U.S.C. § 7262 (2018); *see also* SEC Financial Reporting Manual 4310.6.

that ProPetro was still in the process of integrating its internal controls into its operations, had not yet had an opportunity to test its controls, and might yet identify weaknesses in its internal controls. *See* TAC ¶ 244; MTD at 19-20; *infra* II.E.  In light of such warnings, Plaintiff cannot logically claim that investors were misled.[20]

Indeed, contrary to Plaintiffs' claim, neither the IPO Documents nor the Form 10-K reference "continue[d]" compliance with Section 404 as argued by Plaintiffs and therefore the risk factors represent nothing about ProPetro's controls at the time of those statements.  The risk factors instead speak only in prospective generalities about the requirements of Section 404 and the possible consequences of non-compliance.[21]  Such prospective statements are generally not actionable under the securities laws.  *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).[22]

*Code of Ethics*:  Plaintiffs also challenge various statements in ProPetro's Code of Ethics that, in sum, (i) advise employees not to place themselves in situations that could pose a conflict of interest; and (ii) require ProPetro and its employees to maintain and implement a system of internal

---

[20] Plaintiffs' reliance on *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1115 (N.D. Ca. 2017), regarding ProPetro's IPO disclosure (Opp. at 29) is misplaced, as the court in *LendingClub* found that at the time of the IPO the registration statement had "concluded that [the registrant's] disclosure controls and procedures were effective."  254 F. Supp. 3d at 1114-15.  No such assurance was provided by ProPetro at the time of its IPO.

[21] Plaintiffs misquote the 10-K and IPO Documents, which do not speak of "continue[d]" compliance with Section 404. *Compare* Opp. at 25 (quoting 2017 Secondary Offering), *with* Ex. 18, ProPetro 2018 Annual Report (Form 10-K) at 25 (Mar. 1, 2019); Ex. 002, Prospectus at 28 (March 16, 2017).

[22] As for the allegations that ProPetro misled investors by describing legal and regulatory requirements applicable to it, *see* TAC ¶¶ 247, 279, 383; Opp. at 25-26, such statements are inactionable truisms.  *In re Plains All Am. Pipeline, LP Sec. Litig.*, 245 F. Supp. 3d 870, 904 (S.D. Tex. 2017), *aff'd sub nom. Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, LP*, 777 F. App'x 726, 731 (5th Cir. 2019) (per curiam) (holding that a statement that a failure to comply with regulations could result in penalties and civil liability, was a truism, not a false or misleading statement); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360-63 (S.D.N.Y. 2008) (collecting cases and distinguishing *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) (cited in Opp. at 26)).  Here, the risk factors at issue are more akin to the "boilerplate" warnings found inactionable in *In re FBR* than the "specific trading restrictions" that defendants were alleged to have violated in *In re Van der Moolen.  See In re FBR*, 544 F. Supp. 2d at 360-61.

controls and not falsify information.  *See* TAC ¶¶ 302-08.  These are the sort of boilerplate

recitations and generalized puffery courts routinely find inactionable.[23]  *See In re Plains*, 307 F. Supp.

3d. at 625-26; *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

None of Plaintiffs' cases demonstrate otherwise.  *See* Opp. at 27-28.  Several do not relate to

codes of ethics at all, while others relate not to statements *in* a code of ethics, but to statements *about*

a code of ethics issued in response to specific allegations of misconduct.[24]  Statements made for the

purpose of reassuring investors following allegations of misconduct are of a separate species from

the boilerplate statements contained in ProPetro's Code of Ethics.  Plaintiffs' remaining cases fare

no better.  Several involved statements about ethical commitments that were particularized to core

elements of those companies' businesses, which granted them a particular importance and

materiality.  Nor do any of the challenged statements here relate to ethical commitments that form a

"cornerstone" of ProPetro's business, as in other cases cited by Plaintiffs.[25]  Plaintiffs' final case,

---

[23] Plaintiffs incorrectly allege that the Code of Ethics was incorporated into the Forms 10-K.  It was not.  *See* MTD at 16 n.18.

[24] Neither *Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) nor *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) concern codes of ethics.  *In re Signet Jewelers*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) meanwhile, concerns statements in the company's SEC filings *about* its code of conduct, not *in* its code of conduct.  The distinction is critical because the statements at issue in *Signet* were made specifically "to reassure the investing public that Signet did not, in fact, have a toxic workplace" in the wake of sexual harassment allegations.  *Id.*  Similarly, in *In re Eletrobras Securities Litigation*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017), which Plaintiffs cite as support that statements about ethical standards can be actionable, the challenged statements were not in the code of conduct; they were separate statements about the company's compliance issued in response to Eletrobras having been implicated in a bribery scandal.  Moreover, the court found that the statements specifically emphasized the company's reputation for integrity and ethical conduct "as central to its financial condition," thus further indicating that the statements were geared towards the investing public. *Id.* at 463.

[25] *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y 2009) (Moody's statements about its independence were actionable because Moody's business model as a ratings agency rested on its reputation for independence and integrity, which was a "cornerstone" of its business).  Similarly, in both *In re Goldman Sachs Group., Inc. Securities Litigation*, No. 10 Civ. 3461 (PAC), 2014 WL 2815571, at *5-6 (S.D.N.Y. June 23, 2014), and *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012), Goldman's statements about conflicts of interest were actionable

*Plymouth County Retirement System v. Patterson Cos.*, No. 18-cv-871 (MJD/SER), 2019 WL 3336119 at

\*16 (D. Minn. July 25, 2019), concerned specific guidelines for how to comply with a particular legal

regime (*i.e.*, antitrust rules).  None of the challenged statements in ProPetro's Code of Ethics

provided similar "specific guidance for compliance with a specific subset of laws."  *Id.*[26]  Rather,

ProPetro's Code of Ethics contained little more than perfunctory recitations of law and regulations

applicable to all public companies.

> *Internal & Disclosure Control Representations and SOX Certifications*:  Plaintiffs claim statements

regarding ProPetro's financial and disclosure controls made in Forms 10-Q and 10-K and

accompanying SOX certifications were materially misleading because ProPetro subsequently

disclosed certain discrete control breakdowns and that control weaknesses existed as of December

2018.  Plaintiffs do nothing to counter the baseline materiality issue presented by these statements:

none of these control weaknesses impacted ProPetro's reported financials.  Each of the cases

Plaintiffs cite regarding control representations and certifications relate directly to allegations of

financial manipulation.[27]  Plaintiffs do not identify a *single* internal control case where the control

---

because Goldman's very success and reputation as a financial services firm depended on compliance with the law and its ability to address conflicts of interest.  Finally, in *Lapin v. Goldman Sachs Group*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006), the court held that Goldman's statements about its integrity and independence were actionable because integrity "was at the heart" of Goldman's business, and was used to distinguish Goldman from its competitors.

[26] Plaintiffs attempt a shell game on this point by suggesting that what is at issue are the more concrete prohibitions on pledging shares contained in the Insider Trading Policy.  Opp. at 42-44 & n.16.  The Insider Trading Policy was not a public document, and the TAC contains no allegations of misstatements in the Insider Trading Policy.  The statements regarding the Insider Trading Policy quoted in the TAC are from ProPetro's 2020 disclosure of Redman's pledges, not ay prior statement on which investors could have relied.  *See* TAC ¶¶ 15, 94, 208, 238, 240, 301, 309, 357, 363, 375.

