## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **NYKREDIT PORTEFØLJE ADMINISTRATION A/S, OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, OKLAHOMA CITY EMPLOYEE RETIREMENT SYSTEM, POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on behalf of all others similarly situated,** | § § § § § § § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| **v.** | § § | **No. MO:19-CV-217-DC** |
| **PROPETRO HOLDING CORP., DALE REDMAN, JEFFREY SMITH, IAN DENHOLM, and SPENCER D. ARMOUR III,** | § § § § § | |
| *Defendants*. | § | |

## <u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS</u>

BEFORE THE COURT are Defendants Jeffrey Smith ("Smith"),[1] Spencer D. Armour, III ("Armour"), Dale Redman ("Redman"), Ian Denholm ("Denholm"), and ProPetro Holding Corp.'s ("ProPetro") Motions to Dismiss Third Amended Class Action Complaint for Violations of the Federal Securities Laws. (Docs. 89, 90, 91, 92, 93). After due consideration of the Motions, Response, and Reply, the Court **GRANTS** in part and **DENIES** in part the Motions to Dismiss.

---

[1] Redman is ProPetro's former Chief Executive Officer ("CEO"). Smith is ProPetro's former Chief Financial Officer ("CFO"). Denholm is ProPetro's former Chief Accounting Officer. Armour is a member of ProPetro's Board of Directors and former Chairman.

## I.    PROCEDURAL BACKGROUND

Plaintiff Richard Logan filed the Complaint in this action on September 16, 2019.  (Doc. 1).  Plaintiff filed this action as a class action on behalf of all persons and entities who purchased or otherwise acquired ProPetro securities traceable to the Registration Statement issued in connection with ProPetro's March 2017 initial public offering ("IPO") or acquired ProPetro Securities between March 17, 2017 and August 8, 2019 (the "Class Period").  (*Id*. at 2).  On December 16, 2019, the Court granted the Motion for Appointment as Lead Plaintiff filed by Nykredit Portefølje Administration A/S, Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, and Oklahoma City Employee Retirement System (the "Lead Plaintiffs").  (Doc. 43).

On February 13, 2020, Lead Plaintiffs and additional named plaintiff Police and Fire Retirement System of the City of Detroit, individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), filed an Amended Class Action Complaint for Violations of Federal Securities Laws against Defendants ProPetro Holding Corp., Dale Redman, Jeffrey Smith, and Ian Denholm (collectively, "Defendants").  (Doc. 55).  On February 14, 2020, Plaintiffs filed their Second Amended Class Action Complaint.  (Doc. 73).

On July 20, 2020, Plaintiffs filed their Third Amended Complaint.  (Doc. 81).  On August 31, 2020, Defendants Smith (Doc. 89), Armour (Doc. 90), Redman (Doc. 91), Denholm (Doc. 91), and ProPetro Holding Corp. (Doc. 93) filed Motions to Dismiss.  On September 30, 2020, Plaintiffs filed their Response in Opposition to Defendants' Motions to Dismiss.  (Doc. 97).  On October 30, 2020, Defendants filed their Reply briefs in support of their Motions to Dismiss. (Docs. 99, 100, 101, 102, 103, 104).  The Motions to Dismiss are now ripe for disposition.

## II. FACTUAL ALLEGATIONS

### A. The Parties

Lead Plaintiff Nykredit Portefølje Administration A/S is a regulated investment management company based in Denmark. (Doc. 81 ¶ 26). Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a benefit pension fund. (*Id.* ¶ 27). Lead Plaintiff Oklahoma Law Enforcement Retirement System is a defined benefit pension fund. (*Id.* ¶ 28). Lead Plaintiff Oklahoma Police Pension and Retirement System is a benefit pension fund. (*Id.* ¶ 29). Lead Plaintiff Oklahoma City Employee Retirement System provides pension and survivor benefits to full-time civilian employees of the municipality of Oklahoma City. (*Id.* ¶ 30). Additional named plaintiff the Police and Fire Retirement System of the City of Detroit provides retirement benefits for current and former police officers and firefighters of the City of Detroit. (*Id.* ¶ 32). Each Plaintiff purchased ProPetro common stock during the relevant period. (*Id.* ¶¶ 31, 32).

Defendant ProPetro is a publicly traded corporation headquartered in Midland, Texas that provides hydraulic fracturing services to upstream oil and gas operators engaged in the exploration and production of oil and gas resources. (*Id.* ¶ 34). Defendant Redman co-founded ProPetro in 2005 and served as CEO from 2008 until his resignation on March 13, 2020. (*Id.* ¶ 35). Redman also served on ProPetro's board of directors from 2005 until his resignation. (*Id.*). Plaintiffs allege as follows:

> Redman took advantage of ProPetro's inadequate internal controls, improperly obtained approximately $346,000 in cash from the Company for personal expenses and received over $428,000 in undisclosed compensation in 2017 and 2018 alone. Redman also twice pledged his shares in ProPetro stock as collateral for personal loans in violation of the Company's code of conduct and insider trading compliance policy, among other agreements.

(*Id.*).

3

Defendant Smith co-founded ProPetro in 2005 and served as CFO from 2005 until he was reassigned to a new "Chief Administrative Officer" role in 2019.  (*Id*. ¶ 36).  In March 2020, he was demoted to Special Advisor to the CEO.  (*Id*.).  Plaintiffs allege as follows:

> Smith also took advantage of ProPetro's inadequate internal controls, improperly obtained approximately $18,000 in cash from the Company for personal expenses, and received over $15,000 in undisclosed compensation in 2017 and 2018 alone.

(*Id*.).

Defendant Denholm was the Director of Finance at ProPetro from 2013 to 2017 and was Chief Accounting Officer of ProPetro from August 2017 until his resignation in October 2019. (*Id*. ¶ 37).    Plaintiff alleges "Denholm engaged in improper, undisclosed related-party transactions involving the finance, purchase, and sale of assets valued at approximately $3.6 million." (*Id*.).  Further, Plaintiff claims:

> Denholm served as CFO of PBEX, an exploration and production company that is a "bonded operator of oil and gas wells in both Texas and New Mexico." Denholm's simultaneous service at PBEX while he was the CAO of ProPetro—a public company with investor reporting obligations—has never been disclosed to investors.

(*Id*.).

Defendant Armour served as Chairman of ProPetro's Board of Directors from February 2013 until he resigned from the chair position on July 11, 2019.  (*Id*. ¶ 38).  Armour remains a member of the ProPetro Board.  (*Id*.).  Plaintiff alleges as follows:

> Armour engaged in improper, undisclosed related-party transactions valued at approximately $55.7 million. Armour served as the president of PT Petroleum since as early as 2013 through at least 2018. According to ProPetro's website, as of April 13, 2020, Armour was still serving as president of PT Petroleum.

(*Id*.).

Plaintiffs claim Defendants Redman, Smith, Denholm, and Armour, because of their high-ranking positions and involvement in the everyday business of ProPetro and its subsidiaries,

4

directly participated in the management of ProPetro's operations, including its public reporting functions, had the ability to, and did control, ProPetro's conduct, and were privy to confidential information concerning ProPetro and its business operations and financial statements.  (*Id.* ¶ 39).

**B.      Allegations Against ProPetro**

On February 8, 2017, ProPetro filed its first registration statement with the Securities and Exchange Commission ("SEC"), proposing to list its common stock on the New York Stock Exchange through an initial public offering ("IPO").  (Doc. 81 ¶ 43).  On March 16, 2017, ProPetro announced its IPO of 25 million shares of common stock at $14 per share.  (*Id.* ¶ 31). ProPetro completed the IPO on March 22, 2017.  (*Id.* ¶ 44).

In the IPO, ProPetro stated that it was already "evaluating our existing controls against the standards adopted by the Committee of Sponsoring Organizations of the Treadway Commission" ("COSO"), which established a widely adopted set of best practices for internal controls called the "2013 Internal Control-Integrated Framework."  (*Id.* ¶¶ 72, 244).   That framework defines "internal control" as a "process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to, inter alia, reliability of financial reporting and compliance with applicable laws and regulations.  (*Id.* ¶ 72).  The IPO said that a failure to maintain adequate internal controls could "materially adversely affect" both "the accuracy and timeliness" of its financial statements "and could cause investors to lose confidence in our reported financial information, which could have a negative effect on the stock price of our common stock."  (*Id.*).

Disclosure controls and procedures mandate that information required to be disclosed under the Securities and Exchange Act of 1934 ("Exchange Act") be communicated to management sufficiently in advance of the company's filing dates to allow time to review the

information and decide whether and how to disclose it.  (*Id*. ¶ 63).  Section 404 of Regulation S-K, 17 CFR § 229.307 requires management and its outside auditor to annually evaluate the effectiveness of the company's internal controls and report to investors.  (*Id*. ¶ 77).

A statement that such controls are effective necessarily asserts that there are no "material weaknesses."  (*Id*. ¶ 68).  The Public Company Accounting Oversight Board ("PCAOB") defines a "material weakness" in internal controls as a deficiency," so severe that there is a reasonable possibility that a material misstatement in the company's financial statements will not be prevented or timely detected.  (*Id*. ¶ 69).  Item 404 also requires a public company to disclose information about any transaction in which it was or is to be a participant where the amount involved exceeds $120,000 and in which any "related person" had or will have a direct or indirect material interest.  (*Id*. ¶ 77).

In each Form 10-Q (quarterly report) and Form 10-K (annual report), Defendants assured investors, and signed certifications, attesting that ProPetro's disclosure controls and procedures were adequate.  (*Id*. ¶¶ 62, 83–88).  ProPetro repeatedly boasted about its "longstanding customer relationships."  (*Id*. ¶ 52).  The IPO assured investors that ProPetro's directors would review on at least a quarterly basis "all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions."  (*Id*. ¶ 379).

They further stated that the directors "should consider all of the relevant facts and circumstances available," and listed several relevant factors, including "the terms available to unrelated third parties entering into similar transactions" "the availability of other sources for comparable services," "whether entering into the transaction would be consistent with the code of business conduct and ethics," and "the impact of the transaction on a director's

independence." (*Id*. ¶ 379).  ProPetro subsequently reiterated multiple times that related party transactions "must *first* be presented to our Audit Committee *for review, consideration, and approval*," and that "[a]ll of *our directors and executive officers are required to report to the Audit Committee chair any such related party transaction*."  (*Id*. ¶¶ 289, 379) (emphasis added).

ProPetro assured investors that it was applying the COSO standards to evaluate its internal controls and further acknowledged that material weaknesses in its internal controls *could* affect the accuracy of its financial statements, undermine investor confidence, and increase the chances of fraud, loss of customers, and a failure to obtain required financing.  (*Id*. ¶ 73).  ProPetro certified the internal controls as sufficient and compliant with the COSO standards.  (*Id*. ¶¶ 62, 83–88).  The 2018 Form 10-K assured investors that ProPetro "maintained effective internal control over financial reporting."  (*Id*. ¶ 276).  Thus, ProPetro knew of its responsibility to institute internal controls and disclosure controls.  (*Id*.).

ProPetro disclosed on July 12, 2019 that Board and Audit Committee member Steven Beal had resigned, without explanation.  (*Id*. ¶ 140).  On August 1, 2019, ProPetro announced that another Board member—Royce Mitchell—resigned after only five-and-a-half months on the Board.  (*Id*. ¶ 141).  On August 8, 2019, ProPetro disclosed that the Audit Committee of its Board was conducting an internal investigation (the "Investigation").  (*Id*. ¶ 10).  According to ProPetro, the Investigation focused initially on the disclosure of certain agreements but "was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest."  (*Id*. ¶ 147).

ProPetro revealed that its management was "likely to conclude" that its internal controls were deficient, that its disclosure controls and procedures were ineffective, and rose to the "level

of a material weakness." (*Id*. ¶ 150). ProPetro assured investors that it was implementing "*immediate* improvement measures" to address these issues, including "enhancing disclosure controls through the formation of a disclosure committee and the appointment of a Chief Disclosure Officer," and "revising and expanding key Company policies and procedures . . . including with respect to transactions involving related parties or conflicts of interest." (*Id*. ¶ 151).

ProPetro further indicated it "expect[ed] to adopt a formal remediation plan to address internal control and disclosure control deficiencies identified in the review." (*Id*.). ProPetro also disclosed that it was unable to timely file its quarterly report on Form 10-Q for the second quarter of 2019. (*Id*. ¶ 152). ProPetro's stock price dropped 26% falling from $17.34 on August 8, 2019 to $12.75 on August 9, 2019, on extremely heavy trading volume, reflecting $460 million in market capitalization. (*Id*. ¶ 153). Analysts noted the lack of detail in ProPetro's disclosures. (*Id* ¶ 155).

