# EXHIBIT P

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE:<br><br>BofI HOLDING, INC. SECURITIES LITIGATION. | Case No. 3:15-cv-02324-GPC-KSC |

**EXPERT REPORT OF FRANK C. TORCHIO**

May 28, 2021

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF OPINIONS.................................................................... 1

II. QUALIFICATIONS AND COMPENSATION ........................................................................ 2

III. MATERIALS REVIEWED .......................................................................................... 4

IV. BACKGROUND.......................................................................................................... 4

V. CLASS-WIDE DAMAGES METHODOLOGY ...................................................................... 6

    A.  Overview ....................................................................................................... 6

    B.  Event Study Method – Statistical Analysis.......................................................... 8

    C.  Analysis of Information from Disclosures in Event Studies ................................... 16

        i)    Economic Correspondence ....................................................................... 16

        ii)   Direct and Foreseeable Consequences........................................................ 19

        iii)  Truth-on-the-Market ............................................................................... 20

        iv)  Confounding Information.......................................................................... 21

        v)    Length of Event Window ......................................................................... 23

    D.  Techniques Used in Calculating Artificial Inflation ............................................ 24

        i)    Methods of Calculating Artificial Inflation.................................................. 25

        ii)   Methods of Scaling Artificial Inflation ....................................................... 26

    E.  Damages Method for Options on BofI Common Stock ......................................... 28

        i)    Overview............................................................................................... 28

        ii)   Artificial Inflation - Call Options.............................................................. 29

        iii)  Artificial Deflation - Put Options.............................................................. 32

VI. HOW THE METHODOLOGY FOR CALCULATING CLASS-WIDE DAMAGES
      WOULD BE APPLIED IN THIS CASE ....................................................................... 33

## I. INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am the President of Forensic Economics, Inc. and have been retained by Lead Counsel Lieff Cabraser Heimann & Bernstein, LLP ("Counsel") in this Action.  For this report, I have been asked to opine whether damages for Class members in this Action are measurable on a class-wide basis under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  It is my understanding that Class members include individuals and entities who purchased or otherwise acquired the publicly traded common stock of BofI Holding, Inc. ("BofI" or the "Company") between September 4, 2013 and October 14, 2015, inclusive (the "Class Period"), as well as purchasers of BofI call options and sellers of BofI put options during the Class Period.[1,2]

2.       It is my understanding that the Class Period was subsequently modified from that in the Complaint of September 4, 2013 through February 3, 2016 to the time period September 4, 2013 through October 14, 2015 and that the Defendants have "agreed not to dispute market efficiency for purposes of opposing lead plaintiff's anticipated motion for class certification."[3]

---

[1] *See* Third Amended Class Action Complaint for Violations of the Federal Securities Laws, dated December 22, 2017 (the "Complaint"), ¶ 1.

[2] "Excluded from the Class are Defendants [], the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest." Complaint, ¶ 254.

[3] *See* Letter from Ms. Madalyn A. Macarr of Sheppard, Mullin, Richter & Hampton LLP addressed to Mr. Richard Heimann and Mr. Mike Sheen of Lieff Cabraser Heimann & Bernstein, LLP, dated March 10, 2021.

3. Based on my experience and expertise, in my opinion, damages under Section 10(b) of the Exchange Act caused by the alleged Class Period omissions and misrepresentations in this Action are measurable on a class-wide basis for both BofI common stock and options. For investors in BofI common stock, damages can be calculated using an out-of-pocket measure, which will reflect the artificial inflation (defined as the price less the true value) on the dates of purchase and sale of BofI shares, where the true value incorporates the information that was alleged to have been omitted or misrepresented.[4] Damages for investors in BofI options can also be calculated using an out-of-pocket measure. Because option prices are derived primarily based on the underlying stock price, the level of artificial inflation (deflation) in call (put) prices would be based on the levels of artificial inflation in BofI common stock.

4. I reserve the right to amend my conclusions to reflect new information made available to me in the discovery process, information provided by other experts in the litigation, future rulings from the Court in this Action, other rulings binding on this Court, or any motions and trial proceedings.

## II. QUALIFICATIONS AND COMPENSATION

5. I am the President of Forensic Economics, Inc., located in Rochester, New York. I founded Forensic Economics, Inc. in 1989. I have consulted on issues pertaining to financial valuations, regulatory economics, transfer pricing, financial-economic analysis, and analysis of the response of share prices to public information in securities fraud lawsuits for over 30 years.

---

[4] For damaged shares held through the end of the Class Period, the Private Securities Litigation Reform Act of 1995 ("PSLRA") places an upper limit on the maximum amount of recoverable damages, which is the difference between the purchase price paid and the mean trading price of the security for the 90-day period beginning on the day on which the information correcting the misrepresentations or omissions was fully disclosed. A rolling average mean price is used for sales made within the 90-day period.

2

Forensic Economics, Inc. historically has been retained by both plaintiffs and defendants in litigation matters.

6. I am also an Adjunct Professor and a former Executive Professor of finance at the Simon School of Business at the University of Rochester. My courses cover topics including market efficiency, event studies, damages in securities litigation, valuation of businesses and securities, and managerial economics.

7. I have testified at trials, arbitrations, and depositions in U.S. federal district courts, in state courts including the Delaware Court of Chancery, the United Kingdom, and in Switzerland. I have submitted expert reports in numerous securities litigation matters in the United States, Australia, and Canada.

8. I have co-authored an article with Professor Michael Barclay about trading models used for calculating damages in securities lawsuits. The article is published in *Duke University School of Law's Law and Contemporary Problems* (Volume 64, Spring-Summer 2001). I have authored a published article about the proper event study analysis in securities litigation, which was published in *The Journal of Corporation Law* (Volume 35:1, 2009). I have also co-authored a paper about the effect of size premiums from the lack of liquidity, which was published in the *Journal of Business Valuation and Economic Loss Analysis* (Volume 9:1, 2014), as well as a paper titled "Benchmarking Market Efficiency Indicators for Securities Litigation," which was published in the *University of Illinois Law Review Online* (Volume 96, 2020).

9. I hold an MBA in Finance and Economics (1982) from the University of Rochester's Simon Business School. I was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial economic theory. I have also been

awarded the Chartered Financial Analyst (CFA®) designation and am a member of the CFA Institute. My resume is attached as Exhibit 1.

10. My compensation is based on the number of hours worked on this assignment, as well as out-of-pocket expenses. My hourly rate is $600. To assist me, I used employees of Forensic Economics, Inc. who worked under my supervision and at my direction for this assignment. Forensic Economics, Inc.'s hourly rates for those employees range from $155 to $320.

### III. MATERIALS REVIEWED

11. In the course of my assignment in this Action, I have reviewed numerous documents. The attached Exhibit 2 is a comprehensive list of materials I considered in connection with this report. Specific documents and information relied upon in reaching my opinions are cited throughout this report.

### IV. BACKGROUND

12. BofI Holding, Inc., incorporated in 1999 in the State of Delaware, is the holding company for BofI Federal Bank.[5] During the Class Period, the Company described itself as:

> … a diversified financial services company [] that provides consumer and business banking products through its branchless, low-cost distribution channels and affinity partners. The Bank has deposit and loan customers nationwide including consumer and business checking, savings and time deposit accounts and financing for single family and multifamily residential properties, small- to- medium size businesses in target sectors, and selected specialty finance receivables. The Bank generates fee income from consumer and business products including fees from loans

---

[5] *See* BofI Form 10-K filed with the SEC on September 4, 2013, pp. 1, F-10.

originated for sale and transaction fees earned from processing payment activity.[6]

13. At the end of fiscal year 2013, 2014, and 2015, the Company had total assets of $3,090.8 million, $4,403.0 million, and $5,823.7 million, respectively; loans of $2,333.9 million, $3,668.2 million, and $5,031.9 million, respectively; mortgage-backed and other investment securities of $468.4 million, $470.6 million, and $396.7 million, respectively; total deposits of $2,092.0 million, $3,041.5 million, and $4,451.9 million, respectively; and borrowings of $705.6 million, $960.2 million, and $793.2 million, respectively.[7]

14. Throughout the Class Period, the Company's common stock was listed on the NASDAQ Global Select Market under the symbol "BOFI."[8] As of September 4, 2013, at the start of the Class Period, BofI had 13,785,062 shares of common stock outstanding, with a market capitalization of $891.2 million.[9] On October 14, 2015, at the end of the Class Period, BofI had 15,704,126 shares of common stock outstanding, with a market capitalization of $1.6 billion.[10] During the Class Period, the total trading volume was 124.0 million shares and the average daily volume was 232.7 thousand shares.[11]

---

[6] *See* BofI Form 10-K filed with the SEC on September 4, 2013, p. 1. A similar description is contained in BofI's Forms 10-K filed with the SEC on August 28, 2014, p. 1, and August 26, 2015, p. 1.

