**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| NYKREDIT PORTEFØLJE ADMINISTRATION A/S, OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, OKLAHOMA CITY EMPLOYEE RETIREMENT SYSTEM, POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on behalf of all others similarly situated, | § § § § § § § § § § § | No. MO:19-CV-217-DC |
| *Plaintiffs,* | § § § | |
| v. | § § | |
| PROPETRO HOLDING CORP., DALE REDMAN, JEFFREY SMITH, IAN DENHOLM, and SPENCER D. ARMOUR III, | § § § § | |
| *Defendants.* | § § § § § § § | |

**JOINT DECLARATION OF JAMES A. HARROD AND DANIEL L. BERGER
IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S
MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND AWARDS TO
<u>PLAINTIFFS</u>**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     PROSECUTION OF THE ACTION ................................................................................ 6

        A.      Background of Plaintiffs' Allegations .................................................................. 6

        B.      Appointment of Lead Plaintiffs and Lead Counsel............................................. 12

        C.      Lead Plaintiffs' Investigation, Preparation and Filing of the Complaint.............. 12

        D.      Defendants' Motion to Dismiss the Complaint, the Court's Ruling, and
                Defendants' Motion to Strike.............................................................................. 14

        E.      Plaintiffs Pursue Discovery.................................................................................. 18

        F.      Plaintiffs' Motion for Class Certification ............................................................ 19

        G.      The Parties' Mediation and Settlement................................................................ 20

III.    RISKS OF CONTINUED LITIGATION ........................................................................ 21

        A.      General Risks in Prosecuting Securities Class Actions ....................................... 21

        B.      Specific Risks Concerning This Action............................................................... 23

                1.      Risks Concerning Liability .......................................................................... 23

                        (a)     Falsity............................................................................................. 23

                        (b)     Scienter .......................................................................................... 24

                        (c)     Loss Causation and Damages ........................................................ 25

                2.      Risks Associated with Class Certification ................................................. 27

                3.      Risks Concerning Appeals.......................................................................... 28

IV.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT
        OF THE POTENTIAL RECOVERY IN THE ACTION ............................................... 30

V.      ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE SETTLEMENT
        CLASS AND THE REACTION OF THE SETTLEMENT CLASS TO DATE ............. 31

VI.     PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ............ 33

i

VII.    THE FEE AND LITIGATION EXPENSE APPLICATION ........................................... 38

      A.    The Fee Application.................................................................................... 38

            1.    Plaintiffs Have Authorized and Support the Fee Application .................. 39

            2.    The Time and Labor Devoted to the Action by Lead Counsel ................. 40

            3.    The Experience and Standing of Lead Counsel ....................................... 41

            4.    The Standing and Caliber of Defendants' Counsel .................................. 42

            5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ........... 42

            6.    The Reaction of the Settlement Class to the Fee Application ................. 44

      B.    The Litigation Expense Application ...................................................... 44

VIII.    CONCLUSION.................................................................................................. 49

JAMES A. HARROD and DANIEL L. BERGER declare as follows:

## I.   <u>INTRODUCTION</u>

1.      I, James A. Harrod, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the Second, Third, Sixth, and Seventh Circuits.  I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), one of the Court-appointed Lead Counsel in the above-captioned action (the "Action").  BLB&G represents one of the Court-appointed Lead Plaintiffs, Nykredit Portefølje Administration A/S ("Nykredit"), and plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit Police & Fire").

2.      I, Daniel L. Berger, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the First, Second, Third, Sixth, Seventh, Ninth, and Eleventh Circuits.  I am a director in the law firm of Grant & Eisenhofer P.A. ("G&E"), one of the Court-appointed Lead Counsel in the Action.  G&E represents Court-appointed Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, Oklahoma Police Pension and Retirement System, and Oklahoma City Employee Retirement System (collectively, the "Oklahoma Funds").  Nykredit and the Oklahoma Funds are collectively referred to herein as "Lead Plaintiffs" and, together with Detroit Police & Fire, as "Plaintiffs."  BLB&G and G&E are collectively referred to as "Lead Counsel."

3.      We have personal knowledge of the matters stated in this declaration based on our active supervision of and participation in the prosecution and settlement of the Action.  We respectfully submit this declaration in support of Plaintiffs' motion, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action with Defendants ProPetro Holding Corp. ("ProPetro" or the "Company"), Dale Redman, Jeffrey Smith,

Ian Denholm, and Spencer D. Armour III (collectively, "Defendants") for $30 million in cash (the "Settlement").  The Court preliminarily approved the Settlement in its Order dated September 27, 2022, and set April 11, 2023 as the date for the hearing on final approval of the Settlement.  *See* Doc. 169.

4.      We also respectfully submit this declaration in support of: (i) Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion for an award of attorneys' fees in the amount of 20% of the Settlement Fund for all Plaintiff's Counsel; payment of litigation expenses incurred by Plaintiffs' Counsel in the amount of $486,411.27; and payment of $39,816.50 in reimbursement for the costs of Plaintiffs directly related to their representation of the Settlement Class (the "Fee and Expense Application").[1]

5.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $30 million for the benefit of the Settlement Class.  This beneficial Settlement was achieved as a direct result of Plaintiffs' and Lead Counsel's efforts to diligently investigate, prosecute, and negotiate a settlement of the Action against highly skilled opposing counsel.  As discussed in more detail below, Lead Counsel's efforts in the Action included, among other things: (a) conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including performing an extensive review and analysis of public filings, transcripts of ProPetro's earnings calls and industry conferences, Company presentations, media reports, and financial analyst research reports concerning the

---

[1] In conjunction with this declaration, Plaintiffs and Lead Counsel are submitting Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion") and the Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards (the "Fee Motion").

Company, conducting numerous interviews with former ProPetro employees, and consulting with experts regarding the issues of loss causation and damages; (b) researching and preparing three detailed amended complaints, culminating in the filing of the Third Amended Class Action Complaint for Violations of the Federal Securities Laws on July 30, 2020 (Doc. 81) (the "Complaint"); (c) fully briefing Plaintiffs' opposition to Defendants' motion to dismiss the Complaint; (d) litigating a contested motion for class certification, including preparing an expert report and conducting related discovery; (e) conducting substantial merits discovery, which included preparing and responding to document requests and interrogatories, and serving subpoenas on 20 non-parties, and resulted in Defendants and third parties producing a total of over 350,000 pages of documents to Plaintiffs; (f) engaging in intensive, arm's-length settlement negotiations with Defendants, including preparing and submitting detailed mediation statements concerning liability and damages and participating in two full-day mediation sessions with Robert A. Meyer, Esq. of JAMS, an experienced mediator of class actions and other complex litigation; and (g) drafting and negotiating the Stipulation[2] and related settlement documentation.

6.    The Settlement was ultimately reached based on a mediator's proposal from Mr. Meyer, which the Parties considered on a double-blind basis.

7.    Plaintiffs and Lead Counsel believe that the proposed $30 million Settlement represents a very favorable result for the Settlement Class, considering the significant risks in the Action and the amount of the potential recovery.  While Plaintiffs and Lead Counsel believe their

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated September 22, 2022, between Plaintiffs and Defendants.  Doc. 168-1.

claims against Defendants are meritorious, they also recognize that, in the absence of settlement, they faced significant risks, including that continued litigation might have resulted in no recovery.

8.      The close attention paid and oversight provided by Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case.  H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.  Here, Plaintiffs were actively involved in overseeing the litigation and settlement negotiations and have endorsed the Settlement as fair and reasonable. *See* Declaration of Andreas Thielemann Wagner, Senior Legal Counsel of Nykredit Portefølje Administration A/S ("Wagner Decl."), attached as Exhibit 1; Declaration of Chase Rankin, Executive Director of Oklahoma Firefighters Pension and Retirement System ("Rankin Decl."), attached as Exhibit 2; Declaration of Duane Michael, Executive Director of Oklahoma Law Enforcement Retirement System ("Michael Decl."), attached as Exhibit 3; Declaration of Ginger Sigler, Executive Director of Oklahoma Police Pension and Retirement System ("Sigler Decl."), attached as Exhibit 4; Declaration of Regina Story, Retirement System Manager of Oklahoma City Employee Retirement System ("Story Decl."), attached as Exhibit 5; and Declaration of Kelly Tapper, Assistant Executive Director of Police and Fire Retirement System of the City of Detroit ("Tapper Decl."), attached as Exhibit 6.

9.      In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  The Plan of Allocation, which was developed in consultation with Plaintiffs' damages consultant, provides for the distribution of the

Net Settlement Fund on a *pro rata* basis to Settlement Class Members who submit Claim Forms that are approved for payment by the Court. Each Claimant's share of the Net Settlement Fund will be calculated based on his, her, or its losses attributable to the misconduct alleged in the Complaint.

10. Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Lead Counsel prosecuted this case on a fully contingent basis, incurred significant litigation expenses, and bore all the risk of an unfavorable result. For their efforts in prosecuting the case and negotiating the Settlement, Lead Counsel are applying for an award of attorneys' fees in the amount of 20% of the Settlement Fund (or $6,000,000, plus interest earned at the same rate as the Settlement Amount) for all Plaintiffs' Counsel.[3] The 20% fee request is based on the most restrictive of the applicable retainer agreements that Lead Counsel entered into with Plaintiffs at the outset of the Action. Moreover, as discussed in the Fee Motion, the 20% fee request is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries. The requested fee represents a multiplier of approximately 0.9 on the lodestar for Plaintiffs' Counsel's attorneys, which is well within the range of multipliers typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the requested fee.

11. Lead Counsel's Fee and Expense Application also seeks payment of litigation expenses incurred by Lead Counsel in connection with the institution, prosecution, and settlement

---

[3] Plaintiffs' Counsel include Lead Counsel BLB&G and G&E and Martin & Drought, P.C., liaison counsel for Plaintiffs and the Settlement Class; and Clark Hill PLC, additional counsel for Detroit Police & Fire.

of the Action totaling $496,411.27, plus reimbursement of $39,816.50 to Plaintiffs for their costs directly related to their representation of the Settlement Class, as authorized by the PSLRA.

12.     For all of the reasons discussed in this declaration and in the accompanying memoranda and declarations, including the result obtained and the significant litigation risks discussed fully below, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e)(2).  For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background of Plaintiffs' Allegations

13.     ProPetro is a Midland, Texas-based corporation that provides hydraulic fracturing and complementary services through its "pressure pumping" division to upstream oil and gas companies engaged in the exploration and production of North American unconventional oil and natural gas resources.  This securities class action asserts claims on behalf of all persons and entities who (a) purchased, or otherwise acquired ProPetro common stock on the open market during the period from March 17, 2017 to March 13, 2020, both dates inclusive (the "Class Period"), and were damaged thereby; or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering (the "Settlement Class").[4]

---

[4] Excluded from the Settlement Class are Defendants, any person who was an executive officer or director of ProPetro during the Class Period, their Immediate Family members, any affiliates of ProPetro, and any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

14.     This case principally concerns Defendants' alleged misrepresentations that ProPetro had adequate controls to ensure that all relevant relationships, executive compensation, policy compliance, and related-party transactions were disclosed to investors.  Plaintiffs alleged that rather than maintaining and adhering to adequate internal controls, Defendants continually flouted ProPetro's controls, engaged in undisclosed self-dealing and related-party transactions, and ProPetro's former Chief Executive Officer, Dale Redman, violated ProPetro's Code of Conduct by pledging his ProPetro stock as collateral for a personal loan.

15.     On March 16, 2017, ProPetro disclosed it would conduct an initial public offering of 25,000,000 shares of its common stock at $14 per share  (the "Initial Public Offering" or "IPO"). Complaint ¶ 42.  Defendants touted ProPetro's full utilization of its hydraulic fracturing fleets and emphasized the importance of its client and supply chain relationships to the value and success of the Company.  *Id*. ¶¶ 52-59.  Because Defendants touted ProPetro's longstanding customer relationships as critical to the Company's success, analysts also attributed ProPetro's success to management's close ties to ProPetro's customers and suppliers.  *Id*. ¶¶ 56-60.

16.     To mitigate the risk posed by self-dealing and related-party transactions arising from management's close relationships with ProPetro's customers and suppliers, the Company was required to adhere to statutes, regulations, and industry standards—including Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), Section 404 of SOX, Items 307, 308, and 404 of SEC Regulation S-K, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") framework, and Accounting Standards Codification ("ASC") 850, among others.  The Company was also required to devise and maintain disclosure controls to ensure that, to the extent any such material transactions occurred, they would be promptly disclosed.  *Id.* ¶¶ 62-82. Throughout the Class Period, Defendants represented that they had effective internal controls to

7

detect and disclose related-party transactions and detect self-dealing, and Defendants represented that all material information was disclosed to investors. *Id*. ¶¶ 83-86.

17.    In connection with the ProPetro's IPO, Defendant Redman entered into a "lock-up agreement" whereby he agreed not to "offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of shares of Stock of the Company" during the 180 days following the IPO (the "IPO Lock-Up Agreement"). *Id*. ¶ 45. In January 2017, just prior to the IPO, Defendant Redman entered into a pledge agreement covering all of the ProPetro stock he owned at the time and pledging it as collateral for a personal mortgage to acquire real estate. *Id*. ¶ 104. On July 19, 2018, Defendant Redman pledged at least 230,000 ProPetro shares in connection with a second personal real estate transaction. *Id.* ¶¶ 106, 125. Both pledges were undisclosed to investors and violated the IPO Lock-Up Agreement as well as the Company's Code of Ethics.

18.    Additionally, throughout the Class Period, ProPetro was a party to several agreements and transactions involving businesses owned or controlled by Defendant Redman and/or members of ProPetro's senior management. These relationships and transactions included, among others: ProPetro's leasing of its offices from PD Properties, a business owned by Defendant Redman; ProPetro renting equipment from South Midkiff Partners LLC, a business owned by Defendants Redman and Smith that charged ProPetro $420,000 in rent per year; ProPetro's purchase of $10.3 million of "frac sand" from Covia Holdings Corp., a mine located on the property of Red Hogg LLC, a company in which Defendant Redman is a 44% owner; ProPetro providing services valued at over $55 million to PT Petroleum, a company for which Defendant Armour served as president; and numerous other related-party transactions with undisclosed entities owned or controlled by members of ProPetro's senior management, including Clarabby

Development, LLC, FloCap Injection Services, LLC, PBEX, LLC, Ener-Coil LLC, Border Materials, LLC, Lore Venture Group LLC, and others. *Id.* ¶¶ 122-27.

19.     Subsequent to the IPO, ProPetro conducted two secondary public offerings of its common stock, filing registration statements with the SEC on November 2, 2017 and May 10, 2018 for offerings of 10 million shares ("2017 Secondary Offering") and 12 million shares ("2018 Secondary Offering"), respectively. *Id.* ¶¶ 132-35. In connection with the 2017 Secondary Offering and 2018 Secondary Offering, Defendant Redman and ProPetro's other executives agreed to and represented they would not sell, "dispose of or hedge" any ProPetro common stock for 90 and 60 days, respectively. *Id*. ¶ 138.

20.     On August 8, 2019, ProPetro delayed its second quarter 2019 quarterly filing and earnings call and disclosed that the Audit Committee of its Board of Directors (the "Audit Committee") had commenced an investigation into the adequacy of its internal and disclosure controls, related-party transactions, and potential conflicts of interest (the "Audit Committee Investigation"). *Id*. ¶¶ 145, 147. ProPetro further disclosed that the Audit Committee's investigation was ongoing, that it had uncovered several improper transactions involving Defendants Smith and Redman dating back to at least the IPO, and that management "is likely to conclude that [there are] certain internal control deficiencies, rising to a level of material weakness." *Id*. ¶¶ 149-50. ProPetro's stock price fell 26% on the date of that announcement. *Id*. ¶ 153. ProPetro's stock price fell another 9.2% when, just two weeks after the disclosure of the Audit Committee Investigation, ProPetro's General Counsel and Corporate Secretary Mark Howell announced his resignation. *Id*. ¶¶ 160-61.

21.     After the market closed on October 9, 2019, ProPetro announced it had substantially completed the Audit Committee Investigation but was continuing to review one or

9

more related party transactions not involving any current or former customers or vendors. *Id*. ¶ 164. The Company disclosed that the investigation "identified a number of internal control deficiencies" and that management was "likely to conclude there were one or more material weaknesses" in the Company's internal financial and disclosure controls. *Id*. ¶ 165. Further, as part of a "Remediation and Improvement Plan," the Company announced certain management changes which included appointing Phillip A. Gobe as ProPetro's Executive Chairman and principal executive officer, removing Defendant Redman from the role of "principal executive officer," removing Defendant Smith from the position of Chief Financial Officer to a newly-created position of Chief Administrative Officer, appointing Darin G. Holderness as interim Chief Financial Officer, and announcing the resignation of Defendant Denholm, ProPetro's Chief Accounting Officer. *Id.* ¶¶ 167-68. Defendant Denholm's separation agreement with ProPetro provided that he would assist the Company with respect to investigating certain of the Company's transactions involving Clarabby Development, LLC, Clarabby Holdings, LLC, Conquistador Capital, LLC, and Dahlia Development, LLC. *Id.* ¶ 169.