[27] *See In re Enron Corp.*, No. Civ.A. H-01-3624, 2003 WL 21418157 (S.D. Tex. Apr. 24, 2003) (financial collapse of $60 billion company due to accounting fraud, and containing no allegations of false statements about internal controls); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) (concerning overstated receivables and fraudulent statements made to control impact of auditor assessment); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) ($500 million understatement of tax expenses); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93 (D. Mass. 2014) (multiple schemes to inflate financials, and

14

failures did not impact the company's core financials, but were nevertheless material for purposes of Section 10(b) or Section 11.[28]  Opp. at 22-25.[29]

### C.   The TAC Lacks Particularized Allegations Warranting a "Strong Inference of Scienter"

Plaintiffs fail to plead facts demonstrating a "powerful or cogent" inference of scienter that is "strong in light of other explanations."  *Tellabs, Inc. v. Maker Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007).  Plaintiffs focus on whether Individual Defendants had actual knowledge of particular facts, but this is not enough.  To survive a motion to dismiss, such individuals' alleged knowledge must support a cogent or compelling inference of *intent to deceive shareholders or the market*.[30]  Plaintiffs fail to clear this bar with respect to each of their allegations they claim supports an inference of scienter.[31]  Plaintiffs provide no corroborating or contemporaneous evidence in support of an intent

---

containing no allegations of false statements about internal controls); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1117 (N.D. Cal. 2017) (CEO "driv[ing] [the] company's performance with artificially inflated loans" over the course of five years); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015) (financial statements inflated by multi-billion dollar bribery scheme); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007) (inflated profits by way of options backdating scheme).

[28] *See Rok*, 2017 WL 35496, at *9-10 (finding SOX certifications inactionable because "there has never been a financial restatement due to alleged improper expense reporting or the alleged Entity Level Controls Weakness" that allowed such reporting to occur), *aff'd sub nom.* 716 F. App'x 663.

[29] Additionally, the statements largely concern management's conclusions regarding its evaluation of disclosure controls and management's reporting of material weaknesses in internal controls and fraud to its auditors. *See* TAC ¶¶ 256-58.  Plaintiffs' offer no evidence that management did not reach such conclusions or make such reports.  *Cf. Rok*, 2017 WL 35496, at *10.  For all statements dated prior to December 2018, Plaintiffs also fail to allege particularized facts demonstrating that the disclosure controls actually suffered from weaknesses that would render the statements false.

[30] *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) ("Even assuming Wilder was aware that the Board was contemplating a dividend increase, this knowledge alone would not suffice to establish that Wilder intended to deceive investors or was reckless in revealing only that the dividend policy was under review at the time of the tender offer."); *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987) ("[K]nowledge of omitted facts does not itself establish scienter.").

[31] Plaintiffs mischaracterize the Fifth Circuit's decisions in *Flotek* and *Diodes*, both of which affirmed dismissal for failure to plead scienter.  *See* Opp. at 49 n.18.  *Flotek* does not stand for the sweeping proposition that "scienter would be established by allegations indicating the defendants knew or

to deceive shareholders or the market, and their allegations thus lack the particularity required to establish "actual knowledge" or "severe recklessness." *See* MTD at 32 n.37.

Plaintiffs' failure is evident in light of the more plausible inference of innocent errors. The Individual Defendants, who lacked public company experience, were busy managing a rapidly-growing business in a highly-competitive market. That they made errors along the way should shock no one. The statutory framework enacted for Emerging Growth Companies is based on just such an expectation—that new, fast-growing companies are likely to struggle to implement effective controls. Plaintiffs—whose complaint is based almost entirely on ProPetro's public statements, not insider witnesses or documents—cannot overcome this anodyne explanation through baseless insinuation. Nor can Plaintiffs meet their pleading burden by ignoring the technical realities and complexities of the issues ProPetro faced in favor of a casual assertion of fraud.

### 1.  Plaintiffs Fail to Demonstrate Scienter Regarding Perquisites and Expense Reimbursements

Plaintiffs fail to allege facts indicating that Redman or Smith engaged in any intentional misconduct in connection with the reimbursements or perquisites, let alone that they intended to mislead investors. *See* MTD at 29. Plaintiffs now claim, again without any factual support, that Redman and Smith must have known that the reimbursements were improper simply because they personally received them. *See* Opp. at 55. Regardless of whether this would be sufficient to

---

should have known of information at odds with their public statements." *See* Opp. at 49 n.18. As the opinion makes clear, the standard requires actual knowledge or severe recklessness regarding "a danger of misleading buyers or sellers." *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019). With respect to *Diodes*, Plaintiffs latch onto one "consideration[] that might tip the scales in favor of an inference of scienter" in "'special circumstances' cases" and present that consideration as a broad holding of the court. *See Diodes*, 810 F.3d at 959; Opp. at 49 n.18. The court was discussing the "special circumstances" exception to the general rule that an officer's position does not establish scienter. "Special circumstances" such as a small company or issues critical to a company's vitality are not present here. To the extent Plaintiffs suggest they must rely on "special circumstances" cases predicated on circumstantial evidence, the concession is well-taken, as Plaintiffs do "not allege that [they have] direct proof of intentional or severely reckless omissions of material facts on the part of [ProPetro] or its corporate executives." *Diodes*, 810 F.3d at 957.

demonstrate an intent to mislead *investors*, this argument assumes that it was obvious from the face of these reimbursements that they were improper.  Nothing in the TAC or Plaintiffs' brief supports such a contention.[32]  Rather, ProPetro's disclosures (and Plaintiffs claim no other source of information) clearly characterize the reimbursements as "incorrectly recorded" due to "inadequate documentation."  TAC ¶¶ 149, 351.  Although the Court must accept Plaintiffs' well-pled allegations, it need not credit baseless conjecture as a substitute for properly pleading scienter.  *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419-20 (5th Cir. 2001).[33]  Without any well-pled allegations of intentional misconduct, the far more plausible inference to be drawn from the facts is that Redman and Smith overlooked the details of these peripheral matters, devoting their attention to ProPetro's expanding business operations.  *Cf. Rok*, 2017 WL 35496, at *11-12 (noting that "intent to cut corners on reimbursements[] is not the same thing as . . . inten[t] to mislead investors").

### 2.  Plaintiffs Fail to Demonstrate Scienter Regarding the Clarabby Transaction or PBEX

Plaintiffs argue that Denholm either knew the Clarabby Transaction needed to be disclosed or was severely reckless in not knowing.[34]  Plaintiffs again overlook the indirect nature of the Clarabby Transaction and the highly-technical (and disputed) disclosure analysis it necessitated.  *See* Denholm Br. at 11.  These facts are highly suggestive of innocent error.  *See Lewy v. Skypeople Fruit*

---

[32] Plaintiffs argue, "[t]hat ProPetro compelled both Smith and Redman to pay the money back even is clear evidence that the payments they received were facially illegitimate."  *See* Opp. at 54.  Putting aside that ProPetro's disclosures never say that repayment was "compelled," this argument is specious.  By Plaintiffs' logic, anytime a company corrects an error, it admits to fraud.