On August 30, 2019, after the markets had closed, ProPetro announced that Mark Howell, its General Counsel and Corporate Secretary, was resigning effective September 29, 2019. (*Id*. ¶ 160). ProPetro's stock price fell 9.2% the following trading day, a decrease of another $100 million in market capitalization. (*Id*. ¶ 161). Analysts connected Howell's departure to the Investigation. (*Id*. ¶ 162).

ProPetro disclosed that factfinding for the Investigation was almost complete, but that it was "continuing to review one or more related party transactions." (*Id*. ¶ 164). ProPetro further stated that it could not yet file its quarterly report for the second quarter of 2019 (though the third quarter was over by that point), claiming management needed more time to issue its disclosure control certifications. (*Id*. ¶ 166). ProPetro reiterated that it would likely conclude that "one or

more material weaknesses . . . . resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective." (*Id*. ¶ 165).

On October 18, 2019, Reuters reported that the SEC was investigating ProPetro's internal financial controls, disclosures, and financial reporting, which caused ProPetro's stock price to fall 8.1%. (*Id*. ¶ 176). After having concluded its Investigation, on June 22, 2020, ProPetro filed its Form 10-K for 2019, and revealed the full extent of the problems. (*Id*. ¶¶ 204–19). ProPetro admitted that it "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions," and admitted that "two related party transactions were entered into that were not identified by the Company's controls and given consideration of appropriate disclosure." (*Id*. ¶ 211).

ProPetro announced it was implementing an extensive remediation program to correct the material weaknesses that had resulted in undisclosed related-party and other illicit transactions. (*Id*. ¶ 217). These measures included (i) appointment of new executive officers with experience running public companies; (ii) enhanced versions of the ProPetro's polices; (iii) new controls relating to related-party transactions and potential conflicts of interest; and (iv) formation of a disclosure committee with a new Chief Disclosure Officer. (*Id*. ¶ 218).

## C.     Allegations Against Smith

Plaintiffs allege Smith, ProPetro's former CFO, realized proceeds of $3.1 million from shares he sold to investors in the IPO. (*Id*. ¶ 234). Internal controls over financial reporting are designed by, or under the supervision of, a company's CFO and CEO to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the company's financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). (*Id*. ¶ 64). SEC rules require public companies to disclose related-party transactions involving

amounts over $120,000, and GAAP also requires disclosure of such transactions, i.e., transactions between "an entity and its principal owners, management, or members of their immediate families." (*Id*. ¶ 79).

Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") requires that the principal executive officer (CEO) and principal financial officer (CFO) of a public company address in the company's quarterly and annual SEC filings: (1) the material accuracy and fair presentation of the report's disclosures; (2) the establishment and maintenance of disclosure controls and procedures; and (3) deficiencies in, and material changes to, internal control over financial reporting. (*Id*. ¶ 67). The officers must certify that they have reviewed the report and that it does not contain any untrue or misleading statements of material fact or omissions. (*Id*. ¶¶ 65–67). Items 307 and 308 of SEC Regulation S-K, 17 CFR § 229.307, require that the CEO and CFO provide their conclusions on how effective their disclosure controls and procedures are, and take responsibility for maintaining adequate internal controls. (*Id*. ¶¶ 70–71).

Smith certified the internal controls as sufficient and compliant with the COSO standards. (*Id*. ¶¶ 62, 83–88). Defendants stated nothing had occurred that would "materially affect" its internal controls over financial reporting (*Id*. ¶¶ 256–57, 271–74), and Smith specifically certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." (*Id*. ¶¶ 258, 273). Plaintiffs contend Smith knew of his personal responsibility to implement the controls. (*Id*. ¶ 276).

ProPetro assured investors that Smith, was a "Covered Part[y]" under the Code of Ethics and that he was required to execute a "Certification of Compliance" with the Code of Ethics. (*Id*. ¶¶ 92, 297). Thus, investors were told Smith certified "that. . . any current or prior period of my employment . . . with ProPetro Holding Corp., I have complied fully with all policies and

procedures set forth in the . . . Code of Ethics and Conduct and am currently in fully compliance with all such policies and procedures." (*Id*. ¶ 297).

According to the Complaint, Smith helped himself to a host of improper expense reimbursements totaling over $350,000 (*Id*. ¶¶ 143, 149, 157–58, 214, 223); and a series of related-party transactions involving the Defendants were concealed from investors (*Id*. ¶¶ 87–89). The Investigation identified approximately $370,000 in expenses improperly (and secretly) reimbursed to senior management "since the Company's initial public offering in 2017," with approximately $18,000 going to Smith. (*Id*. ¶ 149). As a result, Smith was reassigned from CFO to the newly created role of "Chief Administrative Officer," and Darin G. Holderness was appointed as interim CFO. (*Id*. ¶ 168).

ProPetro filed the IPO Lock-Up Agreement with its IPO (which Smith signed) and assured investors that, prior to the IPO, ProPetro's executive officers, and others, would "enter into lock-up agreements with respect to their common stock." (*Id*. ¶ 237). In July 2018, ProPetro announced that Smith—who had already been demoted from CFO to "Chief Administrative Officer"—was receiving another demotion, this time to "special advisor" to ProPetro's new CEO, Philip Gobe. (*Id*. ¶ 196). Then, ProPetro's stock price dropped 33.5%. (*Id*. ¶ 199).

In June 2020, ProPetro confirmed "material weaknesses" in its "control environment," and placed blame on Smith: "[S]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company. . . . [This] "failure to maintain appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances and disclosures." (*Id*. ¶ 207). Management thus "did not sufficiently promote,

11

monitor or enforce adherence to its Code of Conduct and Ethics," and there was "a general lack of focus on promoting a culture of compliance within the Company." (*Id*. ¶ 208).

**D.    Allegations Against Armour**

Plaintiffs allege Armour, former Chairman of the Board of Directors, realized proceeds of $5.3 million from shares he sold to investors in the IPO. (*Id*. ¶ 234). ProPetro assured investors that Armour was a "Covered Part[y]" under the Code of Ethics and that each was required to execute a "Certification of Compliance" with the Code of Ethics. (*Id*. ¶¶ 92, 297). Thus, investors were told Armour certified "that. . . any current or prior period of my employment . . . with ProPetro Holding Corp., I have complied fully with all policies and procedures set forth in the . . . Code of Ethics and Conduct and am currently in fully compliance with all such policies and procedures." (*Id*. ¶ 297).

Plaintiffs allege a series of related-party transactions involving the Defendants were concealed from investors (*Id*. ¶¶ 87–89), including over $55 million in business with a company headed by Armour (*Id*. ¶¶ 18, 88, 140, 143, 223, 259, 274, 277). ProPetro filed the IPO Lock-Up Agreement with its IPO (which Armour signed) and assured investors that, prior to the IPO, all its executive officers, and others, would "enter into lock-up agreements with respect to their common stock." (*Id*. ¶ 237).

The Complaint alleges that Denholm wholly owned an entity called Conquistador Capital, LLC ("Conquistador"), and, along with his business partner Adam Cunyus, shared 50-50 ownership of Dahlia Development, LLC ("Dahlia") and that Cunyus wholly owned Clarabby Development, LLC ("Clarabby"). (*Id*. ¶ 114). Dahlia (50% owned by Denholm) and Conquistador (wholly owned by Denholm) loaned Clarabby $770,000 so that it could purchase

12

an iron testing facility that was later leased—***and then sold***—to ProPetro for $2.3 million (the "Clarabby Transactions"). (*Id*. ¶¶ 187–89).

Plaintiffs allege the price of ProPetro's stock declined "more than 9%," on what investors viewed as "a negative report questioning business dealings among [ProPetro's] executives and board members." (*Id*. ¶ 185). ProPetro disclosed on July 12, 2019, that Armour was being replaced as Chairman of the Board. (*Id*. ¶ 140). Philip A. Gobe joined the Board and replaced Armour as Chairman. (*Id*. ¶ 168). In June 2020, ProPetro identified the Clarabby Transactions, and disclosed a related-party transaction involving PT Petroleum LLC, of which Armour was President, amounting to $55 million in 2017 and 2018. (*Id*. ¶ 213).

## E.    Allegations Against Redman

Plaintiffs allege Redman, ProPetro's former CEO, realized proceeds of $5.2 million, from shares he sold to investors in the IPO. (*Id*. ¶ 234). Redman certified the internal controls as sufficient and compliant with the COSO standards. (*Id*. ¶¶ 62, 83–88). Redman specifically certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." (*Id*. ¶¶ 258, 273). Thus, Redman knew of his personal responsibility to implement the controls and ensure that they were adhered to. (*Id*.).

ProPetro assured investors that Redman, was a "Covered Part[y]" under the Code of Ethics and that he was required to execute a "Certification of Compliance" with the Code of Ethics. (*Id*. ¶¶ 92, 297). Thus, investors were told that Redman certified "that. . . any current or prior period of my employment . . . with ProPetro Holding Corp., I have complied fully with all policies and procedures set forth in the . . . Code of Ethics and Conduct and am currently in fully compliance with all such policies and procedures." (*Id*. ¶ 297).

According to Plaintiffs, Redman pledged his entire ownership of the Company to purchase two multi-million-dollar ranches, in violation of the Company's Code of Ethics and Insider Trading Compliance Policy (*Id.* ¶ 222); They allege Redman helped himself to a host of improper expense reimbursements totaling over $350,000 (*Id.* ¶¶ 143, 149, 157–58, 214, 223); and a series of related-party transactions involving the Defendants were concealed from investors (*Id.* ¶¶ 87–89).

On March 16, 2020, ProPetro announced that Redman had entered into two significant pledge share agreements, in violation of underwriter agreements disclosed in the IPO and ProPetro's Code of Ethics and Insider Trading Compliance Policy, and also announced that Redman had resigned. (*Id.* ¶ 228). ProPetro announced that Redman, the CEO, would no longer serve as the "principal executive officer," and thus would no longer be responsible for certifying ProPetro's annual and quarterly reports or overseeing the remediation of the deficiencies identified by the Investigation. (*Id.* ¶ 168). Those duties would be handed over to Philip A. Gobe, who became the Company's Executive Chairman and "principal executive officer." (*Id.*). According to Plaintiffs, Redman left significant compensation, including unvested stock options, on the table in connection with his resignation. (*Id.*).

ProPetro disclosed for the first time that Redman had pledged every single share of ProPetro stock that he owned, valued at $8 million, as collateral to secure loans to buy the Preston Ranch. (*Id.* ¶ 104). In connection with the IPO, Redman had signed a "lock-up agreement" promising that he would not "offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of shares of Stock of the Company" during the 180 days following the IPO (the "IPO Lock-Up Agreement"). (*Id.* ¶ 45). The agreement he signed specifically represented that his shares were "free and clear of all liens, encumbrances,

14

and claims whatsoever." (*Id*.). In addition, ProPetro maintained a Code of Ethics, which included an Insider Trading Compliance Policy and shareholders' agreement, to which Redman was a party. (*Id*. ¶ 93). The Insider Trading Compliance Policy, referenced in the Company's public filings and published on its website, expressly "prohibit[s] pledging Company securities as collateral to secure loans." (*Id*. ¶ 94).

On July 29, 2018, Redman pledged at least 230,000 ProPetro shares as collateral for a $24.8 million personal loan used to purchase the Whitehead Ranch. (*Id*. ¶ 106). According to Plaintiffs, the share pledge that secured the Whitehead Ranch for Redman also violated the Company's Code of Ethics and Insider Trading Compliance Policy, and was not disclosed until March 16, 2020. (*Id*. ¶ 107). ProPetro's stock price dropped 33.5%. (*Id*. ¶ 199).

The Investigation identified approximately $370,000 in expenses improperly (and secretly) reimbursed to senior management "since the Company's initial public offering in 2017," with approximately $346,000 going to Redman. (*Id*. ¶ 149). ProPetro filed the IPO Lock-Up Agreement with its IPO (which Redman signed) and assured investors that, prior to the IPO, its executive officers, and others, would "enter into lock-up agreements with respect to their common stock." (*Id*. ¶ 237).

In June 2020, ProPetro confirmed "material weaknesses" in its "control environment," and placed blame on Redman: "[S]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company. . . . [This] failure to maintain appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances and disclosures." (*Id*. ¶ 207). Management thus "did not sufficiently promote,

15

monitor or enforce adherence to its Code of Conduct and Ethics," and there was "a general lack of focus on promoting a culture of compliance within the Company." (*Id*. ¶ 208).

F.      **Allegations Against Denholm**

Plaintiffs allege Denholm, as former Principal Accounting Officer of ProPetro, was also personally responsible for ensuring disclosures and controls were followed. (*Id*. ¶¶ 113, 226). ProPetro assured investors that Denholm was a "Covered Part[y]" under the Code of Ethics and that he was required to execute a "Certification of Compliance" with the Code of Ethics. (*Id*. ¶¶ 92, 297). Thus, investors were told that Denholm certified "that. . . any current or prior period of my employment . . . with ProPetro Holding Corp., I have complied fully with all policies and procedures set forth in the . . . Code of Ethics and Conduct and am currently in fully compliance with all such policies and procedures." (*Id*. ¶ 297).