[7] The Company's fiscal year ended on June 30th. *See* BofI's Forms 10-K filed with the SEC on September 4, 2013, p. 1, August 28, 2014, p. 1, and August 26, 2015, p. 1.

[8] *See* BofI's Forms 10-K filed with the SEC on September 4, 2013, p. 20, August 28, 2014, p. 28, and August 26, 2015, p. 28.

[9] *See* BofI Form 10-K filed with the SEC on September 4, 2013, cover page. Market capitalization based on the September 4, 2013 closing price of $64.65 per share (source: Bloomberg).

[10] *See* BofI Form 10-Q filed with the SEC on October 29, 2015, p. 1. Market capitalization based on the October 14, 2015 closing price of $99.13 per share (source: Bloomberg).

[11] Source: Bloomberg.

## V. CLASS-WIDE DAMAGES METHODOLOGY

### A. Overview

15.     Damages under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are generally based on an out-of-pocket measure – the difference between the artificial inflation on the date of purchase and the artificial inflation on the date of sale.[12]  Artificial inflation is defined as the difference between the actual stock price and the "true value" of the stock on each day in a class period, where the true value of the stock is its value after accounting for the effect of the disclosure failures.  Damages experts routinely provide economic evidence to assist the court or jury in determining whether or not certain misrepresented information is material and the amount of losses caused when such information is revealed to the market.

16.     It is my understanding that, for Section 10(b) claims, plaintiffs are ultimately required to show a sufficient connection between the alleged misconduct and financial losses suffered by investors when the truth is revealed.   I refer to this as economic evidence of loss causation.  In general, losses that result from disclosure failures are manifested as this conduct is actually revealed through "curative" or "corrective" disclosures that eventually bring an alleged disclosure failure and/or its economic effects to light.

17.     I primarily rely on a technique called event study analysis (discussed below) as the basis of my opinions.  The focus of event studies in securities litigation is predominantly on disclosures that correct prior disclosure failures.  Negative price reactions from corrective

---

[12] Damages are also limited by the 90-day look-back provision of the PSLRA.  *See* footnote 4.

disclosures can provide economic evidence of materiality and loss causation.[13]  The stock price change caused by a corrective disclosure is generally the best estimate of the change in the amount of artificial inflation present in the security on the date of the disclosure because the corrective disclosure removes artificial inflation from the market price of the stock.

18.      In addition to analysis of the disclosures that correct prior disclosure failures, event study analysis can also be used in certain circumstances to examine the stock price reaction on the date of an "affirmative misstatement."  An affirmative misstatement is a statement containing misleading information for which such information was unanticipated or unexpected by the market.  Only in circumstances for which there are affirmative misstatements can an event study analysis for the disclosure day provide useful economic evidence.

19.      On the other hand, for a statement that omits material information, as opposed to an affirmative misstatement, it is widely recognized and understood that a researcher would <u>not</u> expect to observe a price reaction.  By definition, an omitted fact is not disclosed to the market.  An event study is designed to quantify the effect of <u>disclosed</u> information, not undisclosed information.[14]  Consequently, an event study is not used to assess disclosures that omit material information.[15]  While one would not expect a statement that omits material information to result

---

[13] Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590; and David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001.

[14] David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 3rd ed., ed. by Roman L. Weil, Michael Wagner, and Peter Frank, Wiley, 2001(emphasis added).

[15] Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), Fall 2009, 159-168.

in a positive price reaction, the omitted information, however, can still result in a significant negative price reaction when it is ultimately corrected. Therefore, omitted information can cause the price of a security to be artificially inflated.

## B. Event Study Method – Statistical Analysis

20. As a general proposition, modern finance theory holds that the market price of a common stock reflects the discounted value of expected future cash flows to the stockholder. In finance, the measure of annual profits used to compute a company's value is called cash flows or free cash flows. A company's annual cash flow is essentially its annual accounting earnings adjusted for the timing of the receipt of cash from sales and the timing of cash payments for the company's costs. Because accounting earnings are computed on an "accrual" basis, finance theory teaches that revenue and costs on an accrual basis should be converted to a cash basis before discounting to a present value.[16] Discounting future cash flows refers to the financial concept that a dollar received today is worth more than a dollar received next year. This is called the time value of money, which takes into account the "riskiness" of generating such cash flows. Thus, when computing a company's present value, future years' cash flow profits are discounted to today's dollars. This sum of future cash flows discounted to today's dollars is called a Discounted Cash Flow ("DCF") analysis. For example, if a company (with no debt or excess cash) has 10 million shares outstanding and its traded price is $15 per share, then the present value of the market expectation of future profits for that company is $150 million ($15 times 10 million).

---

[16] *See* Robert W. Holthausen and Mark E. Zmijewski, <u>Corporate Valuation: Theory, Evidence & Practice</u>, First Edition, Cambridge Business Publishers, 2014, p. 257.

21.     Valuation ratios (or valuation multiples) such as a price-earnings (P/E) ratio, are effectively one-period discounted cash flow analyses that reflect long-term growth in earnings/cash flow from the market.  A one-period DCF is sometimes referred to as the first year's cash flow divided by the capitalization rate, where the capitalization rate equals the difference between the discount rate and the long-term growth rate.  There is an intimate and mathematical connection between DCF analyses and market valuation multiples.[17]

22.     New information that causes the market to significantly alter its expectation of future cash flows will cause a prompt re-pricing of the security to reflect the new expectations.[18] Since the publication in 1969 of a classic paper by Fama, Fisher, Jensen, and Roll, financial economists have used the event study methodology as a tool to measure the effect on market prices of new information relevant to a company's equity valuation.[19]  New information may include, for example, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales, company press releases, ratings agency actions, and analyst reports.

23.     The event study methodology involves an empirical analysis that measures the effect of new information on the market prices of a company's publicly traded securities.  The metric used to measure the effect on a company's stock price from an event is called a "return," which is the percentage change in the market price of a company's shares over a specific time

---

[17] "Any market multiple can be converted into a capitalization rate and vice versa."  *See* Shannon P. Pratt, The Market Approach to Valuing Businesses, Second Edition, John Wiley & Sons, Inc., 2005, p. 23.

[18] *See* Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617; Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23(1), Spring 1985, 336-350.

[19] *See* Eugene F. Fama, Lawrence Fisher, Michael C. Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10(1), February 1969, 1-21.

period such as one trading day.  When new information about the company is disclosed to the

market, a "market model" is used to determine the component of the security return that would

have been expected based on the return predicted by the market model, *i.e.*, from the movement

in the market index and, possibly, an industry index.[20]  The remaining component of the security

return (that which cannot be explained by the return predicted by the market model) is known as

the "excess return" or "abnormal return."

24.     Market models are empirical models that follow the theoretical Capital Asset

Pricing Model ("CAPM") explained in finance literature.[21]  The inference from the CAPM is that

the returns for a given stock are correlated with the returns of the general market.  The sensitivity

of the returns for a given stock to the general market is referred to as the stock's "beta," which I

discuss more fully below.

25.     Thus, a market model describes the normal relation between the return on the

company's security and the return on a broad-based market index, such as the S&P 500 Index or

the Nasdaq Composite Index, and possibly an industry index of stocks of companies that are

similar to the company of interest or an index of stocks of companies from which the company

of interest derives its revenues.  The indexes that are used in a market model are also called

"independent variables."[22]  Once a disclosure has been identified as a potential event related to

the wrongdoing, an event study analysis can measure the company-specific component of the

---

[20] An industry index is generally composed of companies similar to the subject company and it is used to account for additional movements in the industry above and beyond those in the general market to ensure that the price movements analyzed are company specific.  More than one industry index can be included in the market model.