22.    On October 18, 2019, Reuters reported that the SEC had commenced an investigation into ProPetro's internal financial controls and disclosures. *Id*. ¶ 174. On the same day, the Company's stock price fell 8.1%. *Id*. ¶ 175. On October 31, 2019, the Company's stock price fell another 9.36% after Culpeper Research issued a report containing details regarding several undisclosed companies that appeared to be controlled by Defendants, suggested there was more conduct to disclose than the Audit Committee Investigation had appeared to uncover, and reported that Clarabby Development had sold ProPetro at least two properties in 2018—transactions that were not previously disclosed. *Id*. ¶¶ 179-84. ProPetro later confirmed on November 13, 2019 that, despite previously representing that the Audit Committee had completed

10

the fact finding for its investigation, the Audit Committee Investigation had identified a related-party transaction involving Defendant Denholm that was not previously disclosed. *Id.* ¶ 187. In this disclosure, ProPetro also reported that there were several material weaknesses in the Company's internal controls over financial reporting and disclosure controls and that "management has concluded that at least one of these material weaknesses existed as of December 31, 2018." *Id.* ¶ 190.

23.    On March 16, 2020, ProPetro filed a Form 8-K revealing that Defendant Redman was resigning from his position as Chief Executive Officer and from the Board of Directors, effective immediately, and Defendant Smith was being demoted from Chief Administrative Officer to a position as "Special Advisor to the Chief Executive Officer." *Id.* ¶¶ 194-96. Additionally, the Form 8-K reported that Defendant Redman, on at least two occasions, entered into pledge agreements covering his ProPetro stock as collateral for personal loans in violation off the Company's Code of Ethics, Insider Trading Compliance Policy, several underwriting agreements, and the IPO Lock-Up Agreement. *Id.* ¶ 197. In response to this news, ProPetro's stock price fell 33.5%. *Id.* ¶ 199.

24.    After the Class Period, on June 22, 2020, ProPetro filed its Form 10-K for the fiscal year ending December 31, 2019 which detailed the final results of the Audit Committee Investigation. *Id.* ¶ 204. The Company identified several material weaknesses in its internal controls over financial reporting and disclosure controls and concluded that "senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company." *Id.* ¶¶ 204-08. Further, the Company concluded that the "failure to maintain appropriate tone at the top had a pervasive impact, and as such, resulted in a risk that could have impacted virtually all financial statement account balances

11

and disclosures." *Id*. The Company also confirmed ProPetro "did not maintain controls designed to sufficiently identify, evaluate, and disclose related party transactions." *Id*. ¶ 211.

**B.      Appointment of Lead Plaintiffs and Lead Counsel**

25.      On September 16, 2019 an initial complaint against ProPetro, Dale Redman, and Jeffrey Smith, among others, on behalf of plaintiff Richard Logan was filed in this District. Doc. 1. The initial complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

26.      On November 15, 2019, Nykredit and the Oklahoma Funds filed a joint a motion for appointment as lead plaintiffs on behalf of purchasers of ProPetro common stock from March 17, 2017 through August 8, 2019, inclusive, and for the appointment of BLB&G and G&E as lead counsel. Doc. 35.

27.      On December 16, 2019, this Court appointed Nykredit and the Oklahoma Funds as Lead Plaintiffs, and BLB&G and G&E as Lead Counsel. Doc. 43.

**C.      Lead Plaintiffs' Investigation, Preparation and Filing of the Complaint**

28.      On February 13, 2020, Plaintiffs served and filed the Amended Class Action Complaint for Violations of the Federal Securities Laws. Doc. 55. On April 14, 2020, Plaintiffs served and filed their Second Amended Class Action Complaint for Violations of the Federal Securities Laws. Doc. 73.

29.      On July 30, 2020, Plaintiffs served and filed their Third Amended Class Action Complaint for Violations of the Federal Securities Laws, the operative Complaint. Doc. 81. The Complaint asserts claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. The Complaint also asserts claims against ProPetro, Redman, and Smith under

12

Section 11 of the Securities Act and against Redman and Smith under Section 15 of the Securities Act.  The Complaint asserts these claims on behalf of a class consisting of all persons and entities who (a) purchased, or otherwise acquired ProPetro common stock on the open market from March 17, 2017 to March 13, 2020, both dates inclusive, and were damaged thereby; or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering. Among other things, the Complaint alleges that Defendants made materially false and misleading statements about ProPetro's internal and disclosure controls.  The Complaint further alleges that the price of ProPetro common stock was artificially inflated during the Class Period as a result of Defendants' false and misleading statements and declined when the truth was allegedly revealed.

30.    In preparing the Complaint, Lead Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in ProPetro securities related to its internal controls concerning the detection and/or disclosure of self-dealing, related-party transactions, and conflicts of interest.  This investigation included, among other things, a detailed review and analysis of information relating to ProPetro, including (a) ProPetro's public SEC filings; (b) research reports by securities and financial analysts; (c) transcripts of ProPetro's earnings conference calls and industry conferences; (d) other publicly available material, such as Company presentations, news articles, and ProPetro's historical stock price information, as well as similar information concerning ProPetro's competitors and the market as a whole; and (e) economic analyses of ProPetro's stock trading and pricing data.

31.    In addition to undertaking this extensive review and analysis of documents, Lead Counsel engaged experts to consult on certain key issues in the case related to loss causation and the market's reaction to the revelation of Defendants' fraudulent scheme.

13

32.     Throughout the course of the investigation, Lead Counsel and their in-house investigators also located and contacted numerous individuals believed to potentially have information about the claims at issue in the Action, including former ProPetro employees. Lead Counsel ultimately contacted 146 potential witnesses and interviewed 68 of them.

**D.     Defendants' Motion to Dismiss the Complaint, the Court's Ruling, and Defendants' Motion to Strike**

33.     On August 31, 2020, Defendants ProPetro, Smith, Armour, Redman, and Denholm each filed and served their motions to dismiss the Complaint and accompanying declarations, which attached exhibits totaling over 1,300 pages. Docs. 89-93.

34.     In its motion, Defendant ProPetro argued principally that Plaintiffs failed to allege with particularity any materially false and misleading statement or omission in the Company's filings because, among other reasons, Plaintiffs incorrectly claimed that related-party transactions that had not yet occurred at the time of the IPO filings should have been disclosed and, in any event, were immaterial and would have not altered the total mix of information. Doc. 93 at 2, 9-11, 19-24. Defendant ProPetro also argued that Plaintiffs failed to plead falsity with respect to statements concerning internal controls in its IPO, 2017 Secondary Offering, and 2018 Secondary Offering documents because, among other reasons: (i) ProPetro warned of the risk that its controls may be deficient, *id.* at 19-22, and (ii) Plaintiffs failed to plead that Defendants knew its controls were deficient at the time they made the alleged false statements, *id*. at 23. Further, Defendant ProPetro argued that the alleged false statements made with regard to adherence to ProPetro's Code of Ethics were inactionable puffery. *Id*. at 24. Defendant ProPetro additionally argued that the allegations that Defendants failed to disclose certain expense reimbursements were not tied to any particular statements and were thus insufficiently pleaded to sustain a fraud claim. *Id*. at 13-15. With regard to Defendant Redman's pledging of ProPetro stock, Defendant ProPetro argued that

14

Plaintiffs failed to plead a material misstatement or omission in the IPO Lock-Up Agreement and in the IPO, 2017 Secondary Offering, and 2018 Secondary Offering documents. *Id*. at 15-18.

35.     Defendant ProPetro also argued that Plaintiffs failed to adequately plead a strong inference of scienter. In particular, Defendant ProPetro argued that Plaintiffs failed to plead that Defendant Denholm knowingly failed to disclose transactions with the various Clarabby entities, *id*. at 26-27; that ProPetro was aware of Defendant Denholm's position at PBEX, *id*. at 27; that Defendant Armour knew or must have been aware that the PT Petroleum transactions were subject to disclosure requirements, *id*. at 28-29; that Defendants Redman and Smith knew expense reimbursements were improper violations of Company policy, *id*. at 29-30; and that Defendant Redman was aware his share pledges needed to be disclosed and were in violation of ProPetro's policies and lockup agreements, *id*. at 30-31. Regarding ProPetro's internal controls, Defendant ProPetro argued that Plaintiffs failed to sufficiently plead that any Defendant knew or should have known of internal control deficiencies and that the Audit Committee Investigation's conclusion that senior management did not set an appropriate "tone at the top" did not show that Defendants acted with the requisite scienter at the time of the alleged misstatements and omissions. *Id*. at 31-33.

36.     Defendant ProPetro also argued that none of the five alleged corrective disclosures revealed new fraud-related information to the market. *Id.* at 38-44.