[33] Plaintiffs' citation to *Nathenson* is unavailing.  *See* Opp. at 54-55.  In the portion of *Nathenson* cited by Plaintiffs, the Fifth Circuit concluded that plaintiffs had pled, "if perhaps only barely so," a strong inference of scienter as to the CEO based on a number of "special circumstances" that are plainly not applicable here.  *See Nathenson*, 267 F.3d at 425.  These included that the alleged misstatements concerned a vital issue to the company's only product, that there was ample time for the CEO to become acquainted with this important issue, and that the CEO spoke to the market about this specific issue, which was central to the "Company's future prospects."  *Id.*

[34] Plaintiffs assert that, "Denholm does not dispute that he had a material interest in the Clarabby Transactions[.]"  Opp. at 57.  That is misleading at best.  *See, e.g.*, Denholm Br. at 10.

*Juice, Inc.*, No. 11-CV-2700 (PKC), 2012 WL 3957916, at *19 (S.D.N.Y. Sept. 10, 2012) (finding that the "tenuousness of the argument that disclosure was required" cut against an inference of scienter).[35]  Given the attenuated nature of Denholm's involvement in the Clarabby Transaction and Plaintiffs' lack of any particularized allegations evincing an intent on his part to commit fraud, Plaintiffs have failed to show actual knowledge or severe recklessness. *See id.*; *Flotek*, 915 F.3d at 982.

As to Denholm's alleged involvement with PBEX, Plaintiffs again offer no substantive rejoinder to Defendants' reliance on *Fries*.  *See* MTD at 27-28; Denholm Br. at 8, 19.[36]  Plaintiffs' reticence is understandable; the case is materially indistinguishable.  In *Fries*, the court concluded that plaintiffs had failed to state a claim based on allegations that the company's *chief executive officer* failed to disclose that he was simultaneously working a second job at another company.  *See* 285 F. Supp. 3d at 722.  As in *Fries*, Denholm's failure to disclose any relationship with PBEX constitutes, at most, "mere mismanagement."  *Id.*

### 3.  Plaintiffs Fail to Demonstrate Scienter Regarding the PT Petroleum Transactions

With regard to the PT Petroleum transactions, the Company's acknowledgement that the transactions should have been disclosed does not show that Armour or ProPetro intended to withhold the transactions from disclosure.  *Flaherty*, 565 F.3d at 212.  Plaintiffs point to no facts suggesting that to be the case, or that Armour was severely reckless in not ensuring the transactions were disclosed.  All that Plaintiffs can allege with any foundation is that the transactions occurred and that they were not properly disclosed.  Plaintiffs offer not a single additional fact or allegation—

---

[35] Plaintiffs contend it is "highly misleading" to suggest the court in *Lewy* relied on "the uncertainty of the existence of related-party transactions" in declining to find scienter.  *See* Opp. at 59-60.  The case speaks for itself.  *See, e.g.*, *Lewy*, 2012 WL 3957916, at *20 ("The inference that [the company] intended to deceive stockholders is not as strong as the inference that [it] overlooked that the Series B Purchase Agreement created a related-party transaction, if it indeed did so.").

[36] Plaintiffs concede elsewhere that the *Fries* court found "there was no fraudulent intent."  *See* Opp. at 35 n.11.

18

no document, email, or witness—that adds to the analysis.  Plaintiffs' desperation leads them to suggest that Armour's stepping down as Chairman of the ProPetro Board (of which he remains a member) supports an inference of scienter despite the resignation occurring nearly a year prior to the disclosure of the error.[37]

Likewise, Plaintiffs identify no specific benefit, incentive, or motive on Armour's part for "conceal[ing]" the transactions, arguing without basis or citation that the transactions were entered into in violation of Company policy.  *See* Opp. at 61.  Plaintiffs' allegations that, for instance, Armour "viewed ProPetro as [his] own personal piggybank" (TAC ¶ 3) are nonsensical.  Armour simply received no personal benefit from any transaction.

    **4.**    **Redman's Share Pledges Do Not Demonstrate a Strong Inference of Scienter, Let Alone One that Can Be Imputed to ProPetro**

For the reasons stated in the opening briefs of ProPetro and Redman, Plaintiffs fail to plead a cogent or compelling inference with respect to Redman's pledges of shares.  *See* MTD at 30-31; Redman Br. at 10-13.  Plaintiffs plead no facts establishing that Redman knew the pledges had to be disclosed.  Given the obscure nature of such a disclosure (in footnotes to a share table), there is strong reason to believe that Redman simply was unaware of the disclosure requirement.

Moreover, assuming, *arguendo*, the TAC's allegations are credited, Redman's state of mind should not be imputed to ProPetro as the circumstances meet the adverse-interest exception.  *See* MTD at 31.  Under this exception, an executive's scienter is not imputed to a corporation where the executive acted in his own interest and adverse to the interests of the company.  *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2007 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017).  *Plaintiffs*

---

[37] Even if one ignores the *Back to the Future* style of Plaintiffs' allegations (a temporal flaw that, like the movies, was repeated serially in the TAC), Armour's stepping down as Chairman is immaterial to the scienter analysis.  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F. 3d 353, 383 (5th Cir. 2004) (resignations are generally "unavailing as proof of the commission of fraud by these or other individuals").

*themselves allege* that Redman was acting "for his own personal benefit" and "to the detriment of ProPetro," and that "Redman hid these pledges from the Company." TAC ¶¶ 102, 14.[38] The Court should not credit Plaintiffs' attempt to reverse course by claiming that, "Redman's misstatements did in fact benefit ProPetro." Opp. at 70. Plaintiffs' assertion that ProPetro benefited because "admitting Redman's misconduct in the IPO Offering Documents would have imperiled the IPO" (Opp. at 70) is rank speculation and appears nowhere in the TAC. Plaintiffs cannot amend the TAC through their brief in opposition to a motion to dismiss. *See Roebuck v. Dothan Sec., Inc.*, 515 F. App'x 275, 276 (5th Cir. 2013).

Because, "[i]n determining whether to impute an executive's scienter to the company, [the] Court looks to whether an executive's fraud operates to benefit the company or whether the fraud is committed against the company," Redman's scienter cannot be imputed to ProPetro. *See In re Sourcecorp Sec. Litig.*, No. 3:04-CV-2351-N, 2006 WL 8439544, at *4 (N.D. Tex. June 6, 2006).[39]

### 5. Plaintiffs' Conclusory Allegations Regarding Internal Controls Do Not Contribute to the Scienter Analysis

The Fifth Circuit's decision in *Asar* shows why neither Plaintiffs' arguments on SOX certifications nor their arguments on "tone at the top" add to any inference of scienter. Opp. at 62-63. The *Asar* court explained: "'[A] Sarbanes–Oxley certification is only probative of scienter if'. . . . [there are] facts establishing that the officer who signed the certification had a 'reason to know, or

---

[38] Plaintiffs overlook that the language they quote as ProPetro's "argument" is in fact a quotation from the TAC. *See* Opp. at 70.