Without Denholm ensuring compliance with ProPetro's policies and controls, Plaintiffs allege that a series of related-party transactions involving the Defendants were concealed from investors. (*Id*. ¶¶ 87–89). These transactions purportedly included $3.6 million of deals involving Denholm's own businesses. (*Id*. ¶¶ 17, 37, 115, 143, 223, 226, 259, 274, 277). Plaintiffs contend Defendants disregarded their duties as officers of a public company subject to the rigorous SEC disclosure regime in part because Denholm, the Chief Accounting Officer, was distracted by his second job as the CFO of another company, PBEX, and was motivated to conceal his own related-party transaction. (*Id*. ¶¶ 113–21).

On October 9, 2019, ProPetro announced Denholm was resigning from the company entirely. (*Id*.). ProPetro made public Denholm's separation agreement, which stated that Denholm had "notified the Company of transactions involving Clarabby Development, LLC, Clarabby Holdings, LLC, Conquistador Capital, LLC and Dahlia Development, LLC, Denholm,

and Adam Cunyus," referred to therein as the "Clarabby Transactions." (*Id.* ¶ 169). Though ProPetro had earlier claimed that the Investigation factfinding was substantially complete, Denholm's separation agreement obligated him to "assist the Company with respect to its investigation of the Clarabby Transactions," the substance of which ProPetro did not explain. (*Id.*). Clarabby Development, LLC, founded and controlled by Denholm, sold ProPetro at least two properties in 2018. (*Id.* ¶ 181). This news drove down the price of ProPetro's stock by 9.4%, and analysts labeled the Investigation a "farce." (*Id.* ¶¶ 184–85).

ProPetro made additional disclosures about Clarabby on November 13, 2019. (*Id.* ¶ 187). ProPetro filed a Form 8-K, which described that "Entity A," which Denholm and his business partner owned 50-50, loaned $770,000 to "Entity C." (*Id.*). In addition, "Entity B," owned entirely by Denholm's same business partner, loaned Entity C $57,000. (*Id.*). Entity C, in turn, using the funds procured from Denholm's and his partner's businesses, used those funds to pay for an iron testing facility that was sold to ProPetro. (*Id.* ¶ 188). Investors were warned not to rely "on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent registered public accounting firm." (*Id.* ¶ 190).

In June 2020, ProPetro confirmed "material weaknesses" in its "control environment," and placed blame on Denholm: "[S]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company. . . . [This] "failure to maintain appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances and disclosures." (*Id.* ¶ 207). Management thus "did not sufficiently promote,

17

monitor or enforce adherence to its Code of Conduct and Ethics," and there was "a general lack of focus on promoting a culture of compliance within the Company." (*Id*. ¶ 208).

### III.   LEGAL STANDARD

Plaintiffs assert causes of action against Defendants as follows: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; (2) violations of Section 20(a) of the Exchange Act against Defendants Redman, Smith, Denholm, and Armour; (3) violations of Section 11 of the Securities Act in connection with the IPO against Defendants ProPetro, Redman, and Smith; and (4) violations of Section 15 of the Securities Act in connection with the IPO against Defendants Redman and Smith. (Doc. 81). Defendants move to dismiss Plaintiffs' Third Amended Class Action Complaint for Violations of the Federal Securities Laws pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). (Docs. 89, 90, 91, 92, 93).

### A.   Rule 12(b)(6)

Review on motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is constrained. The reviewing court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). The court must also generally limit itself to the contents of the pleadings and its attachments. *Brand Coupon Network LLC v. Catalina Mktg. Corp*, 748 F.3d 631, 635 (5th Cir. 2014). An exception allows a defendant to attach documents referred to in the complaint and central to the claim. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

Rule 8(a)(2) requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek

dismissal if the plaintiff fails "to state a claim upon which relief can be granted."  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

A complaint must therefore contain enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570.  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

**B.      Rule 9(b)**

Rule 9(b) demands that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  It also provides, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9.  The United States Court of Appeals for the Fifth Circuit holds, "Rule 9(b) requires the complaint to set forth the 'who, what, when, where, and how' of the events at issue." *Dorsey v. Portfolio Equities Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (citation omitted).

**C.      The Private Securities Litigation Reform Act**

A complaint alleging violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 must of course comply with the pleading requirements of both Rules 8 and 9(b).  But it must

also meet the enhanced pleading requirements imposed by the Private Securities Litigation Reform Act, passed by Congress in 1995 and codified at 15 U.S.C. §§ 78u-4 and 78u-5. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). To satisfy PLSRA pleading standards, the Fifth Circuit holds that the plaintiff must:

- *First*, specify each statement alleged to have been misleading or contended to be fraudulent;

- *Second*, identify the speaker;

- *Third*, state when and where the statement was made;

- *Fourth*, plead with particularity the contents of the false representations;

- *Fifth*, plead with particularity what the person making the misrepresentation obtained thereby;

- *Sixth*, explain why the statement is misleading or fraudulent; and

- *Seventh*, state with particularity all facts on which allegations made upon information and belief are formed by setting forth a factual basis for such belief.

*ABC Arbitrage*, 291 F.3d at 350.

**D.     The Securities Exchange Act of 1934**

Following the stock-market crash of 1929 and in the midst of the Great Depression, Congress enacted a number of laws to ensure that "the highest ethical standards prevail in every facet of the securities industry." *Secs. and Exch. Comm'n v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87 (1963) (internal quotations omitted). The Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78a, *et seq.*, "was designed to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson,* 485 U.S. 224, 230 (1988) (citation omitted).

### 1.     Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" in contravention of SEC rules and regulations.  Congress vested rule-making authority in the SEC to enforce this provision.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–13 (1976).  The SEC promulgated Rule 10b-5, which makes it unlawful in connection with the purchase or sale of securities to "employ any device, scheme, or artifice to defraud," to "make any untrue statement of a material fact," or to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit."  17 C.F.R. § 240.10b-5.

Section 10(b) applies to a broad range of conduct because actions under it may be "brought by a purchaser or seller of 'any security' against 'any person' who has used 'any manipulative or deceptive device or contrivance' in connection with the purchase or sale of a security."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983) (quoting 15 U.S.C. § 78j).  But it only gives rise to liability under narrow circumstances.  This is because plaintiffs bringing 10(b) claims "must prove that the defendant[s] acted with scienter, i.e., with intent to deceive, manipulate, or defraud."  *Herman & MacLean*, 459 U.S. at 381 (internal quotations omitted) (alterations in original).

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that:

- *First*, a defendant made a material misrepresentation or an omission;

- *Second*, the material misrepresentation or omission was made with scienter;

- *Third*, a connection exists between the misrepresentation or omission and the plaintiff's purchase or sale of a security;

- *Fourth*, the plaintiff relied on the misrepresentation or omission in purchasing or selling the security;

- *Fifth*, the plaintiff suffered an economic loss; and

- *Sixth*, the plaintiff's injury was proximately caused by the material misrepresentation or omission.

*Edgar v. Anadarko Petroleum Corp.*, No. H-17-1372, 2019 WL 1167786, at \*17 (S.D. Tex. Mar. 13, 2019) (unpublished).

The first two elements are frequently litigated and pertain to what are commonly referred to as *materiality* and *scienter*. As to materiality:

> Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim. There is no bright-line rule for materiality; it requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). The test for whether a representation is material [is] whether there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitting facts from a statement is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [*In re BP p.l.c.*, 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012) (citing *Basic*, 485 U.S. at 232)].

> Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." [*In re BP p.l.c.*, 843 F. Supp. at 748]. The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not actionable as a misrepresentation.

*In re Plains All Am. Pipeline*, 245 F. Supp. 3d 870, 890–91 (S.D. Tex. 2017).

> As to scienter:

> In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the person responsible for the misrepresentation acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b-5 are not insurance against bad corporate management. Rather, they protect only against intentional or knowing

22

misstatements.  [*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008)].  "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005).  "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Shaw Group*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u-4(b)(2); *TXU Corp.*, 565 F.3d at 207).

In considering whether the specific factual allegations create a strong inference of scienter, the court can consider documents incorporated by reference into the complaint and matters proper for judicial notice.  [*In re BP p.l.c.*, 843 F. Supp. at 748] (citing *Tellabs*, 551 U.S. at 323).  The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement at issue, to determine whether they support a strong inference of scienter.  *Tellabs*, 551 U.S. at 324; [*Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364–65 (5th Cir. 2004)].  The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive."  The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323–24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'"  *Id.* at 326 (quoting 15 U.S.C. § 78u-4(b)(2)).  "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice."  [*In re BP p.l.c.*, 843 F. Supp. at 749] (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 430 (5th Cir. 2002).

The rule against group pleading also applies to scienter allegations.  The plaintiffs must make specific allegations about an individual's state of mind when the challenged statement was made.  The plaintiffs cannot simply point to the fact that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker.  *Southland*, 365 F.3d at 366.  Allegations about another person's knowledge, or "the defendants'" collective knowledge, are insufficient.  The plaintiffs must plead facts that give rise to a strong inference of scienter for each individual defendant for each purported misstatement. . . .  Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough.  To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the character of the document, its author and contents, when it was received, and by whom it was received, to link it to the person

making the challenged statement at the time the statement was made.  *Abrams*, 292 F.3d at 432.

*In re Plains All Am. Pipeline*, 245 F. Supp. 3d at 891–92.

## 2.  Section 20(a) Control-Person Claims

The Exchange Act imposes liability on persons or entities who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons in order to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws.  *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1115 (5th Cir. 1980).

Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), in relevant part provides, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  And regulation defines control in this context to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

An important limitation on liability under section 20(a) is its predication on the existence of an independent violation of the securities laws, which means that a party who does not sufficiently plead an underlying claim for an Exchange Act violation by a controlled person cannot plead an independent claim under section 20(a) against the alleged controlling person. *Southland*, 365 F.3d at 383.  But once a plaintiff sufficiently pleads an underlying Exchange Act

24

violation by a controlled person, the plaintiff only needs to plead its control-person claims "in accordance with Rule 8(a)"—as neither "the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element)" are applicable. *Trendsetter Investors, LLC v Hyperdynamics Corp*., No. H-06-0746, 2007 WL 172627, *15 (S.D. Tex. Jan. 18, 2007) (unpublished).

Fifth Circuit precedent is unclear with respect to the exact showing that a plaintiff must make to hold a defendant liable under Section 20(a). The United States Court of Appeals for the Eighth Circuit has established a rigorous test requiring the plaintiff to show that the alleged control person "actually participated in (i.e., exercised control over) the operations of the corporation in general" and "possessed the power to control the specific transaction or activity upon which the primary violation is predicated," even though "he need not prove that this later power was exercised." *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985) (citation omitted). But the Fifth Circuit has declined to address the extent to which it adopts the *Metge* framework. *See Heck v. Triche*, 775 F.3d 265, 283 n. 18 (5th Cir. 2014).

Instead, when assessing control-person liability, the Fifth Circuit has at various times considered whether the alleged control-person had "effective day-to-day control" of the corporation, had "the requisite power to directly or indirectly control or influence corporate policy," or had "actual power or influence over the controlled person." *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 195 (5th Cir. 1979), *modified on other grounds on panel reh'g*, 611 F.2d 105 (5th Cir. 1980) (per curiam). But none of these inquiries is dispositive. And it is unclear which (if any) should take precedence. At the very least, Plaintiffs must "show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck*, 775 F.3d at 283 (internal quotations omitted).

25

**E.     The Securities Act of 1933**

The Securities Act of 1933 is codified at 15 U.S.C. §§ 77a, *et seq*.  Congress designed it to "protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce."  *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) (citations omitted).

A complaint alleging claims under the Securities Act is generally only required to comply with the pleading requirements of Rule 8, without needing to satisfy the more stringent standards required by Rule 9(b) and the PSLRA.  *See Kapps v. Torch Offshore, Inc*., 379 F.3d 207, 210 (5th Cir. 2004) (citations omitted).   But the heightened pleading standard under Rule 9(b) continues to apply to any claims of fraud under the Securities Act.  *Lone Star Ladies Inv. Club v. Schlotzsky's Inc*., 238 F.3d 363, 368 (5th Cir. 2001).

Boilerplate disavowals of an intent to allege fraud do not change the analysis.  *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir. 1994).  When the plaintiff's Securities Act allegations are substantively identical to the Exchange Act allegations, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity.  *Schlotzsky's*, 238 F.3d at 368–69; *Melder*, 27 F.3d at 1100 n. 6.

**1.     Section 11**

Section 11 of the Securities Act, codified at 15 U.S.C. § 77k, is quite long but at base provides purchasers of registered securities with a cause of action against the issuer of the security, every person who signed the registration statement, every person who was a director of or partner in the issuer at the time, every person who prepared or certified any part of the registration statement, and every underwriter with respect to the security.  *See Herman & MacLean,* 459 U.S. at 381–82 n. 13.  This "allows purchasers of a registered security to sue

certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Id.* at 381.  It was designed to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Id.* at 381–82 (citations omitted).