[21] *See*, for example, G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158.

[22] A "variable" is a mathematical term that refers to a quantity that may change within the context of a mathematical problem.

return on that event date.[23]  The company-specific component is the excess return discussed above, which I explain more fully below.

26.    A market model is derived from linear regression analysis.[24]  The company's return is regressed against the returns of the market index and industry index(es) (if applicable) to estimate the historical relation (the "betas") between the index variables and the company returns.[25]  In essence, the indexes in the market model can "explain" or account for some measurable portion of the company's total return.  This is done to isolate the share price movements that result from company-specific factors.

27.    **Figure 1** below shows graphically an example of a market model regression using the S&P 500 Index as the independent variable.  The red line is a result of a regression analysis. The red line in **Figure 1** represents the predicted returns of the company.  It shows the relationship, or beta, between the daily movement in the share price and that for the general market.

---

[23] *See* David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001, 19.2-3.

[24] *See* John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, The Econometrics of Financi al Markets, Princeton University Press, 1997, p. 155.  "A **regression line** is a straight line that describes how a response variable $y$ changes as an explanatory variable $x$ changes.  We often use a regression line to **predict** the value of $y$ for a given value of $x$."  *See* David S. Moore and George P. McCabe, Introduction to the Practice of Statistics, 4th ed., W. H. Freeman and Company, 2003, p. 135 (emphasis in original).

[25] The return on an industry index is generally measured "net-of-market" to minimize the effects of a statistical phenomenon called multicollinearity, in which two or more independent variables in a multiple regression model are highly correlated.  Net-of-market means that the return on the market index is subtracted from the return on the industry index before running the regression.

**FIGURE 1: ILLUSTRATION OF A MARKET MODEL REGRESSION**



28.     The regression analysis is represented by the generalized equation:

$$\text{Company Return} = \alpha + \beta \cdot \text{Market Return}.$$

29.     The slope of the regression line is the beta ($\beta$). The market beta or slope of the regression line indicates the expected return caused by a 1% change in the market return. The $\alpha$ is the constant term or intercept of the equation. It represents the value of the regression line where the market return is zero. It is called an intercept because it is the value where the regression line crosses or intercepts the Company Returns axis.

30.     The predicted return represents an estimate of a company's return based on the return for the market (and possibly industry) index on a given day. For example, if a company's returns regressed against the market returns yields a regression with an intercept of 0.01% and a

12

market beta of 1.20, the expected or predicted return for this company when there is a 2% increase in the market index is 2.41% (= 0.01% + [1.20 * 2.0%]).

31. For a market model with an industry index, predicted returns are equal to the intercept term from the regression plus: (i) the market beta multiplied by the return on the market; and (ii) the net-of-market industry beta multiplied by the net-of-market return on the industry.[26]

32. After calculating predicted returns, excess returns are calculated on each day by subtracting the predicted return from the company's return on each day. This represents the company-specific portion of the return on a given day.

33. Event studies also assess the probability that an excess return was the result of new information disclosed in an event, and not due to random price movements (*i.e.*, due to chance).

34. A statistically significant excess return at significance level (α) of 5% means that the excess return could be due to chance only 5% of the time. A statistically significant excess return at a significance level of 1% means that the excess return could be due to chance only 1% of the time. Significance levels in statistics are closely related to confidence intervals. For instance, a 5% significance level is equivalent to a 95% confidence interval and a 1% significance level is equivalent to 99% confidence interval (a confidence interval "C" equals 1 – α).[27]

---

[26] Additional variables can be utilized if the analyst deems it necessary.

[27] *See* David S. Moore and George P. McCabe, <u>Introduction to the Practice of Statistics</u>, 4th ed., W. H. Freeman and Company, 2003, pp. 442-452.

13

35.     The statistical significance for each daily excess return is measured by the t-statistic, which is calculated as a day's excess return divided by the standard error of the regression:

t-statistic = Excess Return ÷ Standard Error of Regression.

36.     The standard error is the measure of normal volatility, which is one of the parameters obtained from the regression for a market model.

37.     A t-statistic greater than 1.96 in absolute value (either positive or negative) means that the excess return is significant at the 5% significance level; a t-statistic greater than 2.58 in absolute value means that the excess return is significant at the 1% significance level.  As is common in financial economics research, I use the 5% level of significance for my analyses and consider excess returns with a t-statistic greater than 1.96 in absolute value as statistically significant.

38.     Statistical significance can also be depicted graphically.  In **Figure 1** above, the dashed green lines represent 1.96 times the standard error of the regression away from the regression line.  The red diamonds indicate excess returns that are statistically significant because they are outside of the dashed lines.  This means that those excess returns have t-statistics greater than 1.96 (in absolute value).

39.     Not every news item is expected to generate a statistically significant return.  For example, if a news story, analyst report, or company disclosure only repeats information that was already fully known or merely confirms investors' current expectations, no price reaction in the security would be expected.  A news story, analyst report, or company disclosure will cause a statistically significant return only when the information is new and unexpected, and when the information materially changes the value of the security to investors.  Similarly, and as discussed

14

above, a disclosure that omits such material information would not be expected to change the price of the security.

40. Event studies are most useful in determining the effects of new information on security prices under the following conditions: (i) there are well-defined public disclosures or announcements; (ii) the time that the news items reach the market is known; (iii) there is no reason to believe that the market anticipated the news items; and (iv) it is possible to isolate the effect of the news items from market, industry, and other issuer-specific factors simultaneously affecting the issuer's security prices.[28]

41. To summarize, the measurement of the effect on market prices of new information relevant to a company's equity valuation involves the following well-defined steps:

a) A market model is estimated to permit the removal of market and possibly industry-wide effects from the day-to-day security returns;

b) The market model is used to calculate predicted returns for the issuer's security;

c) The predicted returns are then subtracted from the issuer's actual returns to calculate excess returns, which are the price movements in the issuer's security, net of market and possibly industry-wide effects; and

d) On the day or days on which significant new information is disclosed to the market, the excess returns are used to quantify the effects of those disclosures on the market price of the security.[29]

---

[28] *See* David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001, 19.2.

[29] *See* David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001, 19.2-3.

**C.  Analysis of Information from Disclosures in Event Studies**

42.     The first step in performing this part of the event study analysis is to identify disclosures that informed market investors of the alleged misconduct and its direct and foreseeable economic effects.  Then the results of the statistical analysis discussed above are used to determine whether the identified disclosures resulted in statistically significant stock price declines and to quantify the per-share losses caused by the revelation of alleged disclosure failures.

43.     There are several important factors, which I discuss below, that should be considered when identifying which disclosures are relevant in securities litigation.

*i)*        *Economic Correspondence*

44.     As discussed above, in general, losses that result from disclosure failures are manifested as this conduct is revealed through the release of "curative" or "corrective" information that eventually brings the alleged disclosure failure and/or its economic effects to light.  If the new information disclosed has sufficient economic correspondence or equivalence to the information alleged to have been previously misrepresented and/or omitted, then the information is said to "correct," to some degree, the previous misrepresentation and/or omission.[30]

45.     Corrective information can emanate from issuers or from various other sources, including securities analysts, rating agencies, news media, regulators, whistleblowers, and activist shareholders.[31]  The market will generally react quickly to the release of new important

---

[30] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924, at 894.

[31] This is consistent with court decisions in securities class action matters.  *See, e.g.,* *Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) ("Sometimes defendants reveal their own fraud via a 'corrective disclosure,' *i.e.*, a

information. To measure the full effect of a disclosure of complex information will often require the inclusion of subsequent, related or follow-on disclosures, such as reports or statements by expert analysts and additional media reports.[32]

46. I refer to economic correspondence as the extent to which disclosures of economic information connect or correspond to the alleged misrepresentations (misstated or omitted information) or the reasonably foreseeable economic consequences of those misrepresentations and other activities that together constitute the alleged disclosure failure. Thus, economic correspondence means that the economic content and substance of the information disclosed accords with economic content and substance and the foreseeable economic effects of the alleged misrepresentations and related misconduct.