37.     On September 30, 2020, Plaintiffs filed and served a single combined opposition to Defendants' motions to dismiss. Doc. 97. Plaintiffs' opposition primarily argued that the Complaint adequately alleged falsity based on the Company's post-Class Period admissions, in the form of the Audit Committee Investigation findings, that senior management did not establish and promote a control environment with an appropriate tone at the top. *Id.* at 20-21. Further, the Audit

15

Committee Investigation confirmed the existence of control deficiencies and disclosed the existence of related party transactions that should have been disclosed but were not. *Id*. Plaintiffs' opposition also argued that statements made in the IPO documents are actionable because they did not inform that the Company was already suffering from inadequate internal controls. *Id*. at 29. With regard to Defendant Redman's share pledges, Plaintiffs argued that the Company admitted the pledges violated the Company's policies and rendered statements in the IPO, 2017 Secondary Offering, and 2018 Secondary Offering documents and Code of Ethics materially misleading. *Id.* at 39-45.

38.    Plaintiffs further argued that the Complaint adequately alleged myriad facts to support a strong inference of Defendants' scienter, including that Defendant Redman signed documents acknowledging he could not pledge his shares and also signed the documents pledging those shares; that Defendants Redman and Smith personally certified the adequacy of ProPetro's internal controls; that Defendant Denholm knew he had entered into transactions with various Clarabby entities—deals in which he personally had a material interest—and had a position at PBEX; and that the high rate of executive turnover during the Class Period supported an inference of scienter. *Id*. at 50-69.

39.    On November 9, 2020, Defendants filed and served their replies in further support of their motions to dismiss the Complaint. Docs. 99-104. Defendants' replies reiterated the arguments made in their motions to dismiss and responded to the arguments in Plaintiffs' opposition brief.

40.    On September 13, 2021, the Court issued an Opinion and Order granting in part and denying in part Defendants' motions to dismiss ("MTD Order"). Doc. 105. In the MTD Order, the Court provided a detailed analysis of the claims in the case, sustaining many of Plaintiffs'

claims in full, temporally limiting other claims, and dismissing several claims. In particular, the MTD Order limited Plaintiffs' Exchange Act claims to ProPetro's pre-IPO and Secondary Offering statements regarding its internal and disclosure controls in relation to expense reimbursements and related-party transactions. The MTD Order sustained claims based on ProPetro's statements for the duration of the Class Period regarding its internal and disclosure controls as they relate to Defendant Redman's share pledges. *Id*. at 64-65. Regarding Plaintiffs' claims brought under Section 11 of the Securities Act, the MTD Order limited those claims to statements regarding the adequacy of ProPetro's internal and disclosure controls "made in connection with the IPO." *Id.* The MTD Order dismissed Plaintiffs' claims based on false statements concerning the Audit Committee's independence, PBEX, a transaction with PT Petroleum transaction, and transactions with various Clarabby entities. *Id.*

41.     On October 22, 2021, Defendants filed a Motion to Strike certain allegations from the Complaint they contended were rendered impertinent and superfluous by the Court's MTD Order. Doc. 109. On November 5, 2021, Plaintiffs filed their opposition to Defendants' Motion to Strike, arguing that the motion was procedurally improper, impacted Plaintiffs' appellate rights, and, in any event, was unnecessary since the MTD Order removed claims from the operative pleadings that were dismissed by the Court. Doc. 110. Later, on March 14, 2022, the Parties jointly moved the Court to modify the proposed scheduling order to reset the deadlines for discovery, class certification briefing, and expert submissions. Doc. 115. On March 18, 2022, the Court issued an Opinion and Order granting Defendants' Motion to Strike and granting the Parties' joint motion to modify the proposed scheduling order. Doc. 116.

42.     On April 1, 2022, Defendants filed their answers to the Complaint. Docs. 119-124.

17

### E.        Plaintiffs Pursue Discovery

43.      Following the Court's MTD Order and resolution of Defendants' Motion to Strike, the Parties negotiated a Confidentiality and Protective Order and a protocol governing the production of electronically stored information ("ESI"), which was jointly presented to the Court on March 18, 2022, Doc. 117, and subsequently signed and entered by the Court on March 21, 2022, Doc. 118.

44.      The Parties began discovery and served document requests upon one another shortly after the Court's MTD Order.  The Parties exchanged Rule 26(a) Initial Disclosures on November 15, 2021.  Plaintiffs served requests for the production of documents on Defendants in December 2021, and Defendants served requests for the production of documents on Plaintiffs in January 2022.  Plaintiffs also served document subpoenas upon relevant non-parties in April, May, and June of 2022, including AF Global Corporation, Clarabby Development LLC, Clarabby Holdings LLC, Conquistador Capital LLC, Covia Holdings Corporation, D&J Realty LLC, Dahlia Development LLC, Diamondback Energy Inc., Ener-Coil LLC, FloCap Injection Services LLC, HR Double S LLC, Imperative Chemical Partners LLC, Lore Venture Group, Morgan Stovall, PD Properties, PT Petroleum, Red Hogg LLC, South Midkiff Partners LLC, South of the Border Materials LLC, Viper Energy, Trenegy Incorporated, Darin G. Holderness, and Mark Howell. Plaintiffs served interrogatories on Defendants ProPetro and Dale Redman on August 4, 2022.

45.      Defendants and third parties produced over 350,000 pages of documents to Plaintiffs, and Plaintiffs produced over 30,000 pages of documents to Defendants in response to their requests.  The documents produced by Defendants included communications regarding Defendant Redman's stock pledges, documents and communications concerning ProPetro's internal investigation of its internal and disclosure controls, and internal reports generated by that investigation, among other documents relevant to the alleged false statements and omissions.  Lead

18

Counsel reviewed Defendants' production and identified documents to support Plaintiffs' allegations that ProPetro lacked effective internal and disclosure controls concerning detecting and disclosing related-party transactions, that Defendants failed to disclose all reimbursements and compensation, and that Defendants knowingly or recklessly failed to disclose Defendant Redman's stock pledges.

46.     On July 25, 2022, Plaintiffs moved the Court to compel the production of documents concerning ProPetro's handling of certain internal complaints received by senior leadership of the Company.  Doc. 151.  Plaintiffs contended that Defendants' handling of these issues evidenced the "poor tone at the top," which fostered a culture of non-compliance and a failure of internal controls at ProPetro.  *Id.*  In opposition to this motion, Defendants filed an opposition on August 1, 2022 arguing that the requested discovery was irrelevant to the claims remaining in the case.  Doc. 158.  On August 2, 2022, the Court set a hearing date for all pending motions on October 27, 2022.  Doc. 162.  On August 9, 2022, Plaintiffs filed a reply brief in further support of its motion to compel.  Doc. 165.

47.     In July and August 2022, Plaintiffs noticed eight depositions of Defendants and related witnesses, which had been set to take place in August and September 2022.

**F.      Plaintiffs' Motion for Class Certification**

48.     While fact discovery was ongoing, on May 27, 2022, Plaintiffs filed a motion for class certification.  Doc. 126.  Plaintiffs sought to certify "a class consisting of all persons and entities who (a) purchased, or otherwise acquired ProPetro common stock on the open market from March 17, 2017 to March 13, 2020, both dates inclusive . . . , and were damaged thereby; or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering . . . ."  Doc. 126 at 1-2.  Plaintiffs' motion was accompanied by an 80-page report filed by Plaintiffs' expert financial economist, Mr. Frank C. Torchio, concerning the efficiency of

19

the market for ProPetro common stock and Plaintiffs' ability to calculate damages on a class-wide basis.  Doc. 126-9.

49.  In connection with Plaintiffs' motion for class certification, in July 2022, Defendants served non-party subpoenas upon Plaintiffs' investment advisors Earnest Partners, Kennedy Capital Management, Silvercrest Asset Management, and Wellington Management Company.  Defendants deposed eight representatives of Plaintiffs (two from Nykredit and one from each other Plaintiff) and deposed Plaintiffs' market efficiency expert Mr. Torchio on July 12, 2022.

50.  On July 25, 2022, Defendants filed their opposition to Plaintiffs' motion for class certification along with a motion to exclude the expert opinion of Mr. Torchio.  Docs. 146, 148. In the motion to exclude, Defendants argued that Mr. Torchio's proposed class-wide damages methodology did not meet the standard for reliability propounded by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  Doc. 146.