[39] The cases on which Plaintiffs rely are inapposite. In *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 878 (W.D. Tex. 2014), an employee (Wang) fed the company false information that the company had entered a high-profile partnership with another entity on "specific key initiatives" that would improve the company's performance in the Asian market. *See id.* at 878. The court concluded that Wang's lies to the company were not adverse to the company's interests because the lies, "while certainly benefitting [Wang] . . . , also benefitted Active Power in its efforts to bolster its perception in the eyes of investors." *Id.* at 885. Likewise in *Southland* the fraudulent scheme deceived investors about the company's performance and inflated its share price, a clear affirmative benefit to the company. *Southland Sec. Corp.*, 365 F. 3d at 360.

should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the *financial statements contained material misstatements or omissions.*'" *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 187 (5th Cir. 2019) (concluding that SOX certifications did not contribute to inference of scienter) (emphasis added) (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 545 (5th Cir. 2008)); *see also Rok*, 2017 WL 35496, at *15 n.22. Here, without any specific evidence of fraudulent intent, the relatively modest amounts of perquisites and expense reimbursements later deemed to be improper that Redman and Smith received do not constitute "glaring accounting irregularities" or "red flags," and to date ProPetro has not had to restate any of its financials. The internal controls allegations with respect to Denholm—who did not sign any SOX certifications—are even more tenuous.

Similarly, ProPetro's "tone at the top" findings do not suggest scienter as to the internal controls. In *Asar*, the court concluded that an inappropriate "tone at the top" did not contribute to a strong inference of scienter because, "[w]ithout knowing what [individual defendants] said or did [to contribute to an inappropriate tone], it is equally credible that they realized that the tone at the top was inappropriate only with hindsight." *Asar*, 768 F. App'x at 185; *see also* MTD at 33 (citing *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018); *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009)). Plaintiffs' allegations suffer the same defects, and the same conclusion should follow.[40]

---

[40] Plaintiffs cite one unpublished out-of-circuit district court case for the proposition that an inappropriate "tone at the top" supports an inference of scienter. *See* Opp. at 59 (citing *In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523-JSW, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020)). *In re WageWorks* does not support Plaintiffs' arguments. There, the court acknowledged that an inappropriate "'tone at the top' could suggest mere management issues." *Id.* at *6. But the specific "tone" allegations at issue supported an inference of scienter because they fundamentally undercut defendants' contention that the reporting error (resulting in a restatement) stemmed from a "mere contract dispute or failure at oversight." *Id.* at *6-7.

### 6.    Remedial Measures Do Not Contribute to Any Inference of Scienter

Plaintiffs fail to provide specific evidence that ProPetro's personnel changes are suggestive of fraud, rather than mere mismanagement.  Courts in the Fifth Circuit are clear that personnel changes will not add to an inference of scienter unless specific evidence ties the personnel action to particular bad acts.  *See In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 898 (W.D. Tex. 2008) ("Multiple Fifth Circuit decisions suggest resignations have little implication on scienter analysis."). That Plaintiffs cite to a single case, an unpublished report and recommendation to support their position is telling.  *See* Opp. at 65 (citing *Hall v. Rent-A-Center, Inc.*, No. 4:16CV978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)).  But the scienter analysis in *Hall* focused on extensive, particularized allegations of scienter supported by confidential witnesses, not the management changes, which are relegated to a footnote in the district judge's opinion, *see* 2017 WL 6379334, at *12 n.8.  Here, Plaintiffs have alleged no facts from which to infer that the personnel changes were related to fraud rather than mismanagement.  As a result, the personnel changes do not add to an inference of scienter.

### 7.    Plaintiffs Fail to Demonstrate Scienter for Filings Signed by Howell

Plaintiffs concede they cannot show scienter on the part of non-defendant Mark Howell for the proxy statements or August 16, 2017 Form 8-K he signed while General Counsel of ProPetro. *See* Opp. at 71-72.  Plaintiffs instead contend that "the Individual Defendants, the most senior directors and officers at the Company, had authority over the contents or issuance of the proxy statements."  *Id.* at 72.  Even if one were to accept this premise (which utilizes group pleading prohibited in this Circuit), it is irrelevant because Plaintiffs do not plead that *any* of the Individual Defendants "are liable" for the alleged misstatements in the August 16, 2017 Form 8-K or in the proxies.  *See* TAC ¶¶ 329-30 (listing alleged misstatements for which Plaintiffs claim the Individual Defendants "are liable" and omitting IV.C.(4) ("Materially False and Misleading Statements and

Omissions Contained in ProPetro's August 16, 2017 Form 8-K") and IV.C.(5) ("Materially False and Misleading Statements and Omissions Contained in ProPetro's Proxy Statements")).

### 8. Plaintiffs' Allegations Regarding Insider Trading Do Not Contribute to Any Inference of Scienter

Plaintiffs all but concede that their feeble allegations of improper insider trading do not support a strong inference of scienter. *See* Opp. at 69 ("[P]laintiffs are not required to allege insider trading for a finding of scienter."). Plaintiffs' allegations regarding stock sales lack any particularity and do not describe how the purported trades were unusual in timing or scope. *Id.* Indeed, the lack of particularized allegations *lessens* any inference of scienter; Plaintiffs identify no "unusual" insider sales of stock where Individual Defendants would have "cashed in" on their alleged scheme.

### 9. Plaintiffs' Scienter Allegations Are Not Improved by a Holistic View

Plaintiffs urge the Court to conduct a "holistic" review of their scienter allegations rather than focus on individual allegations.[41] Opp. at 3. As ProPetro discussed in its Motion to Dismiss, a holistic view does not help Plaintiffs' case. Plaintiffs' scattershot allegations of scienter do not demonstrate a cogent or compelling inference that the Individual Defendants (or the Company) acted intentionally or severely recklessly to defraud shareholders. Plaintiffs point to no evidence of the Individual Defendants' state of mind at the time of the alleged misstatements, and Plaintiffs ignore the many caveats communicated to investors as the Company continued to grow. *See* MTD at 32. Plaintiffs' allegations are classic allegations of "fraud by hindsight" and are insufficient to show scienter. *See id.* at 33. Tellingly, after stressing the importance of a holistic scienter analysis, Plaintiffs never attempt one.

---

[41] Although Plaintiffs criticize Defendants for addressing the scienter allegations individually, the Fifth Circuit has endorsed beginning any scienter analysis by "first looking to the contribution of each individual allegation to a strong inference of scienter, especially in a complicated case," followed by a holistic view. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015).

### D.      Plaintiffs Do Not Adequately Plead Loss Causation

None of the five alleged corrective disclosures establish loss causation because: (a) they fail to reveal *previously-concealed* information relevant to the alleged misstatements or omissions, (b) they do not reveal *any relevant* information, or (c) Plaintiffs have not plausibly alleged "that it is *more probable than not* that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *See Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (emphasis added).