To sufficiently plead a claim under Section 11, plaintiffs must allege that:

- *First*, they purchased a registered security, either directly from the issuer or in the aftermarket following the offering;

- *Second*, the defendants participated in the offering in a manner sufficient to give rise to liability under Section 11; and

- *Third,* the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

15 U.S.C. § 77k.

As with claims under Section 10(b) of the Exchange Act, a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  *Basic*, 485 U.S. at 234.  This requires determination "whether 'the information allegedly omitted or misrepresented in the [registration statement] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the [registration statement] as a whole.'"  *In re Franklin Bank Corp.*, 782 F. Supp. 2d 364, 404 (S.D. Tex. 2011) (quoting *Krim v. BancTexas Grp.*, 989 F.2d 1435, 1445 (5th Cir. 1993)) (alterations in original).  Inquiry into scienter is not required.  *In re Plains All Am. Pipeline,* 307 F. Supp. 3d 583, 618 (S.D. Tex. 2018) (quotation omitted).

## 2.    Section 15 Control-Person Claims

Section 15 of the Securities Act, codified at 15 U.S.C. § 77*o*, provides that "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally

liable to the same extent as the persons they control." This operates much like control-person liability under the Exchange Act.

To allege control-person liability under the Securities Act, "the plaintiff must allege both a primary violation of § 11 or § 12 and the defendant's control over the primary violator." *In re Kosmos Energy Ltd.*, 955 F. Supp. 2d 658, 674 (N.D. Tex. 2013). Control-person liability under Section 15 (as under section 20(a) of the Exchange Act) is thus "secondary or derivative, dependent on the plaintiff demonstrating an underlying 'primary' violation." *In re Plains All Am. Pipeline,* 307 F. Supp. 3d at 618. Likewise, the same definition of control that applies to Section 20(a) of the Exchange Act also pertains here, being "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

All of this means that the Fifth Circuit construes the control-person provisions of Section 15 of the Securities Act and Section 20(a) of the Exchange Act in the same manner. *Heck*, 775 F.3d at 283. And as with control-person claims under the Exchange Act, there are no controlling decisions that establish precise pleading requirements for such a claim. Federal district courts in Texas instead "apply a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control-person liability." *In re Cobalt Int'l Energy*, No. H-14-3428, 2016 WL 215476 at *9 (S.D. Tex. Jan. 19, 2016) (unpublished) (quotations omitted) (collecting cases).

## IV.   DISCUSSION

Plaintiffs' Third Amended Complaint is a sprawling web of allegations, often repetitive and overlapping with circular reasoning. It is hardly the model for "a short and plain statement," as contemplated by Fed. R. Civ. P. 8. Distilled, the heart of the Complaint is that ProPetro had

defective internal controls resulting from a pervasive "tone at the top." (Doc. 81 ¶ 207). All of Plaintiffs' claims in this lawsuit spring from ProPetro's *ex post facto* admissions about the inadequacy of its internal controls. In summary, Plaintiffs allege Defendants' past statements that relate to ProPetro's retroactive admissions of defective internal controls were false and misleading.

The alleged misrepresentations and omissions that give rise to liability under the Exchange Act and the Securities Act are related. The Court first addresses the Exchange Act claims because it applies in a broader context than the Securities Act claims.

## A.    Section 10(b) of the Exchange Act and Rule 10b-5 Claims

Plaintiffs assert liability against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 arguing that the Complaint adequately alleges: (1) materially false and misleading statements and omissions; (2) scienter; and (3) loss causation. (Doc. 97).

### 1.    Materiality

Defendant ProPetro argues that Plaintiffs fail to identify with particularity any materially false or misleading statements or omissions in any of ProPetro's filings. (Doc. 93 at 10). All Defendants adopt and incorporate by reference the arguments in ProPetro's Motion to Dismiss. (Doc. 89 at 18; Doc. 90 at 6; Doc. 91 at 8; Doc. 92 at 9).

The materiality analysis typically presents "a mixed question of fact and law" and is "generally a decision for the jury;" but representations can at times be determined "immaterial as a matter of law" on review of a motion to dismiss. *In re Enron Corp. Secs., Derivative & ERISA Lit.*, 235 F. Supp. 2d 549, 573 (S.D. Tex. 2002); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) (issues of materiality should be decided by the trier of fact unless the misrepresentations are "so obviously unimportant to an investor that reasonable minds cannot

29

differ on the question of materiality"); *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 7760201, at *7–8 (W.D. Tex. Dec. 1, 2015) (unpublished) ("[T]he Court cannot say at this stage of the proceedings that these three omissions are so obviously unimportant to a reasonable investor that they are immaterial as a matter of law.").

### i.       False Statements Relating to ProPetro

Plaintiffs contend Defendants misrepresented the adequacy of ProPetro's internal controls and disclosure controls and procedures, which ProPetro assured were adequate in its SEC filings.  (Doc. 81 ¶¶ 244, 246, 249, 256–58, 260, 262–64, 269–73, 276, 278, 305–07). Plaintiffs allege the following facts in support of their materiality argument:

- ProPetro overhauled its personnel to appoint new executive officers with "extensive public company experience to improve the tone at the top," enhancing policies, designing more rigid controls, and forming a "disclosure committee," led by a "Chief Disclosure Officer" to improve corporate governance (Doc. 81 ¶ 217); and

- Stock price drops associated with corrective disclosures show the omissions and misstatements were material to investors (*Id.* ¶¶ 153, 160, 176, 185, 199).

On June 22, 2020 in the final findings from its Audit Committee Investigation, ProPetro identified several material weaknesses in its internal control over financial reporting rendering those controls ineffective.  (*Id.* ¶ 206).  ProPetro admitted that its "***senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company***," and that this "failure to maintain an appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement and account balances and disclosures."  (*Id.* ¶ 207) (emphasis added).

ProPetro further concluded that its management "did not sufficiently promote, monitor or enforce adherence to its Code of Conduct and Ethics," and that there was "a general lack of focus

on promoting a culture of compliance within the Company." (*Id*.).  ProPetro admitted it "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions. As a result, two related party transactions were entered into that were not identified by the Company's controls and given consideration of appropriate disclosure."  (*Id*. ¶ 211). ProPetro concluded its executives engaged in improper related-party transactions, improper expense reimbursements, and benefitted from conflicts interest.  (*Id*. ¶¶ 214–16).

According to Plaintiffs, ProPetro made a series of disclosures admitting its prior disclosures regarding its controls were false:

- On August 8, 2019, ProPetro disclosed the improper expense reimbursements to Redman and Smith amounting to $370,000. (*Id*. ¶ 149). ProPetro also stated that it was evaluating its internal controls would likely conclude there were material weaknesses and deficient controls. As a result, it would overhaul its disclosure regime. (*Id*. ¶¶ 150–51).

- On October 9, 2019, ProPetro announced that Denholm, its Chief Accounting Officer, was resigning, (*Id*. ¶ 168), and that it identified internal control deficiencies. (*Id*. ¶ 165). It reiterated that there were material weaknesses in its internal controls and cautioned investors not to rely on its prior financial statements. (*Id*.).

- On November 13, 2019, ProPetro shed further light on the related-party transactions among entities owned by Denholm. (*Id*. ¶¶ 87–89). In connection with this disclosure, ProPetro again advised that investors should no longer rely on management's report on internal control over financial reporting or the internal control over financial reporting opinion of ProPetro independent registered public accounting firm included in the 2018 Annual Report. (*Id*. ¶ 190).

- On March 16, 2019, the Company announced that Redman had violated ProPetro's Code of Ethics and Conduct and Insider Trading Compliance Policy by pledging all of his ProPetro stock as collateral for personal loans, indicating to the market that ProPetro's internal controls were inadequate to prevent and detect such illicit transactions. (*Id*. ¶ 197).

- On June 22, 2020, ProPetro identified several material weaknesses in its internal controls and disclosure controls and procedures. (*Id*. ¶¶ 204–11). It also provided additional details concerning the improper expense reimbursements and ProPetro's transaction with PT Petroleum, Armour's company. (*Id*. ¶¶ 212–13).

31

Plaintiffs contend Defendants' statements concerning ProPetro's internal and disclosure controls were demonstrated to be false through ProPetro's own admissions.  (*Id*. ¶¶ 15, 88).  ProPetro argues that "fraud by hindsight" cannot support Plaintiffs' allegations.  (Doc. 93 at 23).  ProPetro relies on *Schiro v. Comex*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019), where the court found that the plaintiffs set forth no allegations that the defendants had reason to believe the statements concerning internal controls were false when made.

### a.    False Statements About Internal Controls

The Complaint in the present case contains detailed factual allegations explaining why ProPetro's statements concerning the adequacy of its internal controls were false when made.  (Doc. 81 ¶¶ 88, 90–1, 112–3, 120, 143–44).  Courts have held such statements to be actionable.  *In re Enron Corp.*, No. 2003 WL 21418157, at *17-19 (S.D. Tex. Apr. 24, 2003) (upholding securities fraud claims regarding defective internal controls and related party transactions against defendants for whom scienter could be established); *In re OCA Inc. Sec. and Deriv. Litig*., 2006 WL 3747560, at *14 (E.D. La. Dec. 14, 2006) (holding that false statements regarding sufficiency of internal controls were adequately pled); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc*., 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (internal controls false where complaint alleged consistent failures of controls and ultimate admission of inadequacy); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244 (S.D.N.Y. 2012) (upholding allegations that statements concerning adequacy of internal controls were false and misleading considering company's admission that it had identified material weaknesses).

Plaintiffs allege ProPetro misleadingly warned in SEC filings that "if we fail to continue to comply with the requirements of Section 404 of the Sarbanes-Oxley Act, or if we or our auditors identify and report material weaknesses in internal control over financial reporting, the

32

accuracy and timeliness of the filing of our annual and quarterly reports may be materially adversely affected and could cause investors to lose confidence in our reported financial information." (*Id.* ¶¶ 246, 278, 244). ProPetro contends its IPO "accurately warned that ProPetro was still in the process of evaluating its controls." (Doc. 93 at 19). The Complaint alleges that these statements were materially misleading because ProPetro was not in compliance with Section 404 of SOX at the time of these statements and the "risk" warned of had already come to pass. (*Id.* ¶¶ 245, 247, 279).

With respect to ProPetro's argument that Defendants' false statements "did not result in any material misstatements in the Company's financials," the Court disagrees that false statements about ProPetro's internal controls cannot be material. (Doc. 93 at 23). Material falsity does not hinge on whether the defective controls resulted in misstated financials, nor is that the only reason investors would find such deficiencies material. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1117 (N.D. Cal. 2017) (rejecting argument that internal control weaknesses were not material because "the mere fact that [the CEO] had engaged in the improper transactions . . . made the adequacy of LendingClub's internal controls material. Reasonable investors would have found it important to know of CEO Laplanche's prior efforts to drive his company's performance with artificially initiated loans, and even more importantly, that LendingClub's internal controls could not effectively curb the artifice.").

The Court finds that Plaintiffs' allegations plausibly state a claim against ProPetro based on its statements regarding internal and disclosure controls, which will go forward. Accordingly, Defendants' Motions to Dismiss are **DENIED** in part. (Docs. 89, 90, 91, 92, 93).

### b.    False Statements Relating to Code of Conduct

Plaintiffs also complain that ProPetro made statements in its Code of Ethics and Conduct concerning internal controls that required Defendants to "maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties," and "prohibited [Defendants] from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including other Covered Parties and the Company's independent auditors, governmental regulators and self-regulatory organizations." (*Id*. ¶ 305). The Code also stated that ProPetro's "[CEO] and [CFO] are responsible for implementing and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that all transactions were appropriately reviewed and disclosed." (*Id*. ¶ 306).

Defendants argue that statements contained in ProPetro's Code of Ethics and Conduct are puffery. (Doc. 93 at 24). However, when the statements "could be found to contain material representations and there is nothing vague or merely optimistic about them," courts reject such arguments. *Brody v. Zix Corp.*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006); *see also Rougier v. Applied Optoelectronics, Inc*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (no puffery where truth "conflicted with what a reasonable investor would take from the statement itself"); *In re Signet Jewelers*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (statements in code of conduct are not inactionable puffery). Because ProPetro's Code of Ethics specifies practices the company purports to adopt or that purport to reflect the current state of the company, as opposed to aspirational statements, these statements are actionable.[2]

---

[2] *See Plymouth Ct. Ret. Sys. v. Patterson Co., Inc.*, 2019 WL 3336119, at *16 (D. Minn. July 25, 2019) (code of ethics and conduct regarding compliance with antitrust laws contained actionable misstatements); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (Code of Conduct statements about independence actionable when company "did not address or manage its conflicts of interest"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) ("repeated assertions about [ ] strong ethical standards" actionable where they "stand in stark contrast with" reality); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "[w]e have extensive procedures and controls that are designed to

ProPetro also argues that these statements do not "imply that all employees consistently follow the code's requirements." (Doc. 93 at 21–22, 24). However, statements creating and enforcing an internal control environment that would ensure compliance of the company's top management with the Code of Ethics—although they may not be literally true—are statements with the ability to either inform or mislead prospective buyers and are therefore actionable. *Lormand*, 565 F.3d at 248.