47. In securities litigation, it is rare to encounter language in a corrective disclosure that is identical to the language describing the alleged misrepresentations.[33] A cursory

---

statement that reveals what the defendants themselves previously concealed. But such admissions can be hard to come by, and courts have otherwise held that revelations can come from many sources, including whistleblowers, analysts, and newspaper reports."); *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("A corrective disclosure can come from any source, and can 'take any form from which the market can absorb [the information] and react,' Matthew L. Fry, Pleading and Proving Loss Causation in Fraud-on-the-Market-Based Securities Suits Post-*Dura Pharmaceuticals*, 36 Sec. Reg. L.J. 31, 64-71 (2008), so long as it 'reveal[s] to the market the falsity' of the prior misstatements. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n. 4 (2d Cir. 2005).")

[32] This is consistent with court decisions in securities class action matters. *See, e.g.*, *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("Nor does the corrective disclosure have to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures. *Lormand*, 565 F.3d at 261. 'Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud from a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.' *In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*, No. MDL-1446, 2005 U.S. Dist. LEXIS 41240, 2005 WL 3504860 at *16 (S.D. Tex. 2005) (citations omitted).").

[33] This is consistent with court decisions in securities class action matters. *See, e.g., In re*

17

comparison of the language in a corrective disclosure to that in a statement of claim may suggest that the corrective disclosure "over-corrects" (or sometimes "under-corrects") the disclosure failures.

48.     Whether the information in a disclosure over-corrects or under-corrects, however, cannot be determined by merely comparing a literal reading of the language from a corrective disclosure with the language describing the misrepresentations in a complaint.  Rather, the answer requires an analysis of how investors, analysts, the media, and others translate the language of a disclosure into financial consequences for the company.  That is, it requires consideration as to how the market processes information from a disclosure and forms a consensus of the consequences from that disclosure.

49.     More precisely, a corrective disclosure can be an over-correction if part of corrective disclosure contains material negative information related to the misrepresentations but is not alleged to have been misrepresented.  For example, consider a company that failed to disclose but was required to disclose $2 billion write-down of its assets.  Also assume that the corrective disclosure announced that the company would take a $2.5 billion write-down of its assets.  Although the corrective disclosure reveals a write-down, the magnitude of the write-down exceeds that which could have been disclosed earlier in the class period.

---

*Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company"); *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) ("This Circuit has previously observed that the standard of 'relevance' in an evidentiary context is not a steep or difficult one to satisfy.  *Lormand*, 565 F.3d at 256 n.20.  The test for 'relevant truth' simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true.").

50.     There are also examples in which there is an under-correction, that is the market never learns of the full degree of misrepresentations in the corrective disclosures.

### ii)     *Direct and Foreseeable Consequences*

51.     Direct and foreseeable consequences, as I apply the term in an economic context, refer to whether the ultimate effects or consequences of the alleged misrepresentations from a corrective disclosure would have been reasonably anticipated or predictable from the given counterfactuals.  The literature discusses the concept of foreseeability within the fundamentals of loss causation for financial expert witnesses.[34]  There are some judges' opinions that allude to acceptance of foreseeability regarding consequential damages as a basis for losses from disclosure failures.[35]

52.     One common example of foreseeable consequences in securities litigation concerns the loss of management credibility or integrity because of disclosure failures.[36] Generally, top managers in publicly traded corporations are sophisticated and knowledgeable. Therefore, top managers could and would anticipate that if they fail to disclose important and relevant information to investors (for example, by overstating their firm's performance in its

---

[34] *See* Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," <u>Litigation Services Handbook: The Role of the Financial Expert</u>, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, p. 3.4.

[35] *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1361 (8th Cir. 1977); *DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442, 1449 (9th Cir. 1996); and *The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017, 1030 (9th Cir. 1999).

[36] Some argue that damages should not include any stock losses attributable to a diminution in management credibility that results from the disclosure failures.  This view is based principally on a legal theory that a stock loss from diminished management credibility, even if directly caused by the disclosure failures, is a form of "collateral damage" and that collateral damages should not be included in a damage award to harmed shareholders.  *See* Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review*, 2009, 199-242; Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747.

financial statements) and the disclosure failure is later discovered, the market could well reduce the firm's stock price because of perceived lack of credibility associated with the disclosure failure in addition to the direct effect from the true financial information hidden by the disclosure failure. That is, the revelation that management withheld information, when discovered, can have significant negative effects on the stock in excess of <u>the direct effect</u> from the revelation of previously undisclosed information itself.

53. In my view, this approach is appropriate and proper to answer the question of what losses were caused by the disclosure failures in securities cases.

### iii) Truth-on-the-Market

54. "Truth-on-the-market" means that the information identified in a specific disclosure that corrects the alleged misrepresentations has already been previously disclosed and, therefore, is already in the total mix of publicly available information and incorporated in the company's market price.[37] If the information that corrects the misrepresentations and/or omissions has already been disclosed so that the market price has already adjusted to this news, then the same news cannot later cause any stock-price changes, all else held equal.

55. An economic analysis of truth-on-the-market requires that "new" information must be analyzed, not only with regard to the specific language and economic content of a disclosure, but the analyst must also be cognizant of the relevant context of the disclosure.[38] The economic context is comprised of the relevant facts and circumstances that surround the

---

[37] Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38, November 1982, 1-20.

[38] Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365, at 348-349.

disclosure, which allows the researcher to determine the likely interpretation of the disclosure by the market.

56.     For example, a disclosure by a securities analyst speculating that there will be a takeover of Company A by Company B may contain similar language as a subsequent announcement made by Company A itself two days later when it officially announces the acquisition.  The fact that the company made the second announcement, however, may allow the market to place significantly more weight on the same news content.  Thus, despite the prior disclosure by the securities analyst, the market price would still react to the company's disclosure made two days later.  Therefore, it would be incorrect to conclude that the securities analyst's disclosure constituted truth-on-the-market regarding the subsequent takeover announcement.  While the content of the two disclosures may be similar, the economic context is certainly not.

57.     Similarly, if a company previously disclosed that its financial results may be adversely affected by declining commodity prices but misleads the market regarding the true extent of its financial exposure to declining commodity prices, then it may be incorrect to conclude that the prior disclosure of potential risk exposure constitutes truth-on-the-market.  The misstatement can still cause the stock price to be artificially inflated (or deflated).

58.     Therefore, economic analysis of truth-on-the-market requires an analysis of the content, context, and source of disclosures so the researcher may correctly determine the interpretation of the disclosure made by the market.

### iv)     *Confounding Information*

59.     Confounding information refers to other information that affects the valuation of a stock that enters the market in the event window and is unrelated to the alleged disclosure failure

or its foreseeable economic consequences. Such news can have a simultaneous, "confounding" effect on the stock's price.

60. It is important to understand that the multi-factor market model is designed to account for and "net out" from the subject company's stock returns the effects of simultaneous movements in the market and the industry indices, so that the excess return should be largely free of any confounding macro-economic and industry-specific news on that day. This presumes, however, that the company's disclosure did not substantially affect the prices of firms in the industry. If the company's disclosure was of such import that it affected the prices for firms in its industry, then the industry return should not be used to compute a predicted return for that event. To do so would artificially mask the true effect of the information on the company's price. This is sometimes referred to as a "contagion" effect.

61. If the analyst believes that confounding information outside of market-wide and industry-specific influences may still be present, there are several analyses that may shed light on the potential magnitude of any confounding firm-specific information.

62. First, one should attempt to determine whether or not the confounding information is sufficiently material, *i.e.*, whether it would be expected to significantly change the security's price when it is disclosed. If it is found to be immaterial, then such confounding information should not affect the conclusion. Often, the analyst can analyze contemporaneous commentary by analysts and the media to help gauge the importance to investors of the information related to the disclosure failure relative to the potentially confounding information. Sometimes the confounding information has economic implications that can be potentially measured or quantified independently of the subject company's stock returns.