### G.  The Parties' Mediation and Settlement

51.  The Parties retained with Robert A. Meyer, Esq. of JAMS to act as a mediator in the Action.  Mr. Meyer is an experienced mediator of complex business litigation matters, including securities class actions.  His biography is available at https://www.jamsadr.com/meyer/. The Parties conducted an initial mediation with Mr. Meyer in August 2021, which did not result in a settlement.  The Parties remained in touch with Mr. Meyer and scheduled a second mediation, which took place in Los Angeles, California in May 2022.  Both mediations were preceded by the exchange of detailed mediation submissions addressing issues of liability and damages.  The May 2022 mediation included presentations made to the mediator also concerning liability and damages issues.  The May 2022 mediation did not result in a settlement, but the Parties continued to engage in settlement discussions through Mr. Meyer from May 2022 through August 2022.  Ultimately,

Mr. Meyer made a mediator's proposal that the Parties settle the action for $30,000,000, which the Parties considered on a double-blind basis.  On August 11, 2022, Mr. Meyer informed the Parties that both sides had accepted the proposal.  On August 19, 2022, the Parties entered a term sheet memorializing their agreement in principle to settle the Action for $30,000,000.

III.    **RISKS OF CONTINUED LITIGATION**

52.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $30,000,000 cash payment.  Plaintiffs and Lead Counsel believe that the proposed Settlement is a fair and favorable result for the Settlement Class.

53.    As explained below, Plaintiffs faced meaningful risks with respect to proving liability and recovering full damages in this case.  Absent the Settlement, Plaintiffs would still need to overcome Defendants' challenges to Plaintiffs' motion to certify the class, including the motion to exclude Plaintiffs' market efficiency expert, and prevail at additional stages of the litigation, including defeating Defendants' anticipated motion for summary judgment, at trial, and on appeal. Even after any trial, Plaintiffs would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Plaintiffs from successfully obtaining a recovery for the Settlement Class.

A.    **General Risks in Prosecuting Securities Class Actions**

54.    In recent years, securities class actions have faced greater risks than in prior years, and it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2021 WL 2080016, at *1 (D. Or. May 24, 2021), *aff'd sub nom. AMF Pensionsforsakring AB v. Precision Castparts Corp.*, No. 21-35516, 2022 WL 2800825 (9th Cir. July 18, 2022); *Fosbre v. Las Vegas Sands Corp.*, No. 2:10-cv-0076-APG-GWF, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd sub. nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x

21

543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub. nom. Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

55.    And even cases that have survived summary judgment can be dismissed prior to trial in connection with Daubert motions, such as those likely to be filed by Defendants here.  *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

56.    Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles pre-trial, there remain significant risks that a jury will not find the defendants liable or award expected damages.  For instance, a jury recently found in *In re Tesla Inc. Securities Litigation* that none of the defendants had violated the federal securities laws, even though the plaintiffs had previously obtained summary judgment on the critical elements of falsity and scienter.  *See* Verdict Form, *In re Tesla., Inc. Sec. Litig.*, No. 3:18-cv-04865 (N.D. Cal. Feb. 2, 2023), Doc. 671.

57.    Further, post-trial motions, based on a complete record, also present substantial risks.  For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims.  2011 WL 1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F.3d 713 (11th Cir. 2012) (holding that there was insufficient trial evidence to support a finding of loss causation).

58.     Intervening changes in the law may also impact a successful trial verdict.  For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit.  *See Precision Castparts*, 2021 WL 2080016, at *6.

59.     Securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

**B.      Specific Risks Concerning This Action**

60.     Plaintiffs and Lead Counsel believe the claims asserted against Defendants in this action are meritorious.  They recognize, however, that this action presented a number of serious risks to establishing Defendants' liability to successfully certifying the class, and to proving the class' damages.

**1.      Risks Concerning Liability**

**(a)      Falsity**

61.     Through the summary judgment stage of the case and at trial, Defendants will likely argue that the fraud alleged by Plaintiffs amount to immaterial misrepresentations to investors.  In particular, Defendants will argue that the alleged false statements do not concern the operations or financial results of ProPetro's business, but rather highly technical and abstract disclosure requirements concerning subject matters that do not shed light on the financial health of the Company, specifically, relatively small amounts of expense reimbursements and/or discrete related-party transactions.  To this end, Defendants will likely argue the financial impact of these issues were very modest—totaling only $370,000—and did not require ProPetro's historical financial results to be restated.  To bolster this argument, Defendants will emphasize that the related investigation into these issues by the U.S. Securities Exchange Commission ("SEC") was settled

without any admissions of guilt and no fine or penalty imposed on ProPetro, while Defendant Redman was fined just $195,000.

62.     Further, Defendants will marshal the fact that ProPetro qualified as an "emerging growth company" under the Jumpstart Our Business Startups Act during the Class Period and thus was exempt from being required to get an attestation from its external auditor on the effectiveness of the Company's internal controls or provide assessments regarding those controls. Accordingly, Defendants will point out that its IPO prospectus warned investors of the risk of insufficient internal controls repeatedly by cautioning that ProPetro was inexperienced as a public company, achieving rapid growth, and that its reliance on "informal agreements and close-knit working relationships" may make it difficult for the Company to comply with all internal control requirements. Indeed, in Defendants' motion to dismiss the Complaint, Defendants highlighted that ProPetro's IPO Prospectus warned investors "We will not be required to make our first assessment of our internal control over financial reporting until the year of our second annual report required to be filed with the SEC," and "we may need to implement additional financial and management controls, reporting systems and procedures and hire additional accounting, finance and legal staff." Doc. 93 at 4.

**(b)     Scienter**

63.     There are also substantial risks to proving that Defendants acted with scienter, *i.e.*, that they acted intentionally or severely recklessly when making the alleged misstatements and omissions. Defendants will likely argue that ProPetro was a "young" newly public company doing its best to meet the relevant disclosure requirements. They will similarly point out that they went to great lengths to investigate and correct any past deficiencies. Defendants will claim, in light of those factors, that it is impossible to find that they acted intentionally to mislead investors. They

24

will claim that in the absence of an intent to deceive investors about core aspects of its business or financial performance, a jury will not find that the Defendants acted with scienter.

64.     Regarding Plaintiffs' Exchange Act claim stemming from undisclosed expense reimbursements to Defendants Redman and Smith, Defendants will likely argue that given the multitude of demands the senior leadership in a fast growing, newly public company experience, Defendants Redman and Smith inadvertently overlooked such reimbursements and did not knowingly conceal them or act to prevent their disclosure.  Defendants will point out that ProPetro's business was generating hundreds of millions of dollars in revenues, and given the demands of ProPetro's growing business, there is no evidence either Defendant was focused on improperly extracting what was ultimately a modest amount of extra compensation from ProPetro.

### (c)     Loss Causation and Damages

65.     Plaintiffs retained a damages expert, who would have performed an event study to estimate the company-specific price inflation that was removed from ProPetro's stock price as a result of each corrective disclosure alleged in the Complaint and then used a trading model to determine aggregate damages incurred by the class.  While Plaintiffs have strong arguments to support their expected damages estimate, Defendants have a number of credible arguments for why aggregate damages in this case should be significantly lower than Plaintiffs' damages estimates, including the following:

- Defendants point out that on three dates—October 10, 2019, November 13, 2019, and February 24, 2020—news revealing truthful information about Defendants' alleged fraud was released, yet ProPetro's stock price increased on those dates. Defendants will argue that because the news affecting ProPetro's stock price on those dates revealed information to investors about ProPetro's investigation into the very subject matters at issue in this case, the stock price increases on those dates

need to be "offset" against declines on the five alleged corrective disclosure dates when ProPetro's stock price declined.  In other words, Defendants will contend that the stock price increases that occurred as a result of ProPetro disclosing information about its investigation into internal control deficiencies, related-party transactions, and undisclosed expense reimbursements removed a portion of the artificial inflation in ProPetro's stock price purportedly caused by the alleged fraud.

- Defendants will argue that there can be no damages for shares purchased after November 13, 2019 since, after that date, the only remaining stock price declines occurred because of revelations concerning Defendant Redman's share pledges. Because Defendants contend that claims based solely on these share pledges have been dismissed from the case by the MTD Order, Defendants will maintain that the stock price decreases following the alleged corrective disclosures after November 13, 2019 cannot form a basis for damages.

- Defendants will also argue that there is no loss causation that can be predicated on ProPetro's March 16, 2020 disclosure that Defendant Redman had pledged his ProPetro stock—a disclosure that accompanied a 33.5% decline in ProPetro's share price—because, on that date, the United States was experiencing the onset of the COVID-19 pandemic.  Defendants will highlight the immense magnitude of the pandemic's negative effect on equity markets by pointing out, for example, that on March 16, 2020, the pandemic caused the Dow Jones Industrial Average to suffer the largest point drop in history.  Given the immense market forces caused by the pandemic, Defendants have a credible argument that the alleged corrective

26

disclosure on March 16, 2020 was not caused by the release of any fraud-related information.