Plaintiffs try to rehabilitate their pleadings primarily by arguing that the disclosures must be read collectively.  Opp. at 74-80.  But, here, the "whole is not greater than the sum of its parts." *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 904 (5th Cir. 2018) (quoting *Amedisys*, 769 F.3d at 324-35).  Plaintiffs plainly selected a series of events as "corrective disclosures" because they were followed by share price declines, and not because they actually revealed *relevant*, and previously concealed truths about the alleged misstatements and omissions to the market.  Whether viewed collectively[42] or individually, Plaintiffs have failed to plausibly allege loss causation for each claim.[43]

#### 1.  August 8, 2019 Form 8-K

On August 8, 2019, ProPetro disclosed that it had incorrectly reimbursed certain expenses to

---

[42] Plaintiffs' prayer to view the Company's disclosures collectively is ironic given their selective omission of clearly relevant disclosures that resulted in stock price increases and selective inclusion of events such as Howell's resignation, the Culper Report, and the Reuters article that did not reveal any previously concealed and relevant information to the market.  *See* October 9, 2019 (ProPetro disclosed, among other things, that Denholm had resigned and was assisting the company in its review of the Clarabby Transaction); November 13, 2019 (ProPetro confirmed for the first time that it suffered from internal control deficiencies as of December 31, 2018); June 22, 2020 (ProPetro provided the detailed results of its investigative findings); *see also In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850 DSF, 2015 WL 1245191, at *7-8 (C.D. Cal. Mar. 16, 2015) (explaining that plaintiffs' omission of additional events revealing similar matters but not followed by any stock price declines "undercuts [their] loss causation theory").

[43] *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 260 (5th Cir. 2009) (affirming dismissal of claim regarding US Unwired's conversion to Type II affiliation and transfer of core functions to Sprint because none of the alleged corrective disclosures, *even when viewed collectively*, revealed relevant information about these issues).

members of management. *See* TAC ¶ 10. Plaintiffs' own allegations make clear that the market was far less concerned with the supposed "corrective information" regarding internal controls and expense reimbursements than with the broader uncertainty of an ongoing investigation. *See* TAC ¶¶ 155-157 (detailing analysts' concerns over the other issues presented by this disclosure). Plaintiffs thus have failed to plausibly allege that it was the disclosure of the challenged information (as opposed to other factors) that caused a substantial part of the share price decline.

### 2. August 30, 2019 Form 8-K

On August 30, 2019, ProPetro disclosed that Mark Howell was resigning as general counsel due to family circumstances that required him to relocate from Midland to Houston. *See* Form 8-K, Ex. 10.1 at 1 (Aug. 30, 2019) (Ex. 22). The Form 8-K addressed no other matters and in no way provided the market with relevant "truth" regarding the alleged fraud at issue in this case. It is not a corrective disclosure. *See, e.g.*, *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 888 (N.D. Tex. 2005). Plaintiffs weakly argue that Howell's resignation came "in the wake" of the Audit Committee's review, and therefore "revealed further complications" from the review. Opp. at 76-77.[44] Such vague speculation, untethered from any well-pled fact, is insufficient to plead loss causation. *See Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation.").

### 3. October 18, 2019 Reuters Article

The Reuters article only revealed that the SEC was interested in the same control issues that ProPetro itself had *already* disclosed to the market. In fact, ProPetro had already disclosed that the

---

[44] This reframing already marks a notable retreat from the TAC itself, in which Plaintiffs contend—without any basis in the document itself—that the August 30, 2019 Form 8-K revealed to investors that ProPetro's "internal controls were inadequate, that its senior executives . . . had not created proper and adequate internal controls . . . and that ProPetro was not in compliance with applicable laws." TAC ¶¶ 314-15.

control issues would likely result in material deficiencies.[45]  As such, the Reuters article does not "constitute a corrective disclosure for purposes of loss causation."[46]  The cases cited by Plaintiffs do not show otherwise.[47]  In *Amedisys*, the Fifth Circuit recognized "that generally, commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure."  *Amedisys*, 769 F.3d at 323 (collecting cases).  But there the court made an exception because, "[a]fter each negative partial disclosure, [d]efendants attempted to mitigate the impact of those disclosures by making *contemporaneous misstatements* to the market and prevented the full truth from being revealed at once."  *Id.* at 324 (emphasis added).  Unlike the defendants in *Amedisys*, ProPetro itself informed the market that it was investigating disclosure and control deficiencies, and that it was likely to find a material weakness.  ProPetro made no contemporaneous misstatements denying potential deficiencies; thus, the announcement of an SEC investigation did not reveal any further "relevant truths" to the market.[48]

### 4. October 31, 2019 Culper Report

The Culper Report did not disclose previously withheld relevant facts to the market; it only

---

[45] Liz Hampton, *SEC Probes oilfield firm ProPetro over accounting, disclosures*, REUTERS (Oct. 18, 2019 3:04 PM) (Ex. 24).

[46] *See Dell*, 591 F. Supp. 2d at 910 (finding on motion to dismiss that disclosure of a government investigation was not a corrective disclosure if it did not reveal the truth that was previously concealed); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *In re Maxim Integrated Prods., Inc.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009).

[47] Plaintiffs' straw-man assertion that Defendants have argued that the announcement of an SEC investigation "can never be a corrective disclosure" (Opp. at 77) mischaracterizes ProPetro's clear position that the relevant circumstances compel the conclusion that the existence of an SEC investigation was not a corrective disclosure. MTD at 41-42.

[48] Similar to *Amedisys*, in *Ramirez v. Exxon Mobil Corp.*, disclosures of government investigations were not *preceded* by a statement from the defendant that it was itself already looking into the events at issue.  334 F. Supp. 3d 832, 858 (N.D. Tex. 2018).  One of the partial disclosures, an op-ed by two U.S. Senators, stated ExxonMobil "was attempting to sidetrack" the government's investigation into the company.  *Id.*  As in *Amedisys*, in *Ramirez*, the disclosure of ExxonMobil's alleged dissembling, coupled with disclosures of government investigations into concerns that were previously not disclosed by the company, revealed far more to the market than the Reuters article did in this case.

expressed Culper Research's admittedly self-interested views on already publicly-available information.[49]  The Culper Report cannot be a corrective disclosure as to the Clarabby Transaction in particular because ProPetro had already disclosed that it was reviewing the Clarabby Transactions[50] and the Culper Report was based *on this very disclosure* and other public information.[51] Plaintiffs look to *Amedisys* to argue that a report based on public information can nevertheless serve as a corrective disclosure.  Opp. at 78-79.  This comparison fails.  The report at issue in *Amedisys* was not a shortseller's sensationalized compilation of public information but a Wall Street Journal article that utilized a Medicare expert to process and review "complex economic data" that were "only available to a narrow segment of the public" because their significance was "understandable only through [such] expert analysis."  769 F.3d at 323.  The Culper Report—an amalgam of information obtained from YouTube videos, websites, ProPetro's own SEC filings, and public land records—is simply not comparable.  *See In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *3 (explaining that the shortseller presentations at issue were distinguishable from the Wall Street Journal article in *Amedisys* because there was "no basis to conclude that [the shortseller's] conclusions required expert analysis or that the underlying information was not available to the public"); *see also Meyer*, 710 F.3d at 1199.  Because this is the only alleged corrective disclosure that provides even arguably relevant information regarding the Clarabby Transaction or Douglas, those claims should be dismissed for

---

[49] CULPER RESEARCH, PROPETRO HOLDING CORP (PUMP): FRIENDS & FAMILY FIRST AT THIS PERMIAN CESSPOOL at Disclaimer (Oct. 31, 2019) (Ex. 25) (the information in the report is obtained from public sources and not insiders); *id.* at 3 (stating Culper Research sold ProPetro's stock short).

[50] *See* Form 8-K, Ex. 10.6 at 5, 8 (Oct. 9, 2019) (Ex. 23).