The Court finds that Plaintiffs' allegations plausibly state a claim against ProPetro based on its statements regarding internal and disclosure controls in relation to ProPetro's Code of Ethics and Conduct, which will go forward. Accordingly, the Motions to Dismiss are **DENIED** in part.

### c.    False Statements in IPO Documents

ProPetro also challenges the false statements in ProPetro's IPO documents. (Doc. 93 at 19–21). ProPetro points to statements regarding its efforts to comply with Section 404 of SOX, concerning Defendants' duties to evaluate internal controls. (*Id.*). As Plaintiffs allege, these disclosures were false and misleading because they did not inform investors that ProPetro was already suffering from inadequate controls. (Doc. 81 ¶¶ 245, 247). ProPetro asserts it was "not yet required to conduct, and had not yet conducted, an assessment of its controls at the time of either offering." (Doc. 93 at 20).

As one court explained "though [the company] never directly admitted that the same internal controls existed at the time of the IPO or that those controls suffered from material

---

address conflicts of interest" actionable when company had "clear and egregious conflicts of interest"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278, 280 (S.D.N.Y. 2012) ("repeated assertions that [issuer] complies with letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest" actionable when alleged conduct "involved both client conflicts and outright fraud"); *Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 239–40 (S.D.N.Y. 2006) (statements in "business principles" about independence and integrity actionable when company was beset by conflicts).

35

weaknesses at that time, the specific facts alleged in the complaint corroborate the express allegation to that effect." *In re LendingClub*, 254 F. Supp. 3d at 1115. Similarly, the Court finds that Plaintiffs adequately allege statements in ProPetro's IPO documents that are actionable.

The Court finds that Plaintiffs' allegations plausibly state a claim against ProPetro based on its statements regarding internal and disclosure controls in relation to IPO documents, which will go forward. Accordingly, the Motions to Dismiss are **DENIED** in part.

### d.      False Statements About Related-Party Transactions in the IPO

Next, Plaintiffs claim that undisclosed related-party transactions should have been disclosed as material because they reflected a culture of noncompliance with internal and disclosure controls stemming from the top. (Doc. 97 at 46 n. 10). The Court is of the opinion that Plaintiffs' claims concerning related-party transactions stem from the same underlying complaint about ProPetro's defective internal controls. In other words, Plaintiffs allege that ProPetro is liable for false statements in relation to admittedly inadequate internal controls, which would have disclosed related-party transactions had the internal controls not been defective. The Court finds these allegations to be one and the same, and therefore, duplicative.

Regardless, the allegedly false statements concerning ProPetro's related-party transactions cannot be false and misleading because the facts underscoring falsity—i.e., improper expense reimbursements, the Clarabby Transactions, and the PT Petroleum transaction—did not occur until after the statements were made. (Doc. 93 at 9–10). ProPetro's admission that it was experiencing "growing pains" (Doc. 93 at 8) is simply not a basis to reasonably infer statements about related-party transactions that had not yet occurred were false at the time of the IPO and secondary offerings.

Accordingly, the Court **GRANTS** Defendants' Motions to Dismiss in part as to statements in the IPO and secondary offerings concerning related-party transactions that had not yet occurred.

> **e.    False Statements About Related-Party Transactions in Quarterly and Annual Filings**

Plaintiffs allege that ProPetro's quarterly and annual filings represented "[a]ll related party transactions are immaterial and have not been separately shown on the face of the financial statements." (Doc. 81 ¶¶ 265–66, 280–81). In addition, in its proxy statements, ProPetro listed related-party transactions but omitted several material transactions. (*Id*. ¶ 288). Further, the proxy statement explained ProPetro's "policies and procedures for related party transactions," and explained that any such transaction "must first be presented to our audit committee for review, consideration and approval. All of our directors and executive officers are required to report to the audit committee chair any such related party transaction." (*Id*. ¶¶ 289, 291).

ProPetro argues that the Complaint "takes an impermissible shotgun approach" to alleging the falsity of these statements. (Doc. 93 at 9). However, the Court finds that the statements regarding related-party transactions in quarterly and annual filings *after* such related-party transactions occurred are actionable at the pleading stage. *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 407 (S.D.N.Y. 2013) (finding omissions concerning related-party transactions were actionable, because it could not conclude "as a matter of law that these omissions 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' particularly in light of the alleged related-party nature of the transaction under Item 404(a)").

Further, ProPetro argues that it cannot be held liable for omitting related-party transactions in its quarterly reports because Item 404 only applies to annual reports. (Doc. 93 at

14–15).  But ProPetro's quarterly reports on Form 10-Q contained section listing related-party transactions and stating that "[a]ll related party transactions are immaterial and have not been separately shown on the face of the financial statements."  (*Id.* ¶¶ 265–66).

The Court finds that the series of omitted related-party transactions alleged in the Complaint is material considering the overriding principle of disclosure.  *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008); *S.E.C. v. China N.E. Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014) (holding that the number of transactions, and their total value, rendered the omissions material).

Plaintiffs do not contend that if such related-party transactions had been disclosed it "would have led to a chain reaction" revealing fraudulent activity, as the plaintiffs unsuccessfully argued in *ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187,195 (2d Cir. 2009).  Further, ProPetro relies on cases addressing misstatements concerning real estate loans,[3] and misstatements concerning disruption in pipeline use,[4] which do not relate to the materiality of statements concerning related-party transactions and therefore are inapposite.

Accordingly, the Court **DENIES** Defendants' Motions to Dismiss in part as to Plaintiffs' allegations concerning false statements about related-party transactions in quarterly and annual filings.  (Docs. 89, 90, 91, 92, 93).

### f.        False Statements About Audit Committee Independence

Plaintiffs also allege materially false and misleading statements and omissions concerning audit committee independence.  The IPO stated that ProPetro would appoint an audit committee consisting "solely of independent directors."  (Doc. 81 ¶ 254).  Plaintiffs complain

---

[3] *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011).
[4] *In re Lone Pine Res., Inc*., 2014 WL 1259653, at *4-5 (S.D.N.Y. Mar. 27, 2014)

that ProPetro appointed Alan Douglas to the committee, who was a friend and accountant to Redman, and therefore, not an independent director according to the NYSE Listing Company Manual.  (*Id*.).  The Court finds that Plaintiffs' bare assertion that a nonparty to this litigation was not independent because he was a friend and accountant to the CEO of ProPetro to be too speculative to be actionable.

Accordingly, the Court **GRANTS** Defendants' Motions to Dismiss in part with respect to any false statements about audit committee independence.  (Docs. 89, 90, 91, 92, 93).

### ii.  False Statements in Smith and Redman's Forms 10-K and 10-Q and SEC Filings

With respect to Defendants Redman and Smith, ProPetro's disclosures in their Forms 10-K and Forms 10-Q stated that "we have evaluated, under the supervision and with the participation of or management, including our principal executive officer [Redman] and principal financial officer [Smith], the effectiveness of the design and operation of our disclosure controls and procedures . . . our principal executive officer [Redman] and principal financial officer [Smith] concluded that our disclosure controls and procedures were effective at the reasonable assurance level."  (*Id*. ¶¶ 256, 259, 270, 274).

Defendants Redman and Smith further stated ProPetro "maintain[s] disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported."  (*Id*. ¶¶ 256, 269).  Defendants Redman and Smith assured investors in each of ProPetro's Forms 10-Q that "[n]o changes in our system of internal control over financial reporting . . . occurred during the quarterly period . . . that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  (*Id*. ¶ 256).

In ProPetro's SEC filings, Defendants Redman and Smith signed SOX certifications, attesting to ProPetro's "effective" internal controls and provided "reasonable assurance" that required disclosures would be made.  (*Id*. ¶¶ 256–57, 260, 270, 272–73, 276). Defendants stated that they "designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision . . . to ensure that material information . . . is made known to us . . . evaluated the effectiveness of [ProPetro's] disclosure controls and procedures . . . [and] disclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]"  (*Id*. ¶¶ 257, 272).

Defendants Redman and Smith also assured investors that they were each ***personally "responsible for establishing and maintaining disclosure controls and procedures***."  (*Id*. ¶¶ 257, 272, 276).  They further assured investors that they had disclosed to the Company's auditors and Audit Committee, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."  (*Id*. ¶¶ 257–58).

Defendants have admitted that these statements were false because ProPetro failed to design, implement, and enforce effective internal controls.  (*Id*. ¶¶ 204–18).  Similar statements have been found to be actionable.  *See In re Petrobras Sec. Litig*., 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (falsity of SOX certifications pled where complaint alleged "management was well aware of the extensive" bribery scheme); *Middlesex Ret. Sys. v. Quest Software Inc*., 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements.").

The Court finds the allegedly false statements made in relation to Redman and Smith to be material and actionable.  Therefore, the Court **DENIES** in part Defendants' Motions to Dismiss.

### iii.    Omissions Relating to Smith and Redman's Improper Reimbursements

The Complaint alleges ProPetro did not disclose until August 8, 2019, that Smith and Redman had been improperly reimbursed $364,000 for expenses.  (*Id*. ¶ 149).  According to Plaintiffs, these improper expense reimbursements demonstrated to ProPetro that its internal and disclosure controls were deficient, causing ProPetro to embark on a serious undertaking to overhaul its entire internal and disclosure control regimen, and, ultimately, to sever its relationship with Redman altogether. (Doc. 97 at 51).

Plaintiffs allege ProPetro's own disclosures show that it retroactively changed the reported compensation to reflect, for Redman, an additional $142,570 for 2017 and an additional $285,615 for 2018 and, for Smith, an additional $9,301 for 2017 and $5,845 for 2018.  (Doc. 81 ¶ 214).  Notably, ProPetro indicated that it would "review" and disclose all "transaction with related persons that are required to be disclosed."  (*Id*. ¶ 251).  The Complaint alleges that the $370,000 in compensation, paid principally to Redman and Smith, was subject to that policy, and should have been disclosed.  (*Id*. ¶¶ 253, 267, 281, 290).  As a result of the audit committee investigation, ProPetro acknowledged that Redman and Smith received more than $364,000 in expense reimbursements that should have been disclosed.  (*Id*. ¶ 149).

The Court finds the omissions made in relation to Redman and Smith's improper reimbursements to be material and actionable.  However, the Court limits the scope of this claim to only those statements and/or omissions made prior to the IPO and secondary offerings.  Therefore, the Court **GRANTS** in part and **DENIES** in part Defendants' Motions to Dismiss.

### iv.    False Statements Relating to Redman

The Complaint also pleads that Redman's improper share pledges and certain related-party transactions occurred at the time of or before the IPO, which establishes that ProPetro's internal controls were deficient before and at the time the IPO occurred.  (Doc. 81 ¶ 104, 245). ProPetro disclosed for the first time on March 16, 2020 that Redman had entered into two share pledge agreements to procure two multi-million-dollar ranches for his personal use, in violation of the Company's Code of Ethics and shareholders agreement.  (*Id*. ¶¶ 89–108, 197–98). Redman pledged over 600,000 shares of ProPetro stock worth more than $8 million at the time, as collateral for two personal loans.  (*Id*. ¶ 103).  The first share pledge agreement, executed in 2017, represented all the ProPetro stock he owned at the time.  (*Id*. ¶¶ 103–07).

When ProPetro disclosed these pledges, it admitted Redman's pledge agreements violated its "Insider Trading Compliance Policy," which it had adopted in connection with its IPO in March 2017.  (*Id*. ¶ 90).  Specifically, the Insider Trading Compliance Policy "prohibits pledging the Company's securities as collateral to secure loans."  (*Id*.).  Redman contends that because he did not default on the loans, and because there are no allegations that he was likely to default on his loans, that he was not required to disclose the share pledges.  (Doc. 91 at 6–7). The Court finds this argument unavailing.

The reason for such prohibition is that pledging one's stock as collateral for loans creates conflicts of interest.  (Doc. 81 ¶ 93).  In particular, share pledge agreements can "create[] a situation wherein Redman would benefit from liquidating his ProPetro shares to avoid defaulting on his personal loans, driving down the value of ProPetro's stock to the detriment of ProPetro and its shareholders."  (*Id*. ¶ 102).  That is why ProPetro "prohibit[s] pledging Company securities as collateral to secure loans.".  (*Id*. ¶ 94).  Thus, ProPetro characterized Redman's

share pledges as "inappropriate conduct" that led to his separation from ProPetro. (*Id*. ¶ 95). The Complaint alleges that failing to disclose Redman's pledge agreement was a material omission, and that it should have been disclosed in ProPetro's SEC filings. (*Id*. ¶ 309).