22

63.    Second, one should determine if the confounding information was previously disclosed in full or in part to the investing public.  If it has already been disclosed and fully incorporated into the stock price, then such confounding information is unlikely to have caused any stock-price changes measured on the day of the corrective disclosure.

64.    Third, if confounding information is disclosed at a different time of day than the corrective disclosure, intraday price movements can sometimes be used to differentiate the price responses to each piece of information.

65.    Fourth, financial analysis such as discounted cash flow or price-earnings ratio analyses can be used to differentiate the price responses to each piece of information.

66.    Although this is not meant to be an exhaustive list, the aforementioned techniques include some of the ways researchers can attempt to deal with confounding news.  If confounding news is present and material, then the researcher must attempt to exclude the effect of the confounding news so that it is not included in the quantification of investor losses and artificial inflation.

### v)    *Length of Event Window*

67.    The length of the event window used to measure the full effect on the stock price of new information is often an important consideration.  It is common to use windows of one or two days depending on the information that is being disclosed.  But a window of more than two days can also be appropriate in certain circumstances.  The determination of the appropriate length of an event window is dependent on case-specific circumstances such as the complexity of the disclosure, the extent of its distribution and dissemination among the investing public, whether or not the defendants are denying or otherwise influencing the market's interpretations of the event, as well as the degree to which additional information from securities analysts and other commentators is forthcoming in subsequent hours or days.

23

68.     If a particular material disclosure continues to generate analyst commentary and additional news stories beyond the first event day and the excess returns are statistically significant in active trading, then the analyst should consider lengthening the event window to include the effects of this continued market response.  Otherwise, improperly excluding a day with a significant negative excess return can understate damages, and improperly excluding a day with a significant positive excess return can overstate damages.

**D.  Techniques Used in Calculating Artificial Inflation**

69.     Artificial inflation is defined as the difference between the actual stock price and the "true value" of the stock on each day in a class period, where the true value of the stock is its value after accounting for the effect of the disclosure failures.  In general, losses per share caused by disclosures of alleged misrepresentations and omissions are translated into artificial inflation per share for each day of a class period.  Thus, artificial inflation is generally computed by first starting with the losses measured from the declines in the stock price over the event window used for each identified corrective disclosure, which generally occur toward the end of a class period. As discussed previously, corrective disclosures are relevant disclosures that reveal or partially reveal the disclosure failures to the market.  Artificial inflation for each day is then determined by working backward from the dates of the measured losses from identified corrective disclosures to the beginning of the class period.[39]

---

[39] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, June 1990, 883-924; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002; David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004; David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007.

### i) *Methods of Calculating Artificial Inflation*

70.     There are several different ways or methods to translate the computed losses per share into a computation of artificial inflation per share.  Among the commonly used methods are the "constant dollar" (sometimes called the "constant ribbon") method and the "constant percentage" method.[40]

71.     Under a constant dollar method, the "dollar per share" measure of losses from each correction of a disclosure failure is applied to all days preceding that corrective disclosure. This approach is better understood by the following example.

72.      Assume that the class period is one year ending December 30, 2007.  Further assume that there are two corrective disclosures – one impacting the market price on December 14, 2007 and the other impacting the market price on December 31, 2007.  The loss per share as measured by the excess price decline on December 14, 2007 is $2.00, and on December 31, 2007 the loss per share is $5.00.  Starting from the end of the class period and working backward, the artificial inflation is $5.00 per share until December 14, 2007 when the artificial inflation becomes $7.00 per share (or the sum of $2.00 and $5.00) on days prior to December 14, 2007. The economic logic is that just before December 14, 2007, all the inflation, as measured by the total losses of $7.00 per share, is still in the stock price.  After the December 14, 2007 disclosure, the market price now reflects that $2.00 (of the total $7.00 artificial inflation) has come out of the stock price and hence inflation goes from $7.00 to $5.00 starting on December 14, 2007. Starting on December 31, 2007, the inflation is zero because the remaining $5.00 of inflation has now come out of the stock price.

---

[40] *See, e.g.*, David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002.

73.     Using the constant dollar approach, and continuing to work backward from December 14, 2007, artificial inflation will equal a constant $7.00 per share on each day going back to January 1, 2007, the first day of the class period.

74.     The constant percentage method is similar but instead of using the dollar losses, it uses the measured losses as a <u>percentage</u> of the price before a corrective disclosure.  This percentage is multiplied by the prices on each day in the class period that precedes the date of the corrective disclosure.  Under the constant percentage method, the dollar amount of artificial inflation will generally change on a daily basis with the changes in the stock price.  For circumstances in which the stock price is generally declining prior to a corrective disclosure, the constant percentage approach will yield higher artificial inflation than the constant dollar method.

75.     The choice between the constant dollar method and the constant percentage method is dependent on case-specific factors relating to the disclosure failure but, based on the 2005 U.S. Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, artificial inflation from the percentage method cannot exceed the cumulative amount of dollar per share declines over the corrective disclosures (*i.e.*, cannot exceed the constant dollar artificial inflation measure) in computing Section 10(b) damages.[41]

### ii)     *Methods of Scaling Artificial Inflation*

76.     There can be circumstances for which it is appropriate and necessary to adjust the artificial inflation that is measured by share losses from the corrective disclosures. This can

---

[41] *Dura Pharm. v. Broudo*, 544 U.S. 336 125 S. Ct. (2005).  The *Williams* decision ruled that the use of the percentage approach violated *Dura* because it resulted in artificial inflation that exceeded the per share losses caused when the misrepresentations were corrected. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

occur when economic conditions are substantially different at the time of the corrective disclosures relative to the economic conditions that existed during a class period, or if the financial impact of the wrongdoing became greater over time.[42] In such circumstances, inflation can be scaled by some reasonable parameter to better reflect the economic reality.

77. Scaling methods for artificial inflation generally start with the same dollar losses used for the constant dollar approach (or constant percentage) but then those measured losses are scaled or indexed to a selected economic or accounting variable. Examples of scaling using accounting variables can be seen in cases involving earnings overstatements in which the amount of overstated retained earnings increase over the class period. In these situations, inflation can be scaled to the amount of overstated retained earnings.[43] Examples of scaling using economic variables include changing expectations about the likelihood of outcomes as in the case of misrepresentations concerning a possible merger. In these situations, inflation can be scaled to the probabilities of such an outcome at various times during the relevant period.

78. One can also scale artificial inflation to economic variables such as industry metrics or bond yields to reflect changes in the broader economy.[44] Scaling inflation is designed to provide a reasonable and objective approach to account for factors that may have affected the degree of inflation during a class period.

---

[42] *See* Nicolas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in Litigation Services Handbook: The Role of the Financial Expert, Fifth Edition, ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Wiley, 2012, 24.13.

[43] *See*, for example, *In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327 (N.D. Cal. 1997), and *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 256 (D.N.J. 2000).

[44] Declaration of Frank C. Torchio for Settlement Purposes, *In re Countrywide Fin. Corp. Sec. Litig.*, Lead Case No. CV 07-05295 MRP (MANx) (C.D. Cal. June 29, 2010).

27

### E.  Damages Method for Options on BofI Common Stock

### i)        *Overview*

79.        Options are a type of "derivative" financial security whose value is dependent on the value of another financial security or asset, such as BofI common stock.  There were both call and put options available on BofI common stock throughout the Class Period.  Call options give the holder the right, but not the obligation, to purchase the underlying security at a specified price (the "exercise price" or "strike price") on or before a specified date (the "expiration date").  Put options give the holder the right, but not the obligation, to sell the underlying security at a specified price on or before a specified date.

80.        At expiration, the value of an option is the difference between the underlying security's price ("$S$") and the option's exercise price ("$X$").  This difference is called the "intrinsic value" of an option.  For a call option, the intrinsic value is equal to $S - X$, but not less than zero.  For example, a call option with $X=\$50$ will be worth $10 at expiration if the stock is trading at $60 (the stock valued at $60 can be purchased for $50), and worth $0 if the stock is trading at or below $50.  Because the option holder does not have an obligation to exercise her option, the value of an option cannot decline below zero.  For a put option, the intrinsic value is equal to $X - S$, but not less than zero.  For example, a put option with X=$50 will be worth $10 at expiration if the stock is trading at $40 (the stock valued at $40 can be sold for $50), and worth $0 if the stock is trading at or above $50.