### 2.     Risks Associated with Class Certification

66.     Plaintiffs also faced risks at class certification.  On July 22, 2022, Defendants filed their opposition to Plaintiffs' motion to certify the class.  Doc. 144.  In their opposition, Defendants, at the outset, argued that the proposed class should be separated into two separate classes: a Securities Act Class and a separate Exchange Act Class.  *Id*. at 2.  With regard to a Securities Act Class, Defendants argued that individual issues would predominate over issues common to the proposed class because: purchasers of ProPetro stock after September 13, 2017 would have to "trace" their shares to ProPetro's IPO on March 17, 2017; purchasers after May 8, 2018 would have to individually prove reliance on the IPO documents; and purchasers after August 8, 2019 would not be able to show reliance or damages since, when announcing the results of the Audit Committee Investigation, the Company expressly warned investors they should not rely on prior statements regarding internal controls.  *Id*. at 22-25.  With regard to the Exchange Act Class, Defendants argued that: Lead Counsel and proposed Class Counsel BLB&G and G&E were inadequate to represent the proposed class; Plaintiffs have inadequately supervised the litigation; Plaintiffs' damages expert, Mr. Torchio, failed to describe a workable damages methodology; the proposed class is overbroad because it includes the SEC-imposed "quiet period" from March 17, 2017 through April 11, 2017 and, thus, must start on May 12, 2017—the date of the first alleged misstatements after the "quiet period;" and the proposed class must end on August 9, 2019 (the day ProPetro disclosed it was likely to conclude that certain material weaknesses existed in its disclosure controls) or, alternatively, that the proposed class must end on November 13, 2019 (when ProPetro confirmed the existence of internal control deficiencies rising to the level of

material weaknesses and warned investors not to rely on "management's report on internal control over financial reporting"). *Id.* at 6-20.

67. While Lead Counsel believe there are strong rebuttals to the arguments that Defendants put forth in their opposition to Plaintiffs' motion to certify the class, if the Court were to accept any one of Defendants' arguments, the Court might decline to certify the proposed class or shorten the Class Period to the dates that Defendants contend are appropriate, resulting in either a substantial diminution or total elimination of the settlement value of Plaintiffs' claims.

### 3. Risks Concerning Appeals

68. The risk that even a successful trial verdict could be overturned by a later appeal is very real in securities fraud class actions. There are numerous instances across the country where jury verdicts for plaintiffs in securities class actions were overturned after appeal. *See*, *e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *In re Oracle Corp. Sec. Litig.*, No. C 01-00988-SI, 2009 WL 1709050 (N.D. Cal. June 16, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010) (granting summary judgment to defendants after eight years of litigation); *Robbins v. Koger Props., Inc.,* 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Comp. Sec. Litig.*, No. C-84-20148, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

69. Moreover, even if a judgment in Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged reliance and damages as to each class member, including Plaintiffs, in an extended series of individual proceedings. That process could have taken multiple additional years, and could have severely reduced any recovery to the Settlement Class as

Defendants "picked off" class members.  For example, in *In re Vivendi Universal SA Securities Litigation*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members."  765 F. Supp. 2d 520, 583-584 (S.D.N.Y. 2011).  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

70.     Thus, even if Plaintiffs and the Settlement Class prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely limited, or even eliminated, any recovery—and, at minimum, could have added several years of further delay.

*     *     *     *     *

71.     Based on all the factors summarized above, Plaintiffs and Lead Counsel respectfully submit that it is in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $30,000,000 Settlement instead of incurring the significant risk that the Settlement Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation.  Indeed, the Parties were deeply divided on several key factual issues central to the litigation, and there was no guarantee that Plaintiffs' positions on these issues would prevail at class certification, summary judgment, or trial.  If Defendants had succeeded on any of their substantial defenses, Plaintiffs and the Settlement Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.

29

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

72.    The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Plaintiffs prevailed at trial, which was far from certain for all the reasons noted above. Plaintiffs' damages consultant has estimated the Settlement Class' *maximum* likely aggregate damages in this Action to be approximately $240 million. Accordingly, the $30,000,000 Settlement represents approximately 12.5% of the *maximum* damages that could likely be established for the Settlement Class. Defendants asserted that damages were far lower, and if successful in those arguments could have significantly reduced Plaintiffs' and the Settlement Class' recovery at trial, even assuming a verdict in favor of Plaintiffs on all liability issues.

73.    Moreover, proving that level of damages assumes that Plaintiffs would have prevailed on all their merits arguments about falsity, materiality, and scienter, which was far from certain. In addition, the calculations of loss causation and damages would be subject to substantial risk at trial, as they would be subject to a "battle of the experts." Even if Plaintiffs prevailed at trial, the amount of damages could have been substantially reduced based on arguments about the substance of the disclosures that purportedly dissipated the artificial inflation in the price of ProPetro common stock; the amount that ProPetro's share price declined on the alleged corrective disclosure date in connection with the truth being revealed (as opposed to other confounding information released the same day); and the need to offset class members' gains from their sales of pre-Class Period shares.

74.    For all these reasons, Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of

30

incurring the significant risk that the Settlement Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## V.    ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE SETTLEMENT CLASS AND THE REACTION OF THE SETTLEMENT CLASS TO DATE

75.    The Parties have stipulated to certification of a Settlement Class for purposes of the Settlement only.  Stipulation ¶ 2.  The Settlement Class consists of "all persons and entities who (a) purchased or otherwise acquired ProPetro common stock on the open market during the Class Period, and were damaged thereby, or (b) purchased ProPetro common stock in or traceable to the Company's March 17, 2017 Initial Public Offering." *Id.*¶ 1(tt).[5]  In its Preliminary Approval Order, the Court found, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, that it "will likely be able to certify the Settlement Class for purposes of the proposed Settlement" and "will likely be able to certify Plaintiffs as Class Representatives for the Settlement Class and appoint Lead Counsel as Class Counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure."  Doc. 169, at ¶¶ 2-3.  In connection with final approval of the Settlement, the Court will be asked to finally certify the Settlement Class and finally approve the appointment of Plaintiffs as Class Representatives for the Settlement Class and the appointment of BLB&G and G&E as Class Counsel for the Settlement Class.

76.    The Court's Preliminary Approval Order directed that notice of the Settlement be provided to the Settlement Class, including mailing of the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and

---

[5] "Excluded from the Settlement Class are Defendants; ProPetro's affiliates and subsidiaries; the Officers and directors of ProPetro and its subsidiaries and affiliates at all relevant times; members of the Immediate Family of any excluded person; heirs, successors and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest." Stipulation ¶ 1(tt).

Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form"). The Preliminary Approval Order set March 21, 2023 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set the final approval hearing for April 11, 2023.

77. Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and Claim Form (together, the "Notice Packet") by mail. The Notice contains, among other things, descriptions of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 20% of the Settlement Fund and for payment of Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $750,000, which amount may include the reasonable costs and expenses incurred directly by Plaintiffs related to their representation of the Settlement Class. To disseminate the Notice, JND obtained information from ProPetro and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 7, at ¶¶ 3-10.

78. JND began mailing copies of the Notice Packet to potential Settlement Class Members and nominees on October 26, 2022. *See id.* ¶¶ 3-7. Through March 3, 2023, JND has

disseminated a total of 72,189 Notice Packets to potential Settlement Class Members and nominees. *Id.* ¶ 10.

79. In addition to mailed notice, JND caused the Summary Notice to be published in *Investor's Business Daily* and by *PR Newswire* on November 7, 2022. *See id*. ¶ 11.

80. Lead Counsel also caused JND to establish a dedicated website for the Settlement, www.ProPetroSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement, including important dates and deadlines in connection therewith, and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation and other relevant documents. *See id*. ¶ 12. That website became operational on October 26, 2022. Additionally, JND maintains a toll-free telephone number with an interactive voice-response system and live operators to respond to inquiries regarding the Settlement. *See id.* ¶ 13. Settlement Class Members can also contact JND by sending an e-mail to info@ProPetroSecuritiesLitigation.com.

81. As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is March 21, 2023. To date, no objections have been filed or otherwise received and only one request for exclusion from the Settlement Class has been received. *See* Segura Decl. ¶ 15. Lead Counsel will file reply papers on April 4, 2023, after the deadline for submitting requests for exclusion and objections has passed, which will address any objections and all requests for exclusion that may be received.

## VI. PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

82. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Amount (*i.e.,* the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs,

(c) Litigation Expenses awarded by the Court; (d) attorneys' fees awarded by the Court; and (e) other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked (if mailed), or online through the Settlement website, no later than February 23, 2023.  As set forth in the Notice, the Net Settlement Amount will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

83.     Lead Counsel consulted with Plaintiffs' damages consultant in developing the proposed Plan of Allocation.  The Plan of Allocation is set forth at pages 16 to 22 of the Notice. *See* Segura Decl. Ex. A at pp. 16-22.  As described in the Notice, the objective of the Plan is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the violations of the federal securities laws Plaintiffs have alleged in the Complaint, as modified by the Court's MTD Order.  Plan ¶ 2.  Lead Counsel believe that the Plan provides a fair and reasonable method to equitably allocate the Net Settlement Amount among Settlement Class Members, taking into account the damages each Settlement Class Member suffered as a result of Defendants' alleged misconduct and the statute(s) under which their claim(s) arose.