[51] Plaintiffs deflect by claiming that "the Culper Report provided information far beyond that concerning Denholm and the Clarabby Transactions."  Opp. at 78.  But Plaintiffs do not allege how the inflammatory statements in the Culper Report (which simply repackaged already-public facts about ProPetro's executives' and directors' connections to other companies) revealed the "truth" related to the alleged fraud in this case.  *See* TAC ¶¶ 318-19.  To the extent this oblique reference is Plaintiffs' belated attempt to amend their complaint to plead loss causation for their claim regarding Douglas' purported lack of independence, it fails.

failure to plead loss causation.  *See Lormand*, 565 F.3d at 260; *Whole Foods*, 905 F.3d at 904.

### 5. March 16, 2020 Form 8-K

On March 16, 2020, with concerns over the pandemic overwhelming the market, the Dow

Jones Industrial Average suffered its *largest point drop in its history*.[52]  Plaintiffs claim that these truly

extraordinary events are of no moment for their loss causation claim.  Citing *Amedisys*, Plaintiffs

argue that they are not required to "disaggregate macro-economic effects at the pleading stage."

Opp. at 79.  But in evaluating the sufficiency of the loss causation pleadings, the *Amedisys* court

made clear that it was careful to ensure there were no "other contravening negative event[s]" that

could account for the stock price decline.  769 F.3d at 326; *see also Stratte-McClure*, 598 F. App'x at 29

("Although Plaintiffs need not rule out all competing theories for the decline in stock price, their

allegations must 'show that [their] loss was caused by the alleged misstatements as opposed to

intervening events.'").

Where, as here, the company's drop in stock price "coincide[d] with a marketwide

phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was

caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pleaded facts

which, if proven, would show that its loss was caused by the alleged misstatements as opposed to

intervening events." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005); *see also Bastian v.*

*Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990); *In re Sec. Cap. Assurance Ltd. Sec. Litig.*, No. 07 Civ.

11086(DAB), 2011 WL 4444206, at 6 (S.D.N.Y. Sept. 23, 2011) (dismissing claim where "[p]laintiff

has failed to plead facts which would disaggregate the losses it contends were caused by Defendants'

misstatements from the losses attributable to other causes").  Given the macro-economic events

taking place on March 16, 2020, there is simply no "reasonably founded hope" that the discovery

---

[52] *See, e.g.*, Pippa Stevens, Yun Li & Fred Imbert, *Stock market live Monday: Dow drops 13%, Trump says recession possible, trading halted at open*, CNBC (Mar. 16, 2020 7:13 AM) (Ex. 28).

process could reveal evidence sufficient to prove that a *significant* part of ProPetro's share price decline was caused by its disclosure, as opposed to the overwhelming market forces. *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)).[53] Because this is the only alleged corrective disclosure that provides any relevant information regarding Redman's pledges, that claim should be dismissed for failure to plead loss causation. *See Lormand*, 565 F.3d at 260; *Whole Foods*, 905 F.3d at 904.

**6.** **None of the Alleged Corrective Disclosures are Relevant to the PBEX and PT Petroleum Allegations**

Plaintiffs must allege loss causation for *each* alleged misstatement or omission. *See Lormand*, 565 F.3d at 260; *see also Whole Foods*, 905 F.3d at 904. Yet, here, Plaintiffs' "corrective disclosures" are devoid of any mention of Denholm's alleged employment at PBEX or ProPetro's transactions with PT Petroleum. *See* TAC ¶¶ 310-20. Plaintiffs do not disagree but, instead, argue that these alleged omissions were "corrected and revealed to the market" when (i) Denholm resigned, (ii) Gobe replaced Armour as Chairman of ProPetro, and (iii) ProPetro acknowledged that it had internal control weaknesses. Opp. at 79-80. This argument all but admits that Plaintiffs failed to allege loss causation for these claims. Even if Denholm's resignation or Gobe's replacement of Armour revealed information that was sufficiently "relevant" to alert the market that Denholm worked for PBEX and that ProPetro engaged in transactions with PT Petroleum—which they certainly did not—the TAC does not plead either of these announcements as corrective disclosures. *See* TAC ¶¶ 310-320; *see also* Form 8-K (Oct. 9, 2019) (announcing Denholm's resignation); Form 8-K (July

---

[53] Plaintiffs have failed to plead that they suffered *any* loss associated with the alleged corrective disclosure filed on March 16, 2020. The certifications filed with Plaintiffs' Second Amended Complaint (no certifications were filed with the TAC) anticipate a class period from March 2017 through October 2019, and do not include information establishing that any of the Plaintiffs still held ProPetro shares as of March 16, 2020. As a result, Plaintiffs' pleadings are insufficient to establish whether the March 16, 2020 disclosure could plausibly establish loss causation. *See* First Amended Complaint, dated Feb. 13, 2020 (ECF No. 55), Appendix A.

12, 2019) (announcing Gobe's replacement of Armour as Chairman of the Board).[54]

## II.      Plaintiffs' Section 11 Claims Should Also Be Dismissed[55]

The Fifth Circuit has made clear that when "Securities Act claims are grounded in fraud

rather than negligence," Rule 9(b) applies. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363,

368 (5th Cir. 2001) (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994)).  Unconvincing

as it may be, Plaintiffs' overarching theory is an alleged continuous fraud tracing back to ProPetro's

IPO Documents.  Each challenged statement in the IPO Documents is likewise challenged by

Plaintiffs in their Exchange Act claims and where, as here, "the [Securities Act] claim is based on the

same underlying facts and allegations as a securities fraud claim under the Exchange Act, then the

pleading standard is the standard contained in Rule 9(b)."  *See Plains All Am. Pipeline*, 777 F. App'x

726, 730 (5th Cir. 2019) (per curiam) (citing *Lone Star Ladies*, 238 F.3d at 368-69).[56]  Should Plaintiffs

fail to plead their Section 11 claims with the required particularity then—contrary to Plaintiffs'

protestations (Opp. at 80-81)—the Court should dismiss.  *Lone Star Ladies*, 238 F.3d at 368 (Fifth

---

[54] Moreover, it is simply not plausible that by learning of possible controls shortcomings, the market was somehow sufficiently made aware of the PT Petroleum and PBEX transactions such that any artificial inflation to the share price that was caused by the failure to disclose these two specific issues was removed.  The market *did not know* about PT Petroleum and PBEX from these disclosures, and there is no "reasonable hope or expectation that discovery will reveal evidence" that would alter this fatal flaw in the TAC.  *See Lormand*, 565 F.3d at 258.

[55] Plaintiffs do not contest that OLERS is the only lead plaintiff with standing to pursue claims under Section 11.  *See* Opp. at 81.  Whether OLERS might eventually represent a class including other members with standing to pursue claims under Section 11 is irrelevant to Defendants' pending motions.  The Section 11 claims of the non-OLERS lead plaintiffs should be dismissed for lack of standing, and any claims predicated on shares purchased after May 9, 2018, should also be dismissed for failure to plead actual reliance.  *See* MTD at 45-46 & n.49.