The Complaint further alleges that Redman's share pledge agreement rendered certain statements false and misleading in the IPO and secondary offering documents. Specifically, the IPO represented that "[w]e, all of our directors and executive officers and holders of substantially all of our outstanding common stock will agree not to sell any common stock or securities convertible into or exchangeable for shares of common stock for a period of 180 days from the date of this prospectus." (*Id*. ¶ 237). The IPO stated that "[t]he Company and its officers and directors, and holders of substantially all of the Company's common stock have agreed with the underwriters, subject to certain exceptions, not to dispose of or hedge any of their common stock or securities convertible into or exchangeable for shares of common stock[.]" (*Id*. ¶¶ 237, 239). Plaintiffs claim these statements were false and misleading because, in fact, Redman had already entered into a share pledge agreement, in direct contravention of these statements.

Finally, the Complaint alleges that the IPO represented that Redman was the beneficial owner of 2.9% of ProPetro, and the secondary offering documents represented that he owned 1.6% of ProPetro. But since those shares were subject to the share pledge agreement, investors were misled because they had no way of knowing about the encumbrances on Redman's ownership stake in ProPetro. (*Id*. ¶¶ 242–43). In addition to those specific statements, the failure to disclose the share pledge agreements rendered additional statements false and misleading, including that Redman complied with ProPetro's Code of Ethics and Conduct, the

Company's Insider Trading Compliance Policy, and that ProPetro's internal and disclosure controls were adequate.  (*Id.* ¶ 238).

ProPetro responds that the statements in the IPO and secondary offering documents were contained in "lock-up agreements," which are "form agreements supplied as annexes to the offering documents."  (Doc. 93 at 16; Doc. 91 at 9).  Because these "inure solely to the benefit of the Underwriters, the Company and the Selling Stockholders," Defendants claim the statements are not actionable.  (*Id.*).  But claims made outside of official regulatory filings have been upheld as actionable.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Lit.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) (finding that assurances on Volkswagon's emissions compliance stickers, provided to consumers, were actionable under the securities laws).

ProPetro argues that statements in an underwriter agreement cannot be actionable. ProPetro cites *Greenfield Children's Partnership v. Friendfinder Network, Inc.*, 590 Fed. App'x 854 (11th Cir. 2014), a case in which the misstatements at issue concerned whether there was a lockup agreement.  In the instant case, there is no dispute that a lockup agreement existed— instead, the assurances within the lockup agreement are at issue.  ProPetro also cites *In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 638 (S.D. Tex. 2018) where the court held that "reasonable investors understand that similar statements [in underwriter agreements] are not affirmative disclosures by a company about its financial health."  However, Plaintiffs do not point to the misstatements about pledged stock to indicate ProPetro's financial health.  Rather, Plaintiffs rely on statements concerning ProPetro's management and their representations to avoid engaging in unethical behavior.

ProPetro asserts that it does not matter that the share pledges put Redman in violation of its Code of Ethics, which ProPetro's SEC filings direct investors to review and which was

44

maintained on its website.  (Doc. 93 at 16 n. 18).  Defendants contend that because the Code of Ethics was not specifically incorporated into ProPetro's SEC filings, the failure to disclose Redman's share pledges are not actionable.  (*Id.*).   The Court disagrees. A CEO's violations of a code of conduct and insider trading policy is material regardless of whether they appear in SEC filings.  *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221 (S.D.N.Y. 2019) (statements regarding code of conduct were actionable as false statements once transgressions were revealed).

Redman sets forth three additional arguments.  First, he argues that Plaintiffs do not "articulate why an investor would care that a miniscule percentage of the Company's stock was pledged to financial institutions."  (Doc. 91 at 5–6).  However, the Court finds that the materiality of Redman's concealed share pledges lies not with the size of the loans but rather the fact that Redman was flouting ProPetro's Code of Ethics and Insider Trading Policy.  ProPetro agreed by its proscription of *all* such pledge agreements, not merely those over a certain percentage of ProPetro's market capitalization.  (Doc. 81 ¶ 94).

Second, Redman argues that statements in ProPetro's Code of Conduct and Insider Trading Compliance Policy are not actionable as a matter of law because they are merely "aspirational" and thus "immaterial."  (Doc. 91 at 7–9).  Redman cites *In re Plains All Am. Pipeline, L.P. Sec. Litig*., 307 F. Supp. 3d 583, 625 (S.D. Tex. 2018), for the proposition that codes reading like aspirational statements of company policy are not actionable.  In that case, the company Code of Conduct stated that the company "supported its commitment to safe and environmentally responsible operations through extensive and ongoing education" and that the company's "commitment [to safe and responsible operations] also includes compliance with applicable environmental, health, and safety environmentally rules, laws, and regulations."  307

F. Supp. 3d at 607.   These statements refer to general "commitments" and compliance with existing rules and regulations and do not reference any concrete policy or practice.  *Id.* at 626.

Likewise, in *Bondali v. Yum! Brands, Inc*., 620 F. App'x 483, 490 (6th Cir. 2015), the statements at issue involved a company commitment to "food safety."   Such aspirational goals are markedly different than ProPetro's prohibition of share pledges that Redman allegedly violated twice.   While statements in a code of conduct or ethics that are "too open-ended, indefinite, or subjective," such as statements that a company strives to "comply with applicable laws," *In re Plains,* 397 F. Supp. 3d at 622–23, 639–40, and statements that are "too general to constitute a guarantee," *Bondali*, 620 F. App'x at 16 n. 18, may not be actionable, highly specific statements that are "directly related to the subject of the fraud" including "representations about . . . purported controls for avoiding conflicts [that are] directly at odds with [a company's] alleged conduct" are actionable. *See In re Goldman Sachs Grp., Inc. Sec. Litig*., No. 10 CIV. 3461 PAC, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (unpublished).

The statements at issue here fall into the category of actionable claims.   In addition to expressing ProPetro's general "fundamental policy. . . to conduct its business with honesty and integrity in accordance with the highest legal and ethical standard," the ProPetro Code of Ethics independently (a) required that Defendants implement and maintain "a system of internal accounting controls sufficient to provide reasonable assurances" that all transactions were properly executed and recorded; (b) prohibited Defendants from "willfully, directly or indirectly . . . falsify[ing], or caus[ing] to be falsified, any book, record or account of the Company;" (c) required Defendants "comply with the spirit as well as the letter of this Code, and must not attempt to achieve indirectly, through the use of agents or other intermediaries, what is prohibited directly by this Code;" and (d) required that Defendants "not permit themselves to be

placed in a position that might give rise to even the appearance [of] a conflict of interest." (Doc. 81 ¶¶ 96–97 99).

Third, Redman cites to a series of cases alleging that the SEC requirement that companies post codes of ethics makes it impossible that securities fraud occurs each time one is violated. (Doc. 91 at 8). However, ProPetro's SEC filings affirmatively directed investors to ProPetro's Code of Ethics and Defendants signed a Certificate of Compliance with the Code of Ethics. The code at issue in the case *In re Cognizant Tech Solutions Corp. Sec. Litig.*, No. 216-CV-06509-WHW-CLW, 2018 WL 3772675, at *18 (D.N.J. Aug. 8, 2018), was an "internal document" that could not have been relied on or material to investors. By contrast, Plaintiffs allege that the ProPetro Code of Ethics was available on the ProPetro website and referenced in SEC filings.[5]

Plaintiffs do not allege, as in the cases Defendants cite, that the omission of a code for certain conduct made the code misleading, but instead, that the affirmative statements in the Code itself and Defendants' affirmative statements of adherence to the Code were false and misleading due to Defendants' violations of the Code.

The Court finds the statements made in relation to Redman to be material. Therefore, Defendants' Motions to Dismiss are **DENIED** in part. (Docs. 89, 90, 91, 92, 93).

### v.    False Statements Relating to the Clarabby Transactions

ProPetro disclosed the Clarabby Transactions on November 13, 2019. (*Id*. ¶¶ 187–88). On June 22, 2020, ProPetro admitted to two related-party transactions "entered into that were not identified by the Company's controls and given the appropriate level of disclosure," referring to the Clarabby Transactions. (*Id*. ¶¶ 211–12). Plaintiffs allege Denholm made it possible for Clarabby to procure a facility that was then sold to ProPetro.

---

[5] *See In re Eletrobras Sec. Litig.*, 245 F. Supp. at 463 (distinguishing statements in codes of conduct that were referenced by the company in other contexts).

Denholm claims he had no role in the Clarabby Transactions because he was not the legal owner of Clarabby, which is the only entity that contracted directly with ProPetro, and thus, the transaction did not need to be disclosed.  (Doc. 92 at 9–12).  However, Plaintiffs argues that his indirect interest in Clarabby rendered it a related-party transaction, under Item 404 and ProPetro's own policies.  (*Id*. ¶¶ 77, 97, 251).  Plaintiffs allege Denholm owned and half-owned, respectively, two entities that participated directly in the transaction at issue by loaning Clarabby the funds to purchase the iron testing facility that was later sold to ProPetro.  (*Id*. ¶¶ 115, 188–89).

The Court finds that the failure to disclose Denholm's involvement with the Clarabby Transactions is actionable based on the allegations in the Complaint only to the extent the conduct occurred prior to the IPO and secondary offerings.  Accordingly, Defendants' Motions to Dismiss are **DENIED** in part as to statements and/or omissions involving the Clarabby Transactions prior to the IPO and secondary offerings.  (Doc. 92).

### vi.    False Statements and Omissions Relating to PBEX

The Complaint also alleges Denholm—ProPetro's Chief Accounting Officer—was the Chief Financial Officer at PBEX, LLC ("PBEX"), a Texas company that purchases oil and gas rights.  (Doc. 81 ¶¶ 116–117).  Plaintiffs allege Denholm's employment at PBEX was never disclosed to investors.  (*Id*. ¶ 118).  Plaintiffs claim this was important because Denholm, as ProPetro's Chief Accounting Officer, was charged with critical oversight of the internal and disclosure controls that proved to be insufficient.  (*Id*. ¶¶ 113, 232).

The Court does not find this omission to be material.  Plaintiffs' allegation that "[i]nvestors should have been able to evaluate the Company in light of the fact that Denholm was splitting his time with PBEX" is wholly speculative.  (Doc. 97 at 47).  The Court finds that the

Complaint fails to sufficiently allege that the disclosure of Denholm's position as CFO at PBEX would have been material since Item 404 requires disclosure only of transactions with the registrant company.   Plaintiffs' complaint that Denholm's employment at PBEX may have distracted him from his responsibilities as Chief Accounting Officer at ProPetro is simply too attenuated from any oversights and failures in ProPetro's internal and disclosure controls.  (*Id.* at 47–48).

In *Fries v. N. Oil and Gas*, 285 F. Supp. 3d 706, 717-720 (S.D.N.Y. 2018), the Court found that failure to disclose an executive's employment at a different company was not actionable.  In the present case, the Court finds that Plaintiffs' allegations regarding Denholm's work at PBEX and how it could have contributed to ProPetro's flaws amount to mere surmise that cannot state a plausible claim for relief.  While PBEX and ProPetro are both businesses operating in the oil and gas industry in Midland, there is no allegation that they are competitors or that there is some inherent conflict of interest relating to Denholm's position at both companies.

Also, Plaintiffs' allegation that PBEX's chairman—a nonparty to the present suit—serves on the board of directors of Viper Energy, an affiliate of Diamondback Energy, who is a customer of ProPetro, is simply not material.  It is a logical leap to conclude that because Denholm and such nonparty shared a close relationship that it could have materially benefited an affiliate of a customer of ProPetro.  The Court is unwilling to make such an unreasonable inference at the pleading stage since it amounts to pure speculation without a factual basis.

Accordingly, Defendants' Motions to Dismiss shall be **GRANTED** in part to the extent that they relate to the PBEX statements and/or omissions.

49

### vii.    False Statements Relating to Armour

The Complaint alleges ProPetro provided services valued at over $55 million to PT Petroleum, LLC ("PT Petroleum") and that Defendant Armour was the president of PT Petroleum. (Doc. 81 ¶ 126). Plaintiffs claim Defendants should have disclosed related-party transactions involving PT Petroleum. (*Id*. ¶ 213). Specifically, ProPetro provided services to PT Petroleum amounting to $16.7 million and $39 million, respectively, during 2017 and 2018. (*Id*. ¶ 213). According to Plaintiffs, Defendants were required to disclose these related-party transactions at the time they occurred but did not do so until ProPetro filed its 2019 Form 10-K addressing the results of the audit committee investigation in June 2020. (*Id*.).