81.        Because a call option gives the buyer the right to buy a share of stock at a fixed price, call option prices generally increase when the share price increases, all other things equal.  Thus, if BofI common stock was artificially inflated, call options on these securities would likely be artificially inflated as well.  Artificial inflation in call option prices will cause purchasers of call options to be damaged by an amount equal to the difference between the artificial inflation in

the call option price at the time of purchase and the amount of artificial inflation in the call option price when they close out their position.[45]

82.     Because a put option gives the seller the right to sell a share of stock at a fixed price, put option prices generally decrease when the share price increases, all other things being equal.  Thus, if BofI common stock was artificially inflated, put options on these securities would likely be artificially deflated.  Artificial deflation in put option prices will cause sellers of put options to be damaged by an amount equal to the difference between the artificial deflation in the put option price at the time of sale and the amount of artificial deflation in the put option price when they close out their position.[46]

83.     Generally, options that expire before a corrective disclosure are not considered to be damaged.

### ii)     *Artificial Inflation - Call Options*

84.     The daily artificial inflation in the call options on BofI common stock would be a function of the daily artificial inflation in the common stock itself.  For each day in the Class Period, the artificial inflation in each call option on BofI common stock would be calculated as the difference between the actual option price and a "true value" of the option calculated using an option pricing model, such as the Black-Scholes option pricing model.

85.     Options can be priced using the widely accepted Black-Scholes formula.  The Black-Scholes option pricing model is taught universally and is ubiquitous in financial practice.

---

[45] Option purchasers and sellers generally close out their positions by taking an off-setting position prior to expiration or through option exercise at expiration if the option is in the money at expiration (if an option is out of the money at expiration, it has no intrinsic value).

[46] For simplicity of exposition, I will sometimes refer to the "artificial inflation" in BofI common stock call and put options.  When this term is applied to put options, it should be interpreted as artificial deflation.

Indeed, the Black-Scholes option pricing model or its variants are the most common model for valuing options of all types. Numerous empirical studies attest to its reliability, and courts have accepted options valuations based on the Black-Scholes option pricing model.[47] The formula was developed by Fischer Black and Myron Scholes in the early 1970s.[48] The Black-Scholes pricing formula uses risk neutral valuation to create a portfolio that mimics an option's expected payoff, and thus enables a mathematically rigorous pricing of an option.[49] The Black-Scholes formula, adjusted for dividends is:[50]

$$c = Se^{-qt}N(d_1) - Xe^{-rt}N(d_2)$$
$$and$$
$$p = Xe^{-rt}N(-d_2) - Se^{-qt}N(-d_1)$$

$$where,$$
$$d_1 = \frac{ln(S/X) + (r - q + \sigma^2/2)T}{\sigma\sqrt{T}}$$
$$and$$
$$d_2 = d_1 - \sigma\sqrt{T}$$

and: $c$ = the price of a call option;
$p$ = the price of a put option;
$S$ = the current stock price underlying the option;
$\sigma$ = the volatility of the underlying stock;
$X$ = the exercise price of the option;
$T$ = the time to expiration of the option (in years);
$q$ = the dividend yield on the underlying stock;

---

[47] *See, e.g.*, Opinion Denying Attorney's Fees and Expenses, *Oscar Wyatt, et al., v. El Paso Corp., et al.*, United States District Court, Southern District of Texas, Civil Action H-02-2717; and Declaration of Frank C. Torchio dated February 13, 2007.

[48] *See* Fisher Black and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81(3), May-June 1973, 637-54. Myron Scholes, along with Robert Merton, were awarded Nobel Prizes for their work in developing option pricing models. Unfortunately, Fischer Black had passed away when the Nobel Prizes were awarded.

[49] Richard Merton adjusted the original Black-Scholes model to accommodate dividend paying stocks. *See* Robert C. Merton, "Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4(1), Spring 1973, 141-83; J. C. Hull, Options, Futures, and Other Derivatives, Sixth Edition, Prentice Hall: New Jersey, 2006, pp. 314-315.

[50] I note that BofI did not distribute any dividends during the Class Period. Therefore, the dividend term in the Black-Scholes formula would be set to zero.

30

$r$ = the risk-free interest rate; and
$N$ denotes the cumulative probability density function for a standardized normal distribution.

86.     To calculate the true value Black-Scholes option price, I would replace the actual stock price with the true value of the stock that I would compute with the methods described above.

87.     In addition, I would calculate the excess option price declines that were associated with the revelation of the alleged fraud, which can be used as a limit to the damages recoverable to call option buyers under *Dura*.[51]  To calculate the excess price decline over a disclosure, I would compare the option's price the day prior to the disclosure to an estimated option price using the Black-Scholes formula.  The inputs in the Black-Scholes model are as described above, but for each price movement over a disclosure, I would replace the actual stock price with a new stock price that is the actual stock price on the prior date less (assuming a price decline) the excess price change in the stock due to the disclosure.  This would effectively yield an option price that would have occurred due to any partial corrective disclosure of the alleged fraud on the disclosure date.  The difference between this option price and the actual option price on the prior day is the "excess" price decline in the option due to the correction of the alleged fraud (this will be an excess price increase, if the alleged fraud caused a stock price increase on the date being measured).  Damages could thus be limited by the cumulative excess price declines over which the call option was held.

---

[51] Some have argued that the U.S. Supreme Court decision in *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 125 S. Ct. (2005) caps the amount of per share damages to the dollar drop in the stock that was caused by the revelation of fraud.  For example, *see* D. Tabak, "Inflation and Damages in a Post-*Dura* World," NERA working paper, September 25, 2007.

### iii)   *Artificial Deflation - Put Options*

88.     The daily artificial deflation in BofI put options would be based on the daily artificial inflation in the common stock itself.  For each day during the Class Period, the artificial deflation in each put option on BofI common stock would be calculated as the difference between the actual option price and the true value of the option calculated using the Black-Scholes option pricing model.  The inputs in the Black-Scholes model are as described above, but I would replace the actual stock price with the stock price minus the amount of artificial inflation.

89.     In addition, I would calculate the excess option price increases that were associated with the revelation of the alleged fraud, which can be used as a limit to the damages recoverable to the option writer under *Dura*.  To calculate the excess price increase over a disclosure, I would compare the option's price the day prior to the disclosure to an estimated option price using the Black-Scholes formula.  The inputs in the Black-Scholes model are as described above, but for each price movement over a disclosure, I would replace the actual stock price with a new stock price that is the actual stock price on the prior date less (assuming a price decline) the excess price change in the stock due to the disclosure.  This would effectively yield an option price that would have occurred due to any partial corrective disclosure of the alleged fraud.  The difference between this option price and the actual option price on the prior day is the "excess" price increase in the option due to the alleged fraud (this will be an excess price decrease if the alleged fraud caused a stock price increase on the date being measured).  Damages could thus be limited by the cumulative excess price increases over which the put option was held.

## VI. HOW THE METHODOLOGY FOR CALCULATING CLASS-WIDE DAMAGES WOULD BE APPLIED IN THIS CASE

90. If a class is certified by the court, I could, if requested, calculate damages on a class-wide basis by applying the principles and methodologies discussed in Section V above.

91. A primary aspect of that analysis would be analyzing Defendants' alleged misstatements and omissions as well as any public disclosures that ultimately apprised the market of facts that were previously misstated or concealed.

92. According to the Complaint, "… Defendants' representations portraying BofI as a careful, prudent institution masked a troubled entity that resorted to high-risk lending practices and disregarding internal controls to fraudulently boost its loan volume and earnings."[52]

93. It is my understanding that the district court ruled at the pleading stage that Plaintiff sufficiently alleged Defendants knowingly or recklessly made false or misleading statements regarding BofI's loan underwriting standards as well as its internal controls and compliance infrastructure. I further understand the Ninth Circuit Court of Appeals upheld those determinations.[53]

94. Plaintiff alleges the revelations in the Erhart Complaint corrected previous false or misleading public statements by Defendants.[54] The Ninth Circuit held that Mr. Erhart's allegations, "if true, render BofI's prior assertions about the strength of its underwriting standards, internal controls, and compliance infrastructure false or misleading."[55]

---

[52] Complaint, ¶ 8.