84.     The Plan of Allocation creates a framework for equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws.  The Plan also takes into account the statute under which those violations arose, such that members of the Settlement Class who purchased ProPetro common stock during the Class Period have a potential claim under Section 10(b) of the Exchange Act, and members of the Settlement Class who purchased ProPetro common stock in or traceable to ProPetro's March 17, 2017 IPO have a potential claim under the Securities Act.

85.     **Exchange Act Loss Amounts**. The formula for calculating a Claimant's Exchange Act Loss Amount under the Plan is the same as that typically used in plans of allocations in other securities class action asserting Section 10(b) claims.  An Exchange Act Loss Amount will be calculated for each purchase or acquisition of ProPetro common stock during the Class Period.  In general, that amount is equal to (a) the difference between the estimated artificial inflation in the price of ProPetro common stock on the date of purchase and the estimated artificial inflation on the date of sale, or (b) the difference between the actual purchase price and sale price of the stock, whichever is less.  *See* Plan ¶¶ 5, 8.[6]

86.     In developing the Plan, Plaintiffs considered the estimated amount of artificial inflation in the price of ProPetro common stock that was allegedly caused by Defendants' alleged false and misleading statements and material omissions as calculated by Plaintiffs' damages expert. In calculating the estimated artificial inflation, Plaintiffs' damages expert calculated the "Abnormal Return" for each corrective disclosure allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions by considering the price changes in ProPetro common stock on the trading day immediately following the disclosures, adjusting for price changes that day that were attributable to market or industry forces.  In addition, Plaintiffs adjusted the Abnormal Return for each corrective disclosure date to account for specific litigation

---

[6] In addition, in accordance with the PSLRA, Exchange Act Loss Amounts for ProPetro common stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale.  Plan ¶ 8(c)(iii).  Exchange Act Loss Amounts for shares of ProPetro common stock still held as of the close of trading on June 12, 2020, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $4.00, the average closing price for the stock during that 90-day period.  *Id.* ¶ 8(d).

risks related to proving that the full Abnormal Return for that disclosure was related to the alleged misstatements, including risks related to disaggregating the effect of unrelated statements. *Id.* ¶ 3.

87.     Claimants who purchased and sold all their ProPetro common stock before the first alleged corrective disclosure on August 9, 2019, and claimants who purchased ProPetro stock after August 9, 2019 but did not hold those shares through at least one subsequent alleged corrective disclosure date (when additional corrective information was released to the market and removed the remaining artificial inflation from the price of ProPetro common stock), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same on the date of purchase and sale, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action. *Id.* ¶ 5.

88.     **Securities Act Loss Amounts**.  Claimants who purchased shares of ProPetro common stock either (a) in ProPetro's March 17, 2017 IPO; or (b) on the open market during the period from March 17, 2017 through and including September 12, 2017, the final day prior to the expiration of the lock-up on sales of shares of ProPetro common stock held by ProPetro's directors and executive officers, and other investors who held ProPetro stock prior to the IPO (the "Lock-Up Period"), when all shares were traceable to the IPO, may have a Securities Act Loss Amount on these purchases. *See id.* ¶ 9.  The Securities Act Loss Amount is calculated based on the statutory formula for damages under Section 11 of the Securities Act, 15 U.S.C. § 77k(e). Specifically, the Plan provides that:

(a)     for shares sold before the suit was brought (September 16, 2019), the Securities Act Loss Amount is the purchase price per share (not to exceed the $14.00 offering price) minus the sale price;

36

(b)     for shares sold after the suit was brought and before June 12, 2020, the Securities Act Loss Amount is the purchase price per share (not to exceed the $14 offering price) minus the greater of (i) the sale price per share or (ii) $11.43, the closing price of ProPetro common stock on September 16, 2016; and

(c)     for shares still held as of June 12, 2020, the Securities Act Loss Amount is the purchase price per share (not to exceed the $14 offering price) minus $11.43.

*See id.* ¶ 9.

89.     **"Recognized Loss Amounts"** and **"Recognized Claim" Amounts**.  For each Claimant's purchase or acquisition of ProPetro common stock during the Class Period, a "**Recognized Loss Amount**" will be calculated, which will be the greater of the Exchange Act Loss Amount, if any, or the Securities Act Loss Amount, if any, for each eligible purchase or acquisition.  *Id.* ¶¶ 7, 10.  If a Recognized Loss Amount calculates to a negative number, the Recognized Loss Amount for that transaction will be zero.  The sum of a Claimant's Recognized Loss Amounts for all their purchases or acquisitions of ProPetro common stock during the Class Period is the Claimant's "**Recognized Claim**." *Id.* ¶ 12.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id.* ¶ 18.

90.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Amount among Settlement Class Members based on the losses they suffered on transactions in ProPetro common stock that were attributable to Defendants' alleged

misconduct.  Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

91.     As noted above, through March 3, 2023, more than 72,000 copies of the Notice Packet, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members and nominees.  *See* Segura Decl. ¶ 11.  To date, no objections to the proposed Plan of Allocation have been received.

## VII.    THE FEE AND LITIGATION EXPENSE APPLICATION

92.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees in the amount of 20% of the Settlement Fund, including any interest earned.  Lead Counsel also request payment for expenses that they incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $486,411.27 and reimbursement to Plaintiffs in the aggregate amount of $39,816.50 for costs that Plaintiffs incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

93.     The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Motion.  The primary factual bases for the requested fee and expenses are summarized below.

### A.     The Fee Application

94.     For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Motion, the percentage method is an appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the

38

circumstances, and has been recognized as appropriate by the U.S. Supreme Court and the Fifth Circuit Court of Appeals for cases of this nature.

95.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved.  As discussed in the Fee Motion, a 20% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, particularly given the facts and circumstances of this case, and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.     Plaintiffs Have Authorized and Support the Fee Application

96.     Plaintiffs Nykredit, the Oklahoma Funds, and Detroit Police & Fire are sophisticated institutional investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action.  *See* Wagner Decl. ¶¶ 2-8; Rankin Decl. ¶¶ 2-8; Michael Decl. ¶¶ 2-8; Sigler Decl. ¶¶ 2-8; Story Decl. ¶¶ 2-8; Tapper Decl. ¶¶ 2-6.

97.     Plaintiffs have evaluated Lead Counsel's application for fees and fully support the fee requested.   *See* Wagner Decl. ¶ 10; Rankin Decl. ¶ 10; Michael Decl. ¶ 10; Sigler Decl. ¶ 10; Story Decl. ¶ 10; Tapper Decl. ¶ 8.  Each of the Plaintiffs entered into retainer agreements with one of the Lead Counsel firms at the outset of the litigation, and the 20% fee requested is consistent with or lower than the permissible rate under these retainer agreements.

98.     Moreover, after reaching the Settlement, Plaintiffs again reviewed and approved the requested fee and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Lead Counsel. *See* Wagner Decl. ¶ 10; Rankin Decl. ¶ 10; Michael Decl. ¶ 10; Sigler Decl. ¶ 10; Story Decl. ¶ 10;

Tapper Decl. ¶ 8. Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor Devoted to the Action by Lead Counsel

99. Lead Counsel devoted substantial time to the prosecution of the Action. As described above in greater detail, the work that Lead Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly available documents such as SEC filings, analyst reports, conference call transcripts, press releases, Company presentations, and media reports, and interviews with 68 individuals, including former employees of ProPetro and others believed to be knowledgeable about the facts alleged in the Complaint; (ii) drafting and filing three detailed amended complaints based on this investigation; (iii) fully briefing and opposing Defendants' motions to dismiss; (iv) undertaking substantial discovery, which included obtaining and analyzing more than 350,000 pages of documents produced by Defendants and third-parties; (v) consulting extensively throughout the litigation with experts in financial economics; and (vi) engaging in extensive arm's-length settlement negotiations to achieve the Settlement.

100. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at BLB&G and G&E throughout the litigation. Other experienced attorneys at Lead Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

101. Attached hereto as Exhibits 8A through 8C are declarations on behalf of BLB&G; G&E; and Martin & Drought, P.C., liaison counsel for Plaintiffs and the Settlement Class; and

Clark Hill PLC, additional counsel for Detroit Police & Fire in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

102. As set forth in Exhibits 8A to 8D, attorneys at Plaintiffs' Counsel collectively expended a total of 8,978.10 hours in the investigation and prosecution of the Action from its inception through February 15, 2023. The resulting lodestar for Plaintiffs' Counsel's attorneys only is $6,318,248.00.