[56] Plaintiffs contend that by incanting that their Securities Act claims do not sound in fraud, they magically avail themselves of Rule 8.  *See* Opp. at 80-81.  But "[b]oilerplate disavowals of an intent to allege fraud" are insufficient.  *In re Plains All Am.*, 307 F. Supp. 3d at 619, *aff'd*, 777 F. App'x 726. Plaintiffs' reliance on district court cases that appear to misinterpret *Lone Star Ladies*, where plaintiffs sought to pursue *only* Securities Act claims in their amended complaint, is misguided in light of the Fifth Circuit's more recent decision in *Plains*.  *See* 777 F. App'x at 730 (finding Rule 9(b) applies where "the allegations under both the Securities Act and the Exchange Act are essentially identical") (citing *Lone Star Ladies*, 238 F.3d at 368).

Circuit expressly rejected the notion that a district court analyzing Section 11 claims must "sift through allegations of fraud in search of some 'lesser included' claim of strict liability"). In any event, whether the Court considers Plaintiffs' Section 11 claims under Rule 9(b) or Rule 8, Plaintiffs' grasping attempt to identify actionable misstatements or omissions in the IPO Documents fails.[57]

### A. Alleged Misstatements Concerning the Share Pledge and PT Petroleum are Barred by the Statute of Repose

The statute of repose bars Plaintiffs' Section 11 claims asserted for the first time more than three years after the March 2017 IPO, including their claims based on alleged misstatements regarding Redman's share pledge.[58] *See* MTD at 46-48. In their Opposition, Plaintiffs do not dispute that the statute of repose started to run from March 16, 2017, and ended three years later on March 16, 2020. *See* Opp. at 82. Nor do Plaintiffs dispute that new claims and alleged misstatements that are added to a securities complaint for the first time after the repose period has expired are subject to dismissal. *See id.* at 83. Instead, Plaintiffs argue that they "brought their Section 11 claim within the repose period, and *neither added claims nor additional misstatements thereafter.*" *Id.* (emphasis added). This is just not so.

Plaintiffs' first two complaints made no mention of Redman's share pledges. In the Second Amended Complaint ("SAC"), filed after the repose period lapsed, Plaintiffs added *an entirely new section* titled "Materially False and Misleading Statements and Omissions Concerning Redman's Improper, Undisclosed Share Pledges." *See* SAC ¶¶ 326-29; TAC ¶¶ 373-77. The new section identified *for the first time* purportedly false and misleading statements regarding Redman's share pledges contained in the IPO Lock-Up Agreement and the Underwriting Agreement—two

---

[57] None of the alleged misstatements or omissions in the IPO Documents were material. *Supra* I.B.

[58] Plaintiffs filed their initial complaint on September 16, 2019 (ECF No. 1) and their Amended Complaint on February 13, 2020 ("FAC") (ECF No. 55). On April 14, 2020—more than three years after the March 16, 2017 IPO—Plaintiffs filed their Second Amended Complaint ("SAC") (ECF No. 73). Plaintiffs again amended their complaint on July 30, 2020, by filing the TAC.

documents never addressed in the earlier complaints.[59] *Id.* In addition, Plaintiffs alleged for the first time in the SAC that the beneficial ownership information with respect to Redman found in a section of the IPO Documents titled "Principal and Selling Shareholders" was "false and misleading." *See* SAC ¶¶ 328-29; TAC ¶¶ 376-77. Claims based on such new alleged misstatements—first identified after the period of repose had run—should be dismissed.[60]

The PT Petroleum claim is also barred by the statute of repose. Plaintiffs attempt to cast their PT Petroleum allegations as "additional evidence" of prior alleged misstatements, Opp. at 82, but the allegations are new, specific alleged *omissions* on which Plaintiffs seek to base Section 11 liability. Indeed, PT Petroleum was never mentioned in a complaint prior to the filing of the TAC on July 30, 2020. These new claims are thus untimely. *Cf. See Sjunde AP-Fonden*, 417 F. Supp. 3d at 391-92 (dismissing Section 10(b) claims as time-barred because "[s]ecurities fraud claims arise from, among other things, *specific* 'statement[s] of a material fact' and *specific* material omissions" and "[t]he statue of repose for such claims begins running from the time that each allegedly fraudulent

---

[59] To the extent that Plaintiffs' Section 11 share pledge claims are based on statements in the Insider Trading Policy (TAC ¶¶ 375, 377), those claims too must fail. *See* 15 U.S.C. § 77k(a) (Section 11 liability is limited to material misstatements or omissions in *registration statements*).

[60] Because Plaintiffs have in fact added new claims and alleged misstatements since the period of repose lapsed, they are unable to distinguish *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232 (S.D.N.Y. 2019) and *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019). *See Barilli*, 389 F. Supp. 3d at 264 ("To permit Plaintiffs to seek liability for . . . a claim that was introduced in [a later-amended complaint] after the repose period lapsed[] would be to undermine Section 13's purpose and abridge Defendants' right to be free from liability after the expiration of three years."); *Sjunde AP-Fonden*, 417 F. Supp. 3d at 392 ("[A] timely raised claim based on misleading statements . . . does not somehow preserve other, as-yet-unpleaded claims based on different misleading statements, even if the two sets of misleading statements were made at the same time and in the same document."); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 379-80 (S.D.N.Y. 2013) (rejecting claims that "merely added additional violations to pre-existing causes of action" because that "ignore[s] the distinction between statutes of repose and statutes of limitation"). Nor can the statute of repose be "circumvented by the relation-back doctrine." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 451 (S.D.N.Y. 2017) (collecting cases).

statement or omission is made") (citations omitted).[61]

### B.   Alleged Omissions of "Related Party Transactions" are Not Actionable Because the Transactions Post-Date the Information in the IPO Documents

Plaintiffs' issues with timing are not limited to the statute of repose.  Plaintiffs complain that ProPetro unfairly asserts that the conduct at issue in the TAC with respect to the IPO Documents "occurred many months later."  Opp. at 83.  Plaintiffs, however, grossly understate the magnitude of the timing issue.  Plaintiffs allege that ProPetro failed to disclose various transactions in a section of the IPO Documents titled "Related-Party Transactions."  *See* TAC ¶¶ 378, 380.  Plaintiffs neglect to mention that this "Related-Party Transactions" section is included in the notes to ProPetro's **historical** consolidated financial statements and only covers the years ended **December 31, 2015 and 2016**.  *See* Amendment No. 1 to Registration Statement (Form S-1) at F-27 (PDF p. 170) Ex. 1.  Thus, the related-party transactions disclosed in the IPO Documents are those that took place in 2015 and 2016.  The TAC does not include any plausible allegations indicating that the Clarabby, PT Petroleum, transportation employees, or expense reimbursement transactions took place prior to 2017,[62] and thus it is apparent from Plaintiffs' own allegations that ProPetro did not make any actionable omission regarding these transactions in the IPO Documents.[63]

### C.   Alleged Misstatements Concerning Related Party Controls are Not Actionable

Plaintiffs challenge statements in a section of the IPO Documents titled "Procedures for

---

[61] For the same reasons, Plaintiffs' new allegations related to ProPetro's payment for transportation employees (TAC ¶ 380) should also be barred by the statute of repose.

[62] *See* TAC ¶ 181 (dating the Clarabby Transactions to 2018); *id.* ¶ 368 (dating the PT Petroleum transactions to 2017 and 2018); *id.* ¶ 351 (expense reimbursements occurred post-IPO); *id.* ¶ 253 (dating transportation employee amounts in 2017 and 2018).