The Complaint alleges that ProPetro's failure to disclose its transactions with PT Petroleum rendered its statements about related-party transactions materially false and misleading. (*Id*. ¶¶ 253, 267, 281, 290, 304). Plaintiffs claim ProPetro admitted it should have disclosed the transactions with PT Petroleum. (*Id*. ¶¶ 211–12).

In *Zagami*, the court held that several undisclosed related-party transactions, whose dollar amounts were relatively small, were material and thus actionable. 540 F. Supp. 2d 705. In so holding, the court noted "in some cases[,] the significance of an item may be independent of the amount involved. For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately even though the dollar amounts are relatively small." *Id*. at 710. Thus, "'disclosure is the overriding principle' governing related party transactions, because while they are not 'inherently bad, they have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial transactions . . . [and] are difficult to measure economically because they may not be comparable[.]'" *Id*. at 711 (internal citations omitted).

The Court finds that allegations that Defendants concealed the PT Petroleum transactions, which were related-party transactions that allegedly benefitted management, and specifically Armour, are material. Such misconduct would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Southland*, 365 F.3d at 362.

Accordingly, the Court **DENIES** Defendants' Motions to Dismiss in part on this ground but limits Plaintiffs' claims to only statements and omissions that occurred prior to the IPO and secondary offerings.

### 2.    Scienter

All Defendants contend that Plaintiffs fail to carry their statutory burden of alleging particularized facts giving rise to a strong inference of scienter. (Docs. 89, 90, 91, 92, 93). ProPetro argues that Defendants' statements cannot be false because the Complaint did not "plead facts showing that management *knew* the controls were insufficient or ignored red flags of such deficiency at the time they made the disclosures and certifications." (Doc. 93 at 23). ProPetro cites *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017), where the plaintiffs relied only on allegations of mismanagement and an admission of "tone at the top" issues to establish scienter.

Liability under Section 10(b) and Rule 10b-5 depends on scienter. For purposes of determining "whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter," the Fifth Circuit holds that it is "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366.

Scienter here as to ProPetro thus rises or falls with its determination as to the corporate officers who made the challenged statements.

### i. Redman

Plaintiffs plead the following statements attributable to Redman: (1) Redman personally signed the IPO Lock-Up Agreement representing that he had not encumbered his ProPetro shares and that he would not do so for 180 days following the IPO; (2) Redman personally executed a certification that he had complied fully with the ProPetro policy prohibiting "pledging the Company's securities as collateral to secure loans;" (3) Redman repeatedly executed SOX certifications that Defendants designed, or caused to be designed, disclosure controls and procedures "to ensure that material information . . . is made known to us," and that they had "evaluated" those controls and procedures and deemed them effective; and (4) Redman furnished information for proxy statements signed by ProPetro's General Counsel, Mark Howell.

Further, Plaintiffs plead the following omissions attributable to Redman: (1) undisclosed share pledges two months before the IPO that violated the IPO Lock-Up Agreement that he signed and filed with the SEC as an attachment to the IPO and that violated ProPetro's internal policies; (2) undisclosed expense reimbursements totaling more than $346,000; and (3) retroactive revisions to compensation disclosures for Redman reflecting an additional $142,570 for 2017 and $285,615 for 2018.

The Court finds there is ample allegation of scienter as to Redman. This includes substantial indication that Smith had regular access to information that ProPetro was required by SEC rules to disclose but did not and transactions subject to internal ProPetro policies that were violated. Redman voluntarily made representations to the public and allegedly failed to tell the

whole truth or disclose material or adverse facts that affected the validity or plausibility of his statements. *In re ArthroCare Corp. Secs. Lit.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010).

The Complaint alleges shareholders relied on Redman's representations which were made with the approval of ProPetro that selected him to speak on its behalf and sign SEC filings. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015); *Belmont v. MB Inv. Partners*, 708 F.3d 470, 479 (3d Cir. 2013). While Redman's alleged violations of the IPO Lock-Up Agreement and internal policies concerning Redman's share pledge "certainly benefit[ed] himself," they "also benefitted [ProPetro] in its efforts to bolster its perception in the eyes of investors." *Lee v. Active Power*, 29 F. Supp. 3d 876, 885 (W.D. Tex. 2014); *Zagami*, 540 F. Supp. 2d at 714 (allegations that corporate officers "engaged in related-party transactions that required disclosure does not" permit the corporation to disclaim imputation of the officers' knowledge) (citing RESTATEMENT (SECOND) OF AGENCY §282(1) (June 2020)).

Because Plaintiffs allege Redman failed to disclose share pledges to inflate the price of stock for his own financial benefit, and since Redman was involved in formulating ProPetro's internal controls and disclosure policies to the market, knowledge of Redman as CEO as to his share pledges can be imputed to ProPetro. *Southland*, 365 F.3d at 360; *FDIC v. Ernst & Young,* 967 F.2d 166, 171 (5th Cir. 1992); *Barrett v. PJT Partners,* No. 16-cv-2841, 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 9, 2017).

Further, scienter is established by looking to the state of mind of General Counsel, Mark Howell, who signed the proxy statements as a corporate official at the order or approval of Redman as CEO. Redman was the most senior officer of ProPetro, and therefore, had authority over the contents or issuance of the proxy statements. *Southland,* 365 F.3d at 366.

      **ii.**      **Smith**

Plaintiffs plead Smith repeatedly executed SOX certifications. Plaintiffs plead the following omissions attributable to Smith: (1) undisclosed expense reimbursements totaling thousands of dollars; (2) retroactive revisions to compensation disclosures for Smith including an additional $9,301 for 2017 and $5,845 for 2018; and (3) undisclosed personal stake in six other companies including companies in the Permian Basin oil business.

As an initial matter, the Court does not find Smith's involvement in various other third party companies relevant to the determination of whether ProPetro appropriately disclosed related-party transactions. The general allegation that ProPetro's management was deeply entangled in other companies in the Permian Basin oil business amounts to mere conjecture and cannot support an inference of scienter.

With respect to the SOX certifications and the undisclosed expense reimbursements and retroactive revisions to compensation disclosures, the Court finds that ProPetro's breakdown in internal controls and failure to institute an employee expense reimbursement policy supports an inference of scienter only as to Plaintiffs' claims regarding the false statements and/or omissions relating to ProPetro's disclosure of the existence or adequacy of internal controls. Notably, "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005). The Court concludes that Plaintiffs have sufficiently pleaded that Smith made materially misleading statements with the requisite scienter regarding the adequacy of ProPetro's internal and disclosure controls.

### iii.    Denholm

Plaintiffs plead that ProPetro's August 16, 2017 Form 8-K was issued for the purpose of announcing Defendant Denholm had been promoted to Chief Accounting Officer and it allegedly

54

falsely represented that Denholm had "no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K." (Doc. 81 ¶ 284). Plaintiffs plead the following omissions attributable to Denholm: (1) failure to disclose the Clarabby Transactions; and (2) failure to disclose Denholm's employment as Chief Financial Officer of another oil company, PBEX. For the reasons previously explained, the Court does not find Denholm's employment as CFO of PBEX to be material and such allegations cannot support an inference of scienter.

While Denholm did not sign the 8-K, it relied on information furnished by Denholm for inclusion therein. *Southland,* 365 F.3d at 366. Accordingly, the statement that Denholm had "no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K" is attributable to Denholm and supports a finding of scienter. (Doc. 81 ¶ 284).

As to the Clarabby Transactions, the Complaint alleges Denholm knew of the transactions, and as Chief Accounting Officer, he knew they needed to be disclosed or was severely reckless in not knowing the disclosure requirements. Plaintiffs plead that as Chief Accounting Officer, Denholm was directly responsible for maintaining, applying, monitoring, and improving ProPetro's internal and disclosure controls. Accordingly, Denholm's failure to disclose the Clarabby Transactions supports a strong inference of scienter that ProPetro lacked internal and disclosure controls for related-party transactions. *Zagami*, 540 F. Supp. 3d at 713.

#### iv.    Armour

Plaintiffs plead Armour failed to disclose the PT Petroleum transactions. As Chairman of ProPetro and President of PT Petroleum, Plaintiffs allege Armour had knowledge of the multi-million-dollar transactions between the two companies as well as ProPetro's policy requiring that

the audit committee of ProPetro's Board of Directors disclose related-party transactions. (Doc. 81 ¶ 268). While scienter cannot be shown by mere inference that a corporate defendant somehow surely must have known of a misrepresentation or omission simply by virtue of position within the company, *Abrams*, 292 F.3d at 432, if a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter. *See In re Odyssey Healthcare, Inc. Securities Litigation*, 424 F. Supp. 2d 880, 889–90 (N.D. Tex. 2005).

The Court finds that Armour's role as Chairman of ProPetro's Board of Directors and the alleged breakdown in ProPetro's internal controls gives rise to an inference of scienter as to ProPetro's purported false statements regarding disclosure controls for related-party transactions.

### 3.    Loss Causation

ProPetro contends Plaintiffs do not adequately plead that the alleged false or misleading statements proximately caused their economic loss. (Doc. 93). The Complaint alleges the following facts in support of loss causation:

- *August 8, 2019:* Disclosure of the Investigation into improper expense reimbursements and related-party transactions involving Redman and Smith, the market learned for the first time that the audit committee would likely conclude that ProPetro's internal controls suffered from material weaknesses. (Doc. 81 ¶¶ 10, 150, 165, 352).

- *August 30, 2019:* Announcement that its general counsel, Mark Howell, had resigned in the wake of the Audit Committee Investigation with analysts confirming that Howell's "resignation should be considered in [the] context" of that Investigation. (*Id.* ¶ 162).

- *October 18, 2019:* News that SEC had commenced an investigation into ProPetro's internal financial controls, disclosures, and financial reporting, signaling to the market how serious the issues were and that ProPetro's stock price declined in response. (*Id.* ¶¶ 174–79).

- *October 31, 2019:* Report that included Denholm's resignation (disclosed on October 9, 2019) and his involvement with the previously undisclosed Clarabby Transactions,

and that ProPetro executives and Board members were the founders of, or were otherwise linked to, numerous other companies in the oil and gas industry. (*Id.* ¶¶ 179–87).

- *March 16, 2020:* ProPetro disclosed that Redman was resigning and forfeiting several million dollars of compensation, and that Smith was again being demoted from his executive post entirely and would similarly give up incentive compensation that he had been previously entitled to. (*Id.* ¶¶ 89, 194–96). ProPetro simultaneously disclosed that the Investigation uncovered that Redman, on at least two occasions and in violation of the Company's Code of Ethics and Conduct, Insider Trading Compliance Policy, several underwriting agreements, and the shareholders' agreement effective in January 2017, entered into pledge agreements covering, at times, all of Redman's ProPetro stock as collateral for personal loans. The same Form 8-K reported that Redman, in addition to the pledges, "engaged in other inappropriate conduct in connection with these personal loans." (*Id.* ¶¶ 90, 197).

"Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016). Further, the Fifth Circuit has rejected a bright line rule that "government investigations can never constitute a corrective disclosure in the absence of discovery of actual fraud" as "overly rigid." *Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324–25 (5th Cir. 2014). "[T]o require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." *Id.*

"A corrective disclosure can come from any source, and can take any form from which the market can absorb [the information] and react" so long as it "reveal[s] to the market the falsity" of the prior misstatements. *Id.* at 322–25; *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 859 (5th Cir. 2018) (noting that "the Fifth Circuit has considered both news articles that reveal information to the marketplace and government investigations of suspected fraud in the total mix of information to determine whether the alleged partial disclosures cumulatively plead

loss causation"). There is "no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion." *Lormand*, 565 F.3d at 264.

ProPetro's arguments about what the market believed and the consideration of COVID-19's effect on the market require the Court to draw inferences adverse to Plaintiffs, which is inappropriate at the motion to dismiss stage. Stock price increases or decreases present fact questions concerning what the market knew at the time. Further, the Court will not ignore news and reports that could serve as a corrective disclosure at the pleading stage simply because the raw data was technically available to the public. *Amedysis*, 769 F.3d at 323. Accordingly, the Court **DENIES** Defendants' Motions to Dismiss in part on this ground. (Docs. 89, 90, 91, 92, 93).

### i.    PBEX Allegations

Denholm claims Plaintiffs fail to specify any material, misleading statement or omission by him or cite adequate facts to establish loss causation resulting from his actions with respect to PBEX. (Doc. 92). The Court finds that the Complaint fails to allege loss causation between any failure to disclose Denholm's position with PBEX. Specifically, the Complaint fails to identify any loss or improper transaction that resulted from Denholm's position at PBEX. Plaintiffs' speculation that "Denholm was so distracted by his employment at PBEX that he failed to perform the functions of his role as Chief Accounting Officer at ProPetro" amounts to nothing more than guesswork and is not actionable. Accordingly, the Court **GRANTS** in part Defendants' Motions to Dismiss to the extent they relate to the PBEX allegations. (Docs. 89, 90, 91, 92, 93).