[53] *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) ("*BofI*, 977 F.3d") ("We agree with the district court that the shareholders have adequately alleged falsity and scienter with respect to misstatements concerning BofI's underwriting standards, internal controls, and compliance infrastructure.").

[54] *See, e.g.*, Complaint, ¶¶ 124-126.

[55] *BofI*, 977 F.3d at 791 (footnote omitted).

33

95.     Consistent with Plaintiff's allegations and the Ninth Circuit's opinion, I would construct a market model and conduct an event study analysis of the single corrective disclosure in this case (the Erhart Complaint and associated news coverage) to determine whether, given the information previously in the market (including Defendants' representations cited in Plaintiff's Complaint), Mr. Erhart's allegations in fact apprised the market of previously undisclosed new material information, and would calculate inflation per share during the Class Period, as well as class-wide damages per share (assuming Plaintiff will prevail on liability at trial).

96.     That event study would be used to determine:

a)  whether the disclosures made by Mr. Erhart, and as disseminated through contemporaneous news sources, corrected prior statements by Defendants by providing credence to the speculation that the abnormally high growth of BofI may be because it had relaxed underwriting standards and failed to adhere to its represented internal controls;

b)  whether the content, context, and source of the information of the Erhart Complaint resulted in the market placing significantly greater weight on the veracity of the alleged wrongful conduct than what was in the mix of information in the market prior to that disclosure;

c)  whether there was any material information in the Erhart disclosure that was not a foreseeable consequence of counterfactual information that corrects the misrepresentations;

d)  the amount by which each share of BofI stock was inflated during the Class Period as a result of those misstatements or omissions; and

e)  the amount of class-wide damages based on the per-share inflation figure.

97.     It is my opinion that such an analysis applying the principles and methodologies discussed in Section V above can be done reliably for BofI.

I certify that, to the best of my knowledge and belief:

–   the statements of fact contained in this Report are true and correct;

–   the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions;

–   I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

–   I have made all the inquiries that I believe are desirable and appropriate and that no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court; and

–   my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this Report.


_May 28, 2021_
Date

Frank C. Torchio

35

**Exhibit 1**                                                          May 2021

### FRANK C. TORCHIO, CFA

| Business Address: | School Address: | Home Address: |
|---|---|---|
| Forensic Economics, Inc. | Simon Business School | 68 Knollwood Drive |
| 95 Allens Creek Road | University of Rochester | Rochester, NY 14618 |
| Building 2, Suite 303 | Carol Simon Hall | (585) 249-9455 |
| Rochester, NY 14618 | Rochester, NY 14627 | |
| (585) 385-7440 | | |
| frank@forensiceconomics.com | frank.torchio@simon.rochester.edu | |

### Employment and Education

9/97-present   **Simon Business School**, University of Rochester, Rochester, NY.  Adjunct Professor and Former Executive Professor of Finance.

8/89-present   **Forensic Economics, Inc.** (incorporated in 1993), Rochester, NY. President.  Consulting in financial valuations and financial-economic analysis in securities litigation and business disputes.

6/82-8/89   **Rochester Gas and Electric Corporation**, Rochester, NY.

6/88-8/89   Vice President for Utilicom, an RG&E venture subsidiary.

4/87-6/88   Economist - Strategic Planning Department.

6/82-3/87   Financial Analyst - Treasury Department.

9/80-12/81   **M.B.A., Economics and Finance**, Simon Business School, University of Rochester, Rochester, NY.

9/78-8/80   **Insurance Services Office**, New York, NY. Statistician - Commercial Lines.

9/74-5/78   **B.A., Mathematics**, Niagara University, Niagara Falls, NY.

### Publications

"Benchmarking Market Efficiency Indicators for Securities Litigation," with Bharat Bhole and Sunita Surana, 2020 *University of Illinois Law Review Online* 96, May 4, 2020.

"Effect of Liquidity on Size Premium and its Implications for Financial Valuations," with Sunita Surana, *The Journal of Business Valuation and Economic Loss Analysis*, Vol. 9, Issue 1, Jan 2014.

"Event Study Analysis in Securities Litigation and the Bonferroni Correction," Working Paper, 2010.

"Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law*, 35:1, 2009, pp.159-168.

"The Circularity of Life in Securities Class Actions," Working Paper, 2008.

"A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," with Michael Barclay, *Law and Contemporary Problems: Complex Litigation at the Millennium*, Vol. 64, Nos. 2 & 3, Spring/Summer 2001.

"University of Rochester's Endowment Fund Review," with Gregg A. Jarrell, University of Rochester Simon School Working Paper, 11/93.

"The Longer-Term Relation Between Accounting Performance and Stock Returns," with Gregg A. Jarrell, Working Paper - Bradley Policy Research Center, 8/92.

"Calculating Proper Transfer Prices," with Gregg A. Jarrell, *Public Utilities Fortnightly*, 1/1/91.

"Proper Transfer Pricing Aids Success," with Gregg A. Jarrell, *Rochester Business Journal*, 7/30/90.

## Awards

Awarded the Chartered Financial Analyst (CFA)[®] designation by the CFA Institute (2002).

William E. Simon Graduate School of Business Administration Alumni Service Award (1992).

The Richard L. Rosenthal Fellowship at the University of Rochester (1991).

## Activities

Presenter on Class Actions – Expert Event Study Evidence in Shareholder Class Actions at Judicial Education Seminar, Adelaide, Australia, March 23, 2018.

Speaker and Panelist on Damages at DRRT's 9th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 6, 2017.

Speaker and Panelist on Damages at DRRT's 8th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 1, 2016.

Panelist on the Market Efficiency segment of the 2015 Winter Bench and Bar Conference (Feb. 14-21, 2015) sponsored by the *Federal Bar Council*.

Participant at Roundtable Discussion at Duke University Law School composed of 30 judges, academics, practitioners, and policy makers designed to examine the future landscape of

2

corporate and securities law private and public enforcement in the aftermath of recent U.S. Supreme Court and Delaware decisions, September 26, 2014.

Presenter for "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court" for Institute for Law & Economic Policy, April 4, 2014.

Panelist for "Fraud on the Market" for the Federal Bar Council, February 25, 2014.

Speaker at 1st DRRT Conference on securities class actions around the world for institutional investors, Oct. 28-29, 2013

Chairperson and speaker on Transfer Pricing Economics at the International Institute of Manufacturing.

Former adjunct faculty for economics and finance at Rochester Institute of Technology Graduate School of Business.

Member of the National Association of Forensic Economics.

Volunteer for entertaining at nursing homes and senior citizen communities to raise funds for the American Cancer Society.

## **Expert Testimony (Last Four Years)**

Expert Reply Report of Frank C. Torchio in re: Howard Green, et al. v. Canadian Imperial Bank of Commerce, et al., in Ontario Superior Court of Justice, Court File No: CV-08-359335 (May 21, 2021).

Expert Report of Frank C. Torchio in re: Howard Green, et al. v. Canadian Imperial Bank of Commerce, et al., in Ontario Superior Court of Justice, Court File No: CV-08-359335 (October 6, 2020).

Expert Report of Frank C. Torchio in Allianz Global Investors, et al. v. Toshiba Corporation in the Tokyo District Court, Civil Affairs 8, No. 2016 (Wa) No. 20446 Damages Claim Case (August 27, 2020).

Joint Report of Share Price Inflation/Valuation Experts in Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (June 19, 2020).

Expert Report of Frank C. Torchio in Excel Texel Pty LTD V. Quintis LTD in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD1983/2017 (June 12, 2020).

Expert Response Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (April 16, 2020).

Expert Response Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (December 19, 2019).

Trial Testimony of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (September 19-20, 2019).

Deposition of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (August 23, 2019).

Expert Reply Report of Frank C. Torchio in <u>Tajdin Abdulla v. Canadian Solar Inc., Shawn Xiaohua Qu, and Arthur Chien</u> in the Superior Court of Justice, Ontario, Canada, Court File No. C-710-10 (August 19, 2019).