103. The requested fee of 20% of the Settlement Fund is $6,000,000, plus interest accrued at the same rate as the Settlement Fund, and therefore represents a "negative" multiplier of 0.9 on the lodestar for Plaintiffs' Counsel's attorneys. As discussed in further detail in the Fee Motion, the requested multiplier cross-check is within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3. The Experience and Standing of Lead Counsel

104. As demonstrated by the firm resumes included in Exhibits 8A and 8B hereto, BLB&G and G&E are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country. We believe our firms' extensive

41

experience in the field and the ability of our attorneys added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

105.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by experienced and extremely able counsel from Hughes Hubbard & Reed LLP; Winstead PC; Bell Nunnally & Martin LLP; and Edmundson Shelton Weiss PLLC, who vigorously represented their clients. In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to negotiate with Defendants to settle the case on terms that are favorable to the Settlement Class.

### 5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

106.    This prosecution was undertaken by Lead Counsel on an entirely contingent basis. The risks assumed by Lead Counsel in prosecuting these claims to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

107.    From the outset of their retention, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this Action requires. With an average lag time of several years for such cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel

42

received no compensation during the course of the Action and have collectively incurred over $486,411.27 in litigation expenses in prosecuting the Action for the benefit of the Settlement Class.

108.    Lead Counsel also bore the risk that no recovery would be achieved.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have resulted in no recovery whatsoever.

109.    Lead Counsel know from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

110.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

111.    Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the excellent result achieved, we believe the requested fee is reasonable and should be approved.

43

**6.      The Reaction of the Settlement Class to the Fee Application**

112.    As stated above, through March 3, 2023, 72,189 Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund.  *See* Segura Decl. ¶ 10. In addition, the Court-approved Summary Notice was published in *Investor's Business Daily* and by *PR Newswire* on November 7, 2022.  *Id.* ¶ 11.  To date, no objections to the request for attorneys' fees has been received.  Any objections received will be addressed in Lead Counsel's reply papers to be filed on April 4, 2022, after the deadline for submitting objections has passed.

113.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 20%, resulting in a "negative" 0.9 multiplier on counsel's lodestar, is fair and reasonable, and is consistent with and supported by the fee awards that courts have granted in other comparable cases.

**B.      The Litigation Expense Application**

114.    Lead Counsel also seek payment from the Settlement Fund of $486,411.27 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

115.    From the outset of the Action, Lead Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute

44

the Action. Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

116.    Lead Counsel have incurred a total of $486,411.27 in litigation expenses in connection with the prosecution of the Action. These expenses are summarized in Exhibit 10, which identifies each category of expense, *e.g.*, expert/consultant fees, mediation costs, and on-line research, and the amount incurred for each category. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's hourly rates.

117.    The largest category of expense by far, $396,172.15, or approximately 81% of Lead Counsel's expenses, was expended for the retention of experts and consultants. As noted above, Lead Counsel consulted with experts in the fields of financial economics, including loss causation and damages, during their investigation and the preparation of the Complaint, in preparation for mediation, as part of Plaintiffs' motion for class certification, and in connection with the development of the proposed Plan of Allocation.

118.    Another large component of Lead Counsel's litigation expenses was for online legal and factual research, which was necessary to conduct a factual investigation and identify potential witnesses, prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, prepare Plaintiffs' mediation submissions, and argue Plaintiffs' motion for class certification. The charges for on-line research amounted to $34,542.59, or 7% of the total amount of Lead Counsel's expenses.

119.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the

45

hour.  These expenses include, among others, court fees, travel costs, mediation fees charged by JAMS for the services of Mr. Meyer, telephone costs, copying, and postage and delivery expenses.

120.    All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Plaintiffs.  *See* Wagner Decl. ¶ 11; Rankin Decl. ¶ 11; Michael Decl. ¶ 11; Sigler Decl. ¶ 11; Story Decl. ¶ 11; Tapper Decl. ¶ 9.

121.    In addition, Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Motion at 18-19.  Lead Plaintiff Nykeredit seeks reimbursement of $18,075.00 for 97 hours expended in connection with the Action by its Senior Legal Counsel and other employees, who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending their depositions.  *See* Wagner Decl. ¶¶ 7, 13-15.  Lead Plaintiff Oklahoma Firefighters Pension and Retirement System seeks reimbursement of $4,583.00 for 44.5 hours expended in connection with the Action by Chase Rankin, who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending a deposition on behalf of Oklahoma Firefighters Pension and Retirement System.  *See* Rankin Decl. ¶¶ 7, 13-15.  Lead Plaintiff Oklahoma Law Enforcement Retirement System seeks reimbursement of $2,425.50 for 30 hours expended in connection with the Action by Duane Michael, who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending a deposition on behalf of Oklahoma Law Enforcement Retirement System.  *See* Michael Decl. ¶¶ 7, 13-15.  Lead Plaintiff Oklahoma Police Pension and Retirement System seeks reimbursement of $4,074.00 for 42 hours expended in connection with the Action by Ginger Sigler,

46

who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending a deposition on behalf of Oklahoma Police Pension and Retirement System. *See* Sigler Decl. ¶¶ 7, 123-15. Lead Plaintiff Oklahoma City Employee Retirement System seeks reimbursement of $7,798.70 for 118 hours expended in connection with the Action by Regina Story, Paul Bronson, and others, who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending a deposition on behalf of Oklahoma City Employee Retirement System. *See* Story Decl. ¶¶ 7, 13-15. Detroit Police & Fire seeks $2,860.30 for 36 hours dedicated to the Action by its Executive Director and Assistant Executive Director, who spent time communicating with Lead Counsel, reviewing pleadings and motion papers, and preparing for and attending a deposition on behalf of Detroit Police & Fire. *See* Tapper Decl. ¶¶ 11-13.

122.    The Notice informed potential Settlement Class Members that Plaintiffs' Counsel would be seeking Litigation Expenses in a total amount not to exceed $750,000. The total amount requested, $526,227.77 ($486,411.27 for Lead Counsel's expenses and $39,816.50 for Plaintiffs' expenses), is below the $750,000 that Settlement Class Members were advised could be sought. To date, no objections to the request for Litigation Expenses have been received.

123.    In sum, the expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the application for payment of these expenses should be approved.

124.    Attached hereto are true and correct copies of the following documents previously cited in this Declaration:

47

Exhibit 1:    Declaration of Andreas Thielemann Wagner, Senior Legal Counsel of Nykredit Portefølje Administration A/S in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 2:    Declaration of Chase Rankin, Executive Director of Oklahoma Firefighters Pension and Retirement System in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards

Exhibit 3:    Declaration of Duane Michael, Executive Director of Oklahoma Law Enforcement Retirement System in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards

Exhibit 4:    Declaration of Ginger Sigler, Executive Director of Oklahoma Police Pension and Retirement System in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards

Exhibit 5:    Declaration of Regina Story, Retirement System Manager of Oklahoma City Employee Retirement System in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards

Exhibit 6:    Declaration of Kelly Tapper, Assistant Executive Director of Police and Fire Retirement System of the City of Detroit in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses and Plaintiffs' Motion for Awards

Exhibit 7:    Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

Exhibit 8:

    Exhibit 8A:    Declaration of James A. Harrod on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Final Approval and Plaintiffs' Counsel's Motion for Attorneys' Fees and Litigation Expenses

    Exhibit 8B:    Declaration of Daniel L. Berger on Behalf of Grant & Eisenhofer P.A. in Support of Motion for Attorneys' Fees and Litigation Expenses

Exhibit 8C:    Declaration of Frank B. Burney on Behalf of Martin & Drought, P.C.in Support of Motion for Attorneys' Fees and Litigation Expenses

Exhibit 8D:    Declaration of Ronald A. King on Behalf of Clark Hill PLC in Support of Motion for Attorneys' Fees and Litigation Expenses

Exhibit 9:    Contributions to and Disbursement from the Litigation Fund

Exhibit 10:    Plaintiffs' Counsel's Total Expenses by Category

## VIII.    CONCLUSION

125.    For all the reasons set forth above, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate. Lead Counsel further submit that the requested fee in the amount of 20% of the Settlement Fund should be approved as fair and reasonable, and the request for Lead Counsel's litigation expenses in the amount of $486,411.27 and Plaintiffs' costs, in the amount of $39,816.50, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Dated: March 7, 2023                          Respectfully submitted,


_/s/ James A. Harrod_                                      _/s/ Daniel L. Berger_
James A. Harrod                                              Daniel L. Berger

49