[63] *See Takata v. Riot Blockchain, Inc.*, Case No. 18-cv-02293, 2020 WL 2079375, at *10 (D.N.J. Apr. 30, 2020) (finding plaintiff "failed to allege facts to show that the challenged statements concerning related party transactions were false or misleading" where the "proxy statements unambiguously state that the challenged statements only refer to transactions that occurred 'during the last fiscal year,'" which ended December 31, 2016 and the transactions at issue did not occur until September 2017 and November 2017).

Review, Approval, and Ratification for Related Party Transactions," which discussed ProPetro's intent to adopt a code of conduct and ethics with provisions on related-party transactions. TAC ¶¶ 251-53, 379. As explained in the Motion to Dismiss, statements in the IPO Documents indicating that ProPetro would adopt a related party policy are not actionable because ProPetro adopted such a policy (TAC ¶¶ 296, 302) and because ProPetro made no statements indicating that it was already consistently implementing the policy at the time of the IPO,[64] or that the controls would be consistently followed in the future. MTD at 21-22. Plaintiffs appear to agree for they offer no rebuttal in their Opposition.[65]

### D.   Alleged Misstatement Concerning Audit Committee Independence is Not Actionable

Plaintiffs allege that the statement in the prospectus that the Company "will establish an audit committee consisting solely of independent directors" was materially false and misleading. *See* TAC ¶ 381. Plaintiffs have failed to plausibly allege that Douglas lacked independence under the relevant NYSE Listing Standards. *See supra* I.B. Indeed, Douglas remains an Audit Committee member to this day, and the management changes brought about by the Audit Committee's investigation demonstrate that the Audit Committee was in fact independent of management.

### E.   Alleged Misstatements Concerning Risk Factors are Not Actionable

Plaintiffs allege that the risk factor in ProPetro's IPO Documents describing its internal

---

[64] Indeed, the next sentence after the passage quoted by Plaintiffs (TAC ¶ 379) states: "The code of business conduct and ethics described above will be adopted in connection with the completion of this offering and, therefore, the *transactions described below were not reviewed under such policy*." Ex. 1, Amendment No. 1 to Registration Statement (Form S-1), at 105 (Feb. 23, 2017) (emphasis added).

[65] In the TAC, Plaintiffs also allege for the first time that ProPetro's recent acknowledgement of an ineffective "tone at the top" renders false its statements in the IPO Documents that ProPetro would "promote, monitor, and enforce adherence to its code of ethics." *See* TAC ¶ 380. ProPetro is aware of no such statement in the IPO Documents. *See* MTD at 50. Given that Plaintiffs have not responded to this argument, it is likely that they too are aware of no such statement. In any event, not only is such a statement immaterial puffery, but any claim based on this alleged misstatement— challenged for the first time in the TAC—is also barred by the statute of repose. *See supra* II.A.

controls risks was false and misleading because it failed to disclose that ProPetro was *already* suffering from *material control weaknesses* at the time of the IPO. TAC ¶¶ 382-83. This allegation is (i) not supported by the facts alleged in the TAC, which in no way show material weaknesses at the time of or predating the IPO, and (ii) inconsistent with ProPetro's clear warning that it was still in the process of integrating its internal controls into its operations at the time of the IPO and that neither it, nor its auditors, had yet evaluated its controls. *See* TAC ¶ 383; *see also* MTD at 19-21.

Plaintiffs argue that even though "literally accurate," it was misleading for ProPetro to suggest that its controls "even potentially could pass muster, when those controls were already proving to be ineffective." Opp. at 26. The standard for disclosing a "material weakness," however, is not whether controls are "proving to be ineffective," but rather where there is a "deficiency, so severe that there is a reasonable possibility that a material misstatement in the company's financial statements will not be prevented or timely detected." *See* Opp. at 6 (referencing the Public Company Accounting Oversight Board's Auditing Standard No. 5).

Plaintiffs offer no plausible (much less particularized) allegations that ProPetro's controls suffered from such a severe deficiency at the time of the IPO. Aside from Redman's personal share pledge, all of the alleged control breakdowns occurred after the IPO, and plainly cannot establish that ProPetro's controls were deficient at the time of the IPO. For the share pledge, Plaintiffs fail to explain how this single alleged breakdown alone established a "material weakness" that ProPetro should have disclosed despite having not yet evaluated its controls. *See* TAC ¶ 382.[66]

---

[66] These circumstances are clearly distinguishable from *Lormand* and *In re LendingClub*, which Plaintiffs cite. *See* Opp. at 26, 29. In *Lormand*, the court was evaluating the sufficiency of disclaimers for purposes of invoking the PSLRA's safe harbor rule for *separate* statements; it was not evaluating whether the disclaimers *themselves* were false and misleading. 565 F.3d at 243, 247-48. In any event, the *Lormand* court found that plaintiffs had made ample allegations that defendants knew the subprime subscriber program posed an imminent threat of financial and business ruin at the time they made statements to the contrary, and that some of the damage had already materialized. *Id.* In *LendingClub*, defendants had affirmatively stated in their IPO offering documents that they had

Plaintiffs seize upon ProPetro's subsequent disclosure that its controls suffered from material weaknesses *as of December 31, 2018* and *December 2019* and speculate without support that its controls must have suffered from the same material weaknesses at the time of the IPO—nearly two years earlier—because these things "did not develop overnight." Opp. at 84. Plaintiffs' argument defeats itself and only highlights the absence of well-pleaded facts. ProPetro forewarned investors that it was still developing and integrating its internal controls, that it had not yet tested its controls, and that there was a risk that it, or its auditors, could find deficiencies in its internal controls in the future. Plaintiffs' view that ProPetro should have explicitly stated that it was suffering from a material weakness in its internal controls at the time of the IPO is nonsensical and ignores that ProPetro had not yet fully integrated and tested its internal controls, and thus could not possibly have reached such a definitive conclusion.

## **CONCLUSION**

For the foregoing reasons and those expressed in ProPetro's opening brief, ProPetro requests that the Court dismiss the Third Amended Complaint in its entirety with prejudice.

---

evaluated their internal controls and concluded that they were effective at a reasonable assurance level at the time of the IPO. 254 F. Supp. 3d at 1115-17. The court pointed to allegations of multiple serious control breakdowns that predated the IPO (and thus defendants' review of their controls) when concluding that plaintiffs had sufficiently alleged that the control shortcomings existed at the time of the IPO. *Id.*

36

Dated: October 30, 2020                           HUGHES HUBBARD & REED LLP


                                                  By:   /s/ Kevin T. Abikoff
                                                  Kevin T. Abikoff
                                                  Texas Bar No. 24034118
                                                  Benjamin Britz (admitted *pro hac vice*)
                                                  D.C. Bar No. 499232
                                                  1775 I Street, N.W.
                                                  Washington, D.C. 20006-2401
                                                  Tel:  202-721-4600
                                                  Fax:  202-721-4646
                                                  Email: kevin.abikoff@hugheshubbard.com
                                                  Email: benjamin.britz@hugheshubbard.com

1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on October 30, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter.

                                        /s/ Kevin T. Abikoff
                                        Kevin T. Abikoff