### ii.    PT Petroleum Allegations

Defendant Armour also alleges that Plaintiffs have failed to plead the element of loss causation with respect to the challenged statements regarding the PT Petroleum transaction, which generated more than $55 million of revenue for ProPetro.  (Doc. 90 at 7–8).  ProPetro argues that Plaintiffs' allegations concerning the PT Petroleum transactions are speculative because those transactions never "led to any of the[ ] harms" posed by related-party transactions.  (Doc. 93 at 12).  Plaintiffs argue "such detail is not required at the pleading stage."  (Doc. 97 at 37).  The Court disagrees.  The Complaint fails to specifically allege loss causation for Armour's role at and ProPetro's transactions with PT Petroleum.  Accordingly, the Court **GRANTS** in part Defendants' Motions to Dismiss to the extent they relate to the PT Petroleum transactions.

### iii.    Clarabby Allegations

Denholm claims Plaintiffs also fail to specify any material, misleading statement or omission by him or cite adequate facts to establish loss causation resulting from his actions with respect to the Clarabby disclosures.  The Court agrees.  Plaintiffs' Complaint fails to specifically allege loss causation for Denholm's role in the Clarabby Transactions.  Accordingly, the Court **GRANTS** in part Defendants' Motions to Dismiss to the extent they relate to the Clarabby allegations.  (Docs. 89, 90, 91, 92, 93).

## B.    Section 20(a) Control-Person Claims

Plaintiffs allege that Redman, Smith, Denholm, and Armour are liable under Section 20(a) as "controlling persons" for the acts by ProPetro in violation of Section 10(b).  To the extent Defendants argue the control-person claims should fail because Plaintiffs have not alleged a primary violation of the securities laws, this argument is unavailing given that it has already been determined that Plaintiffs have sufficiently pleaded certain claims under Section 10(b).

Control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  The question under Fifth Circuit precedent, then, is whether the alleged control-person had "effective day-to-day control" of the corporation, or had "the requisite power to directly or indirectly control or influence corporate policy," or had "actual power or influence over the controlled person." *Cameron*, 608 F2d at 195; *Thompson*, 636 F2d at 958; *Dennis*, 918 F2d at 509.  None of these inquiries are dispositive, but plaintiffs at a minimum must "show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based."  *Heck*, 775 F3d at 283 (internal quotations omitted).

Plaintiffs allege that Defendants, the most senior officers at ProPetro, made and signed false statements and had the power to control and did control the activities alleged to be fraudulent.  The pleaded facts are thus sufficient to make quite plausible a conclusion that Redman, Smith, Denholm, and Armour did indeed control ProPetro.  Perhaps discovery will adduce evidence showing that despite such roles Defendants took a hands-off approach to the day-to-day conduct of ProPetro's business and as pertinent here did not control the public dissemination of misleading statements about ProPetro's internal controls and disclosure controls.  *See In re ArthroCare Corp*., 726 F. Supp. 2d at 731.  But whether Defendants exercised control over those who made the alleged misrepresentations and omissions is evidence within the control of Defendants, making it fair for Plaintiffs to seek discovery.  *See Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.,* 892 F.3d 719, 730 (5th Cir. 2018).

Plaintiffs have sufficiently pleaded that Defendants had and exercised the necessary control over ProPetro as to make them liable as controlling persons under Section 20(a). Thus, the control-person claims against Redman, Smith, Denholm, and Armour will proceed.

## C.    Securities Act Claims

Plaintiffs assert claims under Section 11 of the Securities Act against Defendants ProPetro, Redman, and Smith, and Section 15 of the Securities Act against Defendants Redman and Smith. (Doc. 81). These Sections generally "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Secs. Lit.*, 592 F.3d 347, 358 (2d Cir. 2010). Defendants ProPetro, Redman, and Smith seek dismissal of each category of claims, while also asserting that the applicable statute of limitations bars them all. (Docs. 89, 91, 93).

### 1.    Standing

ProPetro argues that only one Plaintiff—Oklahoma Law Enforcement Retirement System ("OLERS")— has standing to assert the Section 11 claim. (Doc. 93 at 45–46). The Court agrees. OLERS has standing to assert Section 11 claims on behalf of the proposed class but the other named plaintiffs do not. Accordingly, Defendants' Motions to Dismiss shall be **GRANTED** in part as to the remaining named Plaintiffs other than OLERS.

### 2.    Statute of Repose

ProPetro argues Plaintiffs' Section 11 claims based on Redman's share pledges and the PT Petroleum transaction are barred by the statute of repose because they were made more than three years after ProPetro filed the IPO in which Plaintiffs allege Defendants made false and misleading statements. The statute of repose begins to run on "the date of the last culpable act or

61

omission of the defendant." *Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017).

Plaintiffs claim the last culpable act was the offering of securities on March 16, 2017, the effective date of the IPO.  (Doc. 97 at 95).  The Original Complaint filed September 16, 2019, did not mention Redman's share pledges or the PT Petroleum transaction.  (Doc. 1).  The Amended Complaint filed February 13, 2020, did not mention Redman's share pledges or the PT Petroleum transaction.  (Doc. 55).  It was not until April 14, 2020, that Plaintiffs referenced Redman's share pledges in their Second Amended Complaint.  (Doc. 73).  It was not until July 30, 2020, that Plaintiffs referenced the PT Petroleum transactions in their Third Amended Complaint.  (Doc. 81).

Accordingly, the Court finds that Plaintiffs' claims under Section 11 of the Securities Act relating to Redman's share pledges and the PT Petroleum transaction are barred by the statute of repose.  Thus, Defendants' Motions to Dismiss shall be **GRANTED** in part as to Plaintiffs' claims under Section 11 of the Securities Act relating to Redman's share pledges and the PT Petroleum transaction.

### 3.    Section 11

Plaintiffs argue that the heightened pleading standard under Rule 9(b) should not apply to their claims under Section 11 because they do not sound in fraud.  However, Plaintiffs support their Section 11 claims with the same knowing or reckless misrepresentations and/or omissions as their Exchange Act claims.  Where the "Securities Act and Exchange Act allegations are substantively identical, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity."  *In re Plains All Am. Pipeline II,* 307 F. Supp. 3d at 643 (citations omitted); *see*

*also Kurtzman v. Compaq Comp. Corp.*, 2002 WL 32442832 at *24 (S.D. Tex. Mar. 30, 2002); *Melder v Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir. 1994) (citations omitted).

This means that the Section 11 claims are analyzed and resolved here as to materiality in the same manner as the Exchange Act claims—and to the same conclusion. *See In re Plains All Am. Pipeline II,* 307 F. Supp. 3d at 618, 643–44 (citations omitted). And so, Plaintiff OLERS's claims under Section 11 against Defendants ProPetro, Redman, and Smith based on statements relating to the adequacy of ProPetro's internal and disclosure controls made in connection with the IPO will go forward. Plaintiffs' claims under Section 11 against Defendants ProPetro, Redman, and Smith outside the scope Defendants ProPetro, Redman, and Smith's representations about the adequacy of ProPetro's internal and disclosure controls in connection with the IPO will not go forward. Accordingly, Defendants' Motions to Dismiss are **GRANTED** in part.

### 4.      Section 15 Control-Person Claims

Plaintiffs bring control-person claims under Section 15 against Redman and Smith. (Doc. 81). The Complaint alleges Redman and Smith as CEO and CFO, respectively, made and signed false statements, had the power to control—and did control—ProPetro's activities alleged to be fraudulent. The Court finds that the control-person claims based on violations of Section 11 will go forward. *In re Netsolve, Inc. Sec. Litig.,* 185 F. Supp. 2d 684, 699 (W.D. Tex. 2001); *Griffin v. GK Intelligent Sys., Inc.,* 87 F. Supp. 2d 684, 689 (S.D. Tex. 1999) (defendants included vice president, chief financial officer and chief administrative officer "had actual power or influence over GK and the ability to control corporate policy").

## V.    POTENTIAL FOR REPLEADING

A district court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Fifth Circuit holds that this "evinces a bias in favor of granting leave to amend." *Carroll v. Fort James Corp*., 470 F3d 1171, 1175 (5th Cir. 2006) (citation omitted). But the decision whether to grant leave to amend is within the sound discretion of the district court.  *Pervasive Software Inc. v. Lexware GmbH & Co. KG,* 688 F3d 214, 232 (5th Cir. 2012) (citation omitted).  It may be denied "when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v. Chapman*, 969 F.3d 238, 248 (5th Cir. 2020).

The claims by Plaintiffs have not been subject to a prior motion to dismiss.  This warrants another opportunity to further amend the pleadings if desired.  Plaintiffs must bring any motion seeking such leave along with a specific draft proposal within fourteen (14) days of the date of this Order and any such amended complaint shall be limited to twenty (20) pages.

## VI.    CONCLUSION

The claims against Defendants ProPetro, Redman, Smith, Denholm, and Armour under Section 10(b) of the Exchange Act and Rule 10b-5 will proceed but are limited as follows:

Statements regarding the adequacy of ProPetro's internal and disclosure controls in relation to (i) improper expense reimbursements to Redman and Smith (limited to statements made prior to the IPO and secondary offerings), (ii) related-party transactions (limited to statements made prior to the IPO and secondary offerings), and (iii) Redman's pledging of ProPetro stock as collateral for personal loans.

Claims based on any statements outside the scope of the categories listed above will not go forward.  Specifically, the Court **GRANTS** Defendants' Motions to Dismiss under the Exchange Act in part with respect to any false statements relating to audit committee independence, PBEX, PT Petroleum, and the Clarabby Transactions, for the reasons stated

64

above.  However, nothing in this order shall prevent Plaintiffs from offering evidence of related-party transactions in support of Plaintiffs' live claims that Defendants made false statements regarding the adequacy of ProPetro's internal and disclosure controls.  Further, the Court **DENIES** Defendants' Motions to Dismiss under Section 20(a) of the Exchange Act.

As to the Securities Act claims, only Plaintiff Oklahoma Law Enforcement Retirement System ("OLERS") has standing to proceed on its claims under Section 11 of the Securities Act individually and on behalf of the proposed class.  Thus, Defendants' Motions to Dismiss are **GRANTED** in part as to the named Plaintiffs other than OLERS.

Further, Defendants' Motions to Dismiss are **GRANTED** in part as to the statute of repose barring Plaintiffs' claims under Section 11 relating to Redman's share pledges and the PT Petroleum transaction.

Plaintiff OLERS's claims against Defendants ProPetro, Redman, and Smith under Section 11 of the Securities Act will proceed but are limited as follows:

> Statements regarding the adequacy of ProPetro's internal and disclosure controls made in connection with the IPO.

Specifically, the Court **GRANTS** Defendants' Motions to Dismiss under the Securities Act in part with respect to any false statements relating to audit committee independence, PBEX, PT Petroleum, the Clarabby Transactions, and Redman's share pledges for the reasons stated above.  However, nothing in this order shall prevent Plaintiffs from offering evidence of related-party transactions in support of Plaintiff OLERS's live claims that Defendants made false statements regarding the adequacy of ProPetro's internal and disclosure controls in connection with the IPO.

It is therefore **ORDERED** that Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part.  (Docs. 89, 90, 91, 92, 93).

It is further **ORDERED** that the claims by Plaintiffs under Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5 against Defendants Smith, Armour, Redman, Denholm, ProPetro regarding the adequacy of ProPetro's internal and disclosure controls in relation to (i) improper expense reimbursements to Redman and Smith (limited to statements made prior to the IPO and secondary offerings), (ii) related-party transactions (limited to statements made prior to the IPO and secondary offerings), and (iii) Redman's pledging of ProPetro stock as collateral for personal loans will proceed.  Such claims against them regarding audit committee independence, PBEX, PT Petroleum, and the Clarabby Transactions are hereby **DISMISSED WITHOUT PREJUDICE**.

It is further **ORDERED** that the control-person claims under Section 20(a) of the Exchange Act against Redman, Smith, Denholm, and Armour will proceed.

It is further **ORDERED** that only Plaintiff Oklahoma Law Enforcement Retirement System's ("OLERS") claims individually and on behalf of the proposed class under Section 11 of the Securities Act against ProPetro, Redman and Smith regarding the adequacy of ProPetro's internal and disclosure controls made in connection with the IPO will proceed.  Such claims brought by any named Plaintiffs other than OLERS under Section 11 against Defendants shall be **DISMISSED WITHOUT PREJUDICE,** and such claims brought by OLERS individually and on behalf of the proposed class regarding audit committee independence, PBEX, PT Petroleum, the Clarabby Transactions, and Redman's share pledges are hereby **DISMISSED WITHOUT PREJUDICE**.

Plaintiffs may bring a motion seeking leave to amend along with a specific draft proposal limited to twenty (20) pages on or before fourteen (14) days from the date of this Order, if at all.

It is so **ORDERED**.

SIGNED this 13th day of September, 2021.

_____

DAVID COUNTS
UNITED STATES DISTRICT JUDGE