Joint Report of the Economic Experts in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (August 4, 2019).

Joint Report of the Economic Experts in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (July 26, 2019).

Expert Report of Frank C. Torchio in <u>Clime Capital Limited v. UGL Pty Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID 1390/2017 (June 28, 2019).

Expert Report of Frank C. Torchio in <u>Daniel Kleeberg, Lisa Stein, and Aubrey Hays v. Lester Eber, Alexbay, LLC f/k/a Lester Eber, LLC., Elliot W. Gumaer, Wendy Eber, et al.</u> in the United States District Court for the Southern District of New York, Civil Action No. 16-CV-9517(LAK) (KDP) (June 28, 2019).

Expert Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (June 23, 2019).

Expert Report of Frank C. Torchio in <u>Tajdin Abdulla v. Canadian Solar Inc., Shawn Xiaohua Qu, and Arthur Chien</u> in the Superior Court of Justice, Ontario, Canada, Court File No. C-710-10 (May 27, 2019).

Deposition of Frank C. Torchio in <u>Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al.</u> in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (March 20, 2019).

Expert Rebuttal Report of Frank C. Torchio in <u>Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al.</u> in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (March 1, 2019).

Expert Report of Frank C. Torchio in <u>Clime Capital Limited v. UGL Pty Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID 1390/2017 (February 5, 2019).

Expert Response Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (January 31, 2019).

Expert Report of Frank C. Torchio in <u>Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al.</u> in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (December 21, 2018).

Expert Response Report of Frank C. Torchio in <u>Inabu Pty Ltd as trustee for Alidas Superannuation Fund CIMIC Group Limited</u> in Federal Court of Australia, Australian Capital Territory District Registry, General Division, Case No. ACD 93 of 2016 (November 28, 2018).

Expert Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (October 31, 2018).

Expert Supplemental Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (October 18, 2018).

Expert Report of Frank C. Torchio in <u>Inabu Pty Ltd as trustee for Alidas Superannuation Fund CIMIC Group Limited</u> in Federal Court of Australia, Australian Capital Territory District Registry, General Division, Case No. ACD 93 of 2016 (June 29, 2018).

Expert Report of Frank C. Torchio in <u>David Scott Hopkins (As Trustee of the David Hopkins Super Fund) v. Macmahon Holdings Limited</u> in Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1346 of 2015 (April 6, 2018).

Expert Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (April 2, 2018).

Expert Report of Frank C. Torchio in <u>Findlay & Anor v DSHE Holdings Limited & Ors</u> in the Supreme Court of New South Wales, Equity Division, Case No. 2017/294069 (February 27, 2018).

Trial Testimony of Frank C. Torchio in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (December 21, 2017).

Statement of Opinions By Mr Torchio and Dr Unni in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (October 6, 2017).

Expert Report of Frank C. Torchio in <u>Isabel Newson v. OnX USA, LLC, et al.</u> in the United States District Court, District of New Jersey (Newark Vicinage), Civil Action No. 3:16-CV-0276-MAS-DEA (August 14, 2017).

Expert Report of Frank C. Torchio in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (June 22, 2017).

Testimony of Frank C. Torchio at hearing in <u>Deka Investment Gmbh v. Santander Consumer USA Holdings Inc.</u> in the United States District Court, Northern District of Texas, Dallas Division, Case No. 3:15-CV-2129-K (May 31, 2017).

6

**Exhibit 2**
**Materials Reviewed**

Third Amended Class Action Complaint for Violations of the Federal Securities Laws, dated December 22, 2017.

Letter from Ms. Madalyn A. Macarr of Sheppard, Mullin, Richter & Hampton LLP addressed to Mr. Richard Heimann and Mr. Mike Sheen of Lieff Cabraser Heimann & Bernstein, LLP, dated March 10, 2021.

BofI SEC filings.

Daily reported composite volume and prices for BofI common stock (Bloomberg ticker "AX US") for the period January 2011 – December 2015. Source: Bloomberg.

Daily index levels for the S&P 500 Total Return Index (Bloomberg identifier "SPTR"), the Nasdaq Composite Total Return Index (Bloomberg identifier "XCMP") and commercially available industry indexes in the financial and banking industry for the period January 2011 – December 2015. Source: Bloomberg.

Daily data on options on BofI common stock for the period September 2013 – October 2015. Source: Cboe Exchange, Inc., Cboe DataShop.

Shares outstanding for BofI common stock for the period September 2013 – October 2015. Source: SEC filings.

News stories regarding BofI during the period September 2013 – October 2015. Sources: Bloomberg and Factiva.

Analyst reports/list of reports regarding BofI during the period September 2013 – October 2015. Sources: Counsel, Thomson Eikon and Capital IQ electronic databases.

Private Securities Litigation Reform Act of 1995.

**Academic literature, treatises, or articles relied on:**

Fisher Black and Myron Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81(3), May-June 1973, 637-54.

John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, The Econometrics of Financial Markets, Princeton University Press, 1997.

Lucy Chang, "The Truth-on-the-Market Defense and its Relevance in SEC Enforcement Actions," *Law and Contemporary Problems* 76(3/4), 2013, 341-365.

Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37, 1990, 883-924.

Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3, 2009, 717-747.

Nicolas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in Litigation Services Handbook: The Role of the Financial Expert,

**Exhibit 2**
**Materials Reviewed**

Fifth Edition, ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Wiley, 2012.

Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review* 2009(2), 2009, 199-242.

Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617.

Eugene F. Fama, Lawrence Fisher, Michael C. Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10(1), February 1969, 1-21.

Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38(1), November 1982, 1-20.

Robert W. Holthausen and Mark E. Zmijewski, Corporate Valuation: Theory, Evidence & Practice, First Edition, Cambridge Business Publishers, 2014.

J. C. Hull, Options, Futures, and Other Derivatives, Sixth Edition, Prentice Hall: New Jersey, 2006.

Robert Jennings and Laura Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23(1), Spring 1985, 336-350.

Joshi, Madrid, Mulholland, "Causation Issues and Expert Testimony, The Fundamentals of Causation," Litigation Services Handbook: The Role of the Financial Expert, 5th Ed., ed. by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman.

Robert C. Merton, "Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4(1), Spring 1973, 141-83.

Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, February 1994, 545-590.

David S. Moore and George P. McCabe, Introduction to the Practice of Statistics, 4th ed., W. H. Freeman and Company, 2003.

Shannon P. Pratt, The Market Approach to Valuing Businesses, Second Edition, John Wiley & Sons, Inc., 2005.

G. William Schwert, "Using Financial Data to Measure Effects of Regulation," *The Journal of Law and Economics* 24(1), 1981, 121-158.

David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA White Paper, May 2004.

David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA White Paper, September 2007.

David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, 3rd ed., ed. by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Wiley, 2001.

David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA White Paper, July 2002.

Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), 2009, 159-168.

**Exhibit 2**
**Materials Reviewed**

<u>**Court opinions and reports:**</u>

    *DCD Programs v. Michael W. Leighton, et al.*, 90 F.3d 1442 (9th Cir. 1996).

    *Dura Pharm. v. Broudo*, 544 U.S. 336 125 S. Ct. (2005).

    *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357 (8th Cir. 1977).

    *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020).

    *In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327 (N.D. Cal. 1997).

    *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000).

    Declaration of Frank C. Torchio for Settlement Purposes, *In re Countrywide Fin. Corp. Sec. Litig.*, Lead Case No. CV 07-05295 MRP (MANx) (C.D. Cal. June 29, 2010).

    *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

    *In re Williams Securities Litigation - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).

    *Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687 (6th Cir. 2017).

    Opinion Denying Attorney's Fees and Expenses, *Oscar Wyatt, et al., v. El Paso Corp., et al.*, United States District Court, Southern District of Texas, Civil Action H-02-2717; and Declaration of Frank C. Torchio dated February 13, 2007.

    *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014).

    *The Ambassador Hotel Company, Ltd. v. Wei-Chuan Investment, et al.*, 189 F. 3d 1017 (9th Cir. 1999).

All other materials cited in the text of the Report.